ACCEPTED
14-14-00942-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
10/22/2015 11:07:03 PM
CHRISTOPHER PRINE
CLERK

14-14-00942-CV

==================================================================

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
10/22/2015 11:07:03 PM
CHRISTOPHER A. PRINE
Clerk

# IN THE FOURTEENTH COURT OF APPEALS
# HOUSTON, TEXAS

==================================================================

**Aloysius Duy-Hung Hoang**
**aka Hoang Duy Hung,**

**Appellant**

**vs.**

**Thinh Dat Nguyen**
**Thoi Bao Houston,**
**Thoi Bao,**

**Appellees**

--------------------------------------------------------------------

**Appeal from the 215th Judicial District Court**
**Houston Harris County, Texas**

--------------------------------------------------------------------

**APPELLANT's AMENDED BRIEF**

--------------------------------------------------------------------

**Aloysius Duy-Hung Hoang**
Pro se
State Bar number 2400-2295
801 Congress St #350
Houston TX 77002
Tel. 281-788-8486
Fax 713-224-3111
Email: Alhoang77072@Gmail.com

**ORAL ARGUMENT IS NOT REQUESTED**

**********************************************************************

1

# IDENTITY OF PARTIES AND COUNSEL

**Appellant/Plaintiff**

Aloysius Duy-Hung Hoang aka Al Hoang aka Hoang Duy Hung

**Counsel for Appelant**

Al Hoang, pro se

**Appellees/Defendants**

| | |
|---|---|
| Thinh Dat Nguyen, | an individual. |
| Thoi Bao Houston, | a Vietnamese magazine published in Houston. |
| Thoi Bao, | a Vietnamese Magazine published in Canada and the United States of which Houston Thoi Bao is a part of the chain. |

**Counsel for Appellees**

Mark Bennettt
SBN 0079-2970
Bennett & Bennett
917 Franklin Street, Fourth Floor
Houston TX 77002
Tel. 713-224-1747
Email: mb@ivi3.com

2

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ............................................. 2

INDEX OF AUTHORITIES ................................................. 4

STATEMENT OF THE CASE ................................................. 5

ISSUES PRESENTED ................................................. 6

STATEMENT REGARDING ORAL ARGUMENT ............................. 7

STATEMENT OF FACTS ................................ ................. 8

SUMMARY OF ARGUMENT ................................................. 12

ARGUMENTS ................................................. 12

    First issue ................................................. 12

    Second issue ................................................. 16

    Third issue ................................................. 18

    Fourth issue ................................................. 20

CONCLUSION AND PRAYER ................................................. 21

CERTIFICATE OF COMPLIANCE ................................................. 22

CERTIFICATE OF SERVICE ................................................. 22

## APPENDIX

1. COURT'S RECORD [CR]
2. REPORTER'S RECORD [RR]

# INDEX OF AUTHORITIES

**PAGE**

**STATUTES:**

1.  Texas Citizens Participation Act (the "Texas Anti-SLAPP statute")
    Texas Civil Practice & Remedies Code, Chapter 27  ...................... 12

*2.*  *Texas Civil and Remedy Code*, Sec. 154.073 (a)  ......................... 21

**CASES:**

*Hearst Corp. vs. Skeen*, 130 S.W. 3d 910 (Tex. App. 2004)  ..... 13

*Musser vs. Smith Protective Services Inc.*, 723 S.W. 2d 653, 655
(Tex. 1987) ...................... 12

*Spanel et al. vs Pegler*, 160 F (2d) 619, A.L.R. 699 (Fed. Ct., 1947) ..... 18

# INDEX OF AUTHORITIES FOR REFERENCE

**Burrell vs. Moran et al,** 82 N.E. (2d) 334 (Ohio, 1948)  ...... 18

*Hoai Thanh vs. Hien Thi Ngo and Vietnamese Public Radio Inc.,*
CASE No: AW 05 CV 3420  ........... 19

*Bui vs. Do*, D-1-GN-09-001567 in Travis County  ............. 20

*Nguoi Viet News, Inc., vs. Saigon Nho Newspapers,*
*30-2012-00595526 in the Superior Court of Orange County, California* 20

**TO THE HONORABLES FOURTEENTH COURT OF APPEALS:**

**STATEMENT OF THE CASE**

**Nature of the case**    This is an appeal from the Trial Court Motion To Dismiss brought by Appellees. On October 13, 2014, Appellant filed a Defamation lawsuit against Appellees. [CR. 4]. On October 21, 2014, Appellees filed the Answer and Motion To Dismiss. [CR. 15].

**Trial Court**    215th Judicial District Court of Harris County, TX.

**Trial Court's disposition**    On November 18, 2014, the Trial Court Granted Defendants' Motion to Dismiss based on Texas Citizens Participation Act (the "Texas Anti-SLAPP statute"), Texas Civil Practice & Remedies Code, Chapter 27. [CR 323]

# ISSUES PRESENTED

I.     Did the District Court err in holding that Defendants are entitled to dismissal under the Texas Citizens Participation Act (the "Texas Anti-SLAPP statute"), Texas Civil Practice & Remedies Code, Chapter 27 when there are sufficient elements to show Defendants fabricated facts to libel Plaintiff?

II.     Did the District Court err when not considering Plaintiff's affidavit in the Original Petition as *prima facie* facts to establish elements of a Defamation case?

III.     Did the District Court err when considering the label of someone as a "Communist," "Spy for the Communist," or "Communist Sympathizer" in an anti-Communist community like the Vietnamese Community as "may be wrongheaded, but is not illegal or disgraceful?"

IV.     Did the District Court err when considering previous lawsuits filed by Plaintiff to various individuals in the last 10 years and later on through mediations dismissed them as a basis for dismissal in this case?

## STATEMENT REGARDING ORAL ARGUMENT

Appellant/Plaintiff does not request an oral argument.

# STATEMENT OF FACTS

"CR" means the Court's Record on Appeal.

"RR" means the Reporter's Record.

Appellee Thinh Dat Nguyen is a Texas resident. Thoi Bao Magazine is a Vietnamese weekly magazine which has branches in Canada and in the United States. Thoi Bao Houston Magazine is its branch in Houston. Nguyen is the Editor-in-chief of Thoi Bao Houston and Thoi Bao in Texas. [CR 5].

In 2010, after Hoang was elected as Houston District F City Councilmember, Hoang was invited to Nguyen's house for dinner. During dinner, Hoang disclosed that Hoang was invited by Houston Airport System Director Mario Diaz to accompany him to Vietnam. Nguyen then ordered Hoang: "I order you not to go to Vietnam. If you go, I will mobilize Thoi Bao to destroy you, to take your council seat away." An argument broke out between Hoang and Nguyen, Hoang left the house. After this event, almost in every issue of Thoi Bao, Nguyen labeled Hoang as a Vietnamese Communist, an agent of the Vietnamese Communist, or a spy of the Vietnamese Communist. [CR.6]

Sometime in October, 2012, Vice Minister of Vietnam, Mr. Nguyen Thanh Son, visited Houston. Mayor Anise Parker and her Administration, with Hoang, welcomed the Delegation. A Forum was opened for Vietnamese freedom fighters to come and make pressure on Vietnam to honor human rights as well as open up

the door for multi-party system. Nguyen twisted the facts to label Hoang as Vietnamese Communist Spy or an arm of the Vietnamese Communist to "sabotage the Vietnamese Community in Houston and abroad." Nguyen did not libel Anise Parker and her Administration as Communists. Because of such libel, many Vietnamese people, especially the seniors who do not read English and read only Vietnamese, believe that Hoang is a Communist, and they organized protests in front of Hoang's residence and a cocktail bomb threat was put in front of Hoang's house. [CR 7].

In early 2013, on behalf of the City of Houston, Hoang made a tour to Asia countries such as Japan, Taiwan, Indonesia, and Vietnam to enhance the business relationship of those countries with Houston and the Port of Houston. Nguyen ignored the trips to Indonesia, Taiwan, and Japan to concentrate only on the trip to Vietnam to libel Hoang as Vietnamese Communist working for the Vietnamese Communist government. [CR 7].

Hoang publicly announced numerous times that he would welcome for an open interview or debate. Nguyen and his group ignored. [CR 8 and RR 9 lines 22 - 25]

Hoang won the Republican primary in 2014 to run for State Representative District 149. Nguyen had articles to support the Democratic candidate Hubert Vo.

Again, almost every issue, Nguyen libeled Hoang as a Vietnamese Communist. [CR 7].

In issue 412 of early October, 2014, Nguyen ran the headline "NOT VOTING FOR HOANG DUY HUNG" whereby he also turned the facts so that the readers understand that because Hoang is a Communist, Hoang's father in 2007 committed suicide by jumping into the moving truck. In fact, Hoang's father died because of an undocumented immigrant who ran the red light and hit Hoang's father, he was taken to Ben Taub and died. [CR. 8].

In issue 413, midst of October, 2014, a week before the early voting of the General Election, Nguyen ran the headline "UNMASK THE SPY FACE OF HOANG DUY HUNG" whereby Nguyen published at least three false statements about Hoang. Nguyen published statements affirming that Hoang is "a Communist," "an insider working for the Vietnamese Communist regime," "planned a scheme to put a death threat bomb killing him and his family members at his house and then called the police to blame on Vietnamese Nationalist activists, afterward he took the pictures to take credit with the Vietnamese Communists," and "his father was so shameful of the betrayal son whereby he committed suicide by jumping himself to the oncoming 18-wheeler." [CR. 8 and Affidavit CR 12].

After Plaintiff filed the Answer to Defendant's Motion to Dismiss, on November 10, 2014, Nguyen published a statement on the Vietnamese e-forums as follows: **"I was sued for calling <span style="color:red">a communist</span> a communist."** Then he asked supporters to come to Court to **"witness the fighting spirit against the Communist of the Vietnamese People Abroad, the victims of the Communist."** [CR. 123. RR 2 line 11-13].

## SUMMARY OF THE ARGUMENT

The trial Court erred in dismissing the case in ruling that "the legal action was brought to deter or prevent the Defendants from exercising Constitutional rights and was brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation." [CR 323]. Constitutional rights are the rights to opine, but not the rights to fabricate facts libeling other person, and this is not protected either by the Constitution or by Texas Anti-Slapp Statute.

## ARGUMENT

**I.  Did the District Court err in holding that Defendants are entitled to dismissal under the Texas Citizens Participation Act (the "Texas Anti-SLAPP statute"), Texas Civil Practice & Remedies Code, Chapter 27 when there are sufficient elements to show Defendants fabricated facts to libel Plaintiff?**

Does TCPR Chapter 27 applied to an Editor-in-chief of a magazine who almost every issue labels Plaintiff a Communist flaring hatred within an Anti-Communist Community against Plaintiff?  The Legislature intent when passing

this Statute was to protect an individual to speak out the opinion on public issue by writing to the Editor of a newspaper, testifying before the Legislature, reporting official misconduct, circulating a Petition, or posting a comment on the internet. It is quite ambiguous on the Legislature intent whether it should be applied to an Editor-in-chief of a magazine in this matter.

If TCPR Chapter 27 applied to Nguyen, then whether Nguyen is protected under the Statute when Hoang can prove on *prima facie* the elements of Defamation?

The elements of Defamation are: 1. Defendant published a statement; 2. that was defamatory concerning the Plaintiff; 3. while acting with either actual malice, if the Plaintiff was a public figure, or negligence, if the Plaintiff was a private individual, regarding the truth of the statement. **Hearst Corp. vs. Skeen**, 130 S.W. 3d 910 (Tex. App. 2004), review granted, judgment rev'd., 159 S.W. 3d 633 (Tex. 2005). In **Musser vs. Smith Protective Services Inc.**, 723 S.W. 2d 653, 655 (Tex. 1987), the Court stated that "to prove an action for defamation, the statement must also be false."

**1. Statement of facts published by Defendants concerning Plaintiff:** In this case, Nguyen published at least three false statements about Hoang. Nguyen published statements affirming that Hoang is "a Communist," "an insider working for the Vietnamese Communist regime," "planned a scheme to put a death threat

bomb killing him and his family members at his house and then called the police to blame on Vietnamese Nationalist activists, afterward he took the pictures to take credit with the Vietnamese Communists,"  and "his father was so shameful of the betrayal son whereby he committed suicide by jumping himself to the oncoming 18-wheeler."  [CR 121]. Defendant never stated that it was his opinion, but he stated them as facts in the affirmative tone.

**2. The statements are false and defamatory:** Hoang came to the United States in 1975 when Plaintiff was 13. After graduating from the University of Houston, in 1990, Hoang came back to Vietnam to fight against the Communist and Hoang was imprisoned by the Vietnamese Communist for 16 months in solitary confinement. In 1993, in order to have the normalization with the United States, Vietnamese Communist had to release all U.S citizens of which Hoang was one of them. In November 2007, Hoang was elected as President of the Vietnamese Community of Houston & Vicinities. In 2009, Hoang was elected as Houston District F City Councilmember. [CR 115].

After September 11, 2001, Hoang changed the strategy in fighting against the Communist. Hoang sees that there is no way to use force to overthrow the Communist regime; therefore, Hoang promote "open dialogue" to make pressure on Vietnam to honor human rights and to have political change. [CR 116].

In the capacity as the City elected official, together with the Mayor, Hoang welcomed a Delegation from Vietnam, opened up a Forum for Vietnamese Freedom Fighters to pressure on Vietnam for political changes and honoring human rights [CR 7]. In early 2013, as a city elected official, Hoang visited 4 Asian countries to promote economic growth for the City of Houston and Vietnam was one of the four countries. [CR. 7].

Labeling Hoang as a "Communist" or "insider working for the Communist regime" is not only an insult, but also a defamation flaring hatred within an anti-communist community against Hoang. Labeling Hoang to plan "a scheme to put a death threat bomb killing him and his family members at his house and then called the police to blame on Vietnamese Nationalist activists, afterward he took the pictures to take credit with the Vietnamese Communists" [CR 121] is a defamation turning a victim into the criminal mastermind. Making a false statement that "his father was so shameful of the betrayal son whereby he committed suicide by jumping himself to the oncoming 18-wheeler" [CR 121] is not only an insult to the decedent and to Hoang, but also a defamation discrediting Hoang in the public's eyes.

**3. The statements are made with actual malice:** Hoang has asked Nguyen for a public debate, [CR 8], and if Nguyen can show a better way of fighting the

Vietnamese Communist, Hoang would immediately "kneel down and carry Nguyen's shoes." [RR 9 lines 21-25].

In his Original Pleading, Hoang stated that Hoang has asked Nguyen "to stop the such libel, and if Nguyen has any question, Hoang is happy to entertain a public interview forum. Hoang also informed him that by FCC rules, Nguyen has to give Hoang equal space to correct the facts and Nguyen ignored." [CR 8]. Hoang also notified the owner in Toronto, Canada, by email davenguyent@gmail.com and left messages on the phone 416-624-7297 for him to take appropriate steps but there was no return. [CR 8].

There are fabrications of facts here, not opinions, published by the Nguyen that Hoang can show on prima facie the elements of Defamation. The Statute only requires the Plaintiff to prove on "preponderance of the evidence," not "beyond a reasonable doubt" and the Statute requires the elements of the evidence are to be in the Pleading and/or in the Affidavits. Hoang had it in his Original Pleading along with the Affidavit [CR 12].

**II. Did the District Court err when not considering Plaintiff's affidavit in the Original Petition as *prima facie* facts to establish elements of a Defamation case?**

In the Original Petition, Hoang also filed an affidavit stating that *"all the statements of facts in Plaintiff's Original Petition is true and they are within my*

*personal knowledge. Defendants Thinh Dat Nguyen, Thoi Bao Houston, and Thoi Bao Magazine published false statements of facts to libel Al Hoang as a spy of the Vietnamese Communist, Al Hoang is a Communist, Al Hoang is a Communist Sympathizer, or Al Hoang is working for the interest of the Vietnamese Communist Government. These false statements of facts are one of the factors leading to Al Hoang's lost of 2013 Election and it could be the same for 2014 Election."* [CR 12].

In answering Nguyen's Motion To Dismiss, Hoang also filed a certified translation and the Affidavit of the translator as follows: *"My name is Fawn D. Nguyen. I am capable of making this affidavit. I am a certified translator from Vietnamese to English and from English to Vietnamese. My Texas License number is 930. The translation of Thoi Bao Magazine, issue 413, pages 36-37, the related statements of the lawsuit, was under my supervision and I hereby certify that the translation is true and correct from Vietnamese to English."* [CR 121]

Nguyen, during the hearing of the Motion to Dismiss, claimed that there was no affidavit filed by Hoang to support the elements of a defamation case. Whether the Court took this into consideration to dismiss the case is unclear; yet, on the contrary, the affidavit was made and was properly submitted in the Original Petition. [CR 12].

**III. Did the District Court err when considering the label of someone as a "Communist," "Spy for the Communist," or "Communist Sympathizer" in an anti-Communist community like the Vietnamese Community as "may be wrongheaded, but is not illegal or disgraceful?"**

At the hearing of Nguyen's Motion to Dismiss, Nguyen's attorney turned in the Brief. The Court should not take the Brief in consideration because it did not provide Hoang a fair chance to answer [RR 13 lines 8-14]. In the Brief, Nguyen stated "it may be wrongheaded, but is not illegal or disgraceful, to be a communist." [CR 13] Maybe it is not disgraceful to various persons to be a communist, but it is to Hoang.

Half a century ago, in the United States, to label a person as a Communist, is libel per se: *"The fact that it may be legal to be a Communist or a Communist sympathizer does not prevent such a charge from being libelous per se, as a publication need not impute a crime to constitute a libel."* **Spanel et al. vs Pegler**, 160 F (2d) 619, A.L.R. 699 (Fed. Ct., 1947). The Court in **Burrell vs. Moran et al,** 82 N.E. (2d) 334 (Ohio, 1948), the Court also stated: *".. a large segment of our populace attaches to the activities of Communists an odorous interpretation that tends toward public aversion."* After the Fall of Communism in Eastern Europe and in the Soviet Union in the late 1980's and early 1990's, that kind of sentiment

may not be that deepened in the hearts of mainstream Americans, but it exists in minority communities such as Vietnamese Community who has recently fled from Communism and Vietnam is still under the yoke of Communist regime.

For the past 40 years, many folks who were misunderstood as "Communist" or "Communist sympathizer" in the Vietnamese Community were murdered or were threatened to death. In December 2012, after Hoang was labeled as a "Communist," there were couples of demonstration in front of Hoang's residence and immediately there was a death-threat cocktail bomb was placed at Hoang's door [CR 7].

In the Vietnamese Community, a person is to be labeled or to be misunderstood as a Communist, the livelihood of that person and family members are in jeopardy, that person could hardly advance further to higher status. Because Hoang was labeled and/or misunderstood as a Communist, Hoang lost the Election in 2013 to a no-name at that time, Richard Nguyen [CR 7]

Understanding the situation to be labeled as a Communist in the Vietnamese Community, Courts all over the United States took the matter seriously and allowed cases to go to trial. In Virginia, ***Hoai Thanh vs. Hien Thi Ngo and Vietnamese Public Radio Inc.,*** CASE No: AW 05 CV 3420, in the Federal District Court, on October 21, 2011, the case was tried, the Court awarded $1 million punitive damages to Plaintiff for being called as a "Communist." Likewise,

in Texas, after the Anti-Slapp Law was in effective, in the case of *Bui vs. Do*, D-1-GN-09-001567 in Travis County, on October 27, 2011, the Court granted 1.9 punitive damages in favor of Plaintiff because Defendant Michael Do labeled Plaintiff Nancy Bui as a Communist or a Communist sympathizer. In the case of *Nguoi Viet News, Inc., vs. Saigon Nho Newspapers, 30-2012-00595526 in the Superior Court of Orange County, California*, On December 30, 2014, a Jury of 12 awarded the Plaintiffs $3,000,000 in damages and $1,500,000 in punitive against Defendants for labeling Plaintiffs as Communist agents or Communist sympathizers.

**IV. Did the District Court err when considering previous lawsuits filed by Plaintiff to various individuals in the last 10 years and later on through mediations dismissed them as a basis for dismissal in this case?**

In the Motion to Dismiss, Nguyen asserted that Hoang in the last over 10 years, filed a couple of lawsuits and dismissed them. The facts and issues in those cases are different. Those cases went through mediation, Defendants either agreed to issue either an apology or Statements of Corrections, such as Defendant Free Vietnam Government issued the Letter of Correction [CR 36], Defendant Anh Tai

Nguyen issued the Letter of Apology [CR 50], and to promote harmony, in accordance to mediation rule, Hoang dismissed the cases. [RR p. 7]. Dismissing lawsuits in accordance to Mediation Procedure cannot be used as a ground for the Court dismissing this case. See *Texas Civil and Remedy Code*, Sec. 154.073 (a). CONFIDENTIALITY OF CERTAIN RECORDS AND COMMUNICATIONS.: "Except as provided by Subsections (c), (d), (e), and (f), a communication relating to the subject matter of any civil or criminal dispute made by a participant in an alternative dispute resolution procedure, whether before or after the institution of formal judicial proceedings, is confidential, is not subject to disclosure, and may not be used as evidence against the participant in any judicial or administrative proceeding."

## CONCLUSION AND PRAYERS

The Trial Court's decision in dismissing the case sent out a wrong message to the Community that Freedom of Speech also includes freedom to make up facts libeling people. WHEREFORE, as premises considered, Appellant Al Hoang respectfully requests the Court to reverse the Trial Court's decision, grant Appellant an opportunity to have a fair trial, grant appellant such other and further

relief, at law or in equity, to which Appellant may by this pleading or proper amendment thereto show himself justly entitled.

Respectfully submitted

_____
Hoang & Associates
Aloysius Duy-Hung Hoang
State Bar No. 24002295
801 Congress St. #350
Houston, TX 77002
 Telephone: 713/229-8900
Telecopier: 713/224-3111
pro se

## CERTIFICATE OF COMPLIANCE

I certify that the word count in this entire document is 3545

_____
Al Hoang

## CERTIFICATE OF SERVICE

I, Al Hoang, hereby certify that a true and correct copy of the above and foregoing was served in accordance with the Texas Rules of Civil Procedure on all counsel of record by placing same in the United States mail, certified mail, return receipt requested, by hand delivery or by telecopier, on this the 22nd day of October, 2015.

_____
Al  Hoang

# APPENDIX 1

ORIGINAL CLERKS RECORD

VOLUME I

APPELLATE COURT NO.  14-14-00942-CV

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
2/3/2015 11:49:24 AM
CHRISTOPHER A. PRINE
Clerk

ALYOSIUS HOANG AKA HOANG DUY HUNG

    APPELLANT(S)

VS.                      TRIAL COURT NO. 2014-59665

THINH DAT NGUYEN INDIVIDUAL THOI BAO HOUSTON AND THOI BAO

    APPELLEE(S)

FROM THE 215TH District Court of Harris County, at Houston, Texas

HON. ELAINE PALMER, JUDGE PRESIDING.

Applied for by ALOYSIUS DUY-HUNG HOAN on 24TH  day of NOVEMBER  A.D., 2014 and delivered to the **"FOURTEENTH"**

COURT OF APPEALS A.D., 2014.

CHRIS DANIEL
Harris County, District Clerk

By:   /s/PHYLLIS WASHINGTON
      **PHYLLIS WASHINGTON, Deputy**

Attorney for Appellant:

**ALOYSIUS DUY-HUNG HOAN
HOANG & ASSOCIATES
801 CONGRESS STE 350
HOUSTON, TX 77002**

Attorney for Appellee:

**MARK WILLIAM BENNETT
ATTY AT LAW
917 FRANKLIN ST 4TH FLR
HOUSTON, TX 77002**

1

# INDEX

**ALYOSIUS HOANG AKA HOANG DUY HUNG**

**VS.    NO. 2014-59665 #14-14-00942-CV**

**THINH DAT NGUYEN INDIVIDUAL THOI BAO HOUSTON AND THOI BAO**

PAGE

**COVER PAGE VOLUME I**.................................................................................... 1

**INDEX** ................................................................................................................ 2

PLAINTIFFS' ORIGINAL PETITION AND APPLICATION FOR TEMPORARY INJUNCTION
ORDER FILED OCTOBER 13, 2014........................................................................ 4
**AL HOANG'S AFFIDAVIT** ................................................................................ 12

MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT
FILED OCTOBER 21, 2014.................................................................................... 15

ANSWER FILED OCTOBER 21, 2014 .................................................................. 18

NOTICE OF HEARING ON PLAINTIFF'S AMENDED MOTION TO DISMISS
UNDER THE TEXAS CITIZENS PARTICIPATION ACT FILED OCTOBER 27, 2014 ............................ 20

AMENDED MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT WITH
EXHIBITS FILED OCTOBER 27, 2014 .................................................................. 21
**EXHIBIT A** .......................................................................................................... 26
**EXHIBIT B** .......................................................................................................... 34
**EXHIBIT C** .......................................................................................................... 40
**EXHIBIT D** .......................................................................................................... 46
**EXHIBIT E** .......................................................................................................... 56
**EXHIBIT F** .......................................................................................................... 104
**EXHIBIT G** .......................................................................................................... 106
**EXHIBIT H** .......................................................................................................... 111

PLAINTIFF'S ANSWER TO DEFENDANTS MOTION TO DISMISS WITH AFFIDAVIT
FILED NOVEMBER 10, 2014................................................................................ 115
**FAWN D. NGUYEN'S AFFIDAIT** ...................................................................... 120

PLAINTIFF'S SUPPLEMENTAL ANSWER TO DEFENDANTS MOTION TO DISMISS
FILED NOVEMBER 13, 2014................................................................................ 123

PROPOSED ORDER ON DEFENDANTS' AMENDED MOTION TO DISMISS
UNDER THE TEXAS CITIZENS PARTICIPATION ACT FILED NOVEMBER 14, 2014 ........................ 129

BRIEF IN SUPPORT OF AMENDED MOTION TO DISMISS UNDER THE TEXAS CITIZENS
PARTICIPATION ACT WITH ATTACHMENTS FILED NOVEMBER 14, 2014..................................... 130
**AFFIDAVIT OF THINH DAT NGUYEN** .............................................................. 140
**CASE LAW**.......................................................................................................... 142
**CASE LAW**.......................................................................................................... 161
**CASE LAW**.......................................................................................................... 167
**CASE LAW**.......................................................................................................... 172
**CASE LAW**.......................................................................................................... 194
**CASE LAW**.......................................................................................................... 257
**CASE LAW**.......................................................................................................... 264
**CASE LAW**.......................................................................................................... 268
**CASE LAW**.......................................................................................................... 278
**CASE LAW**.......................................................................................................... 299

CASE LAW ............................................................................................................ 311

2

**INDEX**

**ALYOSIUS HOANG AKA HOANG DUY HUNG**

**VS.      NO. 2014-59665 #14-14-00942-CV**

**THINH DAT NGUYEN INDIVIDUAL THOI BAO HOUSTON AND THOI BAO**

PAGE

ORDER ON DEFENDANTS' AMENDED MOTION TO DISMISS UNDER THE TEXAS CITIZENS
PARTICIPATION ACT SIGNED NOVEMBER 18, 2014 .............................................................. 323

TRIAL COURT ACTIVITY INQUIRY SHEETS............................................................................ 324

TRIAL COURT  ELECTRONIC DOCKET SHEET...................................................................... 325

NOTICE OF APPEAL BY ATTORNEY ALOYSIUS DUY-HUNG HOANG
FILED NOVEMBER 24, 2014.......................................................................................................... 326
**COVER PAGE TO NOTICE OF APPEAL ................................................................................** 328

CERTIFICATE ................................................................................................................................. 329

BILL OF COSTS .............................................................................................................................. 330

COMPLETE ORIGINAL CLERKS RECORD. PW

10/13/2014 6:41:51 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 2816639
By: CUERO, NELSON

CAUSE NO.

| | | |
|---|---|---|
| ALOYSIUS HOANG (Al Hoang) | § | IN THE JUDICIAL DISTRICT COURT |
| AKA HOANG DUY HUNG | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | JUDICIAL DISTRICT # _____ |
| | § | |
| THINH DAT NGUYEN, indvidual | § | |
| THOI BAO HOUSTON | § | |
| THOI BAO | § | |
| Defendants | § | HARRIS COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION
## AND APPLICATION FOR TEMPORARY INJUNCTION ORDER

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, ALOYSIUS HOANG, aka AL HOANG, aka Hoang Duy Hung, hereinafter referred to as the "Plaintiff", hereby complains of Defendants, THINH DAT NGUYEN, individually, and THOI BAO HOUSTON a subsidiary of THOI BAO MAGAZINE, (collectively referred to "THOI BAO"), and for causes of action would respectfully show:

## I.
## PARTIES AND SERVICES OF PROCESS

1. Plaintiff is an individual residing in Houston, Harris County, Texas.

2. Defendant, Thinh Dat Nguyen, is a resident of Texas and his working place is 11205 Bellaire Blvd. #B4, Houston, Harris County, Texas 77072. Service of Process to Defendant Thinh Dat Nguyen at 11205 Bellaire Blvd. #B4, Houston, Harris County, Texas 77072 or where ever he could be found.

3. Defendant Thoi Bao Houston is a magazine with its principal place of business is at 11205 Bellaire Blvd. #B4, Houston, Harris County, Texas 77072. Service of Process to Thoi Bao

1

4

Magazine through its agent Thinh Dat Nguyen at 11205 Bellaire Blvd. #B4, Houston, Harris County, Texas 77072 or where ever he could be found.

4.    Defendant Thoi Bao Magazine is a magazine worldwide and is principal place of business in Texas is at 11205 Bellaire Blvd. #B4, Houston, Harris County, Texas 77072. Service to Thoi Bao Magazine is through its agent, Thinh Dat Nguyen, at 11205 Bellaire Blvd. #B4, Houston, Harris County, Texas 77072 or where ever he could be found.

## II.
## VENUE

Venue in this action is proper in Harris County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §15.002 (a)(1), (2), and (3) and 15.005 because Plaintiff resides in Harris County, Houston, Texas at the time of the accrual of the causes of action alleged herein.  Further, the basis for venue in Harris County is that all or a substantial part of the events or omissions giving rise to these causes of action occurred in Harris County, Texas.  Furthermore, all claims or actions against Defendants arose out of the same transaction, occurrence, or series of transactions or occurrences.

## III.
## DISCOVERY CONTROL PLAN

Plaintiffs intend to conduct Discovery pursuant to Level 2 of Rule 190.1 of the Texas Rules of Civil Procedure.

## IV.
## FACTS

Defendant Thinh Dat Nguyen is a Texas resident. Thoi Bao Magazine is a Vietnamese weekly magazine which has branches all over the world including Houston, and in Houston, it is called as Thoi Bao Houston. Thinh Dat Nguyen is the Editor-in-Chief of Thoi Bao Houston and Thoi Bao in Texas.

2

5

Thoi Bao Houston has its principal place of business at 11205 Bellaire Blvd. #B4, Houston, Harris County, Texas 77072, within Universal Studio Shopping Center, owned by Mr. Hubert Vo's company, and Mr. Hubert Vo is the opponent of Plaintiff in the race for State Representative District 149. Whether Hubert Vo or his campaign paid Thoi Bao to have articles libeling Plaintiff is a question to be answered during Discovery.

In 2010, after Al Hoang was elected as Houston City Councilmember District F, Defendant Thinh Dat Nguyen invited Al Hoang and a couple of friends to his house for dinner. During dinner, Al Hoang disclosed that Houston Airport System Director Mario Diaz has invited Al Hoang to accompany him for a trip to Vietnam. Plaintiff stated that Plaintiff is considering the pros and cons of the trip. Suddenly Defendant Thinh Dat Nguyen ordered Al Hoang: *"I order you not to go to Vietnam. If you go, I will mobilize Thoi Bao to destroy you, to take your council seat away. That is my order."* Al Hoang replied: *"I am a councilman, I do things in accordance to my conscience, you cannot order me like that."* Hoang left the house.

Immediately that night, a person used an email address VoterdistrictF@yahoo.com sending an email on Vietnamese e-forums that Al Hoang is going to Vietnam to "bow down to Ho Chi Minh and the Vietnamese Communist". VoterdistrictF@yahoo.com signed the name of The Gioi Magazine, but the Editor-in-Chief of The Gioi Magazine immediately voiced up that VoterdistrictF@yahoo.com is not The Gioi Magazine but it is the address created by Defendant Thinh Dat Nguyen.

After this event, almost every issue, Thinh Dat Nguyen writes on Thoi Bao Houston libeling Al Hoang is a Vietnamese Communist, an agent of Vietnamese Communist, or a spy of the Vietnamese Communist. After the articles were printed on Thoi Bao, the articles then disseminated on Vietnamese e-forums and internet for millions of readers to view.

3

Sometime in October 2012, Vice Minister of Vietnam, Mr. Nguyen Thanh Son, visited Houston. Mayor Anise Parker and her Administration, with Al Hoang, welcomed the Delegation. A Forum was opened for Vietnamese freedom fighters to come and make pressure on Vietnam to honor human rights as well as open up the door for political parties. Defendant Thinh Dat Nguyen cut and twisted the facts to label Al Hoang as a Vietnamese Communist spy or an arm of the Vietnamese Communist to "sabotage the Vietnamese Community in Houston and abroad". Thinh Dat Nguyen did not dare to libel Anise Parker and Administration as Communists. Because of such libel, many Vietnamese people, especially the seniors who read Thoi Bao, believe that Al Hoang is a Communist, and three protests were organized in front of Al Hoang's residence and a cocktail bomb death threat was put in front of Al Hoang's house.

In early 2013, on behalf of the City of Houston, Al Hoang made a tour to Asia countries such as Japan, Taiwan, Indonesia and Vietnam to enhance the business relationship of those countries with Houston and the Port of Houston. Defendant Thinh Dat Nguyen ignored the other trips to Indonesia, Taiwan, and Japan, he concentrated on the trip to Vietnam to libel Al Hoang as Vietnamese Communist working for the Vietnamese Communist government. Again, after the articles were printed on Thoi Bao Houston, they also immediately disseminated on Vietnamese e-groups and internet for millions of people to view.

Al Hoang publicly announced numerous times that he would welcome for an open interview or debate. Thinh Dat Nguyen and his group refused. Many people believe in Thinh Dat Nguyen's version, and it is one of the factors contributing to Al Hoang's lost for the 2013 Election as City Council.

Al Hoang won the Republican primary in 2014 to run for State Representative District 149. Again, almost every issue, Thinh Dat Nguyen libel Al Hoang is a Vietnamese Communist.

4

In Issue 412 of early October, 2014, Thinh Dat Nguyen ran the headline "NOT VOTING FOR HOANG DUY HUNG" whereby also twisted and turned the facts so that the readers understand that because Al Hoang is a Communist, Al Hoang's father in 2007 committed suicide by jumping into the moving truck. In facts, Al Hoang's father died because of an undocumented immigrant who ran the red light and hit Al Hoang's father, he was taken to Ben Taub and died.

In issue 413, midst of October, 2014, Thinh Dat Nguyen ran the headline 'UNMASK THE SPY FACE OF HOANG DUY HUNG" whereby he libeled Al Hoang is a Vietnamese Communist agent working for the interest of the Vietnamese Communist's government. In this article, he also libeled Al Hoang made the cocktail bomb with a death threat in late 2012 just to get the name of Al Hoang to be noticed!

For numerous times, Al Hoang has asked Thinh Dat Nguyen to stop such libel, and if Thinh Dat Nguyen has any question, Al Hoang is happy to entertain a public interview or forum. Al Hoang also informed him that by FCC rules, he has to give Al Hoang equal space to correct the facts. He ignored.

Al Hoang also contact Dat Nguyen, the founder and owner of Thoi Bao in Toronto, via email Đat Nguyen <davenguyent@gmail.com> and by telephone 416-624-7297 or by other method allowed by law to ask him taking appropriate steps as well as to provide equal space for Al Hoang for such libel, Dat Nguyen never replied back to Al Hoang.

## V.
## CAUSES OF ACTION

Plaintiffs sue Defendant for Libel and Hate Crime. All conditions precedent to Plaintiffs recovery under the agreement have occurred.

**Libel:** Plaintiff will show that Defendants are liable to Plaintiff for libel by making statements of facts that Plaintiff is a Communist Spy, a Communist Agent working for the

5

8

interest of the Vietnamese Communist's government. under the contract. Defendant's actions constituting Libel were done with malice, as that term defined in Tex. Civ. Prac. & Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

**2. Hate Crime**: In the alternative, Defendants are liable to Plaintiff under the Hate Crime Cause of Action. As a result of Defendants' hate crime and malicious revenge, Plaintiffs have suffered actual and consequential damages in excess of the minimum jurisdictional limits of this court. Defendant's actions constituting Misrepresentation were done with malice, as that term defined in Tex. Civ. Prac. & Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

In addition, Plaintiff seeks the recovery of exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code § 41.002. Plaintiff's actual damages exceed the minimum jurisdictional limits of this Court.

## VI.
## ATTORNEY'S FEE

As a result of the facts described above, Plaintiff has found it necessary to engage the law firm of Hoang & Associates or later to be replaced by other Law Firms to prosecute this action. Pursuant to Section 37.001, *et seq.* of the Texas Civil Practices and Remedies Code, Plaintiff seeks an award of his reasonable and necessary attorneys' fees in the amount proven at trial.

## VII.
## REQUEST FOR DISCLOSURE

Plaintiff, requests that Defendants disclose all information and documents required under Rule 194, Texas Rules of Civil Procedure.

6

9

## VIII.
## APPLICATION FOR TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

Irreparable harms will be done to Plaintiff Al Hoang if the Court does not issue a Temporary Restraining Order enjoining Defendants to publish false statements of facts that Plaintiff is a Communist, a Communist Spy, a Communist Sympathizer, or an agent working for the interest of the Vietnamese Communist government. Because of such false statements of facts before the Election in 2013, Plaintiff lost the Election to a No Name.

This 2014 Election, the race is very close and the Vietnamese vote is the swing vote which will make the difference of the Election. Allowing Defendants to publish such false statements will definitely persuade many Vietnamese voters not to vote for Plaintiff and will cast their votes to the opponent, Hubert Vo, who is the Landlord of Defendants.

WHEREFORE, premises considered, Al Hoang is requesting the Court, in ex-parte, to issue a Temporary Restraining Order, restraining Thinh Dat Nguyen and Defendants to further publish statements of facts that Al Hoang is a spy of the Vietnamese Communist, Al Hoang is a Communist, Al Hoang is a Communist Sympathizer, or Al Hoang is working for the interest of the Vietnamese Communist Government. Plaintiffs request Order for a Hearing on whether to make this a Temporary Injunction and a Permanent Injunction.

## IX.
## PRAYER

WHEREFORE, Plaintiff respectfully requests that Defendants be cited to appear and answer, and that Plaintiff be granted judgment against the Defendants as follows:

7

10

(1)      actual damages in excess of the minimum jurisdictional limits of the Court for their wrongful actions;

(2)      reasonable fees for the services of Plaintiff's attorneys, together with all costs of court and expenses incurred by Plaintiffs in the investigation and prosecution of this case;

(3)      exemplary damages in a sum to be determined by the trier of fact;

(4)      pre- and post-judgment interest at the rate allowed by law until paid; and

(4)      such other and further relief, at law or in equity, to which Plaintiffs may by this pleading or proper amendment thereto show itself justly entitled.

Respectfully submitted

**HOANG& ASSOCIATES**

Aloysius Hoang
State Bar No. 24002295
801 Congress St #350
Houston, TX 77002
Telephone: 281-788-8486
Telecopier: 713/224-3111
Email: Alhoang77072@gmail.com
**Pro se**

8

11

10/13/2014 6:41:51 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 2816639
By: CUERO, NELSON

CAUSE NO.

| | | |
|---|---|---|
| ALOYSIUS HOANG (Al Hoang) | § | IN THE JUDICIAL DISTRICT COURT |
| AKA HOANG DUY HUNG | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | JUDICIAL DISTRICT # _____ |
| | § | |
| THINH DAT NGUYEN, indvidual | § | |
| THOI BAO HOUSTON | § | |
| THOI BAO | § | |
| Defendants | § | HARRIS COUNTY, TEXAS |

---

## AL HOANG'S AFFIDAVIT

---

| | |
|---|---|
| STATE OF TEXAS | ] |
| | ] |
| COUNTY OF HARRIS | ] |

Before me is AL HOANG, who is over eighteen (18) years of age, with sound and competent mind, after being duly SUBSCRIBED and SWORN to before me, makes the following statement:

"My name is AL HOANG. I am over the age of eighteen (18), I am the Plaintiff in this the above style and cause number, and I am capable of making this Affidavit.

All the statements of facts in Plaintiff's Original Petition is true and they are within my personal knowledge. Defendants Thinh Dat Nguyen, Thoi Bao Houston, and Thoi Bao Magazine published false statements of facts to libel Al Hoang as a spy of the Vietnamese Communist, Al Hoang is a Communist, Al Hoang is a Communist Sympathizer, or Al Hoang is working for the

1

12

interest of the Vietnamese Communist Government. These false statements of facts are one of the factors leading to Al Hoang's lost of 2013 Election and it could be the same for 2014 Election.

This is my personal knowledge and the truth I testify under oath"

AL HOANG

AL HOANG, Affiant

EXECUTED this document as true and correct on this 12th day of October, 2014. I am a notary public, but not an attorney in this case.

Notary Public in and for
The State of TEXAS.

2

13

No. 2014-59665

| | |
|---|---|
| Aloysus Hoang<br>vs.<br>Thinh Dat Nguyen<br>Thoi Bao Houston | In the 215th District Court<br>Harris County, Texas |

## Motion to Dismiss Under the Texas Citizens Participation Act

**Judge Palmer:**

Defendants Thinh Dat Nguyen and Thoi Bao Houston ask for relief under the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code §§ 27.001 *et seq.*, and would show:

- The legal action is based on, relates to, or is in response to the defendants' exercise of the right of free speech, right to petition, or right of association; and

- This motion is filed not later than the 60th day after the date of service of the legal action.

**Prayer**

For these reasons, please:

- Set this motion for a hearing not later than the 60th day after the date of service of the motion, Tex. Civ. Prac. & Rem. Code §27.004(a);

- Rule on the motion not later than the 30th day after the hearing, Tex. Civ. Prac. & Rem. Code §27.005(a);

15

- Dismiss the legal action, TEX. CIV. PRAC. & REM. CODE §27.005(b);

- Issue findings that the legal action was brought to deter or prevent the defendants from exercising constitutional rights and was brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation, TEX. CIV. PRAC. & REM. CODE §27.007(a);

- Award to the defendants court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require, TEX. CIV. PRAC. & REM. CODE §27.009(a)(1); and

- Award to each defendant sanctions against the as the court determines sufficient to deter the plaintiff from bringing similar actions described in this chapter, TEX. CIV. PRAC. & REM. CODE §27.009(a)(2).

## CERTIFICATE OF SERVICE

I certify compliance with Texas Rule of Civil Procedure 21.

16

Thank you,

Mark Bennett
SBN 00792970
Bennett & Bennett
917 Franklin Street, Fourth Floor
Houston, Texas 77002
713.224.1747
mb@ivi3.com

## No. 2014-59665

| | |
|---|---|
| ALOYSUS HOANG | |
| VS. | IN THE 215TH DISTRICT COURT |
| THINH DAT NGUYEN | HARRIS COUNTY, TEXAS |
| THOI BAO HOUSTON | |

## ANSWER

### JUDGE PALMER:

Defendants Thinh Dat Nguyen and Thoi Bao Houston generally deny the allegations in the plaintiff's original petition.

### PRAYER

For these reasons, please render judgment that the plaintiff take nothing, assess costs against the plaintiff, and award all other relief to which the defendants are entitled.

### CERTIFICATE OF SERVICE

I certify compliance with Texas Rule of Civil Procedure 21.

Thank you,

Mark Bennett
SBN 00792970
Bennett & Bennett
917 Franklin Street, Fourth Floor
Houston, Texas 77002
713.224.1747
mb@ivi3.com

18

No. 2014-59665

| | |
|---|---|
| Aloysus Hoang | |
| vs. | In the 215th District Court |
| Thinh Dat Nguyen | Harris County, Texas |
| Thoi Bao Houston | |

## Notice of Hearing on
## Plaintiff's Amended Motion to Dismiss
## Under the Texas Citizens Participation Act

The defendants' *Amended Motion to Dismiss Under the Texas Citizens Participation Act* is set for hearing in this court on November 14, 2014 at 9:30 A.M.

The defendants estimate that the hearing will take fifteen minutes of the Court's time.

Thank you,

Mark Bennett
SBN 00792970
Bennett & Bennett
917 Franklin Street, Fourth Floor
Houston, Texas 77002
713.224.1747

20

10/25/2014 11:56:41 AM
Chris Daniel - District Clerk Harris County
Envelope No. 2956130
By: GAYLE FULLER
Filed: 10/25/2014 11:56:41 AM

ALOYSUS HOANG

VS.

THINH DAT NGUYEN

THOI BAO HOUSTON

IN THE 215TH DISTRICT COURT
HARRIS COUNTY, TEXAS

## AMENDED MOTION TO DISMISS
## UNDER THE TEXAS CITIZENS PARTICIPATION ACT

JUDGE PALMER:

Defendants Thinh Dat Nguyen and Thoi Bao Houston ask for relief under the Texas Citizens Participation Act, TEX. CIV. PRAC. & REM. CODE §§ 27.001 *et seq.*, and would show that the legal action is based on, relates to, or is in response to the defendants' exercise of the right of free speech, right to petition, or right of association; and that the plaintiff has brought similar actions in the past and must be sanctioned to deter him from bringing similar actions in the future.

Plaintiff is a public figure: he is a former Houston City Council member, and a candidate for State Representative. *See Plaintiff's Original Petition* at 3–4.

Plaintiff's complaint is based on the defendants—a magazine and its editor-in-chief—writing and saying things about his politics while he was a candidate for the Texas Legislature. *See Plaintiff's Original Petition.* These are by definition communications on a matter of public concern, TEX. CIV. PRAC. & REM. CODE § 27.001(1), (7).

21

The aim of Chapter 27 of the Texas Civil Practice and Remedies Code is:

> to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.

The plaintiff is in the habit of filing vexatious lawsuits aimed at chilling his critics' right to speak freely and participate in government. This is at least the fifth time he has filed a meritless lawsuit aimed at limiting public participation.

On June 10, 2003, in Cause Number 2003-32226, in the 151st District Court of Harris County, the plaintiff filed a lawsuit against various defendants for libel and conspiracy based on public statements ("the author labeled [plaintiff] as a communist cadre, an unprofessional attorney, an evil and wicked person") about the plaintiff, a public figure. A copy of the petition in Cause Number 2003-32226 is attached as Exhibit "A." A copy of the nonsuit in Cause Number 2003-32226 is attached as Exhibit "B."

Also on June 10, 2003, in Cuase Number 2003-32229, in the 157th District Court of Harris County, the plaintiff filed a lawsuit against various defendants for libel and conspiracy based on public statements that the plaintiff, a public figure, had released confidential

information, exaggerated, and lied about a meeting seeking a City of Houston resolution recognizing the Republic of Vietnam's flag as they symbol of Houston's Vietnamese refugee communication. A copy of the petition in Cause number 2003-32229 is attached as Exhibit "C." A copy of the dismissal order is attached as Exhibit "D."

On September 6, 2005, in Cause Number 2005-57256, in the 151st District Court of Harris County, the plaintiff sued a defendant for, among other things, libeling the plaintiff by, among other things, "libel[ing] Plaintiff to have secret dealings with the Vietnamese Communist Politburo." A copy of the petition in Cause Number 2005-57256 is attached as Exhibit "E." A copy of the order dismissing Cause Number 2005-57255 for want of jurisdiction is attached as Exhibit "F."

On April 18, 2012, in Cause Number 2012-22612, in the 190th District Court of Harris County, the plaintiff filed a lawsuit against a doctor for claiming publicly that he had treated the plaintiff's children for free. A copy of the petition in Cause Number 2012-22612 is attached as Exhibit "G." A copy of the order dismissing Cause Number 2012-22612 with prejudice is attached as Exhibit "H."

23

For these reasons, please:

- Set this motion for a hearing not later than the 60th day after the date of service of the motion, TEX. CIV. PRAC. & REM. CODE §27.004(a);

- Rule on the motion not later than the 30th day after the hearing, TEX. CIV. PRAC. & REM. CODE §27.005(a);

- Dismiss the legal action, TEX. CIV. PRAC. & REM. CODE §27.005(b);

- Issue findings that the legal action was brought to deter or prevent the defendants from exercising constitutional rights and was brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation, TEX. CIV. PRAC. & REM. CODE §27.007(a);

- Award to the defendants court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require, TEX. CIV. PRAC. & REM. CODE §27.009(a)(1); and

- Award to each defendant sanctions against the plaintiff as the court determines sufficient to deter the plaintiff from bringing

similar actions described in this chapter, TEX. CIV. PRAC. & REM. CODE §27.009(a)(2).

**CERTIFICATE OF SERVICE**

I certify compliance with Texas Rule of Civil Procedure 21.

Thank you,

Mark Bennett
SBN 00792970
Bennett & Bennett
917 Franklin Street, Fourth Floor
Houston, Texas 77002
713.224.1747
mb@ivi3.com

25

2003-32226

CAUSE NO._____

| | | |
|---|---|---|
| ALOYSIUS DUY-HUNG HOANG AKA HOANG DUY HUNG, Plaintiff | § § § | IN THE JUDICIAL DISTRICT COURT |
| VS. | § § § | 151 _____ JUDICIAL DISTRICT |
| HUE VAN TRAN, individual THANH CAO NGUYEN, individual HIEP AN NGUYEN, individual THE GOVERNMENT OF FREE VIETNAM AKA CHINH PHU VIET NAM TU DO, Defendants | § § § § § § § | HARRIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, ALOYSIUS DUY-HUNG HOANG, aka HOANG DUY HUNG, hereinafter referred to as Plaintiff, and file this his ORIGINAL PETITION against HUE VAN TRAN, THANH CAO NGUYEN, HIEP AN NGUYEN, and the so-called GOVERNMENT OF FREE VIETNAM, aka CHINH PHU VIET NAM TU DO, hereinafter referred to as Defendants, and for causes of action would respectfully show:

## I. PARTIES

Plaintiff Aloysius Duy-Hung Hoang is a resident of Houston, Harris County, Texas, and the acts/or practices complained have herein took place in Harris County, Texas as well as many other states in the United States and many other countries.

Defendant HUE VAN TRAN is an individual, a resident of Harris County Texas, and Service of Process could be served to him at 7105 Spindle Dr., Houston TX or 11727 Airline Drive, Houston TX 77037.

This instrument is of poor quality and not satisfactory for photographic recordation; and/or alterations were present at the time of imaging RECORDER'S MEMORANDUM

Certified Document Number: 8359691 - Page 1 of 7

1

26

Defendant THANH CAO NGUYEN is an individual, a resident of Harris County Texas, and Service of Process could be served to him at 8354 Carriage Creek, Houston TX 77064.

Defendant HIEP AN NGUYEN could be served at 11727 Airline Dr., Houston TX 77037.

Defendant THE GOVERNMENT OF FREE VIETNAM, aka CHINH PHU VIET NAM TU DO, headed by individuals such as CHANH HUU NGUYEN, DUNG THE CAO, RUYET THE HA, TRAN KHAC HUYNH aka CHU TAN, DINH THAT TON, VIEN QUANG LINH, CHINH KHAC NGUYEN, DAU HUY NGUYEN, THANH CAO NGUYEN, HIEP AN NGUYEN, HUE VAN TRAN, etc., could be served through its representatives in Harris County who are as follows:

HIEP AN NGUYEN, at 11727 Airline Dr., Houston TX 77037.

**Or**

HUE VAN TRAN 7105, Spindle Dr., Houston TX or 11727 Airline Drive, Houston TX 77037.

**Or**

THANH CAO NGUYEN, 8354 Carriage Creek, Houston TX 77064.

## II.
## VENUE

Venue in this action is proper in Harris County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §15.002 (a)(1), (2), and (3) and 15.005 because Plaintiff resides in Harris County, Houston, Texas at the time of the accrual of the causes of action alleged herein. Further, the basis for venue in Harris County is that all or a substantial part of the events or omissions giving rise to these causes of action occurred in Harris County, Texas.

2

Certified Document Number: 8359691 - Page 2 of 7

Certified Document Number: 8359691 - Page 3 of 7

## III.
## FACTS

Sometime in 2002, Rang Dong Xuat Ban, an anonymous publisher, without physical or post office address, published a book of an anonymous person Tran Thanh Tam by the title of "SU THAT CUA 'SU THAT', LUAN VE HIEN TUONG HOANG DUY HUNG VA 'NHOM SU THAT'" ("The Truth of the Truth, An Analysis of the phenomenon Hoang Duy Hung and 'the Truth Group.'")

The book is 525 page thick containing of made-up stories and deforming articles as a mean to mud-sling and to defame Aloysius Duy-Hung Hoang and various persons. Among made-up and deforming articles are some of the following:

1.  On page 196, the author wrote: *"Hoang Duy Hung deceived the people in Northern California to raise fund two times: One time $130,000.00 and the other time $30,000."* In reality, there was only one fund raising in July 1999 about $130,000.00, and it was not by Aloysius Duy-Hung Hoang, it was by Que Huong Radio Station and Mr. Thanh Van Pham, and Aloysius Duy-Hung Hoang was only the sponsor in case Mr. Thanh Van Pham could not fulfill his promise. A year later, Aloysius Duy-Hung Hoang announced that since Mr. Thanh Van Pham did not fulfill his promise, Aloysius Duy-Hung Hoang returned all the money to those who donated with 10% percent interest. The announcement was made public on Vietnamese news and radio stations. The announcement was also reprinted in Aloysius Duy-Hung Hoang's biography in 2000, and in fact Aloysius Duy-Hung Hoang already paid it.

2.  On page 196, 473 and many other pages of the book, the author made up stories that "in 1992 Hoang Duy Hung 'sold' 320 members of Dai Viet Party in Vietnam to the

3

28

Vietnamese Communist" for imprisonment and "confessed" to the Vietnamese Communist in order for the Vietnamese Communist released Hoang Duy Hung. The author cited the witness for such "incident" is Hoang Duc Kham, an imaginary or made-up person by the author, claimed to be Hoang Duy Hung's uncle who lived at a (made-up) address 3.299/CIS Handford Str. Seattle, WA 98144. The truth is in 1992, as a United States citizen, Aloysius Duy-Hung Hoang came back to Vietnam organizing a movement demanding for Freedom and Democracy in Vietnam. The Communists imprisoned Aloysius Duy-Hung Hoang for 15 months, and Aloysius Duy-Hung Hoang protested against the communists by a 28-day-hunger strike. Later on, by the intervention of the United States, the Vietnamese Communist released Aloysius Duy-Hung Hoang. There was no such "uncle" of Aloysius Duy-Hung Hoang by the name of Hoang Duc Kham who was imprisoned, and there was no such 320 members of Dai Viet Party who were imprisoned by the Vietnamese Communists because of Hoang Duy Hung's leak of information.

3. Throughout the book, without evidence, the author labeled Hoang Duy Hung as a communist cadre, an unprofessional attorney, an evil and wicked person.

Throughout the month of June 2001, the so-called Government of Free Vietnam read these defaming articles in Vietnamese on their radio station, which at that time they subleased their airtime from Radio Bolsa on 1180 AM (now 1150 AM) in Harris County, Texas. Thousands of listeners heard the defaming articles.

Certified Document Number: 8359691 - Page 4 of 7

29

Certified Document Number: 8359691 - Page 5 of 7

The representatives of the so-called Government of Free Vietnam distributed the books via Phuong My Video, 11205 Bellaire Blvd. #B8, Houston TX 77072 in the year 2002 up until May 2003.

On or about May 11, 2003, the leaders of the so-called Government of Free Vietnam organized a meeting with the Vietnamese people in Houston and the vicinities at Phu Kim Restaurant, 2615 Fannin St., Houston TX 77002. Before the event took place, the representatives sent out letters and flyers inviting people to attend the meeting, and the content of the flyers promote for the abovementioned book restating fabricating facts such as *"Hoang Duc Kham, the uncle of Hoang Duy Hung, sent a letter to Hoang Duy Hung whereby narrating the evils that had been done by Hoang Duy Hung to the partisans of the Dai Viet Party during the time that Hoang Duy Hung was arrested in Vietnam, and among the 320 comrades of Dai Viet Party that Hoang Duy Hung informed the Vietnamese Communists to arrest them (he was one among them), a few could not endure the horrible tortures by the jailors, died in prison. Some of them already escaped from Vietnam, some are still in prison. Mr. Kham, when he was in prison, his wife missed him and she worried so much that she fell ill and passed away, leaving two children without any place for shelter. For four years, the children lived in poverty until Mr. Kham served his sentence, they took care of one another and they left Vietnam under a political program, the H.O. Mr. Hoang Duc Kham now lives in Seattle, Washington, U.S.A, the residential address is as follows: 3.299/CIS. Handford Str. Seattle, WA 98144."* Aloysius Duy-Hung Hoang has wrote certified mail to the above address and the mail returned with notice from the Post Office: *No Such Address.* The flyers were widely distributed in Harris county. The book was distributed free of charge to attendants during the event.

5

30

## IV. CAUSES OF ACTION

Plaintiff sues Defendants for Libel and Civil Conspiracy.

All conditions precedent to Plaintiff recovery for Libel have occurred. Defendants knew or should have known that these articles are false, fabrications, and/or deforming facts, still, Defendants published and/or conspired with one another in the distribution of such publication all over the world as well as in Harris County continuously forming a chain of events defaming Plaintiff in order to discredit and/or to give a false and negative impression on Plaintiff in front of the public, to ruin Plaintiff's political career as well as to damage Plaintiff's professional legal practice.

Defendants' conduct as described in this petition was committed knowingly and intentionally. Defendants were actually aware, at the time of the conduct, of the falsity, deception, and unfairness of the conduct about which Plaintiff complains. As a direct result of Defendants' knowing misconduct, Plaintiff suffered pecuniary damages, mental anguish, and lost of credibility to the public.

Defendants' actions constituting Libel were done with malice, as that term defined in Tex.Civ.Prac.&Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

## VI.
## REQUEST FOR DISCLOSURE

Plaintiff requests that Defendants disclose all information and documents required under Rule 194, Texas Rules of Civil Procedure.

Certified Document Number: 8359691 - Page 6 of 7

31

## VII.
## PRAYERS

WHEREFORE, Plaintiff respectfully requests that Defendants be cited to appear and answer, and that Plaintiff be granted judgment against the Defendants as follows:

(1) actual damages in excess of the minimum jurisdictional limits of the Court for their wrongful actions;

(2) reasonable attorney's fees together with all costs of court and expenses incurred by Plaintiffs in the investigation and prosecution of this case;

(3) exemplary damages in a sum to be determined by the trier of fact;

(4) pre- and post-judgment interest at the rate allowed by law until paid; and

(4) such other and further relief, at law or in equity, to which Plaintiff may by this pleading or proper amendment thereto show itself justly entitled.

Respectfully submitted

**ALOYSIUS DUY-HUNG HOANG& ASSOCIATES**

Aloysius Duy-Hung Hoang, *pro se*
State Bar No. 24002295
1900 N. Loop West Suite 500
Houston, TX 77018
Telephone: 713/680-9922
Telecopier: 713/680-0804

Certified Document Number: 8359691 - Page 7 of 7



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 24, 2014

Certified Document Number:        8359691 Total Pages:  7

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

33

P-5
EPO
4

## CAUSE NO. 2003-32226

| | |
|---|---|
| ALOYSIUS DUY-HUNG HOANG AKA HOANG DUY HUNG<br>        Plaintiff,<br><br>vs.<br><br>HUE VAN TRAN, INDIVIDUAL<br>THANH CAO NGUYEN, INDIVIDUAL<br>HIEP AN NGUYEN, INDIVIDUAL<br>THE GOVERNMENT OF FREE<br>VIETNAM AKA CHINH PHU VIET<br>NAM TU DO<br>        Defendants. | IN THE DISTRICT COURT<br><br><br><br><br>OF HARRIS COUNTY , TEXAS<br><br><br><br><br><br>151ST JUDICIAL DISTRICT |

### NOTICE OF AGREED NON-SUIT WITH PREJUDICE

Plaintiff and Defendants have settled this controversy and request the Court to dismiss this cause from its docket with prejudice.

Plaintiff and Defendants Hue Van Tran, Hiep An Nguyen, Chanh Huu Nguyen, and the Government of Free Vietnam have settled this controversy pursuant to a letter of apology which is attached as Exhibit A.

Plaintiff and Defendant Thanh Cao Nguyen have settled this controversy pursuant to a letter of disclaimer which is attached as Exhibit B.

Accordingly, the parties request this Court to dismiss this cause with prejudice with costs of court taxed to parties incurring same.

Respectfully submitted,

Aloysius Duy Hung-Hoang



FILED
CHARLES BACARISSE
DISTRICT CLERK
HARRIS COUNTY. TEXAS
2004 JUL -9 PM 4: 36

Page of

Certified Document Number: 5384409 - Page 1 of 5

34

Attorney for Plaintiff
1900 N. Loop West #500
Houston, Texas 77018
713-680-9922
713-680-0804—Fax
SBOT#: 2400-2295


WOODFILL & PRESSLER, L.L.P.

Jared R. Woodfill
State Bar No. 0078-8715
Brent Haynes
State Bar No. 2402-8874
1330 Post Oak Blvd., Suite 2800
Houston, TX 77056
713-751-3080
713-751-3058 FAX

ATTORNEYS FOR DEFENDANTS

Certified Document Number: 5384409 - Page 2 of 5



# CHÍNH PHỦ LÂM THỜI VIỆT NAM TỰ DO
## Government of Free Vietnam

July 7, 2004

The Government of Free Vietnam regrets and hereby repudiates any statements by any of its representatives that may be misunderstood or construed to imply and defamatory comment regarding Aloysius Duy-Hung Hoang, including any statements made on radio and republication of such statements in the book titled, *Sự Thật Của "sự thật,"* published by Rang Dong Xuat Ban.

Hue Van Tran
Government of Free Vietnam

Certified Document Number: 5384409 - Page 3 of 5



PLAINTIFF'S
EXHIBIT

A

36

**Thanh Cao Nguyen**
8354 Carriage Creek
Houston, Texas 77064

## To Whom It May Concern

    I, the undersigned, Thanh Cao Nguyen, hereby state that I have never been a leader, member or representative of The Government of Free Vietnam aka Chanh Phu Viet Nam Tu Do; I also was neither the author, nor the publisher Rang Dong of the book titled SU THAT CUA SU THAT cited in the petition.

                    Respectfully submitted,

                    Thanh Cao Nguyen

Certified Document Number: 5384409 - Page 4 of 5



PLAINTIFF'S
EXHIBIT
B
ALL-STATE LEGAL®
37

## CAUSE NO. 2003-32226

| | | |
|---|---|---|
| ALOYSIUS DUY-HUNG HOANG | § | IN THE DISTRICT COURT |
| AKA HOANG DUY HUNG | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| HUE VAN TRAN, INDIVIDUAL | § | OF HARRIS COUNTY, TEXAS |
| THANH CAO NGUYEN, INDIVIDUAL | § | |
| HIEP AN NGUYEN, INDIVIDUAL | § | |
| THE GOVERNMENT OF FREE | § | |
| VIETNAM AKA CHINH PHU VIET | § | |
| NAM TU DO | § | |
| Defendants. | § | 151ST JUDICIAL DISTRICT |

### ORDER OF DISMISSAL

The Court, having received Plaintiff's and Defendants' Agreed Non-Suit With Prejudice hereby finds that Plaintiff and Defendants Hue Van Tran, Hiep An Nguyen, Chanh Huu Nguyen, and the Government of Free Vietnam have settled this controversy pursuant to a letter of apology which is attached to the Notice of Non-Suit.

The Court also finds that Plaintiff and Defendant Thanh Cao Nguyen have settled this controversy pursuant to a letter of disclaimer which is attached to the Notice of Non-Suit.

Accordingly, this cause is hereby dismissed with prejudice and costs of court are taxed to the parties incurring same.

Signed, this 9th day of August, 2004.



**Judge Presiding**

Certified Document Number: 5384409 - Page 5 of 5

38



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 24, 2014

Certified Document Number:        5384409 Total Pages:  5

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**



CAUSE NO. 2003-32229

ALOYSIUS DUY-HUNG HOANG
AKA HOANG DUY HUNG, Plaintiff §
§
§
VS. §
§
§
ANH TAI NGUYEN, §
AKA NGUYEN TAI ANH, §
DBA TIENG NOI CU TRI §
     Defendant §

IN THE JUDICIAL DISTRICT COURT

151 JUDICIAL DISTRICT

HARRIS COUNTY, TEXAS

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, ALOYSIUS DUY-HUNG HOANG, aka HOANG DUY HUNG, hereinafter referred to as Plaintiff, and file this his ORIGINAL PETITION against ANH TAI NGUYEN, AKA NGUYEN TAI ANH, DBA a magazine by the name of TIENG NOI CU TRI (the Voice of the Voters), hereinafter referred to as Defendants, and for causes of action would respectfully show:

### I.
### PARTIES

Plaintiff Aloysius Duy-Hung Hoang is a resident of Houston, Harris County, Texas, and the acts/or practices complained have herein took place in Harris County, Texas.

Defendant ANH TAI NGUYEN, AKA NGUYEN TAI ANH, is an individual, a resident of Harris County Texas, dba a magazine by the name of TIENG NOI CU TRI (the Voice of the Voters), and Service of Process could be served to him at 9907 Berry Dr., Houston TX 77099.

### II.
### VENUE

Venue in this action is proper in Harris County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §15.002 (a)(1), (2), and (3) and 15.005 because Plaintiff resides in Harris County,

1

Certified Document Number: 9681896 - Page 1 of 5

40

Houston, Texas at the time of the accrual of the causes of action alleged herein. Further, the basis for venue in Harris County is that all or a substantial part of the events or omissions giving rise to these causes of action occurred in Harris County, Texas.

**III.**
**FACTS**

On or about May 5, 2003, edition #13, TIENG NOI CU TRI, (the Voice of the Voters) published in Vietnamese an article, pages 11 and 12, by the title of "Quan Am Hon, Va Mieng" by an anonymous writer by the name of "Ngu Trung." On page 12, the author wrote: *"Recently, Ms. Kim Nguyen, the President of the Vietnamese Community in Houston and the Vicinities, called a meeting to form a Committee Campaigning the City Councilors and the Mayor Lee Brown to pass a Resolution recognizing the Yellow Flag with Three Red Stripes (the Republic of Vietnam's flag) as the symbol of the Vietnamese Refugee Community. The Committee included many individuals such as Mrs. Kim Nix, Attorney Hoang Duy Hung, and young organizations such as VPAC, and political organization such as MTQGTNGPVN. The members of the Committee... One of the most important things the Committee informed all members was to keep the information confidential all the time during the campaign to prevent evildoers and the enemy from exploiting and destroying this plan.*

*...Hoang Duy Hung released the confidential information creating obstacles for all.*

*... Hoang Duy Hung misinformed, exaggerated for the merits of his own individual.*

*... However, nobody agrees with Attorney Hoang Duy Hung publicly released confidential news during the time of the campaign and intentionally exaggerated the facts. This activity is a lie, a misrepresentation to the public for building up personal credibility. The result, for some extend, has become a force preventing the success of the campaign for the Resolution honoring the Yellow Flag with Three Red Stripes."*

2

41

Certified Document Number: 9681896 - Page 2 of 5

The article did not stipulate specific facts for the allegation that Plaintiff Aloysius Duy-Hung Hoang "intentionally released confidential information," and/or "exaggerate the facts," and/or "a lie, a misrepresentation to the public for building up personal credibility."

In reality, Plaintiff Aloysius Duy-Hung Hoang has never released any confidential information to the public.

## IV. CAUSES OF ACTION

Plaintiff sues Defendant for Libel and Civil Conspiracy.

All conditions precedent to Plaintiff recovery for Libel have occurred. Defendant knew or should have known that this article is false, is a fabrication, and/or deforming fact, still, Defendant published it and/or Defendant conspired with the author in the distribution of such publication all over Harris County defaming Plaintiff in order to discredit and/or to give a false and negative impression on Plaintiff in front of the public, to ruin Plaintiff's political career as well as to damage Plaintiff's professional legal practice.

Defendant's conduct as described in this petition was committed knowingly and intentionally. Defendant was actually aware, at the time of the conduct, of the falsity, deception, and unfairness of the conduct about which Plaintiff complains. As a direct result of Defendant's knowing misconduct, Plaintiff suffered pecuniary damages, mental anguish, and lost of credibility to the public.

Defendant's actions constituting Libel and Civil Conspiracy was done with malice, as that term defined in Tex.Civ.Prac.&Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

Certified Document Number: 9681896 - Page 3 of 5

3

42

## VI.
## REQUEST FOR DISCLOSURE

Plaintiff requests that Defendant discloses all information and documents required under Rule 194, Texas Rules of Civil Procedure.

## VII.
## PRAYERS

WHEREFORE, Plaintiff respectfully requests that Defendant be cited to appear and answer, and that Plaintiff be granted judgment against the Defendant as follows:

(1) actual damages in excess of the minimum jurisdictional limits of the Court for their wrongful actions;

(2) reasonable attorney's fees together with all costs of court and expenses incurred by Plaintiff in the investigation and prosecution of this case;

(3) exemplary damages in a sum to be determined by the trier of fact;

(4) pre- and post-judgment interest at the rate allowed by law until paid; and

(4) such other and further relief, at law or in equity, to which Plaintiff may by this pleading or proper amendment thereto show itself justly entitled.

Respectfully submitted

ALOYSIUS DUY-HUNG HOANG& ASSOCIATES

Aloysius Duy-Hung Hoang, *pro se*
State Bar No. 24002295
1900 N. Loop West Suite 500
Houston, TX 77018
Telephone: 713/680-9922
Telecopier: 713/680-0804

Certified Document Number: 9681896 - Page 4 of 5

4

43

Certified Document Number:

COUNTY AUDITOR'S FORM/999
HARRIS COUNTY, TEXAS (REV /99)

OFFICIAL RECEIPT     1 NO 61516

# CHARLES BACARISSE DISTRICT CLERK

ACTION: CONSPIRACY          CASE: C-200332229     TRANS NO: 6620512     COURT: 157
STYLE PLT: HOANG, ALOYSIUS DUY-HUNG (AKA HOANG DUY HUNG)
DEF: NGUYEN, ANH TAI (AKA NGUYEN TAI ANH DBA A MAGAZINE

| FEE | DESCRIPTION | QTY | AMOUNT |
|-----|-------------|-----|--------|
| 103 | FILING NEW CASE | 1 | 45.00 |
| 121 | CITATION WITH 1 COPY | 1 | 8.00 |
| 195 | SECURITY SERVICE FEE | 1 | 5.00 |
| 199 | RECORD PRESERVATION | 1 | 5.00 |
| 350 | CONSTABLE | 1 | 50.00 |
| 450 | JUDICIAL FILING FEE | 1 | 40.00 |
| 452 | LEGAL SRVC FEE-CIVIL | 1 | 10.00 |
| 475 | LAW LIBRARY | 1 | 15.00 |
| 525 | STENO FEE | 1 | 15.00 |
| 601 | DISPUTE RESOLUTION F | 1 | 10.00 |
| 775 | APPELLANT JUDICIAL F | 1 | 5.00 |

PAYMENT 1          CHECK               1061                    208.00
PAYMENT 2
                                                         ------------
AMOUNT TENDERED:                                              208.00
TOTAL AMOUNT:                                                 208.00
AMOUNT APPLIED:                                               208.00

CHANGE:                                                          .00

RECEIVED   HOANG, ALOYSIUS DUY HUNG                       (24002295)
    OF     1900 N LOOP W STE500
           HOUSTON, TX 77018
TWO HUNDRED EIGHT DOLLARS AND 0/100******************************* DOLLARS
PAYMENT DATE: 06/10/2003     FILE DATE: 06/10/2003



ASSESSED BY: VAZQUEZ, ARGENTINA
VALIDATED 06/10/2003  BY: THOMPSON, MARY E

FILE COPY

44



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 24, 2014

Certified Document Number:        9681896 Total Pages:  5

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

45

CAUSE NO. 2003-32229

Dec 2, 2004

| | | |
|---|---|---|
| ALOYSIUS DUY-HUNG HOANG AKA HOANG DUY HUNG, **Plaintiff** | § § § | IN THE JUDICIAL DISTRICT COURT |
| VS. | § § § | 157th JUDICIAL DISTRICT |
| ANH TAI NGUYEN AKA NGUYEN TAI ANH, D/B/A TIENG NOI CU TRI **Defendant** | § § § § | HARRIS COUNTY, TEXAS |

## ORDER OF DISMISSAL WITH PREJUDICE AND ORDER TO SEAL THE RECORD

ON THIS DAY OF _____, 2004, after reviewing Plaintiff's Motion to Nonsuit With Prejudice, the Court

FOUND that Defendant ANH TAI NGUYEN, AKA NGUYEN TAI ANH, D/B/A TIENG NOI CU TRI (VOICE OF VOTERS) have entered an Agreement with Plaintiff whereby Defendant ANH TAI NGUYEN already issued a Letter of Explanation/Apology to Plaintiff;

FOUND that Plaintiff Aloysius Duy Hung Hoang no longer wish to pursue this case and has filed the Motion to Dismiss With Prejudice;

And for the above reasons, the Court

ADJUDGED AND ORDERED THAT THE MOTION IS GRANTED;
ADJUDGED AND ORDERED THAT the case to be DISMISSED WITH PREJUDICE.
ADJUDGED AND ORDERED THAT the case is to be SEALED.

SIGNED ON THIS THE ABOVE DATE.

**DEC 0 6 2004**

JUDGE PRESIDING

AGREED TO BOTH FORM AND SUBSTANCE:

_____
Aloysius Duy Hung Hoang
*Pro se*
1900 North Loop West #500
Houston TX 77018
Tel. 713-680-9922
Fax. 713-680-0804
SBA 2400-2295

Robert Pham
Attorney for Defendant
10260 Westheimer Suite 207
Houston TX 77042
Tel. 713-789-8010
Fax. 713-789-7750
SBA 0079-5590

Certified Document Number: 9259052 - Page 1 of 9

3

I, Anh Tai Nguyen, d/b/a Tieng Noi Cu Tri (voice of voters), because of misinformation and misunderstanding, hereby retract the articles written about Mr. Hoang Duy Hung that could be perceived for defamation in issues 13, 14, 15, and 16 of Tieng Noi Cu Tri. I am sorry they were printed and for the damages that might have been done to him.

_Anh Tai Nguyen_

11/17/04

**EXHIBIT A**

Certified Document Number: 9259052 - Page 2 of 9

Cause No. 2003-32229

| | | |
|---|---|---|
| ALOYSIUS DUY-HUNG HOANG, | § | IN THE JUDICIAL DISTRICT |
| Plaintiff | § | COURT |
| | § | |
| V. | § | |
| | § | 157th JUDICIAL DISTRICT |
| ANH TAI NGUYEN, AKA | § | |
| NGUYEN TAI ANH, DBA | § | |
| TIENG NOI CU TRI, | § | |
| Defendant | § | HARRIS COUNTY, TEXAS |

## CONFIDENTIAL MEMORANDUM

1. Mediation was held on November 17, 2004 between both parties by Mr. Gus J. Zgourides, Mediator.

2. Defendant, Anh Tai Nguyen, d/b/a Voice of the Voters agrees to issue a letter of explanation/apology to plaintiff. This letter will be treated as consideration for the settlement agreement.

3. Plaintiff agrees to file a motion to dismiss with prejudice.

4. Plaintiff agrees to send this letter to one (or two) Vietnamese magazine. In addition, plaintiff agrees NOT to send this letter to any radio station. Furthermore, plaintiff agrees NOT to write any article or giving any comments about this lawsuit in public.

5. Both parties have agreed that the settlement agreement which includes this confidential memorandum will be sealed by court order. However, the letter of explanation/apology will not be sealed.

Respectfully submitted,

Robert Pham
Texas Bar No. 00795590
10260 Westheimer, Suite 207
Houston, Texas 77042
Telephone: (713) 789-8010
Facsimile: (713) 789-7750

ATTORNEY FOR DEFENDANT
ANH TAI NGUYEN

Certified Document Number: 9259052 - Page 3 of 9

48

Aloysius Duy-Hung Hoang
Pro se
State Bar no. 24002295
1900 N. Loop West. Suite 500
Houston, Texas 77018
Telephone: 713 680-9922
Facsimile: 713 680-0804

Certified Document Number: 9259052 - Page 4 of 9

EXHIBIT C

CAUSE NO. 2003-32229

| | | |
|---|---|---|
| ALOYSIUS DUY-HUNG HOANG (A/K/A HOANG DUY HUNG) | § § § | IN THE 157TH JUDICIAL |
| VS. | § § | DISTRICT COURT |
| ANH TAI (A/K/A NGUY) | § § | OF HARRIS COUNTY, TEXAS |

SETTLEMENT AGREEMENT

The parties hereto agree that this dispute and all claims and controversies between them, asserted or assertable in this case against all parties named herein are hereby settled in accordance with the following terms of this Settlement Agreement.

1. The parties acknowledge that bona fide disputes and controversies exist between them, both as to liability and the amount thereof, if any, and by reason of such disputes and controversies, they desire to compromise and settle all claims and causes of action of any kind whatsoever which the parties have or may have arising out of the transaction or occurrence which is the subject of this dispute. It is further understood and agreed that this is a compromise of a disputed claim, and nothing contained herein shall be construed as an admission of liability by any party, all such liability being expressly denied.

2. Each signatory hereto warrants and represents:

    (a)    he or she has authority to bind the parties for whom that signatory acts.

    (b)    the claims, suits, rights and/or interests which are the subject matter hereto are owned by the party asserting same, have not been assigned, transferred or sold, and are free of any encumbrance.

3. The consideration to be given for this agreement in full and final settlement is as follows:

    (a)    ✓ (Check if applicable.) _DEFENDANT_____

will ~~pay~~ _issue a letter of apology to_____

_Plaintiff_____

~~the sum of $~~_____, within ____ days from the date hereof or at the time of court approval.

    (b)    ___(Check if applicable.)_____

Certified Document Number: 9259052 - Page 5 of 9

50

will pay _____
within _____ days or at the time of court approval, the total consideration of
$_____, partly in cash and partly in an annuity funded by or on
behalf of Defendant(s).

(c)     ___(Check if applicable.) The attached Exhibit(s) is/are an example of the contemplated annuity.

(d)     ___ (Check if applicable.)  The consideration to be given for this Agreement in full and final settlement is as follows:

_____
or

___ (Check if applicable.)  Other terms and conditions of this settlement are as follows:

See Attached Letter as
Consideration for this Agreement

This Agreement shall be sealed and
not open to the public, and the parties
shall Request the court to seal judgment, if
any, if if the court does not dismiss with
prejudice pursuant to (5) hereby Order dismissing
Case with prejudice

51

(e)    Costs are to be paid as follows (check which applies):

     ✓    The parties bear their own costs.

    ___    Defendant(s) will pay Plaintiff(s) Attorney's documented taxable costs including but not limited to Plaintiff's mediation fee.

    ___    Defendant(s) will pay Plaintiff(s) Attorney's documented taxable costs and Plaintiff's mediation fee up to a maximum amount of $_____.

(f)  ___    (Check if applicable.)Plaintiff(s) is/are solely responsible for any and all outstanding workers' compensation, hospital, medical, medicare, or other health care provider liens or bills, and will indemnify, defend and hold Defendant(s) harmless therefrom.

(g)  ___    (Check if applicable.)The terms and conditions of this settlement shall remain strictly confidential and be bound by a confidentiality agreement. Specifically, no party to this agreement shall disclose any element of the agreement to any person, group, organization, company, or any branch of the media (print or otherwise). Violation of this agreement will entitle the non-violating party to all remedies allowed by law, including but not limited to injunctive relief. Further, pursuit of available remedies shall entitle the non-violating party to attorneys fees connected with such pursuit.

4.    The parties agree to release, discharge, and forever hold the other and their respective insurers harmless from any and all claims, demands or suits, known or unknown, fixed or contingent, liquidated or unliquidated, whether or not asserted in the above case, as of this date, arising from or related to the events and transactions which are the subject matter of this case, including claims for attorney's fees, indemnification, and costs. This mutual release runs to the benefit of all attorneys, agents, employees, officers, parent corporations, subsidiary corporations, directors, shareholders, partners, heirs, assigns, successors in interest, and legal representatives of the parties hereto.

5.    ✓ (Check if applicable.) The parties will execute and file: Agreed Order dismissing all claims with prejudice and/or a Take-Nothing Judgment as to all claims and/or any other documents necessary to effectuate the terms of this agreement pursuant to law.

or

___(Check if applicable.) The parties will execute: A General Release and/or a Parent/Guardian Release for a Minor and/or any other documents necessary to effectuate the terms of this agreement pursuant to law.

6. Within __7__ days from the date hereof, counsel for __Defendant__ shall deliver the documents to be executed in connection with this settlement to counsel for the other parties hereto. The parties and their counsel agree to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested or required to implement the provisions and spirit of this Settlement Agreement. Notwithstanding such additional documents, the parties confirm that this is a written Settlement Agreement as contemplated by Section 154.071 of the Texas Civil Practice and Remedies Code, is a complete, valid and binding contract, is intended to be an enforceable agreement as contemplated by Rule 11, Texas Rules of Civil Procedure, and may be used as the basis for a motion for judgment, motion for summary judgment, or motion to enforce with each party waiving all rights to a jury trial.

7. **THIS SETTLEMENT AGREEMENT IS NOT SUBJECT TO REVOCATION.**

8. If one or more disputes arise with regard to the interpretation and/or performance of this agreement or any of its provisions, the parties agree to attempt resolution by phone conference with Gus J. Zgourides, the mediator who facilitated this settlement. If the parties cannot resolve their differences by phone conference(s) with the mediator, then each agrees to schedule one day of mediation with him as soon as possible to resolve the disputes and to share the costs of same equally. If a party refuses to mediate, then that party may not recover attorney's fees or costs in any litigation brought to construe or enforce this agreement, and the prevailing party or parties shall be entitled to recover reasonable attorney's fees and expenses, including the cost of the mediation.

9. This agreement is made and performable in __Harris__ County, Texas and shall be construed in accordance with the laws of the State of Texas.

10. By signing this Settlement Agreement, each signatory agrees and acknowledges that: The mediator, as scrivener, has provided a basic outline of the agreement to the parties and their counsel as a courtesy to facilitate the final resolution of this dispute, the parties and their counsel have thoroughly reviewed it and have where necessary, modified it to conform to the requirements of their agreement; Each signatory to the agreement has entered into it freely and without duress after having consulted with attorneys of their choice; Each party has been advised by the mediator that the mediator is not the attorney for any party and that each party should have this agreement reviewed by that party's attorney prior to executing it; Each signatory agrees to release, defend, indemnify and hold the mediator harmless from any and all claims, demands, or suits arising directly or indirectly from the mediation and drafting of this settlement agreement.

Certified Document Number: 9259052 - Page 8 of 9

Settlement Agreement
Page 5 of 5

SIGNED this ___17___ day of ___November___, 2004.

Plaintiff(s):

_____
Aloysius Duy Hung HOANG

_____
Attorney for Plaintiff(s)

_____
Attorney for Plaintiff(s)

Other Parties:

_____

_____

_____
Attorney for [                    ]

_____
Attorney for [                    ]

Defendant(s):

_____

_____
Robert Cham

_____
Attorney for Defendant(s)

_____
Attorney for Defendant(s)

Other Parties:

_____

_____

_____
Attorney for [                    ]

_____
Attorney for [                    ]

Certified Document Number: 9259052 - Page 9 of 9

54



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 24, 2014

Certified Document Number:        9259052 Total Pages:  9

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

CAUSE NO. _____

| | | |
|---|---|---|
| ALOYSIUS DUY-HUNG HOANG AKA HOANG DUY HUNG, Plaintiff | § § § | IN THE JUDICIAL DISTRICT COURT |
| VS. | § § | 151 JUDICIAL DISTRICT |
| TRINH QUANG PHAM, individual Defendant | § § § | HARRIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

**TO THE HONORABLE JUDGE OF THIS COURT:**

COME NOW, ALOYSIUS DUY-HUNG HOANG, aka HOANG DUY HUNG, as individual and as President of the Vietnamese People's Action Movement and as President of Georgia Chapter of the Vietnamese Writers Abroad Pen Centre, hereinafter referred to as Plaintiff, and file this his ORIGINAL PETITION against TRINH QUANG PHAM as individual and as Adjourned President of the Vietnamese Writers Abroad P.E.N. Centre, hereinafter referred to as Defendant, and for causes of action would respectfully show:

## I.
## PARTIES

Plaintiff Aloysius Duy-Hung Hoang, as individual and as President of the Vietnamese People's Action Movement and as President of Georgia Chapter of the Vietnamese Writers Abroad Pen Centre, is a resident of Houston, Harris County, Texas, and the acts/or practices complained have herein took place in Harris County, Texas as well as many other states in the United States and many other countries.

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1

56

Defendant TRINH QUANG PHAM is an individual and as Adjourned President of Vietnamese Writers Abroad P.E.N. Centre, and Service of Process could be served to him at 3637 Snell Avenue, San Jose CA 95136-1325.

Spc #252,

## II.
## VENUE

Venue in this action is proper in Harris County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §15.002 (a)(1), (2), and (3) and 15.005 because Plaintiff resides in Harris County, Houston, Texas at the time of the accrual of the causes of action alleged herein. Further, the basis for venue in Harris County is that all or a substantial part of the events or omissions giving rise to these causes of action occurred in Harris County, Texas. Defendant has been in Houston Harris County Texas and Defendant sent emails to individuals in Harris County Texas including to but not limited to members of Vietnamese Pen Writers Abroad P.E.N. Centre in the relevant matters.

## III.
## FACTS

**First,** Sometime in March 2003, Mr. Pham Quang Trinh was elected as President of the *Vietnamese Writers Abroad Pen Centre* with a margin of one vote for a two-year term. After his election, Mr. Pham Quang Trinh abused his position by using the letterhead *"International Pen – Vietnamese Writers Abroad Pen Centre"* to libel individuals and organizations. During that time, Plaintiff, as the President of Georgia Chapter and President of the Institution Committee of the Vietnamese Writers Abroad Pen Centre, has done his duty by publicly admonished Mr. Pham Quang Trinh for such abuses and libel. To avenge Plaintiff, on or about July 29, 2005, Defendant wrote a so-called *"Letter from the Heart"* with the letterhead *"International Pen – Vietnamese Writers Abroad Pen Centre"* and sent

2

Certified Document Number: 29770969 - Page 2 of 47

via email to egroups and individuals libeling Plaintiff of many things. **Attached is the "Letter From The Heart" as Exhibit A.**

In the Letter From The Heart, Defendant Pham Quang Trinh libeled Plaintiff the following:

1/ Defendant libeled Plaintiff to have secret dealings with the Vietnamese Communist Politbureau via a person named Hong Vinh. There is no person in the Vietnamese Communist Politbureau by the name of Hong Vinh. In fact, Hong Vinh is a dissident of the Communist Party and because of that, he was stripped off his power from the post as Chief-editor of the People's Daily News. Mr. Pham Quang Trinh relied his sources only on hearsay by a person named Pham Van Thanh in Paris, France. When confronted with such matter for a debate, Mr. Pham Van Thanh publicly announced that he would "withdraw his appearance" on web forums. Obviously it was a libel and because of such libel, Mr. Pham Van Thanh secluded himself to avoid abashment of the debate. Relying on such sources and knowing that it was a blunt libel, yet Mr. Pham Quang Trinh asserted that Plaintiff and other members of the Vietnamese People's Action Movement contacted the Vietnamese Communist Politbureau for "secret dealings." Mr. Pham Quang Trinh abused the letterhead to mislead the public into believing that International Pen and Vietnamese Writers Abroad Pen Centre have condemned Vietnamese People's Action Movement and Plaintiff as a communist sympathizer and/or a camouflage of the Vietnamese Communist Party abroad. In fact, other members of Board of Executives such as the Vice President Dao Duc Chuong and the General Secretary Dao Vinh Tuan did not approve such abuse of the letterhead.

2/ In the so-called Letter From The Heart, Defendant libeled Plaintiff that Plaintiff "entered" the Georgia Chapter in 2001 by Nguyen Huu Nghia & Nguyen Huong and later

Certified Document Number: 29770969 - Page 3 of 47

installed as the President of this Chapter. In fact, since 1998, Plaintiff has been a member of the Georgia Chapter. There has been proper and official election by Georgia Chapter's members whereby Plaintiff was elected as President, not by the "installment" of any person by the name of Nguyen Huong or Nguyen Huu Nghia.

**Second,** in the Sixth Plenum of the Vietnamese Writers Abroad Pen Centre held in Westminster California 2003, the Plenum assigned the responsibility to organize the Seventh Plenum to two chapters: Georgia Chapter and Texas Chapter (known as the U.S Southern District). Arbitrarily and without reasons, Mr. Pham Quang Trinh issued the August 12, 2005 Press Release falsely informed all people that Plaintiff "self-recognized as the Organizing Committee of the VII Plenum." Defendant went so far as to strip off the power of Plaintiff, Georgia Chapter, and U.S Southern District Chapter in the organization of the Seventh Plenum. **Attached is the Press Release as Exhibit B.** Defendant did not have the consent of other members in the Board of Executives such as the Vice President Dao Duc Chuong and Dao Vinh Tuan for this Press Release.

**Third,** on August 22, 2005, Mr. Pham Quang Trinh, abusing the letterhead of *"International Pen – Vietnamese Writers Abroad Pen Centre"*, with ambiguous reasons, expelled Plaintiff form Vietnamese Writers Abroad Pen Centre. **Attached is Exhibit C.** The Expulsion was adamantly opposed by the Vice President Dao Duc Chuong and Dao Vinh Tuan. Attached are the oppositions as Exhibit

**Fourth,** Mr. Pham Quang Trinh and his Treasurer Vu Quang Tran deposited the membership fees into their personal accounts and they do not provide a copy of the accountant to members. Attached is a copy of the deposit of membership fees into personal account as **Exhibit D.**

4

Certified Document Number: 29770969 - Page 5 of 47

**Fifth,** Mr. Pham Quang Trinh falsely made record and reports of the Board of Executives' meeting, number 13, 14, and 15 to libel individuals, especially to libel Plaintiff as "having secret dealing with the Vietnamese Communist Party Politbureau." **Attached are the reports 13, 14, and 15 as Exhibit E, Exhibit F, and exhibit G.** The General Secretary Dao Vinh Tuan certified that these reports are false. **Attached is the certification from the General Secretary Dao Vinh Tuan English Version as Exhibit H.** Additionally, the majority of members of the Vietnamese Writers Abroad Pen Centre opposed to the abuses of Mr. Pham Quang Trinh and demanded for his resignation. **Attached is the Resolution demanding Mr. Pham Quang Trinh to resign, English Version, as Exhibit I.** And later on, because Mr. Pham Quang Trinh has gone too far in his abuses and libel, the Standing Committee signed a Resolution to strip off the power of Adjourned President of Mr. Pham Quang Trinh. **Attached is the Resolution, English Version, as Exhibit J.**

## IV. CAUSES OF ACTION

Plaintiff sues Defendants for Breach of Fiduciary Duty, Fraud, Libel, and Embezzlement.

1/     **Breach of Fiduciary Duty:** Plaintiff sues Defendant for Breach of Fiduciary Duty because he abused his position as the President of Vietnamese Writers Abroad Pen Centre, without the consent and the approval of the Board of Executives, used the letterhead to express his personal points-of-view for his personal interest: On or about August 2004, he used the letterhead to personally attacked Mrs. Hoa Hoang Lan as "having relationship with Prof. Nguyen Chau" implying Hoa Hoang Lan is an adulterer. This is a violation of International

5

60

Pen's Charter and a violation of the By-Laws and Regulation of Vietnamese Writers Abroad Pen Centre. **Attached is Exhibit K.** As the President, his responsibility is to oversee the carrying out of the By-Laws and Regulations, not to personally attack other members who have different points of view. Again, he breached his fiduciary when he used the letterhead to attack Mr. Tran Cong Ham, his opponent in another ticket. As the President of the Department of Institution, Plaintiff voiced up such violation, Mr. Pham Quang Trinh again breached his fiduciary duty by using the letterhead to libel Plaintiff as in Exhibit A, to strip off Plaintiff's power to organize the VII Plenum as in Exhibit B, and to illegally expel Plaintiff as in Exhibit C.

All conditions precedent to Plaintiff recovery for Breach of Fiduciary Duty have occurred. As a direct result of Defendants' knowing misconduct, Plaintiff suffered pecuniary damages, mental anguish, and lost of credibility to the public.

Defendant's actions constituting Breach of Fiduciary Duty were done with malice, as that term defined in Tex.Civ.Prac.&Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

2/ **Fraud:** Plaintiff sues Defendant for Fraud because Defendant made up false record and reports of the Board of Executives' meeting as in Exhibits E, F, and G, and is certified be fraud by the General Secretary Dao Vinh Tuan in Exhibit H. The reports falsely depict the image of Plaintiff as a "secret dealer" with the Politbureau of the Vietnamese Communist Party, misleading members of the Vietnamese Writers Abroad Pen Centre and the public that the Board of Executives condemned the act/s of Plaintiff because Plaintiff is a communist and/or a communist sympathizer.

Certified Document Number: 29770969 - Page 6 of 47

All conditions precedent to Plaintiff recovery for Breach of Fraud have occurred. As a direct result of Defendants' knowing misconduct, Plaintiff suffered pecuniary damages, mental anguish, and lost of credibility to the public.

Defendant's actions constituting Fraud were done with malice, as that term defined in Tex.Civ.Prac.&Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

3/ **Libel**: Plaintiff sues Defendant for Libel when Defendant abused the Letterhead to affirm that Plaintiff became a member of Georgia Chapter and immediately became its President because of the installment of Nguyen Huong and Nguyen Huu Nghia in 2001. In fact, Plaintiff has been a member of this Chapter in 1998, properly and officially elected as President in 2000 and 2003.

Additionally, Plaintiff sues Defendant for Libel when Defendant abused the Letterhead to affirm that Plaintiff and the Vietnamese People's Action Movement had secret dealings with the Politbureau of the Vietnamese Communist Party via a person by the name of Hong Vinh. There is no person by the name of Hong Vinh in the Politbureau of the Vietnamese Communist Party. Hong Vinh was the Chief-editor of the People's Daily News, he was stripped off his post because of his opposition to the Party. Mr. Pham Quang Trinh abused the letterhead to mislead the public into believing that International Pen and Vietnamese Writers Abroad Pen Centre have condemned Vietnamese People's Action Movement and Plaintiff as a communist sympathizer and/or a camouflage of the Vietnamese Communist Party abroad.

All conditions precedent to Plaintiff recovery for Libel have occurred. Defendant knew or should have known that these articles are false, fabrications, and/or deforming facts, still,

7

Certified Document Number: 29770969 - Page 7 of 47

Defendant published and/or conspired with one another in the distribution of such publication all over the world as well as in Harris County continuously forming a chain of events defaming Plaintiff in order to discredit and/or to give a false and negative impression on Plaintiff in front of the public, to ruin Plaintiff's political career as well as to damage Plaintiff's professional legal practice.

Defendant's conduct as described in this petition was committed knowingly and intentionally. Defendant was actually aware, at the time of the conduct, of the falsity, deception, and unfairness of the conduct about which Plaintiff complains. As a direct result of Defendant's knowing misconduct, Plaintiff suffered pecuniary damages, mental anguish, and lost of credibility to the public.

Defendant's actions constituting Libel were done with malice, as that term defined in Tex.Civ.Prac.&Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

4/ **Embezzlement**: Plaintiff sues Defendant for Embezzlement because Defendant deposited the membership fees into personal accounts as in Exhibit D, and Defendant never provide an account of money received and what he spent for.

All conditions precedent to Plaintiff recovery for Embezzlement have occurred. Defendant's conduct as described in this petition was committed knowingly and intentionally. As a direct result of Defendants' knowing misconduct, as a member of Vietnamese Writers Abroad Pen Centre, Plaintiff suffered pecuniary damages.

Certified Document Number: 29770969 - Page 8 of 47

8

63

Defendants' actions constituting Embezzlement were done with malice, as that term defined in Tex.Civ.Prac.&Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

## V.
## APPLICATION FOR RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

WHEREFORE, premises considered, Plaintiff respectfully requests the Court to dispense with the issuance of a bond, and Plaintiff requests that Defendant be temporarily restrained immediately, without hearing, and after notice and hearing be temporarily enjoined, pending the further order of this Court, from:

1. Publicly announcing that Plaintiff has been expelled from Vietnamese Writers Abroad Pen Centre.

2. Stripping the power to organize the VII Plenum form Plaintiff, Georgia Chapter and U.S Southern District Chapter.

3. Delegating the power to organize the VII Plenum to other Chapter not selected by the VI Plenum.

Plaintiff requests Order for a Hearing on the Temporary Injunction and the Permanent Injunction to present Plaintiff's arguments.

## VI.
## REQUEST FOR DISCLOSURE

Plaintiff requests that Defendants disclose all information and documents required under Rule 194, Texas Rules of Civil Procedure.

9

Certified Document Number: 29770969 - Page 9 of 47

## VII.
## PRAYERS

WHEREFORE, Plaintiff respectfully requests that Defendants be cited to appear and answer, and that Plaintiff be granted judgment against the Defendants as follows:

(1)    actual damages in excess of the minimum jurisdictional limits of the Court for their wrongful actions;

(2)    reasonable attorney's fees together with all costs of court and expenses incurred by Plaintiffs in the investigation and prosecution of this case;

(3)    exemplary damages in a sum to be determined by the trier of fact;

(4)    pre- and post-judgment interest at the rate allowed by law until paid; and

(4)    such other and further relief, at law or in equity, to which Plaintiff may by this pleading or proper amendment thereto show itself justly entitled.

Respectfully submitted

HOANG & HOANG & ASSOCIATES

Hoang & Hoang & Associates
Aloysius Duy-Hung Hoang, *pro se*
State Bar No. 24002295
Michael A. Manness
SBA #1289-7000
1900 N. Loop West Suite 500
Houston, TX 77018
Telephone: 713/680-9922
Telecopier: 713/680-0804

Certified Document Number: 29770969 - Page 10 of 47

10

"Quang Tran Vu" <tranvu@st...obal.net>, "Anh Duy Thai"
<thaianhduy@yahoo.com>, "Bao Tran" <quocbao30@hotmail.com>,
"Cong Ham Tran" <macnhien2@yahoo.com>, "Thien Tuong Tran"
<thientuong@hotmail.com>, "Thy Van Tran"
<tranthyvan@yahoo.com>, "Ngo Tran Van" <tunguyeen@aol.com>,
"Yen Son" <yen_son68@yahoo.com>, "Lam Thuy Pham"
<lamthuyp@aol.com>, "Ngu Yen Pham"
<pham_ngu_yen@yahoo.com>, "Thien Ly Pham"
<vuchausa@yahoo.com>, "Minh Ngoc Nguyen" <sontungnn@aol.com>,
"Ngoc Anh Nguyen" <nguyen-a@sbcglobal.net>, "Nguyen Huong
Nguyen" <nguyenhuongttcanada@yahoo.com>, "Tam Xuan Nguyen"
<nguyentamxuan@yahoo.com>, "Tinh Ve Nguyen"
<dieutansj@yahoo.com>, **"Van Dien Nguyen"**
**<Anphong38@sbcglobal.net>**, "Van Khai Nguyen"
<khai_huong@yahoo.com>, "Van Thong Nguyen"
<Tvvtnguyen@yahoo.com>, "Viet Nam Nguyen" <vietduc@jps.net>,
"Viet Nu Nguyen" <vietnu99@aol.com>, "Xuan Vinh Nguyen"
<Vinhgiakiem@aol.com>, "An Nguyen" <tuphongca@yahoo.com>,
**"Buu Thoai Nguyen"** <thoaibuunguyen@yahoo.com>, "Dai Hien
Nguyen" <daihien@pentagonmutual.com>, "Dang Nguyen"
<Ngdang99@yahoo.com>, "Huu Nghia Nguyen"
<langvan@langvan.net>, "Khuyen Nguyen"
<thuyen_nhan@yahoo.com.au>, "Hoai Trinh Minh Duc"
<qnguyen4@aol.com>, "Van Chau Le" <lvtrangchau@yahoo.ca>,
"Van Thuy Hoang" <thuysonh@yahoo.com>, "Quang The Huynh"
<Huyqgthe@yahoo.com>, "Xuan Vinh GS Nguyen" <nxvinh@aol.com>,
"Quang Vinh Dao" <VinhFL422001@yahoo.com>, "Vinh Tuan Dao"
<vinhtuan@sbcglobal.net>, "Chuong Dao Duc"
<daochuong09@yahoo.com>, "Thu Nga Do" <dofamily@aol.com>,
"Hanh Nghi Bui" <DrBuiHN@aol.com>, ☐ "Xuan Vu Bui"
<tinh_nuoc@yahoo.com>

CC:

☐ "VIETNAMESE WRITERS
ABROAD P.E.N CENTRE"
<xuannien@yahoo.com>,
VBVNHN@yahoogroups.com
☐ "Trinh Pham"
<xuannien@yahoo.com> ☐View
Contact Details

From:

Learn more

Date:

Fri, 29 Jul 2005 00:34:50 -0700 (PDT)

Subject:

☐[VBVNHN] TAM THU CHU TICH
BCH VBVNHN

# International PEN – Vietnamese Writers Abroad PEN Centre
## Văn Bút Việt Nam Hải Ngoại
P.O.Box 51387 San Jose, CA 95151- 5387 USA

Certified Document Number: 29770969 - Page 11 of 47

66

## Tâm Thư của Chủ tịch Ban Chấp Hành Văn Bút Việt Nam Hải Ngoại gửi Ban Chấp Hành các Trung Tâm cùng toàn thể quý vị Hội viên

Thưa quý Văn hữu,

Trong những ngày qua, liên quan đến tình trạng khủng hoảng của Trung Tâm Nam Hoa Kỳ, nhiều emails xuất hiện trên các Diễn Đàn nói về sự im lặng của Chủ tịch VBVNHN. Có người cho là điều khó hiểu. Có người cho là Chủ tịch bênh che cho người nọ, phe kia. Lại có người cho là chúng tôi nhu nhược. Lại cũng có tin đồn rỉ tai là một Viên Linh, một Đặng Văn Nhâm mới xuất hiện, muốn ngồi lì không chịu ra văn thư triệu tập Đại Hội, không chịu thừa nhận TT do ông Nguyễn Mạnh An Dân làm Chủ tịch và trao cho Trung Tâm này quyền tổ chức Đại Hội VBVNHN kỳ VII. Chúng tôi còn nhận được nhiều emails yêu cầu mau thừa nhận TTNHK do ông NMAD làm CT, nếu không sẽ bị truất phế. Họ còn nhắn hãy tổ chức Đại Hội kỳ7 cho lẹ để được ra đi trong danh dự. Nhiều, nhiều lắm...

Điều Lệ VBVNHN không quy định thời gian nào BCHTU phải ra Văn thư triệp tập Đại Hội. Điều 15 chỉ nói rằng "Ba (3) tháng trước ngày Đại Hội Đồng nhóm họp, ban tổ chức có nhiệm vụ gửi thư thông báo về ngày giờ, địa điểm cùng chương trình Đại Hội Đồng." Điều 20 quy định: "Liên danh ứng cử phải nạp đơn cho Ban Chấp Hành sáu (6) tháng trước ngày họp Đại Hội Đồng. Ban Chấp Hành có nhiệm vụ công bố cho các trung tâm thành viên sau một (1) tháng kể từ ngày hết hạn nộp đơn." Xét như vậy thì BCH có thể ra Văn thư triệu tập Đại Hội trước 7 tháng để các Liên danh có thời hạn một tháng để nạp đơn. Hoặc BCH ra Thông Cáo về thời hạn nộp đơn trước 8 tháng để Liên danh ứng cử có thời gian rộng hơn. Còn văn thư triệu tập thì có thể ra sau đó, miễn là có đủ thời gian cho Trung Tâm nhận trách nhiệm tổ chức gửi thư mời theo điều 15 Điều Lệ. Trước đây, các Liên danh tự động đọc Điều Lệ và gửi đơn ứng cử đến Ban Chấp Hành chờ có phải chờ đến khi BCH đương nhiệm ra văn thư triệu tập Đại Hội đâu.

Ngày 12-07-.2005, BCHTU đã ra Thông Báo cho các Liên danh nộp đơn. Nay cũng vẫn là tháng 7, vậy các Liên danh có thời gian hai tháng rưỡi để chuẩn bị. Việc gửi thư thông báo ngày giờ, địa điểm Đại Hội có thể vào khoảng tháng 11 hay tháng 12, nghĩa là còn những 4 tháng nữa. Vậy mà họ cứ gây ồn lên rằng BCH chưa chịu tổ chức. Trước đây, thời các BCH tiền nhiệm, làm việc ít, chẳng họp hành, chẳng lập Biên Bản chi cả sao họ không lên tiếng mà chỉ nhắm BCH đương nhiệm chúng tôi hiện nay? Họ muốn gì đây? Chúng tôi đã gián tiếp báo động về ý đồ của họ qua một số văn thư trong sự tế nhị kín đáo để họ tự hiểu và chấm dứt âm mưu đó. Nhưng họ không chịu nghe, không đọc kỹ Điều Lệ Nội Quy và Quyết Định của Đại Hội Đồng VBVNHN kỳ VI, vẫn tiếp tục dùng emails mạ lị, phỉ báng, xuyên tạc việc làm của BCH.

Cho nên hôm nay chúng tôi buộc lòng phải nói rõ hết mọi âm mưu và ý đồ của họ cho quý Văn hữu biết. Đây là việc chẳng đặng đừng, có làm buồn lòng quý Văn hữu thì xin bỏ qua. Nhưng trước hết, chúng tôi xin chân thành cám ơn tất cả những Văn hữu Đại Biểu trong ĐHĐ VBVNHN kỳ VI tháng 3.2003 đã tín hiệm dành phiếu cho Liên danh Nhà Việt Nam nhờ đó, tôi được vinh dự làm Chủ tịch VBVNHN để phục vụ tổ chức. Trong số những vị đó, có những vị từ lâu vẫn coi tôi là bạn, nhưng nay có thể đã không còn coi tôi như thế nữa. Tôi không bao giờ quên ơn họ. Chỉ có điều là ơn và việc làm cho tổ chức không thể lẫn lộn. Nhớ ơn không có nghĩa là phải làm theo ý của họ hoặc không làm theo ý họ là vô ơn. Vậy tôi xin bắt đầu.

**Từ chuyện khủng hoảng bên Tổng Hội Thủ Đức**

67

Đầu tháng Giêng 2004, Ông Diệu Tần Nguyễn Tinh Vệ và cá nhân tôi Phạm Quang Trình, đại diện BCH VBVNHN bay qua Houston để nói chuyện về sinh hoạt Văn Bút với đồng bào địa phương đồng thời lên tiếng hỗ trợ việc làm của ông Nguyễn Hữu Luyện trong vụ kiện WJC. Trước khi lên đường, tôi có nói chuyện với ông bà Nguyễn Hữu Nghĩa và Nguyên Hương bên Canada qua diện thoại viễn liên. Vì biết tôi quen ĐT Phạm Bá Hoa, Chủ tịch Hội Đồng Chỉ Đạo Tổng Hội CSVSQ Thủ Đức từ khi ông làm Tỉnh Trưởng Cần Thơ và nhiều anh em bên đó, ông NHN có nói với tôi trong chỗ thân tình: "Ông sang đó, nhờ BỐC tôi với họ..." Tôi "Ừ" cho qua nhưng trong lòng hết sức ngạc nhiên về sự đường đột của ông NHN có lẽ ngay trước mặt bà NH. Lúc đó, ông NHN là thành viên trong Hội Đồng Giám Sát của Tổng Hội Thủ Đức. Ý ông Nghĩa muốn tôi để cao và giới thiệu để ông được Đại Hội bên Úc châu cử vào chức vụ quan trọng của Ban Chấp Hành Tổng Hội. Tôi nghĩ không biết có dịp nói chuyện nhiều với ĐT. Phạm Bá Hoa hay không nhưng việc "BỐC" hay giới thiệu thì cũng để từ từ đã.

Đùng một cái mấy tháng sau, ông Nguyễn Hữu Nghĩa công khai sửa văn ông NBT trên Diễn Đàn khiến ông NBT hết sức bực mình. Người ta nói "Văn mình, vợ người", ông Nghĩa là người thông minh tại sao không biết điều đó. Phải chi ông Nghĩa bốc Phone gọi ông Thoại một tiếng: "Anh Thoại ơi, tôi xin để nghị anh sửa đoạn văn ...như vậy, như vậy... có được không?" Có lẽ ông Thoại sẽ biết ơn ông Nghĩa và coi ông Nghĩa là Bạn, là Cố Vấn không chừng. May mà tôi chưa BỐC ông Nghĩa với ông Thoại, nếu không thì lúc đó, tôi sẽ dở khóc dở cười! Từ đó ông NHN bị mất điểm và quay sang thù ông NBT. Cái nguyên nhân hết sức tầm thường lan sang những cái lớn hơn, đi đến Đại Hội Thủ Đức tại Louisiana, trong đó ông Nghĩa quyết tâm "hạ bệ" ông NBT cho bằng được. Tôi quen cả hai bên, can gián cả hai bên nhưng vô ích vì cả hai đều chủ quan. Ông Nghĩa nhờ tôi giới thiệu một số Tướng Lãnh nhưng tôi trả lời: "Tôi không quen nhiều. Tôi quen biết tướng Nguyễn Khắc Bình gốc Thủ Đức nhưng ông Tướng mắc bận bên Tập Thể Chiến Sĩ, chắc không đi được." Tôi cũng can ông Nghĩa vụ đối luận với ông Hải Triều: "Chẳng đi tới đâu. Coi chừng lỗ vốn đấy". Nhưng ông Nghĩa không nghe, còn nói: "Nhất định làm một lần dứt khoát cho xong". Mà có xong đâu, vì nhờ vụ đối luận mà Hải Triều dồn ông NHN vào cái thế phải thú nhận "Nguyễn Chí Vịnh, Tổng Giám Đốc Tổng Cục 2 (Phản gián) của CSVN" là "anh em cùng cha khác mẹ". (Cả hai đều là con tướng Việt Cộng Nguyễn Chí Thanh).

Chuyện Tổng Hội Thủ Đức thật đáng buồn. Nhưng buồn hơn nữa vì nó lan sang Đại Hội Văn Bút Việt Nam Hải Ngoại kỳ VII dự định được tổ chức tại Houston vào tháng 3.2005, trong đó ông NHN và bà NH quyết liệt "hạ" NBT cho bằng được.

## Đến chuyện khủng hoảng Đại Hội Văn Bút Việt Nam Hải Ngoại kỳ VII

Đại Hội VBVNHN kỳ VII theo quyết định của Đại Hội Đồng kỳ VI tại Westminster 22-23.03.2003 được trao cho TT Nam Hoa Kỳ và TT Georgia xin tiếp tay. Ngặt một nỗi, Chủ tịch TT Nam Hoa Kỳ lại là VH Nguyễn Bửu Thoại theo lệ thường sẽ là Tưởng Ban Tổ Chức Đại Hội cho nên chuyện tranh chấp giữa hai ông NBTvà NHN tiếp tục bùng nổ. Ông NHN và bà NH khiếu nại với Ủy Ban Thường Trực ĐHĐ VBVNHN. Thư Ký UBTT là VH Trần Quốc Bảo không giải quyết mà chuyển hồ sơ qua BCHTU. Chúng tôi đã giải quyết xong bằng cách thuyết phục VH Nguyễn Bửu Thoại để cử một VH khác làm Trường Ban Tổ Chức. Kết quả, TTNHK đã đề cử VH Phạm Ngũ Yên trong phiên họp ngày 20.01.2005 và yêu cầu triển hạn Đại Hội thêm 2 tháng, thay vì tháng 3 sẽ là tháng 5.2005. BCHTU đã nhận được báo cáo cùng với Thông Cáo Chung của 2 VH Nguyễn Bửu Thoại và VH Phạm Ngũ Yên. Ngày 22.01.2005, VH Nguyễn Hữu Nghĩa gọi điện thoại hỏi tôi về kết quả. Ông nói: "tôi rất đồng ý, nhưng không biết bà NH ra sao". Tôi yên tâm vì thấy hai đơn khiếu nại của hai người đều có mục tiêu giống nhau là không muốn ông NBT làm Trường Ban Tổ Chức.

68

Certified Document Number 29770969 - Page 13 of 47

Tôi báo lại kết quả ...ào VH Trần Quốc Bảo. Qua điện thoại, VH Trần Quốc Bảo hé cho biết là bà NH chưa bằng lòng. Quả nhiên là hai ngày sau, Phạm Ngũ Yên tự động lên tiếng yêu cầu dời Đại Hội lại 6 tháng. Nhiều VH phản đối PNY, trong đó có Thu Nga và NBT. Họ nói: "Nếu không làm được thì trả lại cho TT chở không thể tự tiện làm như vậy." PNY tuyên bố là TBTC đứng độc lập, không liên hệ gì với TT. Thế rồi Yên Sơn, Hoàng Duy Hùng phụ họa... Chuyện tổ chức Đại Hội bị cản trở. Trong tình trạng đó, BCHTU chúng tôi đề nghị với UBTT lấy ý kiến của các Trung Tâm chấp thuận lưu nhiệm một năm cho BCH và chúng tôi sẽ không ra ứng cử. Nói cách khác, nhiệm kỳ BCH sẽ là 3 năm theo Điều Lệ đã được tu chính qua Đại Hội VI. UBTT lấy được đa số ý kiến thuận. Như vậy nhiệm kỳ của BCH đương nhiệm sẽ chấm dứt vào cuối tháng 3 - 2006.

## Khủng hoảng tại Trung Tâm Nam Hoa Kỳ

Tưởng rằng mọi chuyện đã xong. Nào ngờ, TTNHK lâm vào khủng hoảng. VH Nguyễn Bửu Thoại triệu tập Đại Hội Trung Tâm để giải quyết chuyện nội bộ vào đầu thang 3-2005. Thay vì Đại Hội được diễn ra theo chương trình nghị sự được quy định theo Điều Lệ, hai ông Phạm Ngũ Yên và Yên Sơn viết Dự thảo bất tín nhiệm ông NBT. VH /NBT phản đối cho là đi sai Điều lệ. Đại Hội thất bại. Phe PNY và YS với VH Túy Hà là TTK ký Văn thư triệu tập Đại Hội thực hiện quyết nghị bất tín nhiệm VH Nguyễn Bửu Thoại. VH NBT cho là bất hợp lệ vì ông vẫn là Chủ tịch phải là người ký văn thư. VH Nguyễn Bửu Thoại liền đăng ký danh xưng Trung Tâm đã hết thời hạn và triệu tập Đại Hội khác. Đầu tháng 4, phe PNY và YS họp Đại Hội truất phế VH Nguyễn Bửu Thoại khỏi chức vụ Chủ tịch, đưa VH Huỳnh Quang Thế lên thay đồng thời khai trừ luôn hai VH Nguyễn Bửu Thoại và VH Nguyễn Văn Diễn ra khỏi TTNHK.

BCHTU nhân được báo cáo của hai phía nhưng BCH không thừa nhận một bên nào. Đặc biệt, báo cáo của BCH Huỳnh Quang Thế lại do Yên Sơn gửi qua BBT Làng Văn và Egroups VHBNHN rồi từ đó ông NHN mới chuyển qua. Chỉ có các TT Canada, Miền Đông và Georgia lên tiếng chào mừng. Vì BCHTU không lên tiếng nên PNY va YS liên tục gửi emails mỉa mai, mạ lị, xuyên tạc việc làm của BCH, một hành động vi phạm Điều Lệ, Nội Quy và Hiến Chương VBQT. BCH gửi thư trả lời PNY và YS nhưng hai ông này vẫn ngoan cố không chịu rút lại. Các TT khác không lên tiếng cũng có lý do của họ. Điều đó dễ hiểu. Ông Nguyễn Hữu Nghĩa trong một email mách nước: "Ông để cho Đào Vĩnh Tuấn gửi email chúc mừng". BCHTU không đồng ý.
Đó là bề mặt. Còn bề sau, thì vào khoảng đầu tháng Giêng, chính ông NHN đã gọi điện thoại báo cho CT Phạm Quang Trình biết "NBT sẽ bị hạ bệ và Thu Nga lên thay. Có thể tổ chức Đại Hội tại Dallas". Sau đó ít tuần, VH Nguyễn Hữu Nghĩa lại gọi điện thoại và nói: "Nếu NBT ra khỏi Văn Bút thì ông đừng có can".

Trong thời gian tranh chấp NHN - NH và NBT, bà Nguyễn Hương đã liên tục gọi điện thoại hoặc gửi emails yêu cầu các Trung Tâm lên tiếng bênh vực bà đồng thời xúi giục các Hội viên TTNHK truất phế NBT. Nhiều người đã nói cho chúng tôi biết. Chính bà Nguyễn Hương nói với tôi và một v/h khác về NBT: "…. Chó điên thì đánh cho chết luôn." Cho nên xuyên qua các diễn tiến, mọi người đều thấy rõ chuyện tranh chấp giữa hai ông NBT và NHN đã đưa THTD và TT/NHK đến khủng hoảng.

## Chuyện Ứng Cử Ban Chấp Hành VBVNHN và những màn đạo diễn

Từ năm 2001 đến khoảng giữa năm 2002, ai cũng nghĩ rằng Nguyễn Đức An sẽ là Chủ tịch Văn Bút VN Hải Ngoại. Nhưng bởi vì ông ra quá đa nghi nên hễ có ai lên tiếng một chút là ông ta "uýnh". Ông ta "uýnh" không trừ ai, từ bà MDHT đến NHN - NH đến Sơn Tùng, đến VQT... Ông ta

Certified Document Number 29770969 - Page 14 of 47

69

đã tự đâm vào chân mình, ...ến mọi người thành kẻ thù và rời xa ...g ta. Cho đến tháng Bảy 2002, tôi vẫn chưa có ý định ứng cử. Nhưng qua tháng 8.2002, khi thấy NĐA làm quá thì trong một phiên họp của TT TB Hoa Kỳ, VH Đào Đức Chương thấy không có ai ra ứng cử ngoài NĐA liền đề nghị tôi lập liên danh ra ứng cử. Ít nhất là có hai Liên danh để cho cuộc bầu phiếu dễ dàng lựa chọn và để NĐA bớt quậy. Được tín nhiệm thì làm việc, mà có thua thì cũng không sao cả.

Khi lập Liên danh, tôi có hỏi thăm thì được biết ông Sơn Tùng không ra. Bà NH hỏi tôi: "Ông ra ứng cử à?" Tôi trả lời: "Ông Sơn Tùng không ra thì tôi ra." Tôi lại hỏi tiếp: "Tại sao ông ST không ra?" Bà NH trả lời: "Ông ra sợ chúng nó chửi." Lúc đó, ông Nghĩa còn giữ lời cam kết với NĐA là sẽ bỏ cho NĐA một phiếu. Tôi nghĩ rằng hai ông bà NHN & NH không muốn tôi ra. Và đúng như thế, một tuần sau, khi tôi đã nộp đơn, bà Nguyên Hương gọi điện thoại bảo tôi: "Ông Sơn Tùng lại muốn ra đấy." Ý bà nói ông Sơn Tùng ra thì tôi nên rút lui đi. Tôi trả lời: "Tôi đã chờ và đã nhường anh em. Không ai ra thì tôi mới ra. Bây giờ tôi đã nạp đơn rồi thì không bao giờ tôi rút lui cả. Dù tôi thua tôi cũng không rút lui." Thấy thái độ cương quyết của tôi, bà NH nói: "Ừ, ông Sơn Tùng là cái thứ thập thò, chẳng làm được cái gì cả. Mọi chuyện mình phải sắp xếp..."

Sau khi NĐA quậy quá, tôi âm thầm vận động và thăm dò được biết mình có cơ thắng ngay vòng đầu. Điều tôi lo ngại là TT Nam Hoa Kỳ với Đào Vĩnh Tuấn. Tôi nhắc VH Tuấn hằng tuần: "Ông là Đệ Nhất Phó Chủ tịch, ông ráng giữ một phiếu cho Liên danh." VH Tuấn trả lời: "Yên tâm đi. Bảo đảm." Đến ngày bầu phiếu, tôi vẫn tin tưởng. Nhưng một biến cố nhỏ như một điểm báo là sau khi hai Liên danh trình bày chương trình hành động thì NĐA đi xuống cuối phòng ngồi cạnh bà HHL. Tôi vẫn ngồi yên vị thế củ, mải xếp giấy tờ và kéo sợi dây diện qua một bên thì cái bảng hiệu Liên danh Nhà Việt Nam bị rớt xuống. Tôi nhặt vội để lên. Đào Vĩnh Tuấn đến hỏi tôi: "Mình là Ứng viên thì có được bỏ phiếu không?" Tôi hỏi: "Thế TT Nam Hoa Kỳ quyết định ai cầm phiếu Đại biểu?" Tuấn trả lời: "Phạm Ngũ Yên, Yên Sơn và Thu Nga." Tôi hỏi lại Tuấn: "Ông không cầm sao?" Tuấn bảo KHÔNG! Tôi nghĩ bụng "nguy to" rồi. Nhưng may ra.." Quả nhiên vòng đầu ngang phiếu. Vòng hai Liên danh Nhà Việt Nam thắng 1 phiếu. Rõ ràng là miếng ăn đến miệng mà không biết giữ. Về nhà trao đổi với nhau, ông Đào Đức Chương bảo: "Thằng Tuấn nó ngu quá, khờ khạo quá để chúng nó lừa!". (Tuấn là em bà con với ông Đào Đức Chương).

Ông Đào Đức Chương chỉ là Ứng viên dự khuyết, không ngờ ông bị đôn lên. Vì Ông Đào Đức Chương là Chủ tịch TT Tây Bắc Hoa Kỳ nên nếu đắc cử thì ông sẽ nghĩ để ông Thúy Sơn là Phó lên thay. Tháng 9.2002 có buổi Trung Tâm họp tại nhà VH Thúy Sơn, tôi lại sớm nói chuyện ra ứng cử BCH /VBVNHN. Nghe tôi nói ra ứng cử, ông Thúy Sơn bảo: "Sao nghe nói Văn Bút đã giao cho Hoàng Duy Hùng rồi." Tôi hỏi: "Ai nói?" Ông Thúy Sơn trả lời: "Hùng nó bảo bà Nghĩa em dâu tôi rằng bà Minh Đức Hoài Trinh đã giao Văn Bút cho nó rồi." Tôi hết sức ngạc nhiên nhưng chỉ trả lời: "Làm gì có chuyện đó." Bà Hồ Thị Nghĩa có tên là Christine Hồ là vợ ông Hoàng Văn Thụy, em dâu VH Thúy Sơn (tên thật là Hoàng Văn Thúy) là người tham gia Phong Trào Quốc Dân Hành Động của Hoàng Duy Hùng.

## Ban Chấp Hành và các chức vụ

Đắc cử xong thì phải lo sắp xếp công việc. Tôi mời ông Từ Nguyên làm Chủ tịch Ủy Ban Định Chế, Ông không nhận nên tôi mời Hoàng Duy Hùng và HDH nhận ngay. Sau này hỏi lý do VH Từ Nguyên thì anh trả lời "Phải cho tôi biết trước chớ." Các chức vụ khác tôi có nhờ ông Nghĩa giới thiệu mấy người phụ trách các Ủy Ban. Tôi mời bà NH vào chức vụ Chủ tịch Ủy Ban Nhà Văn Nữ. Bà không nhận. Về đến San Jose, tôi được VH Đào Đức Chương cho biết họ nói "Anh mời lơi." trong khi tôi mời thật. Ý ông Chương cho biết là phải "năn nỉ" họ thì họ mới nhận. À ra thế. Tôi thì cứ nói thẳng chớ đâu biết họ ca bài "Em chả". Nhưng tôi nghĩ nhận thì cứ nhận chứ bắt tôi xuống nước năn nỉ thì tôi không có can đảm làm chuyện đó. Nhưng không phải vậy, mà chính là cái chức

Certified Document Number 29770969 - Page 15 of 47

70

vụ Cố Vấn. Tôi sơ ý đã n... GS Nguyễn Xuân Vinh, GS Lê Hữu ..ục, GS Doãn Quốc Sỹ, VH Sơn Tùng và VH Trần Thy Vân mà không mời ông Nguyễn Hữu Nghĩa vì Nội Quy ấn định chỉ có 5 người mà thôi và tôi cũng không ngờ ông NHN lại muốn chức vụ đó. Bây giờ qua ông Đào Đức Chương tôi bị mang tiếng là người "vô ơn" vì không mời ông Nghĩa làm Cố Vấn. Bởi đó mà ông bà NH và NHN "rất buồn" đã định lên San Jose với chúng tôi nhưng rồi bỏ luôn chỉ vì tôi sơ ý không mời ông làm Cố Vấn. Vì VH Đào Đức Chương nói lại nhiều lần về chức Cố Vấn cho ông Nghĩa nên làm tôi cũng buồn. Cho đến khi NĐA lên tiếng đòi làm Chủ tịch, tố cáo bầu gian và tố cáo VH Nguyễn Hữu Nghĩa làm Thái Thượng Hoàng Văn Bút thì lúc đó chúng tôi mời nghĩ là may. May mà chúng tôi không mời ông NHN làm Cố Vấn. Có lần tôi cho ông Sơn Tùng biết chuyện đó. Ông ST trả lời: "Tính Nghĩa vẫn vậy."

BCH chúng tôi làm việc đều đặn vì ở gần nhau. Cho đến nay, chúng tôi đã họp 15 lần cả thảy, có Biên Bản hẳn hoi gửi đến các TT. Có người khen và có người chê. Không phải khoe nhưng xin hỏi có BCH tiền nhiệm nào làm việc như chúng tôi không, từ chuyện nội bộ đến chuyện đối ngoại đi họp Đại Hội Văn Bút Quốc Tế. Vậy mà vẫn bị chê, phải chăng là chúng tôi đã không làm theo ý họ muốn? Trong chuyện lộn xộn của TTNHK, ông Đào Đức Chương vì thân với ông bà NHN & NH nên muốn bênh vực phe Huỳnh Quang Thế chống lại phe NBT và bây giờ ông Đào Đức Chương tích cực ủng hộ Nguyễn Mạnh An Dân vì NMAD là bạn của ông Chương, lại viết cho Làng Văn của ông Nghĩa dù chúng tôi đã nói cho ông Chương biết rằng NMAD không còn là Hội viên Văn Bút từ năm 2003. VH Đào Đức Chương cũng là cây viết cho Làng Văn và được ông Nghĩa hứa in cho mấy cuốn sách. Chuyện in sách của Làng Văn thì ông Diệu Tần là người có kinh nghiệm, không biết ông Đào Đức Chương có hỏi ông Diệu Tần về kinh nnghiệm đó không? Còn VH Đào Vĩnh Tuấn thì ở xa, là Tổng Thư Ký BCH. Chúng tôi mong ông làm phận vụ TTK để báo cáo cho BCH nhưng vẫn chưa nhận được báo cáo từ hai năm nay.

## Tái ứng cử Ban Chấp Hành VBVNHN nhiệm kỳ 2005- 2008

BCH chúng tôi làm việc nghiêm túc, có kế hoạch chương trình. Và tôi nghĩ hai năm cũng là đủ. Thâm tâm tôi vẫn nghĩ nếu ông Sơn Tùng hay vị nào khác ra ứng cử thì tôi sẽ không ra nữa. Nếu tôi không nhớ lầm thì đã có lần tôi nói chuyện với ông Sơn Tùng. Tôi chỉ muốn có sự tự nguyện, độc lập, chở không bị áp đặt. Vậy mà vào tháng 8 năm 2004, ông Nguyễn Hữu Nghĩa gửi email cho tôi (còn lưu giữ trong Computer) đại cương nói: "Ông Trình nên hy sinh đứng làm Phó cho ông Sơn Tùng". Tôi không trả lời. Ít ngày sau ông Sơn Tùng gửi email giải thích: "Đó là ý kiến của Nghĩa, chở tôi không có ý định ra ứng cử." Tôi nghĩ bụng ai ra thì cứ ra. Tại sao cứ phải áp đặt? Mà nếu ông ST tự động ra thì tôi nhường ngay. Có chi cần đến bàn tay của ông Nguyễn Hữu Nghĩa dàn dựng sắp xếp. Qua hành động đó, người ta nhớ đến những lời chỉ trích của nhiều người về ông NHN là Thái Thượng Hoàng Văn Bút thì có oan chăng?

Theo Điều Lệ, muốn ứng cử thì phải nộp đơn cho Ban Chấp Hành. BCH chỉ nhận đơn, công bố rồi trao lại cho Đại Hội Đồng chở không có quyền xét đơn hay quyết định gì cả. Điều Lệ ghi rõ ràng như thế, vậy mà Hoàng Duy Hùng lên tiếng phản đối, nói rằng "Phải nộp đơn cho Ủy Ban Bầu Cử". BCH đã đưa Điều Lệ ra nói mà HDH cứ cãi chày cãi cối cho đến khi ông Sơn Tùng và NHN nói HDH mới im. Rồi hình như vào khoảng tháng 9.2004, ông Nguyễn Hữu Nghĩa và bà Nguyễn Hương có chuyện sang Michigan và HDH cũng đến đó. Tôi gọi điện thoại nói ông Nghĩa: "Ông sang đó, có gặp HDH nói giùm nó đọc lại Điều Lệ Nội Quy và đừng có gây lôi thôi gì cả. Luật sư gì mà phát ngôn kỳ quá." Ông Nghĩa trả lời: "Ông quăng cho nó cục xương thì nó bết gẩm gừ." Ý ông Nghĩa nói tôi nên dành cho HDH một chức vụ gì đó. Khổ nỗi làm Chủ tịch Ủy Ban Định Chế mà HDH chẳng làm gì cả. Đã vậy còn đòi đưa ra Hội Đồng Kỷ Luật người nọ, đòi truất phế người kia. Bây giờ biết cho HDH chức vụ gì đây? Tôi bảo ông Nghĩa "Thì ông nói nó phải nghe." Ông Nghĩa

71

Certified Document Number 29770969 - Page 16 of 47

trả lời: "Tôi nói nó cũng c.ung nghe đâu. Tôi cũng không biết ng. nó phản tôi đây. Để tôi bảo bà Nguyên Hương nói thì nó nghe. Bả là chị nuôi của nó mà."

Bà NH có nói và HDH đã im một thời gian rồi lại lên tiếng phê bình chỉ trích. Sau có người cho tôi biết HDH cấu kết với Yên Sơn muốn lập Liên danh ra ứng cử. HDH ngại Liên danh Nhà Việt Nam do tôi làm Thụ Ủy nên ùm cách đánh cho chúng tôi giạt phải rút lui để HDH nhẩy ra. Nhớ lại những gì ông Thúy Sơn nói về HDH tôi mới nghĩ rằng HDH đang lăm le chức vụ Chủ tịch BCH VBVNHN. Nhiều người nhận định HDH háu danh nhưng không phải là người biết tổ chức nên thấy VBVNHN là tổ chức có tiếng nên nhờ NHN và NH đưa vô.

Chuyện lộn xộn tại Trung Tâm Nam Hoa Kỳ khiến BCH chúng tôi xin lưu nhiệm một năm và cá nhân tôi không ứng cử. Một Văn hữu nói: "Họ đã thành công là ngăn cản không cho ông ngồi thêm một nhiệm kỳ nữa." Tôi cười: "Ba năm đủ quá rồi. Còn muốn chi nữa?" Tôi mong muốn hoàn tất nhiệm vụ để các anh em khác ra thay mình mà lo chuyện Văn Bút. Nhưng quả thật là tôi hơi bi quan cho tương lai Văn Bút vì tranh chức vụ thì ồn ào, nhưng mời đi họp Văn Bút Quốc Tế thì chẳng ai chịu đi. Thực tế, BCH nào vừa làm quen được với sinh hoạt VBQT thì đã hết nhiệm kỳ. Người khác lên thay phải học lại từ bước đầu. Trong khi đó, các Trung Tâm bạn trên thế giới họ là những người đi họp thường xuyên nên rất quen nhau, nhờ nhau thật dễ dàng. Còn mình, chán thật!

## Chuyện Hoàng Duy Hùng và Văn Bút Georgia

Hoàng Duy Hùng gia nhập Văn Bút từ năm 2001 do ông bà Nguyễn Hữu Nghĩa & Nguyễn Hương đưa vào. Vô Văn Bút là được làm "Chủ tịch viễn cư" Trung Tâm Georgia ngay, khỏi cần tập sự gì cả nên bị rất nhiều người chỉ trích. Chính HDH cũng cảm thấy mắc cỡ nên trong Biên Bản Đại Hội Kỳ VI đã viết như sau: "VH Hoàng Duy Hùng đề nghị thành viên viễn cư không nên làm chủ tịch trung tâm". Vậy mà HDH làm "Chủ tịch viễn cư" hai nhiệm kỳ kể cũng lạ! Tôi hỏi VH Nguyễn Xuân Vinh, TTK Trung Tâm Georgia thì NXV trả lời: "Trước khi chết, anh Vũ Công có nói với em là để cho HDH làm Chủ tịch nhiệm kỳ nữa." Còn Nguyễn Đại Hiển cho tôi biết: "Khi họp bầu Ban Chấp Hành ở nhà hàng, anh Hùng nói là theo Điều Lệ Văn Bút muốn làm Chủ tịch phải có hai tác phẩm. Ở đây không ai có tác phẩm nên phải bầu cho ảnh." Tôi hỏi Hiển "HDH có đưa cho coi Điều Lệ TT không?" Hiển trả lời không.

Từ hơn hai năm nay, BCH không hề nhận được báo cáo của TT Georgia vì HDH không làm gì cả. Sau này BCHTU mới biết qua lời của VH Phó Chủ tịch Nguyễn Đại Hiển: "Anh Nguyễn Xuân Vinh về Việt Nam làm gì cho anh HDH, bị Công an Việt Cộng bắt giam. Công an đòi tiền chuộc mạng. Anh Vinh phải nằm chờ lâu quá nên rất buồn anh Hùng. Sau anh Hùng phải chạy tiền về nộp cho Công an nó mới thả anh Vinh ra. Nghe anh Vinh nói trước khi thả, Công an cho anh coi băng Video quay ở Mỹ và chúng nó bảo anh Vinh "Đấy anh coi, cái gì ở Mỹ chúng tôi cũng biết hết. Anh về hợp tác với chúng tôi. Anh được quyền chửi tất cả trừ ra không được chửi Bác Hồ và đồng chí Tổng Bí Thư."

Ngày 19.5.2005 vừa qua, Phạm Văn Thành từ Pháp tiết lộ tin động trời trên Diễn Đàn Nước Việt rằng Hoàng Duy Hùng "đi đêm" với Cộng Sản Việt Nam bằng cách viết thư cho Hồng Vinh, Ủy Viên Trung Ương Đảng Cộng Sản Việt Nam ký tên là Nguyễn Tam Phong. Nguyên do là có một người trung gian ở Dallas, Hồng Vinh nhờ gửi thiệp mời HDH về Việt Nam. HDH chối quanh kiểu lạy ông tôi ở bụi này rằng: "Nguyễn Tam Phong là bí danh của Paul Thanh. Còn bí danh của tôi là Nguyễn Nhất Phong. Tôi không viết thư cho Hồng Vinh. Nhưng tôi ủy quyền cho Nguyễn Tam Phong thay mặt Phong Trào Quốc Dân Hành Động trả lời từ chối... chờ tôi không viết.." À thì ra thế. HDH không viết nhưng nhờ anh vợ là Nguyễn Tam Phong tức Paul Thanh thay mặt Phong Trào trả lời giùm. Phạm Văn Thành liền tung nguyên văn bản copy lá thư lên mạng khiến HDH chới với lại chối quanh rằng thì là tôi chống Cộng sản, tôi viết công khai chờ có đi đêm đâu. Đúng là mồm mép

72

thẩy cãi! Nhưng Phạm Và... Thành nói đó là thư của HDH viết và ...t cứ ai đọc văn HDH cũng biết đó là văn phong của HDH thông thường sau cùng thư với hai chữ "Trọng bút".

Nếu thật sự HDH không "đi đêm" với Việt Cộng thì tại sao lại phải nhờ Nguyễn Tam Phong trả lời với nội dung muốn gặp đại diện Việt Cộng ở Hoa Kỳ làm gì? Có ai bắt buộc HDH phải trả lời chúng đâu? Và người trung gian ở Dallas đó là ai? Cộng sản nằm vùng hay tay sai của chúng? Cho nên có người nói HDH là thứ "chính trị hoạt đầu, cơ hội" nhưng lại "vừa đấm vừa run". Trước đây có lần trao đổi với VH Trần Quốc Bảo, Chủ tịch TT Miền Đông, Văn hữu đã nhận xét "HDH là một tên nguy hiểm. Nguyễn Hữu Nghĩa là một người nhiều mưu mô thủ đoạn vượt xa Nguyễn Bửu Thoại".

Câu hỏi cần đặt ra là Văn Bút Việt Nam Hải Ngoại là một tổ chức của người Việt Quốc Gia chống Cộng sản độc tài, vậy sự hiện diện của HDH, kẻ lén lút đi đêm với Việt Cộng có lý do chính đáng không? Ông Nguyễn Hữu Nghĩa và bà Nguyên Hương là những người đưa HDH vào Văn Bút nghĩ sao? Chính sự im lặng của ông bà mới là điều khó hiểu. Nhiều người lên tiếng tố cáo ông Nghĩa nọ kia, và ông đã phản bác lại, nhưng sao ông không lên tiếng về trường hợp Hoàng Duy Hùng? Nếu HDH làm Chủ tịch VBVNHN mà lại "đi đêm" với Việt Cộng thì sao đây?

## Ủy Ban Thường Trực Đại Hội Đồng VBVNHN làm gì?

Ủy Ban Thường Trực Đại Hội Đồng Văn Bút Việt Nam Hải Ngoại là một cơ chế mới do quyết định của Đại Hội Đồng VBVNHN Kỳ VI tháng 3.2003, chưa có trong Điều Lệ VBVNHN, nguyên văn như sau:

"Hai Trung Tâm Âu châu và Canada trình bày dự thảo thành lập Ủy Ban Thường Trực Đại Hội Đồng. Đa số biểu quyết thành lập Ủy Ban này gồm có các Chủ tịch của các Trung Tâm, chỉ hoạt động khi có tranh chấp."

Hoàng Duy Hùng, Thư ký Đại Hội đã viết thiếu mấy chữ "tranh chấp giữa **các Trung Tâm**". Đa số các Đại Biểu đi họp Đại Hội kỳ VI đều nhớ rõ như vậy.

UBTT đã làm việc vụ Nguyễn Đức An. BCH xin ý kiến hậu thuẫn của UBTT và BCH đã ký quyết định thu hồi tư cách Hội viên của NĐA đồng thời thông báo cho VBQT. Quyết định khai trừ là quyết định của Ban Chấp Hành VBVNHN.

Đầu năm nay UBTT lại có việc giải quyết là sự tranh chấp giữa VH Nguyễn Hữu Nghĩa & Nguyên Hương thuộc TT Canada và VH Nguyễn Bửu Thoại (TT Nam Hoa Kỳ). Thư Ký UBTT là VH Trần Quốc Bảo thụ lý nhưng chuyển hồ sơ qua BCH giải quyết giùm như đã nói trên. Vấn đề sau đó là chuyện lưu nhiệm một năm cũng do Ban Chấp Hành đương nhiệm đề nghị UBTT trong hoàn cảnh đặc biệt xin ý kiến của các Trung Tâm.

Vấn đề nêu ra mới đây là qua một email của VH Nguyên Hương lại gán cho UBTT quá nhiều thẩm quyền vượt xa cả quyết định của Đại Hồng Đồng Văn Bút Việt Nam Hải Ngoại. Bà NH còn gọi điện thoại cho một số Chủ tịch TT nói rằng UBTT còn trên cả BCH? Bà căn cứ vào đâu mà nói như thế? Bà còn viết những điều mà Biên Bản Đại Hội không hề ghi như nói về Trưởng Tiểu ban Bầu Cử, một chức vụ do BTC Đại Hội đặt ra. Việc liên lạc với các Trung Tâm để tổ chức Đại Hội là phận vụ của BCH vậy mà bà NH nói là của UBTT. Rồi từ đó bà xúi người nọ người kia. Trong thời gian BCH chúng tôi tham dự Đại Hội VBQT tại Slovenia, VH Trần Quốc Bảo ra Văn thư lấy ý kiến về việc TT Nam Hoa Kỳ đứng ra tổ chức Đại Hội kỳ VII. Không hiểu Văn hữu căn cứ vào văn bản nào, điều nào trong Điều Lệ Nội Quy cho phép vị Thư Ký UBTT làm chuyện đó để áp đặt BCH phải tuân thủ?

Từ tháng 7.2005, VH Thái Anh Duy lên làm Thư Ký UBTT. VH Thái Anh Duy gọi điện thoại cho tôi và nói phải tuân theo ý kiến mà Thư Ký UBTT Trần Quốc Bảo đã thông báo? Tôi hỏi lại VH Thái Anh Duy là VH căn cứ vào đâu mà nói như vậy? VH Thái Anh Duy nói phải coi UHTT như là

73

Certified Document Number 29770969 – Page 18 of 47

một thứ Quốc Hội? Làm [...] có chuyện đó. Điều Lệ nào cho phép [...] làm như vậy? VH Thái Anh Duy cho biết "họ" muốn áp dụng điều 22 Điều Lệ để họp Đại Hội. "Họ" là ai đây? Có phải là bà Nguyễn Hương và mấy người của bà không? Tôi được bà NH cho biết chính ông Thái Anh Duy nói với bà rằng ông ta bỏ phiếu cho tôi (Phạm Quang Trình), còn VH Trần Thy Vân bỏ phiếu cho Nguyễn Đức An. Điều này sai hoàn toàn. Tôi biết chắc rằng VH Trần Thy Vân bỏ phiếu cho Phạm Quang Trình còn VH Thái Anh Duy bỏ phiếu cho Nguyễn Đức An. Vậy mà bây giờ ông Thái Anh Duy nói ngược lại thì có dụng ý gì? Tôi chỉ biết rằng lập luận của ông Thái Anh Duy về UBTT giống y lập luận của bà Nguyễn Hương và do đó tự hỏi ông Thái Anh Duy có đọc Biên Bản Đại Hội kỳ VI và Điều Lệ VBVNHN không? Hay ông đã bị bà NH "thuyết phục"? Tôi cũng biết chắc chắn rằng những gì ông Thái Anh Duy nói về VH Trần Thy Vân với chúng tôi trước ngày ông ra ứng cử Chủ tịch Trung Tâm Nam Cali là không đúng sự thật.

## Trở lại chuyện khủng hoảng của Trung Tâm Nam Hoa Kỳ và Ủy Ban Thường Trực

Mấy hôm nay tôi nhận một số emails và những tin tức dồn dập như một thứ áp lực hết sức nặng nề buộc tôi phải lên tiếng thừa nhận Ban Chấp Hành TT Nam Hoa Kỳ do ông Nguyễn Mạnh An Dân mới được bầu làm Chủ tịch. Nếu làm đúng theo họ thì sẽ được ra đi trong danh dự. Còn không lên tiếng thừa nhận thì "đảo chính" có thể xảy ra cho BCHTU cũng như mấy TT địa phương không theo họ. Trước hết họ sẽ áp dụng điều 22 Điều Lệ để tổ chức Đại Hội Bất Thường để truất phế BCH. Nguyên văn điều 22 như sau: "Trường hợp hết nhiệm kỳ mà Ban Chấp Hành không triệu tập Đại Hội Đồng, với đa số quá bán, các Trung Tâm có thể liên lạc với nhau để đề cử một Trung Tâm tổ chức Đại Hội Đồng, định ngày họp cũng như hoàn tất các thủ tục thông thường để triệu tập Đại Hội Đồng".

Ban Chấp Hành đương nhiệm được các Trung Tâm đồng ý cho "lưu nhiệm một năm" do tôi làm Chủ tịch thì đến hết tháng 3.2006 mới mãn nhiệm. Lúc đó, nếu BCH không ra văn thư triệu tập Đại Hội thì các Trung Tâm mới có quyền thi hành điều 22. Cho nên bây giờ nếu phe nhóm nào âm mưu vận động áp dụng Điều 22 là họ lạm quyền và sai lầm trầm trọng và BCH chúng tôi sẽ quyết liệt phản ứng. Hiện nay, BCH dự trù sẽ ra văn thư triệp tập Đại Hội VBVHN Kỳ VII vào tháng 8.2005, trong đó có việc ấn định Trung Tâm nào đứng lo việc tổ chức. Theo Quyết định của Đại Hội kỳ VI thì Trung Tâm Nam Hoa Kỳ và TT Georgia đảm nhiệm. Nhưng thực tế là phe nhóm Phạm Ngũ Yên và Yên Sơn đã phá hỏng Đại Hội dự trù vào tháng 3 và triển hạn đến tháng 5.2005. Hơn thế nữa qua việc họ truất phế ông Nguyễn Bửu Thoại và đưa ông Huỳnh Quang Thế lên thay, không được BCHTU chào mừng nên hai ông PNY, YS và một Hội viên đội tên Gà Con Houston liên tục viết emails mạ lị, phỉ báng và xuyên tạc việc làm của Ban Chấp Hành VBVNHN. Đấy là một vi phạm trắng trợn điều 4 Hiến Chương VBQT. Chúng tôi đã yêu cầu hai ông PNY và YS phải rút lại, nhưng họ vẫn chưa đáp ứng. Nếu họ ngoan cố thì BCH buộc lòng phải áp dụng điều 3 khoản D Điều Lệ VBQT đối với họ.

Trước tình trạng lộn xộn của TTNHK, BCH có nêu ý kiến là để TT khác nhận lãnh việc tổ chức thì hay hơn. Và nếu không có TT nào nhận thì BCHTU sẽ đứng ra tổ chức tại San Jose vì chúng tôi không ứng cử và cũng không có cảnh người "vừa ôm banh lại vừa làm trọng tài". Chính ông Nguyễn Hữu Nghĩa gọi điện thoại cho tôi sáng ngày 22.05.2005 cũng nói "Không thể tổ chức tại Houston vì thằng cha Thoại sẽ phá". Nhưng bà NH thì cứ muốn TT/NHK đứng ra tổ chức. HDH cũng muốn đứng ra tổ chức tại Houston. Hai phe biết nhận phe nào? BCHTU đã khuyến cáo đôi bên ngồi lại với nhau nhưng vẫn chưa được. Phía VH Huỳnh Quang Thế lại bầu ông Nguyễn Mạnh An Dân làm chủ tịch, nhưng ông NMAD không còn là Hội viênVăn Bút từ ba năm nay. Bản danh sách Hội viên của VH Nguyễn Văn Thông, Thủ quỹ BCH tiền nhiệm chuyển qua năm 2003 và báo

74

cáo Danh sách Hội viên ứng niên liễm cho VBQT tháng 11.200. không có tên Nguyễn Mạnh An Dân. Có ý kiến đề nghị BCH tạm ngưng liên lạc với TT/NHK để đôi bên dàn xếp với nhau dựa trên Điều Lệ hẳn hoi, nếu không sẽ chuyển nội vụ ra Đại Hội Đồng kỳ VII để nơi đây quyết định mà biện pháp nặng nhất là tạm thời cho ngủ (Dormant). Vì không lý do gì vì sự lộn xộn của một TT lại có thể làm ngưng trệ sinh hoạt của cả tổ chức VBVNHN.

Quyết định tổ chức Đại Hội là một quyết định hành chánh, không làm được ở chỗ này thì làm ở chỗ khác. Ngay VBQT đã có lần quyết định tổ chức Đại Hội tại Macedonia nhưng vì nơi đây xẩy ra chiến tranh nên VBQT phải đưa về London tổ chức. VBVNHN cũng vậy, TTNHK lộn xộn thì đưa qua TT khác tổ chức. Nhưng vấn đề không đơn giản như vậy vì TTNHK đã trở thành nơi tranh chấp mà khởi sự từ hai ông Nguyễn Hữu Nghĩa và Nguyễn Bửu Thoại. Ông Nguyễn Hữu Nghĩa và bà Nguyễn Hương muốn TTNHK do Nguyễn Mạnh An Dân đứng ra tổ chức để phe này được hợp thức hóa và là cái tát đập vào mặt ông Nguyễn Bửu Thoại. Tất nhiên ông Nguyễn Bửu Thoại cho rằng phe kia đi sai Điều Lệ và ông vẫn là Chủ tịch vì khi được bầu hồi tháng 7.2004, BCHTU và nhiều TT đã gửi lời chúc mừng.

BCH/ TTNHK do ông Nguyễn Mạnh An Dân làm CT chỉ được ba (3) TT Canada (Nguyễn Hương), TT Miền Đông (Trần Quốc Bảo) và TT Georgia (HDH) chúc mừng. Còn 8 TT khác và BCHTU không có lời chào mừng như thường lệ. Chính vì thế mà có âm mưu muốn xúi giục và mua chuộc một số Hội viên thuộc các TT bằng chức vụ mà họ hứa hẹn trong Ban Chấp Hành VBVNHN tương lai khiến một hai Trung Tâm đang muốn lâm vào cảnh chia rẽ như TT Nam Hoa Kỳ.

## Lại chuyện ra Ứng cử vào Ban Chấp Hành VBVNHN

Ngày 12 - 07 - 2005, BCH đã ra Thông Cáo về việc nạp đơn ứng cử BCH VBVNHN nhiệm kỳ 2006- 2009. BCH căn cứ vào điều 20 Điều Lệ là các Liên danh phải nạp đơn ứng cử cho BCH sáu (6) tháng trước ngày Đại Hội Đồng nhóm họp để các Liên danh có đủ thời gian. Còn văn thư triệu tập Đại Hội thì Điều Lệ không nhắc đến. BCH chỉ căn cứ vào Điều 15 cần ít nhất ba (3) tháng trước để Ban Tổ Chức Đại Hội gửi thư thông báo. BCH dự trù sẽ công bố văn thư triệu tập Đại Hội trong tháng 8, nếu lúc đó có một TT đứng ra nhận lãnh thì hay nhất. Bằng không BCH sẽ đề nghị các TT để BCH đứng ra tổ chức.

Trong việc chuẩn bị ứng cử, tuần qua, tôi nhận được điện thoại của VH Sơn Tùng báo cho biết là ông sẽ ra ứng cử. Lý do như ông ST nói là "Anh không ra thì tôi sẽ ra vì xem ra cũng chẳng còn ai". Tôi trả lời: "Thì anh ra đi." Nhưng cũng khoảng thời gian tuần qua, ông Nguyễn Hữu Nghĩa cũng gọi điện thoại cho Vũ Quang Trân, nói rằng: "... Để nghị Trân tiếp tục giữ chức vụ Chủ tịch Ủy Ban các Nhà Văn bị Cầm Tù trong Ban Chấp Hành mới. Sẽ thảo một Quyết Nghị để Đại Hội Đồng cho Trân làm vai trò này vĩnh viễn..." Tôi nghe Vũ Quang Trân nói lại đại cương là như thế.

Tôi suy nghĩ thấy có cái gì là lạ. Lại bàn tay của ông Nghĩa dính vào! Ông bà Nguyễn Hữu Nghĩa và Nguyễn Hương có phải là người dàn dựng sắp xếp cho ông Sơn Tùng ra ứng cử kỳ này không? Ông Nguyễn Hữu Nghĩa lấy thẩm quyền gì mà "tiền chế" chức vụ cho Vũ Quang Trân? Có phải là một mưu mô dụ dỗ hay cầm chân Vũ Quang Trân vì biết Trân rành rẽ chuyện Đại Hội VBQT, nói được cả tiếng Anh và tiếng Pháp trôi chảy. Nếu trong việc ra ứng cửa BCH của ông Sơn Tùng lại có bàn tay nhào nặn của ông bà NHN & NH như một sự trả ơn (vì mấy năm trước, ông Sơn Tùng đã từng viết bài hết sức khen bà Nguyễn Hương trên báo Thế Giới Ngày Nay ở Witchita, Oklahoma như những vị nữ lưu của thời đại) thì coi chừng nguy cho ông Sơn Tùng! Ai cũng biết ông bà NHN & NH không dừng tại đó mà còn đi xa hơn. Họ không ra nhưng cứ thích "nằm đầu" người ra. Với BCH hiện nay, ông bà NHN và NH không lung lạc nổi vì chúng tôi luôn giữ vị thế độc lập. Nhưng với ông Sơn Tùng thì vì sự liên hệ và cả nể liệu ông có thoát khỏi sự lung lạc và thao túng của ông bà Nguyễn Hữu Nghĩa & Nguyễn Hương không?

Certified Document Number 29770969 – Page 20 of 47

75

BCH đã ra Thông Cáo ngày 12.07.2005 về việc nộp đơn ứng cử vào Ban Chấp Hành VBVNHN. Các Hội viên có thời hạn kể từ ngày ra Thông Cáo này đến hết ngày 24.09.2005, nghĩa là hơn hai tháng. Hy vọng có nhiều Văn hữu dấn thân.

### Đôi Lời Tâm Tình cuối cùng về chuyện Văn Bút

Qua những dòng tâm tình nói trên, tôi xin kết thúc bằng mấy lời đơn sơ như sau: Một Ban Chấp Hành VBVNHN chỉ có thể làm việc hữu hiệu nếu biết làm việc và chăm chỉ làm việc. Hơn nữa BCH đó phải dám đương đầu với những mưu toan phá hoại, giữ được tư thế độc lập, không lệ thuộc phe nhóm nào cả. Nhìn lại quãng thời gian qua, chúng tôi thấy có quá nhiều việc phải làm mà chưa làm được vì phải lo đối phó với những tranh chấp cá nhân phe nhóm. Chống Cộng thì ít mà chống nhau thì nhiều. Sáng tác thì ít mà viết emails để chỉ trích nhau thì nhiều. Toàn là những hiện tượng tiêu cực, thoái hóa.

Trước tình trạng hiện nay, âm mưu tháo túng, phá hoại vẫn chưa chấm dứt được. Thật là điều đáng buồn. Qua những tiếp xúc với các Trung Tâm và Văn hữu, chúng tôi thấy khối đa số thầm lặng rất hiểu biết, nhưng lại ngại ngùng khi phải lên tiếng về những bất công cho nên chỉ cần vài tên phá hoại, tối ngày ngồi viết emails với những tên giả khác nhau khiến cho người ta có cảm tưởng rằng phe nhóm này rất đông, rất nguy hiểm, kỳ thực chỉ có vài người thôi.
Tôi bị cái gọi là "phe đa số" hù dọa sẽ thi hành điều 22 Điều Lệ để làm một cuộc "đảo chánh" BCHTU, mà coi đi coi lại cũng chỉ có vài người! Cứ coi cái việc "chúc mừng BCH TT NHK" thì đủ biết ai là phe đa số. Cho nên tôi nói với họ rằng "Đừng hù dọa tôi. Tôi không sợ khủng bố đâu. Tôi cũng không sợ mỉa mai, nói xấu tôi đâu. Tôi không nổi tiếng nên càng chửi tôi thì tôi càng nổi tiếng đấy."

Riêng với ông bà Nguyên Hữu Nghĩa & Nguyên Hương, tôi cám ơn ông và Đại biểu TT Canada đã dành phiếu cho Liên danh Nhà Việt Nam. Ơn đó tôi không bao giờ quên. Nhưng trong hoàn cảnh lộn xộn hiện nay, qua những điều tôi biết, tôi xin phép được thưa với ông bà rằng: "Ông bà đa đoan nhiều chuyện quá. Rất nhiều Hội viên Văn Bút, trong đó có mấy vị trong BCH các TT nói với tôi: "Hình như ông Nghĩa vô chỗ nào là có lộn xộn ở chỗ đó." Hầu như ai cũng nói ông bà đã đi quá xa. Xin dừng lại. Hãy để yên cho BCHTU và các Trung Tâm làm việc. Thử nghĩ lại coi: Bây giờ ông bà còn bao nhiêu bạn bè, người thân? Ông Trà Lũ hiền lành đã phải "Good Bye" mà ông bà chưa hiểu sao? Xin lỗi bà Nguyên Hương, bà nói nhiều mà chẳng tha ai. Ôn hòa như ông Từ Nguyên mà bà còn phê bình là: "Cái ông Từ Nguyên.... đối với bạn thì... mà đối với người... thì nhũn như con chi chi!!!" Tôi có thể là người bạn cuối cùng, buồn bực nhưng không thù hận". Xin bỏ chuyện ngoài và hãy lo cho TT Canada đi. BCH đã nhận được báo cáo của ông Nghĩa gửi đầu tuần. Xin cám ơn. Nhưng dù chưa nhận được thì BCH chúng tôi cũng đã biết phần nào sinh hoạt của TT Canada rồi. Cứ coi cái "Check" niên liễm mà ông Nghĩa gửi cho BCH thì chúng tôi cũng biết TT Canada sinh hoạt như thế nào. Chả thế mà một Hội viên TT Canada nói với tôi: "Từ ngày vợ chồng NHN & NH nắm BCH thì......" còn rõ hơn nữa.

San Jose ngày 28.07.2005
Phạm Quang Trình
Chủ tịch BCH /VBVNHN

Certified Document Number: 29770969 - Page 21 of 47

76



Date:     Mon. 15 Aug 2005 23:21:27 -0700 (PDT)

From:     "Trinh Pham" <xuannien@yahoo.com>     View Contact Details

                                                                Learn more

Subject:  Thong Cao Bao chi cua Ban Chap Hanh VBVNHN

To:       VBVNHN@yahoogroups.com. "Quang Tran Vu" <tranvu@sbcglobal.net>, "Bao Tran"
          <quocbao30@hotmail.com>,     "Cong Ham Tran" <macnhien2@yahoo.com>, "Thien Tuong
          Tran" <thientuong@hotmail.com>,     "Thy Van Tran" <tranthyvan@yahoo.com>. "Ngo Tran Van"
          <tunguyen@aol.com>.     "Thien Ly Pham" <vuchausa@yahoo.com>.     "An Nguyen"
          <tuphongca@yahoo.com>,     "Buu Thoai Nguyen" <thoaibuunguyen@yahoo.com>, : "Dang
          Nguyen" <Ngdang99@yahoo.com>, "Huu Nghia Nguyen" <langvan@langvan.net>.     "Khuyen
          Nguyen" <thuyen_nhan@yahoo.com.au>. "Minh Ngoc Nguyen" <sontungnn@aol.com>,
          "Nguyen Huong Nguyen" <nguyenhuongttcanada@yahoo.com>, "Phuoc Dang Nguyen"
          <dangnp@sbcglobal.net>.     "Tinh Ve Nguyen" <dieutansj@yahoo.com>. "Van Dien Nguyen"
          <Anphong38@sbcglobal.net>. "Viet Nam Nguyen" <vietduc@jps.net>. "Xuan Vinh Nguyen"
          <Vinhgiakiem@aol.com>,     "Van Chau Le" <lvtrangchau@yahoo.ca>.     "Van Thuy Hoang"
          <thuysonh@yahoo.com>,     "Quang The Huynh" <Huyqgthe@yahoo.com>, "Xuan Vinh GS
          Nguyen" <nxvinh@aol.com>. : "Quang Vinh Dao" <VinhFL422001@yahoo.com>, "Vinh Tuan
          Dao" <vinhtuan@sbcglobal.net>.     "Chuong Dao Duc" <daochuong09@yahoo.com>, "Thu Nga
          Do" <dofamily@aol.com>, "Hung Do & Ai Khanh Do Xuan" <dlbmt@earthlink.net>, "Hanh Nghi
          Bui" <DrBuiHN@aol.com>,     "Xuan Vu Bui" <tinh_nuoc@yahoo.com>

CC:       "VIETNAMESE WRITERS ABROAD P.E.N CENTRE" <xuannien@yahoo.com>.
          VBVNHN@yahoogroups.com. SGHN_9@yahoogroups.com. Vuicuoi@yahoogroups.com

# International PEN – Vietnamese Writers Abroad PEN Centre
## Văn Bút Việt Nam Hải Ngoại
P.O.Box 51387 San Jose, CA 95151- 5387  USA
Tel/Fax: (408) 226 - 4990  Email: xuannien@yahoo.com

# Thông Cáo Báo Chí
### Về Đại Hội Văn Bút Việt Nam Hải Ngoại kỳ VII

Ngày 12 tháng 08 năm 2005, hai ông Nguyễn Mạnh An Dân và Hoàng Duy Hùng tự nhận là TM. Ban Tổ Chức Đại Hội VBVNHN kỳ VII đã gửi một Thư Thông Báo về việc tổ chức Đại Hội VBVNHN kỳ VII. Tuy mang danh nghĩa là Thư Thông Báo, nhưng nội dung lại mang tính chất của một Văn Thư Triệu Tập Đại Hội của Ban Chấp Hành VBVNHN (Trung Ương). Sự việc này đã tạo ra ngộ nhận và gây hoang mang trong dư luận, nhất là trước nguy cơ chia rẽ phá hoại Cộng đồng, mà khởi đầu bằng việc chia hai Tổng Hội Cựu Sinh Viên Sĩ Quan Thủ Đức và nay đến Văn Bút Việt Nam Hải Ngoại cho nên Ban Chấp Hành thấy cần phải lên tiếng làm sáng tỏ vấn đề như sau:

Certified Document Number: 29770969 - Page 22 of 47

77

Điều 14 Điều Lệ VBVNHN quy định: "Đại Hội Đồng họp thường lệ ba (3) năm một lần, do Ban Chấp Hành triệu tập." Điều 15 ĐL quy định: "Ba (3) tháng trước ngày Đại Hội Đồng nhóm họp, ban tổ chức có nhiệm vụ gửi thư thông báo về ngày giờ, địa điểm cùng chương trình Đại Hội Đồng."

Với những quy định nói trên, theo thông lệ, Ban Chấp Hành sẽ ra văn thư triệu tập Đại Hội VBVNHN và sau đó, Ban Tổ Chức nơi Trung Tâm chịu trách nhiệm căn cứ vào Văn Thư Triệu Tập Đại Hội của BCHTU để gửi thư thông báo đến các Trung Tâm.

Đại Hội VBVNHN kỳ VI họp tại Westminster ngày 22- 23 tháng 3 - 2003 đã quyết định Đại Hội VBVNHN kỳ VII sẽ được tổ chức tại Houston, TX vào cuối tháng 3-2005 do hai Trung Tâm Nam Hoa Kỳ và TT Georgia chịu trách nhiệm. Ban Chấp Hành đương nhiệm đã ra văn thư triệu tập Đại Hội ngày 12 - 08 - 2004. Tiếc rằng việc tranh chấp giữa hai ông Nguyễn Bửu Thoại và Nguyễn Hữu Nghĩa từ Tổng Hội Thủ Đức đã lan qua TT Nam Hoa Kỳ khiến TT này rơi vào tình trạng khủng hoảng không thể tổ chức được. Quyết định cuối cùng của VBVNHN là lưu nhiệm Ban Chấp Hành một (1) năm và cá nhân tôi, Chủ tịch BCH sẽ không ra ứng cử nữa. Như vậy, văn thư triệu tập Đại Hội ngày 12-08- 2004 không còn hiệu lực.

Để tiến hành việc tổ chức Đại Hội VBVNHN kỳ VII vào cuối tháng 3- 2006, BCH sẽ phải ra một văn thư triệu tập khác (lần thứ 2) và sau đó, Ban Tổ Chức tại Trung Tâm chịu trách nhiệm sẽ căn cứ vào đó mà gửi thư mời đến các Trung Tâm. Căn cứ vào điều 15, Đại Hội Đồng họp vào tháng 3- 2006 thì thư thông báo có thể gửi vào tháng 12- 2005, nghĩa là trước ba (3) tháng.

Vị bất đồng nội bộ và có sự can dự của những người ngoài TT đã đưa đến việc "truất phế" Chủ tịch Nguyễn Bửu Thoại, khai trừ ba Hội viên (Hà Trang, Nguyễn Văn Diễn, Nguyễn Bửu Thoại) một cách bất hợp pháp, đồng thời lại bầu ông Nguyễn Mạnh An Dân, không phải là Hội viên Văn Bút từ năm 2003 làm Chủ tịch Trung Tâm Nam Hoa Kỳ cũng là hành động bất hợp pháp. Trước đây, BCH/TU đã gửi thư chúc mừng VH Nguyễn Bửu Thoại, Chủ tịch TT Nam Hoa Kỳ được bầu vào tháng 07 năm 2004. Nay sự tranh chấp xảy ra, Ban Chấp Hành Trung Ương không thể thừa nhận Ban Chấp Hành của Trung Tâm mà vị Chủ tịch không phải là Hội viên vì BCH chỉ đại diện cho các Hội viên hợp lệ (có tên trong danh sách và đóng niên liễm cho VBQT) theo điều 2 Nội Quy mà thôi. BCH đã kêu gọi đôi bên tranh chấp ngồi lại với nhau để có một giải pháp hợp tình hợp lý, tôn trọng danh dự của nhau và không dồn nhau vào đường cùng để từ đó lo chuyện tổ chức Đại Hội. Rất tiếc là nỗ lực của BCH vẫn chưa đạt kết quả.

Nay hai ông Nguyễn Mạnh An Dân (không phải là hội viên từ năm 2003) và Hoàng Duy Hùng, "Chủ tịch viễn cư" TT Georgia, tự tiện gửi thư thông báo về Đại Hội mà chưa có văn thư triệu tập Đại Hội của BCH là sai thủ tục. Riêng ông Hoàng Duy Hùng từ hai năm nay không hề báo cáo sinh hoạt của TT Georgia và cũng không đóng Niên liễm cho VBQT. VH Vũ Quang Trân, Thủ Quỹ cho biết ông Hoàng Duy Hùng chỉ mới gửi Check đóng niên liễm vào cuối tháng 7- 2005 cho hai năm 2004 và 2005, nhưng BCH đã khóa sổ từ tháng 2-2005, như vậy theo Điều Lệ VBQT và ĐLNQ của VBVNHN, ông Hoàng Duy Hùng cũng không còn tư cách Hội viên Văn Bút nữa.

Certified Document Number 29770969 - Page 23 of 47

78

Như đã nói trên, vì thư thông báo do hai ông Nguyễn Mạnh An Dân và Hoàng Duy Hùng gửi đi có nội dung mang tính chất của một Văn thư triệu tập Đại Hội thì hiển nhiên đã vượt quyền nếu không muốn nói là cướp quyền của Ban Chấp Hành Trung Ương vì hai người không có thẩm quyền làm việc này. Bởi đó, Ban Chấp Hành VBVNHN coi việc gửi thư thông báo của hai ông Nguyễn Mạnh An Dân và Hoàng Duy Hùng là hoàn toàn bất hợp pháp. Nếu chuyện nội bộ TT Nam Hoa Kỳ giải quyết không xong thì việc tổ chức Đại Hội sẽ được trao cho một Trung Tâm khác. Và nếu không Trung Tâm nào chịu đứng ra thì BCH sẽ lo việc tổ chức Đại Hội kỳ VII.

Cá nhân tôi, Chủ tịch BCH VBVNHN, theo Điều Lệ, sẽ không ra ứng cử. Chúng tôi sẽ chỉ đến đọc diễn văn khai mạc và đọc báo cáo trước Đại Hội tại TT nào được ủy nhiệm đứng ra tổ chức một cách hợp pháp, đúng Điều Lệ VBVNHN. Ban Chấp Hành đương nhiệm cũng sẽ chỉ bàn giao nhiệm vụ cho một Ban Chấp Hành nào được bầu hợp pháp mà thôi. Các Văn hữu nào muốn ứng cử vào BCH VBVNHN nhiệm kỳ 2006- 2009 phải nộp đơn cho BCH đương nhiệm theo Thông Cáo ngày 12-07-2005 tại địa chỉ:

Văn Bút Việt Nam Hải Ngoại
P.O.Box 51387
San Jose, CA 95151- 5387
USA

San Jose ngày 15 tháng 08 năm 2005
TM. Ban Chấp Hành VBVNHN
Chủ tịch
Phạm Quang Trình

Certified Document Number: 29770969 - Page 24 of 47

79

# International PEN – Vietnamese Writers Abroad PEN Centre
## Văn Bút Việt Nam Hải Ngoại

P.O.Box 51387 San Jose, CA 95151- 5387 USA

Tel/Fax: (408) 226 - 4990 Email: xuannien@yahoo.com

San Jose ngày 22 tháng 08 năm 2005

Kính gửi Ông Hoàng Duy Hùng

**EXHIBIT C**

Chủ tịch viễn cư Trung Tâm Georgia

Trích yếu: V/v Thông báo về tư cách Hội viên của ông không còn nữa.

Thưa Ông,

Liên tiếp trong những ngày 18 -04- 2005, 25-04 -005, 24-05- 2005, 28-05- 2005, 06-06- 2005 và 20-08- 2005, Ông đã viết và phổ biến trên Diễn Đàn Internet những vi thư (emails) có nội dung xuyên tạc việc làm của Ban Chấp Hành cũng như của Chủ tịch BCH VBVNHN (nói rằng đã can thiệp vào nội bộ các TT, giả mạo Văn thư của VH Thúy Sơn, tự đánh bóng, vân vân.).

Kể từ hơn hai năm trước, với tư cách là Chủ tịch UB Định Chế thuộc BCH, ông đã không làm gì cả mà chỉ nhắm cơ hội để lên án người này, và đòi đưa người kia ra Hội Đồng Kỷ Luật. Vi thư ngày 18-04- 2005, ông còn tuyên bố: "Nội Quy và Điều Lệ VBVNHN xác định rõ ràng tư cách độc lập của các Trung Tâm..." trái hẳn với điều 9 Điều Lệ VBVNHN và điều 9 Nội Quy VBVNHN: "Trung Tâm VBVNHN tự trị về tài chánh và pháp lý trước chính quyền địa phương sở tại, nhưng là một bộ phận của VBVNHN về tổ chức." Khi ông tuyên bố các "TT độc lập" có nghĩa là các TT không còn là bộ phận của VBVNHN nữa.

Với tư cách là Chủ tịch TT Georgia, suốt hai năm qua, ông đã không hề báo cáo cho BCHTU biết về sinh hoạt của TT cũng như ông cũng đã đóng niên liễm trễ suốt hai năm 2004 và 2005 (vào tháng 7 mỗi năm khi BCH đã khóa sổ 5 tháng) mặc dù BCH đã nhắc nhở chung các TT nhiều lần.

Viết và phổ biến các vi thư đó trên Diễn Đàn, hiển nhiên Ông đã vị phạm Điều 4 Hiến Chương Văn Bút Quốc và điều 5 khoản 2 Điều Lệ Văn Bút Việt Nam Hải Ngoại. Không đóng niên liễm đúng hạn, ông đã vi phạm điều 5 khoản 4 Điều Lệ VBVNHN. Do đó, chiếu điều 3 D Điều Lệ Văn Bút Quốc Tế, tôi xin thông báo cho ông biết rằng ông không còn tư cách Hội viên nữa.

Theo điều 8 Nội Quy VBVNHN thì: "Chủ tịch BCH VBVNHN đại diện Hội về pháp lý, và đại diện toàn thể Hội viên trước Văn Bút Quốc Tế." Vì sự ngoan cố của ông, nên tôi thông báo cho ông biết rằng: "Kể từ hôm nay, tôi không đại diện cho ông trước Văn Bút Quốc Tế nữa. Tôi chấm dứt vĩnh viễn liên hệ với ông về mọi sinh hoạt Văn Bút và tôi sẽ gạch tên ông ra khỏi mọi danh sách Hội viên bất cứ từ đâu gửi đến Ban Chấp Hành VBVNHN."

Trân trọng

TM. Ban Chấp Hành VBVNHN

Chủ tịch

Phạm Quang Trình

Certified Document Number: 29770969 - Page 25 of 47

80

# EXHIBIT D

Certified Document Number: 29770969 - Page 26 of 47



Acct # 2010288, Ck # 1082, 08/23/2004, $360.00

81

Ban Chấp Hành Văn Bút Việt Nam Hải Ngoại
Biên bản phiên họp lần thứ 13 vào lúc 15:00 chiều ngày 17.01.2005
tại nhà VH Vũ Quang Trân, 2532 Monte Lindo Ct, San Jose, CA 95121



**EXHIBIT E**

Hiện diện: - VH Phạm Quang Trình       - VH Diệu Tần Nguyễn Tinh Vệ
            - VH Việt Thao Đào Đức Chương     - VH Vũ Quang Trân
            - VH Đào Vĩnh Tuấn  (qua điện thoại viễn liên)
Chương trình nghị sự: - V/v Trưởng Ban Tổ Chức Đại Hội VBVNHN kỳ VII

Mở đầu chương trình, VH Phạm Quang Trình chào mừng các Văn hữu trong BCH đã dành thì giờ tham dự phiên họp bất thường này liên hệ đến việc tổ chức Đại Hội VBVNHN kỳ VII. Lý do là chuyện xích mích giữa VH Nguyễn Hữu Nghĩa và VH Nguyễn Bửu Thoại trong vụ Tổng Hội Thủ Đức đã lan sang chuyện tổ chức Đại Hội Văn Bút Việt Nam Hải Ngoài kỳ VII vào cuối tháng 3.2005.

VH Nguyễn Hữu Nghĩa và VH Nguyên Hương thuộc TT Canada gửi thư khiếu nại với UBTT (VH Trần Quốc Bảo) về tư cách của VH Nguyễn Bửu Thoại (TT Nam Hoa Kỳ) là không thích hợp trong vai trò Trưởng Ban Tổ Chức Đại Hội. VH Thư Ký UBTT Trần Quốc Bảo không giải quyết mà chuyển hồ sơ qua Ban Chấp Hành nhờ giải quyết giùm. Vậy trong tình trạng này nền đề nghị VH Nguyễn Bửu Thoại, Chủ tịch TT Nam Hoa Kỳ để cử một Văn hữu khác đảm nhiệm vai trò Trưởng Ban Tổ Chức Đại Hội kỳ VII là hay hơn cả. Còn việc tổ chức là trách nhiệm chung của cả Trung Tâm Nam Hoa Kỳ phối hợp với BCHTU, chở không phải của riêng Trưởng Ban Tổ Chức Đại Hội. Hy vọng là qua những cuộc điện đàm giữa VH Phạm Quang trình, VH Diệu Tần với VH Nguyễn Bửu Thoại, mọi chuyện sẽ được giải quyết ổn thỏa.

Hội nghị đã thảo luận và đồng thanh chấp thuận đề nghị này. VH Phạm Quang Trình sẽ viết một Văn thư thay mặt Ban Chấp Hành TU đề nghị với VH Nguyễn Bửu Thoại nên vì đại sự mà chấp thuận đề nghị của Ban Chấp Hành. Được biết vào ngày 20.01.2005, TT Nam Hoa Kỳ sẽ có phiên họp đặc biệt, vậy BCH gửi Văn thư đề nghị cho kịp thời gian.

Phiên họp kết thúc lúc 16 giờ cùng ngày.

Chủ tọa             Thư ký


Phạm Quang Trình        Vũ Quang Trân

Certified Document Number: 29770969 - Page 27 of 47

82

Ban Chấp Hành Văn Bút Việt Nam Hải Ngoại
Biên bản phiên họp lần thứ 14 vào lúc 20:00 chiều ngày 7.04.2005
tại nhà VH Vũ Quang Trân, 2532 Monte Lindo Ct, San Jose, CA 95121

Hiện diện:  - VH Phạm Quang Trình
            - VH Việt Thao Đào Đức Chương    - VH Vũ Quang Trân
            - VH Đào Vĩnh Tuấn  (qua điện thoại viễn liên)
Chương trình nghị sự: - V/v  Khủng hoảng tại TT Nam Hoa Kỳ

Mở đầu chương trình, VH Phạm Quang Trình chào mừng các Văn hữu trong BCH và đề nghị VH Đào Vĩnh Tuấn báo cáo về sự việc xảy ra tại TT Nam Hòa Kỳ. VH Phạm Quang Trình nhắc lại sự việc VH Diệu Tần xin từ chức Đệ Nhất Phó Chủ tịch BCH VBVNHN và xin rút ra khỏi Văn Bút. Nguyên do mà VH Diệu Tần Nguyễn Tinh Vệ quyết định như vậy là sau khi dành nỗ lực thuyết phục VH Nguyên Bửu Thoại từ bỏ chức vụ Trưởng Ban Tổ Chức Đại Hội VBVNHN Kỳ VII đồng thời đề cử Văn hữu khác thay thế đã có kết quả phần nào. VH Diệu Tần đã nói lại cho VH Nguyên Hương biết thì VH Nguyên Hương đã tỏ ra giận dữ, nói rằng "Đó không phải là chuyện của ông. Người nào làm lỗi người ấy phải xin lỗi." VH Diệu Tần nói thêm: "Đánh chó thì cũng phải để cho nó lối thoát, huống chi là Văn hữu với nhau." Nhưng VH Nguyên Hương đã trả lời: "Chó điên thì tôi phải đánh cho chết luôn".  Do thái độ và ngôn từ của VH Nguyên Hương khiến VH Diệu Tần bất mãn và rút ra khỏi Văn Bút. Ban Chấp Hành nhận thấy VH Diệu Tần là người ôn hòa và có thiện chí nhưng quyết định rút ra khỏi Văn Bút của Văn hữu quá vội vã và thật là điều đáng tiếc.

VH Đào Vĩnh Tuấn cho biết: TT Nam Hoa Kỳ xảy ra khủng hoảng từ khi VH Nguyên Bửu Thoại bị truất phế trong phiên họp đầu tháng 3. Nguyên nhân là sau khi VH Phạm Ngũ Yên được đề cử làm Trưởng Ban Tổ Chức Đại Hội VBVNHN kỳ VII trong phiên họp của TTNHK ngày 20.01.2005 đã tự tiện lên tiếng trên Diễn đàn đòi dời Đại Hội lại 6 tháng thay vì 2 tháng như phiên họp của TT đã quyết định vì VH cho rằng không đủ thời gian. Quyết định xin dời Đại Hội VBVNHN kỳ VII lại 2 tháng là quyết định của TT đã được phúc trình cho BCHTU, cũng như hai VH Nguyên Bửu Thoại và VH Phạm Ngũ Yên đã cùng ký thông cáo chung. Hành động đơn phương của VH Phạm Ngũ Yên đã bị nhiều Văn hữu lên tiếng phản đối (trong đó có VH Thu Nga, VH Nguyên Bửu Thoại). VH Đào Vĩnh Tuấn cũng xác nhận là thời gian dời lại 2 tháng là hợp lý vì đó là quyết định của Trung Tâm Nam Hoa Kỳ. Vả lại thời gian còn hơn bốn (4) tháng trong khi Điều Lệ chỉ đòi có ba (3) tháng để gửi thư mời. Mọi người cho rằng VH Phạm Ngũ Yên nếu xét không thể làm trọn được trách vụ thì phải trả lại TT Nam Hoa Kỳ để TT đề cử Văn hữu khác chớ không thể đơn phương lên tiếng trên Diễn Đàn như vậy được.

Vì những lẽ đó, VH Nguyên Bửu Thoại yêu cầu có một Đại Hội Bất Thường giải quyết toàn bộ vấn đề. Nhưng trong Đại Hội bất thường, thay vì giải quyết những vấn đề đã được thông báo qua Thơ Mời Họp với Chương Trình Nghị Sự thì hai VH Phạm Ngũ Yên và VH Yên Sơn lại làm dự thảo Quyết nghị truất phế VH Nguyên Bửu Thoại khỏi chức vụ Chủ tịch TT vì như thế là làm sai Điều Lệ của Trung Tâm. VH Nguyên Bửu Thoại không đồng ý và tuyên bố nếu các anh có muốn bất tín nhiệm thì cũng phải dành cho người ta thời gian để biện bạch. Đại Hội đồng ý một tháng.

Chuyện xảy ra tiếp là vào đầu tháng 4.2003, VH Nguyên Bửu Thoại không tham dự Đại Hội bất thường vì cho rằng bất hợp pháp và do hai VH Phạm Ngũ Yên và Yên Sơn cấu kết với

83

nhau lèo lái để bất tín nhiệm mình và văn thư triệu tập Đại Hội cũng bất hợp pháp vì không phải do Chủ tịch đương nhiệm ký tên và gửi đi. Nhưng vào lúc đó, VH Nguyễn Bửu Thoại lại đăng ký danh xưng VBNHK ở tòa án thành phố và tổ chức một Đại Hội khác. Phía Đại Hội mà VH Đào Vĩnh Tuấn tham dự đã quyết định truất phế VH Nguyễn Bửu Thoại và đưa VH Huỳnh Quang Thế, Đệ Nhất Phó Chủ tịch lên thay. Hơn nữa, "Đại Hội Bất Thường" này còn khai trừ hai VH Nguyễn Bửu Thoại và VH Nguyễn Văn Diễn ra khỏi TT Nam Hoa Kỳ. Như vậy, hiện nay TT Nam Hoa Kỳ có hai Ban Chấp Hành.

Hội nghị nhận định rằng phía VH Huỳnh Quang Thế tuy có đa số Hội viên hoạt nhưng đã đi sai Điều Lệ của TT. Phía VH Nguyễn Bửu Thoại không nắm vững được tình hình và không còn khả năng điều hành.

Điểm nữa là VH Nguyên Hương, Chủ tịch TT Canada đã lên tiếng chúc mừng VH Huỳnh Quang Thế với những lời lẽ quá đáng như một sự biện minh cho "tân Ban Chấp Hành lâm thời của TT Nam Hoa Kỳ". VH Trần Quốc Bảo, Chủ tịch TT Miền Đông và VH Hoàng Duy Hùng (TT Georgia) cũng lên tiếng chúc mừng. BCH Trung Ương nhận thấy tình trạng không rõ ràng nên không lên tiếng vì đây chỉ là BCH lâm thời còn nhiều rắc rối lôi thôi. VH Phạm Quang Trình cho biết VH Nguyễn Hữu Nghĩa qua một email gửi cho BCH đã nhắc khéo là "Ông để cho Đào Vĩnh Tuấn lên tiếng chúc mừng là được" nhưng VH Phạm Quang Trình không đồng ý. Ai cũng biết rằng đây là vấn đề tế nhị, không thể giải quyết theo lối đó. Mặt khác, báo cáo của "BCH Huỳnh Quang Thế" không gửi trực tiếp cho BCHTU mà lại gửi qua BBT Làng Văn và Egroups VBVNHN và bởi đó BBT Làng Văn tung ra các Diễn Đàn bên ngoài như một hình thức "hạ nhục" VH Nguyễn Bửu Thoại (bị truất phế và bị đuổi ra khỏi VBNHK). VH Phạm Quang Trình hỏi tại sao có hiện tượng lạ như vậy thì VH Đào Vĩnh Tuấn nói: "Đó là do Yên Sơn làm".

VH Vũ Quang Trân nêu ý kiến TT Nam Hoa Kỳ đã có nhiều chuyện xẩy ra từ năm qua. Chút chút lại khai trừ, thì còn đâu là Văn Bút? VH Phạm Quang trình cũng nhắc lại là năm qua đã xẩy ra chuyện khai trừ VH Hà Trang và đình chỉ công tác VH Nguyễn Văn Diễn 4 tháng. BCH nhận thấy quyết định khai trừ Hội viên này thật quá đáng do thù cá nhân hơn là tinh thần Văn Bút. Vì là chuyện nội bộ TTNHK nên để cho Tân Ban Chấp Hành với VH Nguyễn Bửu Thoại giải quyết. BCHTU không can thiệp mà chỉ nhắc khéo VH Nguyễn Bửu Thoại nên họp TT và coi lại mà thôi. Bây giờ TTNHK lại do hai VH Phạm Ngũ Yên và Yên Sơn vận động bất tín nhiệm vai trò Chủ tịch TT của VH Nguyễn Bửu Thoại và khai trừ luôn hai VH Nguyễn Bửu Thoại và VH Nguyễn Văn Diễn. VH Nguyễn Văn Diễn bị khai trừ vì đến xem tình hình rồi bỏ đi và không tham dự. Như vậy là chưa đầy một năm đã có hai vụ khai từ tại TT Nam Hoa Kỳ.

VH Đào Vĩnh Tuấn cho biết là VH Nguyễn Bửu Thoại đã mời thêm một số Hội viên. VH Vũ Quang Trân nêu ý kiến là Hội viên chỉ có quyền bỏ phiếu sau "một năm hoạt động" và được "ứng cử" sau hai năm. Như vậy TTNHK sẽ lấy căn bản là 18 Hội viên đã đóng niên liễm để quyết định bầu một Tân Ban Chấp Hành trong một Đại Hội hợp với Điều Lệ, Nội Quy của TT Nam Hoa Kỳ (1). Dẫu sao, BCH cũng nhấn mạnh là các Hội viên phải nghĩ đến Danh Dự của nhau, không nên dồn nhau vào đường cùng, vì có thể có những hậu quả không lường được.

Hội nghị xét thấy TTNHK cần có một Ban Chấp Hành mới, ôn hòa, tạo được không khí đoàn kết. Vậy BCH sẽ ra Văn thư gửi cho TT Nam Hoa Kỳ với hai chữ ký của VH Phạm Quang Trình (Chủ tịch) và VH Đào Vĩnh Tuấn (Tổng Thư Ký) để nghị giải pháp thích nghi qua sự trao đổi với đôi bên nhằm vãn hồi sinh hoạt bình thường của TT. Văn thư này do VH Phạm Quang Trình soạn và sẽ chuyển cho các thành viên của BCH coi trước, tất cả đồng ý rồi hai

Certified Document Number: 29770969 - Page 29 of 47

84

người mới ký và gửi đi. Xin nhấn mạnh hai chữ ký chỉ áp dụng trong trường hợp đặc biệt này mà thôi.

Phiên họp kết thúc lúc 21 giờ cùng ngày.

Chủ tọa                          Thư ký


Phạm Quang Trình            Vũ Quang Trân

---

**Ghi chú thêm: (1)** Danh sách 18 Hội viên đóng niên liễm gửi cho BCHTU của BCH/TT/Nam Hoa Kỳ vào tháng 11.2004 đã không có tên của VH Nguyễn Mạnh An Dân. Danh sách Hội Viên VBVNHN mà VH Nguyễn Văn Thông chuyển cho BCHTU đương nhiệm hồi năm 2003 cũng đã không có tên của VH Nguyễn Mạnh An Dân.

Certified Document Number: 29770969 - Page 30 of 47

Ban Chấp Hành Văn Bút Việt Nam Hải Ngoại
Biên bản phiên họp lần thứ 15 vào lúc 11:00 sáng Chủ Nhật 29.05.2005
tại quán cà phê gần Phi Trường San Jose.

Hiện diện: - VH Phạm Quang Trình
  - VH Việt Thao Đào Đức Chương   - VH Vũ Quang Trân
  - VH Đào Vĩnh Tuấn
Chương trình nghị sự: - V/v giải quyết khủng hoảng tại TT Nam Hoa Kỳ.

Sở dĩ có phiên họp này là VH Đào Vĩnh Tuấn nhân chuyến đi qua San Jose tham dự sinh hoạt của Hội Ái Hữu. VH Vũ Quang Trân để nghị ra Quán Cà Phê gần Phi Trường họp thay vì tại nhà có chuyện riêng. Mọi người đồng ý.

Mở đầu Hội Nghị trao đổi lại những chuyện đã xẩy ra:

Sau phiên họp ngày 7.04.2005 của BCHTU, VH Phạm Quang Trình soạn Văn thư nhưng đồng thời cũng tìm cách liên lạc với các bên liên hệ để tìm một giải pháp ôn hòa, nhất là tránh vội vã, hấp tấp. Văn thư soạn thảo không được các thành viên trong BCH tán đồng nên cần phải sửa lại. Trong khi gió, VH Đào Vĩnh Tuấn lại tự tiện gửi một Văn thư thay mặt Ban Chấp Hành gửi cho BCH Huỳnh Quang Thế mà không có sự đồng ý của BCHTU như đã quyết định nên VH Phạm Quang Trình phải lên tiếng, nói đó là Văn thư riêng của VH Tổng Thư Ký và đã gây ngộ nhận ít nhiều. VH Vũ Quang Trân cho rằng VH Đào Vĩnh Tuấn đã làm sai điều quyết định của phiên họp ngày 7.04.2005.

Trong thời gian qua, hai VH Phạm Ngũ Yên và VH Yên Sơn đã viết những emails với những lời hết lẽ sức nặng nề nhục mạ, phỉ báng cá nhân VH Chủ tịch Phạm Quang Trình và xuyên tạc việc làm của Ban Chấp Hành. VH Yên Sơn căn cứ vào đâu mà nói "Ủy Ban Định Chế là một Ủy Ban độc lập?" VH Yên Sơn hai lần nói "BCH đã dựng lên một TT Văn Bút thứ hai tại Florida." Đây là điều xuyên tạc trắng trợn (vi phạm điều 4 Hiến Chương VBQT). Vì sau khi NDA bị BCH rút tư cách Hội viên, BCH đã liên lạc với các Hội Viên (từ ông BS Trần Trọng Cẩn, Phó Chủ tịch đến Tố Anh (Thủ Quỹ) và các Hội viên. Một số theo NDA nói "Để chờ xem VBQT sẽ thừa nhận NDA". Một số cho biết bị NDA ghi tên vô chớ không tham gia Hội Văn Bút. Số còn lại tiếp tục liên hệ với BCH và đóng niên liễm. Những Văn hữu đó đã họp lại bầu Ban Chấp Hành mới do VH Đào Quang Vinh làm Chủ tịch. Chuyện đơn giản và rõ ràng như vậy mà không hiểu vì lý do gì VH Yên Sơn lại có thành kiến hay dị ứng với VH Đào Quang Vinh (cùng binh chủng Không Quân) cố tình xuyên tạc việc làm của BCHTU. Thực chất nguyên nhân khủng hoảng là do địa phương gây nên, tại sao các ông Phạm Ngũ Yên và Yên Sơn lại đổ trách nhiệm cho Ban Chấp Hành Trung Ương?

VH Vũ Quang Trân cho biết BCH vẫn tìm cách thuyết phục các bên, cứ gần có giải pháp thì lại có người lên tiếng làm cho tình trạng tệ hại ra như đổ thêm dầu vào lửa. Cho đến giờ phút này BCHTU vẫn coi con số 18 Hội viên là con số căn bản trong một Đại Hội được tổ chức đúng Điều Lệ, có Lý có Tình để bầu một Ban Chấp Hành TTNHK.

Với Hoàng Duy Hùng đã nhiều lần lên tiếng chỉ trích người này, phê bình người kia, đòi đưa người này ra Hội Đồng Kỷ Luật, đòi truất phế Chủ tịch BCH, không coi Điều Lệ, Nội Quy và Hiến Chương VBQT ra gì cả. Đã vậy, nhiều lần HDH viết sai về Văn Bút như nói rằng ĐLNQ công nhận "tư cách độc lập" của các TT. Chuyện Hoa Hoàng Lan là chuyện của TTTB Hoa Kỳ. BCH và VH Chủ tịch không can dự, không triệu tập Đại Hội VBTBHK.Vậy mà HDH cứ "tố cáo" BCH và VH Chủ tịch Phạm Quang Trình xen vào nội bộ và triệu tập Đại Hội

Certified Document Number: 29770969 - Page 31 of 47

86

VBTTTB để bầu Ban Chấp Hành mới. Rõ ràng HDH đã cố tình xuyên tạc và chính HDH mới là kẻ xen vào nội bộ TT Tây Bắc Hoa Kỳ.

VH Vũ Quang Trân nói với VH Đào Vĩnh Tuấn: "Có anh Đào Đức Chương đây. Chính bà Hoa Hoàng Lan cấu kết với Nguyễn Châu, một hội viên mới do bà giới thiệu, đòi sửa Điều Lệ và phải bầu Nguyễn Châu làm Chủ tịch Trung Tâm. Vì không được chấp thuận nên bà ta cố tình quậy thối. Nhưng cũng vì tất cả Hội viên không đồng ý nên HHL tự động rút lui, chờ BCHTU và VH Phạm Quang Trình có làm gì đâu mà HDH cứ tố cáo bừa bãi?

Thực tế là HDH không làm gì cả, từ UBĐC đến TT Georgia. Hơn nữa qua những emails trao đổi giữa HDH và Phạm Văn Thành trên các Diễn Đàn cho thấy HDH đã "đi đêm" với Cộng Sản Việt Nam. Chính HDH viết thư cho Hồng Vinh, Ủy Viên Trung Ương Đảng Cộng Sản Việt Nam, Chủ tịch Hội Chủ Báo Việt Nam, đi ngược lại Lời Mở Đầu của Điều Lệ VBVNHN. Việc đơn giản là BCHTU nhờ HDH dịch Bản Điều Lệ sang tiếng Anh cũng không làm. HDH đã không làm lại cứ lên mặt dạy đời nên BCH thấy không còn có thể liên lạc hay hợp tác với HDH về bất cứ chuyện gì liên hệ đến sinh hoạt Văn Bút.

VH Đào Đức Chương nói "Với TT Nam Hoa Kỳ, tôi mong muốn giải quyết và mình phải tôn trọng quyền tự quyết và quyền quyết định đa số của các Hội viên".

VH Phạm Quang Trình: "BCH vẫn tôn trọng nguyên tắc đó, nhưng không thể chấp nhận sự kiện cấu kết với nhau, áp dụng chiến thuật lấy thịt đè người bất kể đến Điều Lệ, Hiến Chương như Yên Sơn và Phạm Ngũ Yên đã làm". VH Vũ Quang Trân nêu ý kiến là Chủ tịch BCH nên đến Houston để tìm hiểu đôi bên và giúp giải quyết chuyện tranh chấp. Nếu không và nếu hai bên cứ tiếp tục tranh chấp thì để cho DORMANT một thời gian.

Liên quan đến việc tổ chức Đại Hội VBVNHN kỳ VII, VH Phạm Quang Trình nhắc lại sự việc xẩy ra sau phiên họp của TTNHK ngày 20.01.2005, nếu như VH Phạm Ngũ Yên chấp hành nghiêm chỉnh quyết định của TTNHK và nếu VH Nguyên Hương không đưa ra yếu sách mới tức là "đưa VH Nguyễn Bửu Thoại ra kỷ luật tại Đại Hội Đồng VBVNHN" thì Đại Hội đã diễn ra tốt đẹp vào cuối tháng 5.2005. Bây giờ có sự tranh chấp thì không thể tổ chức tại Houston được. VH Đào Vĩnh Tuấn cũng đồng ý là không thể tổ chức tại Houston. Vậy BCH sẽ liên lạc với các Trung Tâm để coi TT nào có thể tổ chức. Nếu không TT nào nhận thì BCH sẽ tổ chức. Đây là việc của BCHTU chớ không phải của bộ phận nào khác. Nên nhớ, quyết định TT nào tổ chức chỉ là quyết định hành chánh. Không làm được ở TT này thì làm ở TT khác. Cũng như VBQT từng quyết định tổ chức Đại Hội tại Macedonia hồi năm 2000 (?). Nhưng vì nơi đây xẩy ra chiến tranh nên VBQT phải đưa về London, mà không thể coi là vi phạm Điều Lệ hay Nội Quy.

VH Đào Vĩnh Tuấn nói: "Khi về, tôi sẽ gửi tài liệu họp của TT Nam Hoa Kỳ cho BCHTU" (1)

Sau cùng Hội nghị quyết định: Nhờ VH Đào Vĩnh Tuấn nói với TT Nam Hoa Kỳ là nếu muốn nhờ Ban Chấp Hành TU giải quyết thì:

1. Hai VH Phạm Ngũ Yên và VH Yên Sơn phải viết thư riêng cho CT Phạm Quang Trình, rút lại các emails và xin lỗi BCH. Chỉ cần viết thư riêng cho Chủ tịch mà thôi.

2. BCH sẽ liên lạc với đôi bên để tìm ra giải pháp đúng đắn đem lại danh dự cho đôi bên.


Phiên họp kết thúc lúc 12 giờ 30 cùng ngày.


Chủ tọa                          Thư ký



Phạm Quang Trình                 Vũ Quang Trân

Certified Document Number 29770969 - Page 32 of 47

87

(1) Đến giờ phút này 18.07.2005, BCH vẫn chưa nhận được tài liệu từ VH Đào Vĩnh Tuấn. VH Đào Vĩnh Tuấn có gọi điện thoại cho VH Chủ tịch hứa sẽ gửi ngay.

Certified Document Number: 29770969 - Page 33 of 47

88

VIETNAMESE WRITER ABROAD P.E.N. CENTRE

**JOINT ANNOUNCEMENT**
**Of Vice-President and General Secretary**
**of Adjourned Executive Board of**
**The Vietnamese Writers Abroad P.E.N. Centre**

USA, August 30, 2005

To:
- Mr. President of the Adjourned Executive Board
- Mr. Secretary of the Standing Committee of the Assembly of Delegates of the Vietnamese Writers Abroad PEN Center
- The Advisory Board
- Chapters' Presidents Members of The Vietnamese Writers Abroad P.E.N. Centre

Referring: All letters posted by Mr. Pham Quang Trinh after May 29, 2005

Dear Madams and Sirs:

We – Vice-President and General Secretary of Adjourned Executive Board of The Vietnamese Writers Abroad P.E.N. Centre – hereby determine that:

1. The last meeting of the Executive Board of Adjourned Executive Board of the Vietnamese Writers Abroad PEN Center was held on May 29, 2005 (as reported in the Minutes 15). After that date, the Executive Board has neither actually met nor discussed via telephone or email.

2) We assert that, due to no meeting or discussion made by the Executive Board, all letters written by Mr. Pham Quang Trinh after May 29, 2005 on behalf of the Executive Board, or on his presidency, are personal and therefore actual nullity.

3) We assert that, according to the Bylaws and Regulations of the Vietnamese Writers Abroad PEN Center, a member is only expelled by his/her Chapter where he/she was registered, and that discipline has to rightly follow the principle of democracy and the Chapter's bylaws and regulations.

4) We assert that, according to the Bylaws and Regulations of the Vietnamese Writers Abroad PEN Center, a Chapter is only expelled by the consent of 2/3 of the Assembly of Delegates.

5) We assert that all the Executive Board members are elected by the Assembly of Delegates. Therefore, a dismissal of any of them must have the consent of the Standing Committee of the Assembly of Delegates which is the organization directly represents the Assembly of Delegates.

Certified Document Number: 29770969 - Page 34 of 47

6) Due to above reasons we state that all Mr. Trinh's letters "expelling" and "dismissing" our members Mr. Pham Ngu Yen, Mr.Yen Son, Mr. Hoang Duy Hung, Mrs. Nguyen Huong, Mr. Nguyen Huu Nghia, and Mr. Secrectary Dao Vinh Tuan are invalid; Mr. Dao Vinh Tuan is officially the Secretary of the Adjourned Executive Board. Beside of that, Mr. Trinh's letters on changing the Seventh Congress' location, and his other letters are actual nullity.

7) We request the action of The Standing Committee of the Assembly of Delegates, and the review of the Committee's authenticity.

Signed
Dao Duc Chuong, Vice-President of Adjourned Executive Board
Dao Vinh Tuan, General Secretary of Adjourned Executive Board

Certified Document Number: 29770969 - Page 35 of 47

EXHIBIT I

RESOLUTUON

As recently happened to the Vietnamese Abroad PEN Center, Mr. Pham Quang Trinh, President of the Adjourned Executive Board, has made errors that have incurred turmoil within the organization. Some of his actions are listed as follows:

1/ Mr. Trinh violated the autonomy and the majority principle of Chapter South USA of the Vietnamese Abroad PEN Center: This violation has been repeated as an intention to create turmoil preceding the coming Seventh Congress. Disregarding reports and refusing explanation, Mr. Pham Quang Trinh continued posting and publicizing false information that has disgraced individuals and paralyzed the activities of Chapter South USA.

2/ Violating the Regulations: Mr. Pham Quang Trinh has interfered in the activities of some Chapters that have caused difficulties in their operations.

3/ Disregarding the Minutes of the 14th meeting of the Board on April 7, 2005, Mr. Pham Quang Trinh acted at his convenience, arbitrarily as a dictator, openly despising other members of the Executive Board.

4/ Forging the Minutes 13 with many falsities, Mr. Trinh sent it to all Chapters. Some of the falsities are: "present" are marked for absent members, "Minutes are taken by Secretary" at the absence of the Secretary, and other sayings are made up). This forgery not only disrespected the Chapters' Executive Boards, but also was a crime.

5/ Mr. Trinh went against the Resolution of the Sixth Congress and disregarded the Resolution of the Standing Committee of the Assembly of Delegates which was posted on June 16, 2005 regarding the organizing of the Seventh Congress.

6/ Using the letterhead of "International PEN" and "Vietnamese Writers Abroad PEN Centre" to write his "Letter from the Heart" posted on July 28, 2005: Mr. Trinh forged documents, libeled against many members and publicized it through people who were always attacking the Center. As the result, Mr. Trinh created a divisions of interest in the Center, and caused disgrace on individuals and the Center. The worst of all would be that Vietnamese Communists took advantage of Mr. Trinh's irresponsible behavior and utilized it in their world-wide propaganda.

Because of the aforementioned reasons, in order to re-establish a sound operation for the Vietnamese Writers Abroad PEN Center, we – the undersigned – request Mr. Pham Quang Trinh:

1/ Publicly and on internet forums withdraw his "Letter from the heart" of July 28, 2005.

2/ Recognize the Executive Board of Chapter South USA of the Vietnamese Writers Abroad PEN Center, according to the Resolution of the Center Executive Board in the meeting on July 4, 2005.

Certified Document Number: 29770969 - Page 36 of 47

91

3/ Cooperate with the Organizing Committee from Chapters South USA and Georgia in working for the Seventh Congress.

Date: August 12, 2005

Endorsed by:

- Minh Duc Hoai Trinh, founder and former President of Vietnamese Abroad PEN Center
- Khai Chinh Pham Kim Thu, former Vice-president
- Le Huu Muc, Advisor of the Center
- Son Tung, former President and Advisor of the Center
- Tran Thy Van, Advisor of the Center
- Dao Duc Chuong, Vice-President of the Center
- Dao Vinh Tuan, General Secretary of the Center
- Ngoc Anh, Chairperson of Literary Critic (resigned to protest Mr Trinh)
- Nguyen Viet Duc, Chairperson of Writers for Peace (resigned to protest Mr Trinh)
- Bich Huyen, Chairperson of Women Writers (resigned to protest Mr Trinh)
- Nguyen Van Thong, Chairperson of Translation and Linguistic Rights
- Hoang Duy Hung, Chairperson of Institution (resigned to protest Mr Trinh), President of Chapter Georgia
- Tue Nga, Chapter Northwest USA, former Vice-President of the Center
- Linh Vang, Chapter Northwest USA
- Tran Quoc Bao, President of Chapter East USA
- Lam Thuy, Secretary of Chapter East USA
- Doan Huu Dinh, President of the Organizing Committee for the RCC.
- Thu Van, Treasurer of Chapter East USA
- Vu Hoi, Chapter East USA
- Nguyen Tu, Chapter East USA
- Thai Anh Duy, President of Chapter South California, Secretary of the Standing Committee of the Assembly of Delegates.
- Vu Van Tung, The first Vice-President of Chapter South California
- Vo Don, Secretary of Chapter South California
- Tran Duc Han, Treasurer of Chapter South California
- Vu Thuy Nhan, Chapter South California
- Ly Thao Yen, South California
- Anh Thai Phuong Tran Cong Ham, President of Chapter Louisiana
- Truong Son Le Xuan Nhi, Vice-President of Chapter Louisiana
- Pham Thien Ly, Secretary of Chapter Louisiana
- Vu Chau Sa,Treasurer of Chapter Louisiana
- Nguyen Manh An Dan, President of Chapter South USA
- Huynh Quang The, Vice-President of Chapter South USA
- Thu Nga, Vice-President of Chapter South USA
- Tuy Ha, Secretary of Chapter South USA

Certified Document Number: 29770969 - Page 37 of 47

- Linh Phuong, Treasurer of Chapter South USA
- Truong Sy Luong, former President of Chapter South USA
- Pham Ngu Yen, former President of Chapter South USA
- Yen Son, former Secretary of Chapter South USA
- Phan Dinh Minh, Chapter South USA
- Nhon Nguyen, Chapter South USA
- Nguyen The Giac, Chapter South USA
- Le Huu Minh Toan, Chapter South USA
- Lan Cao, Chapter South USA
- Nguyen Huong, President of Chapter Canada
- Do Quang Vinh, Vice-President of Chapter Canada
- Tong Minh Long Quan, Vice-President of Chapter Canada
- Cung Vu, Secretary, former President of Chapter Canada, Former Advisor of the Center
- Phong Vu, Treasurer of Chapter Canada
- Viet Chi, Former Vice-President of Chapter Canada
- Pham Khac Trung, Chapter Canada
- Thi Giang Vo Huu Quyen, Chapter Canada
- Vy Kham, Chapter Canada
- Nguyen Dang Tuan, Chapter Canada
- Nguyen Phu Sa, Chapter Canada
- Vinh Thao, Chapter Canada
- Dong Chau, Chapter Canada
- Pham Quan Khanh, Chapter Canada
- Truong Xuan Trieu, Chapter Canada
- Nguyen Hoai Phuong, Chapter Canada
- Ngo Tinh Yen, Chapter Canada
- Dao Quang Vinh, President of Chapter South-east USA
- Mai Xuan Khanh, Vice-president of Chapter South-east USA
- Nguyen The Hoang, Vice-president of Chapter South-east USA
- Nguyen Ngoc Thong, Secretary of Chapter South-east USA
- Hoang Mong Luong, Treasurer of Chapter South-east USA
- Ai Khanh, Advisor, Chapter South-east USA
- Bui Xuan Vu, former President of Chapter Sydney/Austrlia

Certified Document Number: 29770969 - Page 38 of 47



VIETNAMESE WRITERS ABROAD P.E.N. CENTRE

## RESOLUTION
### Of the Standing Committee
### Of the Assembly of Delegates
### Of the Vietnamese Writers Abroad P.E.N. Center

**Ref. Amendments of the Resolution to Adjourn the Executive Board**

**Referring to:**

- The Minutes of The 6th Congress on 22 & 23 of March, 2003 which showed that the Congress has assigned the two Chapters of South USA and Georgia to co-organize the Seventh Congress in March 2005;

- The Request of the Executive Board to postpone the Seventh Congress, and to grant an adjournment for one more year which was voted in favor by the Standing Committee of the Assembly of Delegates of the Vietnamese Writers Abroad PEN Center;

- The Resolution signed by more than 70 members of the Vietnamese Writers Abroad PEN Center protesting the paralysis of the Center;

- The Letter of protest from Chapter South USA;

- The Letter of protest from Chapter Canada;

- The Letter of protest from Chapter Georgia;

- The Join-announcement of the Vice-President and the General Secretary of the Executive Board; and

- The Rights and Duties of the Standing Committee.

**The Standing Committee of the Assembly of Delegates of the Vietnamese Writers Abroad PEN Center has carefully investigated and determined that Mr. Pham Quang Trinh - Adjourned President of Vietnamese Writers Abroad PEN Center - has committed the following serious errors:**

- As granted the adjournment by the Standing Committee, Mr. Pham Quang Trinh went against the resolution of the Sixth Congress in obstructing and destroying the organizing plan carried out by the two Chapters of South USA and Georgia to co-organize the Seventh Congress in March 2006 supposedly held in Houston.

Certified Document Number: 29770969 - Page 39 of 47

- Mr. Trinh repeatedly used the letterhead of the "International PEN" and the "Vietnamese Abroad PEN Center" to post on the internet writings full of insults and false charges against many members of the Center and outside organizations (Vietnamese People's Action Movement) which might inflict litigation related to the Center and also International PEN.

- Mr. Trinh created article (3-d) to the Regulations of the International PEN and used it to expel several members for his own personal vengeance reasons.

- Mr. Trinh violated the autonomy of the Chapters; he disregarded the laws of the democracy.

- Mr. Trinh abused his rights, violated the Regulations of the Vietnamese Writers Abroad Center, and forged the Minutes of the Executive Board meetings which caused turmoil in the Center.

- Mr. Trinh arbitrarily dismissed the General Secretary of the Executive Board, who was elected by the Sixth Congress, without the consent of the Board and the Standing Committee of the Assembly of Delegates.

**We now resolve:**

1. To amend the Resolution of The Standing Committee of the Assembly of Delegates of the Vietnamese Writers Abroad PEN Center in adjourning the Executive Board of the Vietnamese Writers Abroad Center (from 3/2005 to 3/2006);

2. To assign Mr. Dao Duc Chuong – Vice-President, and Mr. Dao Vinh Tuan – Genetral Secretary, to assume Mr. Pham Quang Trinh's position in the Adjourned Executive Board, to operate inner businesses, contact the International PEN, and co-operate with the two Chapters of South USA and Georgia to start organizing the Seventh Congress as assigned by the Sixth Congress.

September 2, 2005

---

(Signed):

1) Thai Anh Duy, Chapter's President, Chapter South California, Secrectary of the Standing Committee.
2) Tran Quoc Bao, Chapter's President, Chapter East USA
3) Tran Cong Ham, Chapter's President, Chapter Louisiana.
4) Hoang Duy Hung, Chapter's President, Chapter Georgia.
5) Nguyen Huong, Chapter's President, Chapter Canada.
6) Nguyen Manh An Dan, Chapter's President, Chapter South USA.

Certified Document Number: 29770969 - Page 40 of 47

95

------------------------------------------------------------------------

**(No Reply):**

Dao Quang Vinh, Chapter's President, Chapter Florida/ Southeast USA.
Thuyen Nhan, Chapter's President, Chapter Sydney/Australia.
Tu Nguyen, Chapter's President, Chapter Europe.
Trang Chau, Chapter's President, Chapter Quebec.
Tu Phong, Chapter's President, Chapter Northwest USA.

Certified Document Number: 29770969 - Page 41 of 47

**International PEN – V̶ ̶ ̶amese Writers Abroad PEN Cent̶**

**Văn Bút Việt Nam Hải Ngoại**

P.O.Box 51387 San Jose, CA 95151- 5387  USA

Tel/Fax: (408) 226 - 4990  Email: xuannien@yahoo.com

### Lá Thư Tháng Tám 2004

Thưa quý vị Cố vấn Ban Chấp Hành VBVNHN

Thưa quý Văn hữu Chủ tịch và Ban Chấp Hành các Trung Tâm

Thưa quý Văn hữu Hội viên thuộc Văn Bút Việt Nam Hải Ngoại

Trước hết, thay mặt Ban Chấp Hành VBVNHN, chúng tôi chân thành cám ơn quý Trung Tâm cùng tất cả quý Văn hữu khắp nơi trên thế giới đã lên tiếng ủng hộ mạnh mẽ công việc tổ chức buổi Hội Luận cũng như cuộc đón tiếp Ông Tổng Thư Ký Văn Bút Quốc Tế ngày 08.08.2004 vừa qua. Nhờ sự ủng hộ và khích lệ đó mà công việc tổ chức đã thành công mỹ mãn.

Đặc biệt cám ơn VH Trần Quốc Bảo và Trung Tâm Miền Đông, VH Sơn Tùng, Cố Vấn Ban Chấp Hành, VH Nguyên Hương, VH Nguyễn Hữu Nghĩa và Trung Tâm Canada, VH Nguyễn Văn Thông, VH Hoàng Duy Hùng và Trung Tâm Georgia, VH Thuyền Nhân và Trung Tâm Úc Châu, VH Từ Nguyên và Trung Tâm Âu Châu, VH Trần Văn Hát, VH Nguyễn Tam Xuân, VH Phạm Thiên Lý, VH Vũ Châu Sa, VH Trường Sơn Lê Xuân Nhị và Trung Tâm Louisiana đã ủng hộ tinh thần cũng như tài chánh cho việc tổ chức Hội Luận. Xin cám ơn Ban Chấp Hành Văn Bút Tây Bắc Hoa Kỳ với Chủ tịch Từ Phong, nhị vị Phó Chủ tịch Vũ Gia Sắc và Hoàng Xuyên Anh, VH Tổng Thư Ký Quốc Lân, VH Thủ quỹ Lệ Hoài Hương. Cám ơn VH Phạm Việt Hùng, Nguyễn Thị Ngọc Bích cùng tất cả quý văn hữu. Cám ơn VH Nguyễn Bửu Thoại, VH Yên Sơn và Trung Tâm Nam Hoa Kỳ đã hỗ trợ mạnh mẽ và đã đề cử VH Thu Nga Đại diện Trung Tâm đến dự Hội Luận và đọc tham luận. Cám ơn VH Trần Thy Vân và Trung Tâm Nam Cali đã cử VH Thái Anh Duy, Phó Chủ tịch lên tham dự Hội Luận và yểm trợ tài chánh. Xin cầu chúc quý văn hữu dồi dào sức khỏe và gặp nhiều may mắn.

Thưa quý Văn hữu,

Đáng lý ra Lá Thư này được viết ra vào tháng 07/2004. Nhưng vì quá bận rộn với việc tổ chức Hội Luận và đón tiếp Tiến sĩ Terry Carlbom, Tổng Thư Ký Văn Bút Quốc Tế nên phải dời lại vào tháng Tám này. Nay thì mọi chuyện đã xong mới có thì giờ viết gửi đến quý Văn hữu.

**Về sinh hoạt của Ban Chấp Hành:** vẫn làm việc đều đặn. Hằng tuần và có khi hằng ngày, chúng tôi vẫn gặp nhau trực tiếp hoặc qua điện thoại trao đổi, giải quyết mọi công tác sinh hoạt của Văn Bút. Phải nói đây là nỗ lực đặc biệt, nhờ ở gần nhau và cũng do tinh thần dấn thân làm việc chung, không quản ngại những khó khăn, vất vả, bị đánh phá từ phía từ địch thù đến một số người vẫn mệnh danh là bạn trong Cộng Đồng Việt Nam Hải Ngoại. Những người này chẳng làm gì cả nhưng nếu Văn Bút Việt Nam Hải Ngoại làm là họ rình rập sẵn sàng lên tiếng phê bình, chỉ trích. Tại buổi Tiếp Tân chào mừng Tiến sĩ Terry Carlbom ngày 08.08.2004 ở nhà hàng Phú Lâm, khi trình bày về công tác gây quỹ cho Văn Bút Quốc Tế và Ủy Ban Các Nhà Văn Bị Cầm Tù thuộc VBQT cũng gọi là WiPC (Writers in Prison Committee), chúng tôi đã nói rằng lâu nay Văn Bút Việt Nam Hải Ngoại bị đánh phá rất nhiều. Việc đánh phá đó xảy ra không phải vì VBVNHN tồi hay dở mà là vì Văn Bút Việt Nam Hải Ngoại đấu tranh cho Nhân quyền có kết quả khiến kẻ thù phải điên lên và một vài phần tử ở ngoài Văn Bút ghen tức. VBVNHN là tiếng nói cuối cùng của Khối Người Việt Quốc Gia trên diễn đàn Văn Bút Quốc, quyết liệt đấu tranh cho Nhân quyền và quyền Tự do của người cầm

Certified Document Number 29770969 - Page 42 of 47

bút tại Việt Nam và trên ⌒ giới nên bằng mọi giá phải bảo vệ ⌒ ơn nữa đừng sợ và đừng chùn bước trước sự đánh phá của kẻ thù.

**Buổi Hội Luận về Vai trò Phụ Nữ Việt Nam đối với Văn Hóa Dân Tộc và tiệc Tiếp Tân chào mừng ông Tổng Thư Ký Văn Bút Quốc Tế mà VH Diệu Tần làm Trưởng Ban Tổ Chức:** Như đã phổ biến qua Bản Tin Báo Chí, buổi Hội Luận và tiệc Tiếp Tân chào mừng Tiến sĩ Terry Carlbom, Tổng Thư Ký Văn Bút Quốc Tế rất thành công về phẩm cũng như về lượng do nỗ lực chung của Ban Chấp Hành VBVNHN và Văn Bút Tây Bắc Hoa Kỳ. Tân Ban Chấp Hành Văn Bút Tây Bắc Hoa Kỳ cùng quý hội viên đã dành rất nhiều thì giờ và nỗ lực nên mới đạt thành quả như thế. Cộng đồng ủng hộ mạnh mẽ. Quan khách và đồng bào đến tham dự đông, ngồi tràn đầy các hàng ghế. Chương trình diễn tiến nhịp nhàng, thứ tự không gặp một trở ngại nào. Các diễn giả trình bày rất hay. Tất cả bài vở, tài liệu, hình ảnh sẽ được Ban Chấp Hành và Ban Tổ Chức gom và đúc kết lại trong một tài liệu song ngữ Anh-Việt và sẽ được ấn hành trong thời gian gần đây nhằm quảng bá thành quả của Hội Nghị. Ông Tổng Thư Ký rất vui khi được dịp tiếp xúc với Cộng Đồng Người Việt. Ông đã đến từng bàn ăn tại nhà hàng Phú Lâm trong buổi Tiếp Tân để chụp hình lưu niệm. Ông cũng đánh giá cao việc tổ chức và sinh hoạt của Ban Chấp Hành, nhất là việc hợp tác chặt chẽ với Văn Bút Quốc Tế cũng như các Trung Tâm Văn Bút bạn. Bản Phúc Trình của Ông Tổng Thư Ký đã dành cảm tình đặc biệt đối với Văn Bút Việt Nam Hải Ngoại và ca ngợi nỗ lực cùng những thành quả hợp tác của VBVNHN với các thành viên trong bộ phận lãnh đạo Văn Bút Quốc Tế.

**Đại Hội Văn Bút Quốc Tế kỳ thứ 70** sẽ khai diễn tại Tromso, Norway vào đầu tháng 9/2004. Phái đoàn VBVNHN đã ghi danh với hai đại biểu chính thức (Official Delegates) là VH Phạm Quang Trình và VH Vũ Quang Trân. Chuyến đi này khá tốn kém về nhiều dịch vụ, trong đó có tiền mua vé máy bay. Nhưng Ban Chấp Hành đã cố gắng hoàn tất mọi thủ tục và sẽ tham dự tích cực Đại Hội. Hy vọng lần này, phái đoàn VBVNHN cũng sẽ gặt hái được nhiều thành quả cũng như sẽ học hỏi được thêm nhiều kinh nghiệm.

**Vụ Hoa Hoàng Lan:** Bà Hoa Hoàng Lan nguyên là Tổng Thư Ký Văn Bút Tây Bắc Hoa Kỳ nhiệm kỳ 2002-2004. Bà tham gia Văn Bút được khoảng ba năm. Trước đây trong mọi sinh hoạt Văn Bút, bà tỏ ra là người nhiệt tình với Hội và anh chị em hội viên. Nhưng kể từ khi bà có "liên hệ" với ông Nguyễn Châu thì mọi sự thay đổi một cách lạ thường. Hồi đầu tháng 5/2004, trong phiên họp của Ban Chấp Hành và Ban Tham Vấn Văn Bút Tây Bắc Hoa Kỳ tại nhà VH Vũ Quang Trân, khi biết VH Thúy Sơn không muốn ứng cử chức vụ Chủ tịch thì tất cả hội nghị đã đề nghị bà Hoa Hoàng Lan xung phong lập liên danh ra ứng cử Ban Chấp Hành Văn Bút Tây Bắc Hoa Kỳ nhiệm kỳ 2004 - 2006 với lời khuyến khích: "Bên Canada, bà Nguyên Hương đã xung phong ra làm Chủ tịch thì Vùng Tây Bắc Hoa Kỳ, VH Hoa Hoang Lan cũng nên xung phong chở". Lúc đó, ai cũng nghĩ bà sẽ làm Chủ tịch Văn Bút Tây Bắc Hoa Kỳ nhiệm kỳ 2004 - 2006 vì thấy bà nói cười vui vẻ. Vậy mà chỉ hai tuần sau, bà đã đổi ý hoàn toàn. Bà nằng nặc đòi phải sửa Điều Lệ để đưa ông Nguyễn Châu (hội viên mới do bà mời vô) lên làm Chủ tịch vì theo bà "Giáo sư Nguyễn Châu là người có tài, phải làm Chủ tịch hay Cố vấn đặc biệt chở không thể ngồi ngang hàng với những người khác." Câu nói đã làm buồn lòng các văn hữu hội viên khác. Ông Nguyễn Châu là một hội viên mới xin gia nhập Trung Tâm được mấy tuần mà bà HHL đòi sửa Điều Lệ & Nội Quy (Hội viên sau hai năm thâm niên mới được ứng cử CT/BCH) khiến nhiều hội viên gửi thư phản đối (hiện còn lưu giữ) và chính vì thế mà Trung Tâm đã không thỏa mãn đòi hỏi của bà nên bà cùng ông Nguyễn Châu âm mưu dùng báo chí truyền thông đánh

2

phá Văn Bút. Phần cá nhân tôi (Phạm Quang Trình) chỉ giúp Thúy Sơn thảo một văn thư mời quý hội viên tham dự Đại Hội. Đây là việc thông thường mà chúng tôi đã từng giúp cho nhiều Ban Chấp Hành trước đây cũng như Ban Chấp Hành của VH Thúy Sơn và bà HHL. Việc giúp soạn văn thư mời hội viên tham dự Đại Hội này bắt nguồn từ phiên họp của Trung Tâm ngày 15.05.2004 tại nhà VH Nguyễn Tấn Ích. Vì không kiếm được địa điểm nên nhờ tôi kiếm giùm. Tôi không làm điều gì sai trái hay đi ngược lại Điều Lệ của Trung Tâm cũng như Điều Lệ VBVNHN. Tôi không can thiệp cũng không có quyền thay đổi quyết định của Trung Tâm. Văn thư mời dự Đại Hội do VH Thúy Sơn ký ngày 29.05.2004 trước mặt mọi người (có cả bà Hoa Hoàng Lan), và không ai phản đối.

Nhưng đột nhiên, bà Hoa Hoàng Lan đòi thay đổi địa điểm Đại Hội. Mọi người cũng đồng ý, kể cả việc họp tại nhà bà Hoa Hoàng Lan hay nhà VH Diệu Tần nhưng bà vẫn không chịu. Bà đòi họp ở địa điểm khác mà chính bà kiếm không ra. Cuối cùng bà đành phải chấp nhận địa điểm mà tôi mượn giùm. Trong khi bà không lập Liên danh và nạp đơn ra ứng cử thì VH Từ Phong và một số Văn hữu khác lập Liên danh ra ứng cử khiến bà nổi nóng. Xin nhắc lại là VH Từ Phong tự động chớ không có ai xúi giục hay đạo diễn như bà HHL bịa chuyện. Trong một cuộc điện đàm với VH Diệu Tần và VH Đào Đức Chương, bà HHL đã đòi hỏi những điều quá đáng. VH Diệu Tần và VH Đào Đức Chương cho biết là hai văn hữu đã cố gắng thuyết phục bà nếu muốn làm Đệ nhất Phó Chủ tịch hay Tổng Thư Ký thì hai văn hữu sẽ liên lạc với VH Từ Phong, Thụ ủy Liên danh để đôi bên thương lượng. Chồng bà là ông Trương Duy Cường có vẻ đồng ý. Nhưng bà HHL lại đòi phải lưu nhiệm Ban Chấp Hành mãn nhiệm hoặc "Các anh phải đôn tôi lên làm Chủ tịch". Rõ ràng là bà HHL đã đòi hỏi những điều quá đáng, không ai có thể thỏa mãn bà được.

Tối ngày 23.06.2004, bà HHL cùng ông Nguyễn Châu đến nhà VH Thúy Sơn viết đơn sẵn bắt VH Thúy Sơn phải làm ứng viên Chủ tịch, chồng bà là VH Phương Duy (Trương Duy Cường) làm Ứng viên Phó Chủ tịch, bà HHL làm ứng viên Tổng Thư Ký. VH Thúy Sơn vì không muốn ra ứng cử đã không chịu ký. Bởi đó, hai người tức tối bỏ ra về và đêm hôm đó bà Hoa Hoàng Lan và ông Nguyễn Châu tung emails lên mạng Internet đánh phá cá nhân tôi (Phạm Quang Trình) và Ban Chấp Hành VBVNHN, bịa đủ chuyện và vu khống đủ điều. Tệ hơn nữa, bà HHL bắt thân với Đỗ Quyên (tên này chuyên viết bài đánh phá Văn Bút và các đoàn thể quốc gia cho tờ Thời Báo của Vũ Bình Nghi) thuộc phe nhóm Đặng Văn Nhâm. Bà cũng liên lạc với Thư Sinh viết bài cho tờ Tin Việt của Cao Sơn là những kẻ mà bà từng lên tiếng chống đối hành động đánh phá Văn Bút của họ trước đây. Bà mời những kẻ này đến địa điểm họp nhằm phá tan Đại Hội. Nhưng âm mưu "không ăn được thì quậy cho hôi" bị thất bại. Bà đã la lối đập bàn Chủ tọa của Hòa Thượng Thích Giác Lượng (tức Nhà thơ Tuệ Đàm Tử, Cố vấn Ban Chấp Hành VBTBHK nhiệm kỳ 2004-2006). HT Thích Giác Lượng đã nói: "Hành động của cô không xứng đáng là của người cầm bút, không phải là hành động của người làm văn hóa". Bị Đại Hội phản đối, bà cúi đầu xin lỗi, đọc báo cáo, rồi bỏ ra ngoài đi với ông Nguyễn Châu. Đại Hội vẫn tiến hành tốt đẹp và Liên danh do VH Từ Phong đứng thụ ủy đã đắc cử với số phiếu 20/22. Lễ nghi bàn giao đã diễn ra ngay sau đó. Hai ngày sau 29.06.2004, bà HHL gửi đơn xin rút tên ra khỏi Văn Bút. Còn ông Nguyễn Châu thì xin rút tên từ ngày 25.06.2004. Mới đây nhất là bà HHL đã liên lạc với ông Nguyễn Đức An để tiếp tục đánh phá Văn Bút. Bà còn kêu gọi các ông Trần Thanh Hiệp và Nguyễn Ngọc Bích (ông Bích là một trong nhóm 11 người từng bị ông Tổng Thư Ký cảnh cáo) trở lại "làm sạch" Văn Bút hay dẹp bỏ và làm lại. Thực tế là Văn Bút

3

Certified Document Number: 29770969 - Page 44 of 47

99

Tây Bắc Hoa Kỳ rất đoà...ết, không có chuyện tranh chấp nộ... như một số người cố tình bịa đặt và gán ghép cho.

Phần cá nhân tôi, ngay trong Đại Hội, tôi không làm gì ngoài việc điều khiển nghi thức khai mạc (chào quốc kỳ). Vậy mà bà HHL và ông Nguyễn Châu cố tình bịa chuyện đưa lên mạng là tôi khống chế Đại Hội. Sau này khi thấy tổ chức Hội Luận về vai trò của Phụ Nữ được dư luận Cộng Đồng ủng hộ mạnh mẽ, hai người này xử dụng nhiều địa chỉ email và tên khác nhau (như Trung Ngôn, Hồ Hữu Lý, Tiểu Muội, Chu Lai Tam Kỳ...) bịa chuyện "BS Nguyễn Ý Đức và tay sai Nguyễn Đình Bin đến gặp tôi", "Phạm Quang Trình quịt nợ HHL". Tôi đã không lên tiếng về ba cái trò rẻ tiền đó. Mấy bữa sau, bà lại tung tin chính BS Nguyễn Ý Đức nói cho bà biết. Rõ ràng là chính bà đã liên hệ với BS Nguyễn Ý Đức mà lại đổ vấy cho người khác. Nhưng báo cáo tài chánh ngày 08/08/2004, bà HHL lại ghi rõ tôi đóng đẩy đủ tiền ăn. Như vậy chính những lời của bà HHL viết ra đã tố cáo bà là người ăn gian nói dối. Đó là chưa kể bà HHL đã gọi điện thoại đến VH Đào Đức Chương de dọa: "Nội trong 48 giờ anh phải từ chức Đệ Nhị Phó Chủ Tịch trong Ban Chấp Hành. Nếu không, tôi sẽ uýnh anh luôn". VH Đào Đức Chương trả lời: "Trước kia tôi cử chị làm đại biểu chính thức của Trung Tâm đi dự Đại Hội Văn Bút, tôi không bao giờ bảo chị phải bỏ phiếu cho Liên danh Phạm Quang Trình vì tôi tôn trọng quyền tự do chọn lựa của chị. Thì nay sao chị lại bức bách tôi quá như vậy?" Bà HHL liền cúp Phone và bà gom cả VH Đào Đức Chương với Ban Chấp Hành thành nhóm "Tứ gian nhân".

Nhưng chưa hết, chiều Chủ Nhật 15.08.2004, vào khoảng 6 giờ 15, trong buổi ra mắt tác phẩm của nhà thơ Vũ Lang, Hội viên Văn Bút Nam Cali ở nhà hàng Rex Diner Restaurant, số 420 S. Main Street, Milpitas, CA 95035. VH Diệu Tần và tôi đến nhà hàng, gặp nhạc sĩ Lê Quốc Tấn ngay trước cửa và thấy bà Hoa Hoàng Lan đang đứng cầm Cell Phone nói chuyện. Nhạc sĩ Lê Quốc Tấn nói với bà HHL: "Đây là anh Diệu Tần..." Bà Hoa Hoàng Lan vùng vằng đi vào trong nhà hàng và ngoái cổ ra nói một câu hết sức là thô bỉ đối với chúng tôi (xin lỗi, không tiện viết ra ở đây). Chúng tôi không nói gì và vào nhà hàng, Chừng 5 phút sau, trong khi tôi đang đứng cùng quan khách nói chuyện và nhìn về phía bàn ngồi ký tặng sách của nhà thơ Vũ Lang thì đột nhiên tôi nghe có tiếng của bà Hoa Hoàng Lan đứng phía sau "Uýnh cho mày bể mặt" và thấy một nắm tay đấm mạnh vào má bên trái. Tôi quay lại nhìn thấy bà HHL mặt hùng hổ xỉa xói. Tôi không phản ứng gì và rất bình tĩnh chỉ nói với những người đứng cạnh, trong đó có VH Diệu Tần, nhạc sĩ Lê Quốc Tấn, nhà báo Du Phong rằng: "Các anh thấy rõ nhé." Nhân chứng là quý anh Diệu Tần, Lê Quốc Tấn, Du Phong, Trương Xuân Mẫn và cô Hoàng Xuyên Anh. Lúc ấy, tôi có thể gọi Cảnh sát qua số 911 đến làm việc ngay. Nhưng vì tôn trọng nhà thơ Vũ Lang từ Nam Cali mất bao công sức tổ chức và các văn hữu đến dự nên tôi bỏ qua. Ngược lại, bà Hoa Hoàng Lan chạy vào khoe với Cụ Hà Thượng Nhân, nhà báo Thanh Thương Hoàng và Luật sư Nguyễn Tâm rằng: "Tôi vừa đập vào mặt thằng Phạm Quang Trình!" Các vị này trả lời bà Hoa Hoàng Lan: "Cô đã làm một việc hết sức bậy!" Riêng LS Nguyễn Tâm, Chủ nhiệm báo Sàigòn USA tuyên bố: "Bà Hoa Hoàng Lan còn quậy nữa thì tôi sẽ lên tiếng. Xin Bác bỏ qua." Tôi đã bỏ qua chuyện tại nhà hàng. Nhưng với những lời de dọa của bà, tôi buộc lòng phải báo cáo cho Sở Cảnh Sát San Jose sự việc bà HHL đã dùng bạo lực hành hung tôi cùng với những nhân chứng. Vấn đề cần đặt ra là: "Với những ngôn từ và hành động nói trên, bà Hoa Hoàng Lan có xứng đáng là hội viên Văn Bút hay không? Có nên níu kéo và mời bà trở

4

100

Certified Document Number 29770969 – Page 45 of 47

Certified Document Number: 29770969 - Page 46 of 47

lại nữa hay không khi tiếp tục nguyền rủa, bịa chuyện nhục mạ Ban Chấp Hành VBVNHN và Văn Bút Tây Bắc Hoa Kỳ?"

## Bốn Công Trình Văn Học

Thưa quý Văn hữu, về bốn Công Trình Văn Học, Ban Chấp Hành vẫn tiếp tục thực hiện:

Trước hết là Kỷ Yếu Văn Bút Việt Nam Hải Ngoại: Cho đến giờ phút này, mới có 3 Trung Tâm gửi tài liệu. Vậy xin Ban Chấp Hành các Trung Tâm còn lại vui lòng viết lịch sử Trung Tâm và gửi về Ban Chấp Hành càng sớm càng tốt. Hiện Trang Nhà tức Website của VBVNHN do VH Vũ Quang Trân với sự phụ giúp của "bà xã văn hữu" đã tạm xong. Ban Chấp Hành mong quý Trung Tâm viết và gửi lịch sử Trung Tâm về BCH để chúng tôi post lên trình làng và sau đó sẽ ấn hành. Ban Chấp Hành cũng mong các Trung Tâm gửi tiểu sử các Hội viên và nội dung các tác phẩm của quý vị hội viên để Ban Chấp Hành thực hiện Văn Nhân Lực và Thư Mục Việt Nam Hải Ngoại. Riêng công trình 30 Năm Văn Học Việt Nam Hải Ngoại, Ban Chấp Hành đã mời Văn Hữu Cố Vấn Sơn Tùng phụ trách mà khởi sự là cuốn Văn Học Việt Nam Hải Ngoại Tổng Quan. Vì Ban Chấp Hành đang chuẩn bị đi Na Uy tham dự Đại Hội Văn Bút Quốc Tế kỳ 70 nên các Công Trình Văn Học sẽ được đẩy mạnh sau khi dự Đại Hội VBQT trở về. Vậy xin thông báo để các Trung Tâm chuẩn bị những gì cần thiết nhằm tiếp tay với Ban Chấp Hành.

## Tác phẩm mới:

Xin trân trọng giới thiệu với quý Văn hữu những tác phẩm mới:

- **Các nhà truyền giáo Bồ Đào Nha và Thời Kỳ Đầu của Giáo Hội Công Giáo Việt Nam**, nguyên tác tiếng Pháp "Les Missionnaires Portugals et Les Débuts de l' Eglise Catholique au Vietnam". Tác giả là Linh mục Roland Jacques. Đây không phải là tác phẩm nói thuần túy về Tôn giáo mà là những công việc chung của các nhà truyền giáo Bồ Đào Nha, trong đó có việc sáng tạo chữ Quốc Ngữ. Linh mục Roland Jacques thuộc Dòng Anh Em Hiến Sĩ Đức Mẹ (O.M.I), một chuyên gia về Giáo Luật Công Giáo, Tiến sĩ Luật Học Đại Học Paris XI, và Tiến sĩ Giáo Luật Học viện Công Giáo Paris, hiện là Khoa Trưởng Phân Khoa Giáo Luật, Đại Học Saint Paul, Ottawa, Canada và đã qua Việt Nam sinh sống một thời gian để nghiên cứu. Tác phẩm "Các nhà truyền giáo Bồ Đào Nha" là thành quả của nhiều năm nghiên cứu những tài liệu lịch sử chưa từng được các sử gia Việt Nam cũng như Tây phương nhắc đến. Theo Linh mục Roland thì chính các Giáo sĩ Bồ Đào Nha là những người đầu tiên đã có công hình thành chữ Quốc Ngữ. Tác phẩm song ngữ Pháp-Việt, dày trên 600 trang, do Định Hướng xuất bản, giá 2 cuốn 25 Dollars. Quý Văn hữu chuyên nghiên cứu Văn Học Việt Nam nên mua tác phẩm này.

- **Công Chúa Sử Giả**. Tác giả: Cụ Huỳnh Văn Lang, cựu Giáo sư Đại Học Sư Phạm Sài gòn, Sáng lập viên và Chủ nhiệm Tạp Chí Bách Khoa thời Việt Nam Cộng Hòa. Cụ Huỳnh Văn Lang nguyên là Tổng Giám Đốc Viện Hối Đoái thời Đệ Nhất Cộng Hòa, hiện định cư tại Hoa Kỳ, tác giả hồi ký nổi tiếng Nhân Chứng Một Chế Độ. Cụ cho biết cụ đọc nhiều hồi ký thấy họ viết sai lạc nên bực mình mà viết hồi ký gồm 3 tập. Riêng Công Chúa Sử Giả gồm hai tập: Tập I (Trung Hoa) và Tập II (Việt Nam). Hiện đã phát hành tập I, giá 14 Dollars. Tập II sẽ ra mắt trong nay mai. Cụ cũng viết tập Tiểu Luận "Có Những Sự Kiện Lịch Sử cần phải xem lại" dày trên 300 trang, giá 15 Dollars.

- **Lưu Dấu Ngày Xưa**: tập truyện của VH Hạo Nhiên Nguyễn Tấn Ích, hội viên Văn Bút Tây Bắc Hoa Kỳ dày 360 trang, tác giả xuất bản, bìa láng rất đẹp. Tác phẩm được VH Diệu Tần và GS Lê Hữu Mục đề tựa và giới thiệu.

5

101

**- Thu Gọi Tình Nhân**: th... ầm thứ ba của Thảo Chi Bùi Mỹ Hc... à **CD Bài Ca Ghen** ra mắt tại nhà hàng Cao Nguyên Chủ nhật 22.08. 2004. Thân hữu và quan khách đến tham dự khá đông. Thảo Chi là Hội viên Văn Bút Tây Bắc Hoa Kỳ.

**- Viên Thi**: Thi phẩm Hán Việt của VH **Thúy Sơn**, nguyên Chủ tịch Văn Bút Tây Bắc Hoa Kỳ sẽ ra mắt trong ngày gần đây. VH Thúy Sơn tinh thông chữ Nho và đã làm thơ chữ Nho từ lâu. Năm qua, văn hữu đã cho ra mắt tập truyện **Khúc Nhạc Tương Tư** được nhiều độc giả tán thưởng. Hy vọng tập thơ Hán Việt Viên Thi cũng sẽ được độc giả, nhất là giới cao niên đón nhận nồng nhiệt.

Trân trọng kính chào quý Văn hữu.

San Jose ngày 18 tháng 08 năm 2004
TM. Ban Chấp Hành VBVNHN
Chủ tịch
Phạm Quang Trình

Certified Document Number: 29770969 - Page 47 of 47

6

102



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 24, 2014

Certified Document Number:        29770969 Total Pages:  47

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

103



CAUSE NO. 2005-57256

| | | |
|---|---|---|
| ALOYSIUS DUY-HUNG HOANG AKA HOANG DUY HUNG, Individually | § § | IN THE DISTRICT COURT OF |
| V. | § § | HARRIS COUNTY, TEXAS |
| TRINH QUANG PHAM, Individually and as Adjourned President | § § § | 151ST JUDICIAL DISTRICT |

FILED
CHARLES BACARISSE
District Clerk

MAY 2 3 2007

Harris County, Texas
By_____
Deput y

## ORDER

Came on to be heard the special appearance of Trinh Quang Pham for the purpose of objecting to the jurisdiction of the Court over the person and property of Trinh Quang Pham. His special appearance and objection were made as to this entire proceeding. It is the ruling of the Court that Trinh Quang Pham's objection to jurisdiction is sustained. It is the order of the Court that this entire proceeding is dismissed for want of jurisdiction.

Signed this 23rd day of May , 2007.

*Caroline Baker*

CAROLINE E. BAKER,
JUDGE PRESIDING

Certified Document Number: 28518961 - Page 1 of 1



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 24, 2014

Certified Document Number:          28518961 Total Pages:  1

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Pg.4

**2012 22612**

FILED
Chris Daniel
District Clerk
APR 18 2012
Harris County, Texas
By Deputy

CAUSE NO: _____

| | | |
|---|---|---|
| ALOYSIUS DUYHUNG HOANG | § | IN THE DISTRICT COURT |
| Aka Hoang Duy Hung | § | |
| **Plaintiff** | § | |
| | § | |
| VS. | § | DISTRICT # 190 |
| | § | |
| Bay Van Nguyen, PH.D., M.D. | § | |
| **Defendant** | § | HARRIS COUNTY TEXAS |

**PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, Aloysius Duy Hung Hoang aka Al Hoang and aka Hoang Duy Hung,

hereinafter referred to as Plaintiff, and file his Original Petition against Bay Van Nguyen, PH.D,

M.D, hereinafter referred to as Defendants, and for causes of action would respectfully show:

**I.**
**PARTIES**

Plaintiff is a Texas resident.

Defendant Bay Van Nguyen is conducting his medical clinic at 2045 Space Park Dr.,

Nassau Bay TX 77058; Tel. 281-333-4556.

**II.**
**SERVICE OF PROCESS**

Service of Process could be served to Defendant Defendant Bay Van Nguyen is conducting

his medical clinic at 2045 Space Park Dr., Nassau Bay TX 77058; Tel. 281-333-4556.

CONFIRMED FILE DATE: 4/18/2012

Certified Document Number: 51961847 - Page 1 of 4

106

## III.
## VENUE

Venue in this action is proper in Harris County, Texas pursuant to Tex. Civ. Prac. & Rem. Code §15.002 (a)(1), (2), and (3) and 15.005 because Plaintiff and Defendant are Texas residents. Further, the basis for venue in Harris County is that all or a substantial part of the events or omissions giving rise to these causes of action occurred in Harris County, Texas.

## IV. FACTS

In the year 2000, Plaintiff took his newborn daughter Angel Hoang for three check ups. Plaintiff paid for the check ups and receipts were given to Plaintiff. Attached are the receipts as Exhibit A. After these three visits, Defendant relocated the family, and because of convenience, Plaintiff and his family chose other doctors as Family Doctor. After these three visits, Defendant Bay Van Nguyen has never treated Plaintiff or his Plaintiff's children.

However, because of political reason, in September 2011, Defendant Bay Van Nguyen attended a political fundraising event, Defendant donated $2000, Defendant went on the podium and falsely stated that Defendant has treated all of Plaintiff's children for free. This remark later was published on Xay Dung Magazine. This remark was put on youtube for thousands of people all over the world to view. Plaintiff viewed the youtube and made a copy of such event. This remark was also published on eforums for thousands of people to read and to ridicule Plaintiff.

## V. CAUSES OF ACTION

All of the preceding allegations are incorporated herein as if restated in full. Plaintiff sues Defendant **for Defamatory Conduct, Libel and Slander pursuant to Tex. Civ. Prac. & Rem. Code Sections 73.001 et seq, and Breach of Fiduciary Duty.**

Certified Document Number: 51961847 - Page 2 of 4

107

Plaintiff sues Defendant for Defamatory Conduct, Libel and Slander because Defendant did not treat Plaintiff's child free. Defendant made a false statement with a malicious intent to insult Plaintiff in the public and to damage Plaintiff's reputation. This false remarks was published on the magazines and Vietnamese news as well as it was distributed to millions of people via youtube to humiliate Plaintiff resulting in lost of support. Plaintiff and his family was ridiculed by many people causing great pain.

All conditions precedent to Plaintiff's recovery under Defamatory Conduct, Libel, and Slander causes of action have occurred. Plaintiff has suffered actual and consequential damages as a proximate result of Defendants' wrongful conduct. Plaintiff has suffered actual and consequential damages in excess of the minimum jurisdictional limits of this court. In addition, Plaintiff seeks the recovery of exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code § 41.002.

All of the preceding facts and allegations are incorporated herein as if restated in full. Plaintiff sues Defendant for Breach of Fiduciary Duty because as a doctor, even he provided a pro bono service, Defendant has a duty not to disclose his client's confidential information to the public without his client's consent. Because of Defendant's Breach of Fiduciary Duty, Defendant promoted hatred in people against Plaintiff.

All conditions precedent to Plaintiff's recovery under Breach of Fiduciary Duty have occurred. Plaintiff has suffered actual and consequential damages as a proximate result of Defendants' wrongful conduct. Plaintiff has suffered actual and consequential damages in excess of the minimum jurisdictional limits of this court.

Plaintiff seeks the recovery of exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code § 41.002.

Certified Document Number: 51961847 - Page 3 of 4

108

# VI.
## ATTORNEY'S FEE

As a result of the facts described above, Plaintiff has found it necessary to engage the law firm of Hoang & Associates to prosecute this action. Pursuant to Section 37.001, *et seq.* of the Texas Civil Practices and Remedies Code, Plaintiff seeks an award of his reasonable and necessary attorney's fees in the amount proven at trial.

# VII.
## REQUEST FOR DISCLOSURES PURSUANT TO TRCP 194.

Pursuant of Rule 194 of the Texas Rules of Civil Procedure, Plaintiffs hereby request the disclosure by Defendants.

## VIII. PRAYERS.

WHEREFORE, Plaintiff respectfully requests that Defendant be cited to appear and answer, and that Plaintiff be granted judgment against the Defendant as follows:

(1)     actual damages in excess of the minimum jurisdictional limits of the Court for his wrongful action.
(2)     reasonable fees for the services of Plaintiff's attorneys, together with all costs of court and expenses incurred by Plaintiffs in the investigation and prosecution of this case;
(3)     exemplary damages in a sum to be determined by the trier of fact;
(4)     pre- and post-judgment interest at the rate allowed by law until paid; and
(5)     such other and further relief, at law or in equity, to which Plaintiff may by this pleading or proper amendment thereto show itself justly entitled.

Respectfully submitted
HOANG & ASSOCIATES

Hoang
State Bar No. 2400-2295
**801 Congress St #350**
Houston, TX 77002
**Telephone: 713-229-8900**
**Fax: 713-224-3111**

Certified Document Number: 51961847 - Page 4 of 4



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   October 25, 2014

Certified Document Number:        51961847 Total Pages:  4

*[signature]*

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

P3
11
epo

CAUSE NO: 2012-22612

| ALOYSIUS DUY-HUNG HOANG | | IN THE DISTRICT COURT |
| Aka Hoang Duy Hung | Plaintiff § | |
| | § | |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| BAY VAN NGUYEN | § | |
| | Defendant § | 190TH JUDICIAL DISTRICT |

## DIMISSAL ORDER WITH PREJUDICE

On this ___ day of _____ 2013, Plaintiff's Motion To Dismiss With Prejudice is submitted to the Court with the Settlement Agreement, the Court, after reviewing the Motion, all documents, the Court

**ADJDUGED and ORDERED that** the Motion is Granted.

**ADJDUGED and ORDERED** to Dismiss the Case With Prejudice with Costs are to be taxed to the party that incurs them.

8·16·13

august 16 2013

SIGNED on this ~~the above date.~~

_____
JUDGE PRESIDING

APPROVED TO FORM & SUBSTANCE.

_____
Hoang & Associates
Al Hoang, pro se
SBA 2400 2295
801 Congress St #350
Houston TX  77002

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

**FILED**
Chris Daniel
District Clerk

JUL 25 2013

Time: _____
Harris County, Texas            3
By _____
         Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

Certified Document Number: 56980260 - Page 1 of 3

111

NO. 2012-22612



| Aloysius Duyhung Hoang | § | IN THE '90TH CIVIL |
| | § | |
| vs | § | DISTRICT COURT OF |
| | § | |
| Bay Van Nguyen | § | HARRIS COUNTY, TEXAS |

## SETTLEMENT AGREEMENT

1.      The parties in this case are Aloysius Duyhung Hoang ("Plaintiff") and Bay Van Nguyen ("Defendant"). The Plaintiff and the Defendant agree to settle all claims and controversies between them, asserted or assertable in this case under the following terms and conditions:.

2.      The Plaintiff agrees to dismiss this case against the Defendant, Bay Van Nguyen.

3.      The above styled and numbered case shall be resolved by:

       __X__     (a)     an agreed order of dismissal with prejudice with costs taxed to the party that incurs them..

4.      Each signatory, hereto warrants and represents:

       __X__     (a)     he or she has authority to bind the parties for whom that signatory acts.
       __X__     (b)     the claims, suits, rights and/or interests which are the subject matter of these cases are owned by the party asserting same, have not been assigned, transferred or sold and are free of encumbrance.

5.      The parties agree to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested or required to implement the terms and spirit of this agreement.

6.   If one or more disputes arise with regard to the interpretation and/or performance of this agreement or any of its provisions, the parties agree to attempt to resolve same by phone conference with the mediator who facilitated this settlement. If the parties cannot resolve their differences by phone conference, then each agrees to schedule one day of Mediation with the mediator within thirty (30) days to resolve the disputes and to share the costs of same equally. If a party refuses to mediate, then that party may not recover attorneys fees or costs in any litigation brought to construe or enforce this agreement. Otherwise, if mediation is unsuccessful, then the prevailing party or parties shall be entitled to recover reasonable attorneys fees and expenses, including the cost of the unsuccessful mediation.

7. The parties agree that the terms of this agreement are strictly confidential and shall not be disclosed to anyone without the prior written consent of all parties unless ordered to due so under a duly binding court order. If asked about this case all anyone is allowed to say is "A Confidential Settlement was agreed to by both parties."

1

Certified Document Number: 56980260 - Page 2 of 3

8. This agreement is made and performable in Harris County, Texas and shall be construed exclusively in accordance with the laws of the State of Texas.

Signed this ___15___ day of ___July___, 2013.

Plaintiff:                                    Defendant:

Aloysius Duyhung Hoang              Bay Van Nguyen

By: _____              By: _____

Approved:

Attorney for Plaintiff                   Attorney for Defendant

_____                  _____  Dan Krueger
Aloysius Duyhung Hoang              Bay Van Nguyen

State Bar No. 2400 2295             State Bar No. 2406 4243

Mediator:

_____
Jon E. King

Certified Document Number: 56980260 - Page 3 of 3

113



I, Chris Daniel, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   October 24, 2014

Certified Document Number:        56980260 Total Pages:  3

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

CAUSE NO. 2014-59665

| | | |
|---|---|---|
| ALOYSIUS HOANG<br>aka HOANG DUY HUNG   Plaintiff | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| VS. | §<br>§<br>§ | 215TH JUDICIAL DISTRICT |
| THINH DAT NGUYEN, Individual<br>THOI BAO HOUSTON<br>THOI BAO | §<br>§<br>§<br>§ | |
| Defendants | § | HARRIS COUNTY, TEXAS |

## PLAINTIFF'S ANSWER TO DEFENDANTS' MOTION TO DISMISS

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, Aloysius Hoang, aka Hoang Duy Hung, hereinafter referred to as Plaintiffs, and file this his Answer to Defendant's Motion to Dismiss, and for reasons would show to the Court the following:

## I.
## BACKGROUND

Plaintiff came to the United States in 1975 when Plaintiff was 13. After graduating from the University of Houston, in 1990, Plaintiff came back to Vietnam to fight against the Communist and Plaintiff was imprisoned by the Vietnamese Communist for 16 months in solitary confinement. In 1993, in order to have the normalization with the United States, Vietnamese Communist had to release all U.S citizens of which Plaintiff was one of them. In November 2007, Plaintiff was elected as President of the Vietnamese Community of Houston & Vicinities. In 2009, Plaintiff was elected as Houston District F City Councilmember.

After September 11, 2001, Plaintiff changed the strategy in fighting against the Communist. Plaintiff sees that there is no way to use force to overthrow the Communist regime;

1

115

therefore, Plaintiff promote "open dialogue" to make pressure on Vietnam to honor human rights and to have political change.

In the capacity as the City elected official, together with the Mayor, Plaintiff welcomed a Delegation from Vietnam, and in all meetings, besides doing the duty as a councilmember, Plaintiff always raised the issue of human rights with the Delegation. In early 2013, as a city elected official, Plaintiff visited 4 Asian countries to promote economic growth for the City of Houston and Vietnam was one of the four countries.

Since 2010, at Defendant Nguyen Dat Thinh house, Defendant Nguyen Dat Thinh said: *"I ordered you not to go to Vietnam. If you go, I will use my newspaper, Thoi Bao Magazine, and I will pull you down."* Plaintiff said to him: *"You cannot order me like that, I have to balance out the interest of the City. I will make the decision from my conscience, not from your order."* Plaintiff left Defendant's house. From that day on, almost on every issue of Thoi Bao, Defendant Nguyen Dat Thinh made false statements of facts, not opinion, to defame Plaintiff as "Communist," "Communist Spy," "Insider working for the Vietnamese Communist regime."

Danny Nguyen, Councilmember of Missouri City, welcomed the Vietnamese Communist Delegation and even organized events in Houston to promote trade with Vietnam. Defendant never mentioned a word. Defendant still received the money from Danny Nguyen to run ads for his real estate firm.

On or about October 12, 2014, Plaintiff filed a lawsuit against Defendants for Libel and Hate Crime. Defendants entered and General Denial and filed the Motion To Dismiss on ground of Anti-Slapp Law which allows the Court to dismiss the case within 60 days of filing the lawsuit.

2

116

## II.
## LEGAL AUTHORITIES AND ARGUMENTS

On June 17, 2011, the Texas Citizens Participation Act (the "Texas Anti-SLAPP statute") was signed into law by Gov. Rick Perry, and the law went into effect immediately. Later, the statute was codified at Texas Civil Practice & Remedies Code, Chapter 27. The Statute was designed to protect the First Amendment rights and to promote judicial economy.

First Amendment right is the Freedom of Speech, especially freedom to criticize public figures of matters that are related to government or public concerns. The Statute protects the right to opine, but it does not protect a person to make up facts out in the sky to libel a public figure.

In this case, Defendants are not protected by the Statute because Defendants did not opine, but out of nowhere Defendants fabricated and made statements of facts that are groundless as a mean to avenge Plaintiff for not following Defendant Thinh Dat Nguyen's instructions or orders. From 2010 up until the present, almost every issue, Defendant Thinh Dat Nguyen has articles with false statement of facts that Plaintiff is a Vietnamese Communist agent.

1. **First groundless statement of facts:** On issue 413, page 36, Defendant wrote: *"The second article in asking not to vote for Hoang Duy Hung - Unmask the insider Hoang Duy Hung…. in reality, he is fighting for the Vietnamese Communist regime. … As a son of Republic of Vietnam's (South Vietnam) soldier, maybe Hung understands the word 'insider,' a bad noun. Republic of Vietnam's soldiers despised it because it is specifically labeled for those Vietnamese Communist agents in camouflage infiltrating into the Vietnamese army to work as the spy for the Communist."* The language of the article is not an opinion, but a false statement of fact affirming Plaintiff is a spy for the Vietnamese Communist working for the interest of the Vietnamese Communist regime, not for the interest of the City of Houston or the U.S.A government.

3

2. Second Groundless Statement of facts: In an anti-Communist community with many extremists, to be misunderstood as a Communist agent or spy would jeopardized one's life. It happened to many people already in the last 40 years. Defendants' articles affirming that Plaintiff is a Communist agent or spy flared up the hatred in the Community against Plaintiff to a point that in December 2012, someone put a cocktail bomb in front of Plaintiff's residence with a death threat. On issue 413, page 37, Defendant turned the facts around: *"Hung planned a scheme to put a death threat bomb killing him and his family members at his house and then called the police to blame on Vietnamese Nationalist activists, afterward he took the pictures to take credit with the Vietnamese Communists."* Again, this is not opinions, this is a groundless statement of facts turning Plaintiff from a victim to the criminal mastermind! Homicide Division of Houston has an investigation on this matter, it has narrowed down to a few suspects and the Division at one point had secret agents to protect Plaintiff.

3. Third Groundless Statement of Facts: Plaintiff's father died in an accident on May 5, 2007. As a Catholic, Plaintiff's father attended the *Cinco de Mayo* Mass. After the Mass, he walked over the street and unfortunately an undocumented female immigrant driving a car without insurance passing the red light hit him. He was taking to the hospital and passed away. Thousands of Vietnamese in Houston attended the Funeral. After this funeral, Plaintiff was elected as President of the Vietnamese Community of Houston & Vicinities, then later on in 2009, Plaintiff was elected as Houston District F Councilmember. Late 2012, as City Councilmember, with the Mayor and her Administration, Plaintiff welcomed a Delegation from Vietnam.

On issue 413, page 37, Defendant turned the facts around and wrote about the death of Plaintiff's father as follows: *"It could be said that Hung succeeded in his endeavor to open his*

4

*heart to the Vietnamese Communist that he really admired them. He succeeded to an extent that the Thanh Nien Online raised the question that his father was so shameful of the betrayal son whereby he committed suicide by jumping himself to the oncoming 18-wheeler so that he could not witness the 'advancing' of Hung."* In reality, Plaintiff objected to such defamation on Thanh Nien Online. Again, this is not an opinion, this is a false statement of facts to kindle hatred of voters in the Community against Plaintiff.

## IV.
## PRAYERS

WHEREFORE, Plaintiff respectfully request that the Court deny Defendants' Motion To Dismiss, Defendant take nothing, that the Court grant Plaintiff such other and further relief, at law or in equity, to which Plaintiff may by this pleading or proper amendment thereto show himself justly entitled.

Respectfully submitted

Hoang & Associates
Aloysius Duy-Hung Hoang
State Bar No. 24002295
801 Congress St. #350
Houston, TX 77002
Telephone: 713/229-8900
Telecopier: 713/224-3111
pro se

## CERTIFICATE OF SERVICE

I, Aloysius Duy-Hung Hoang, hereby certify that a true and correct copy of the above and foregoing was served in accordance with the Texas Rules of Civil Procedure on all counsel of record by placing same in the United States mail, certified mail, return receipt requested, by hand delivery or by telecopier, on this the 8th day of November, 2014.

Aloysius Hoang

# AFFIDAVIT OF FAWN D. NGUYEN
## CERTIFIED TRANSLATOR FROM VIETNAMESE TO ENGLISH
## AND FROM ENGLISH TO VIETNAMESE

STATE OF TEXAS                ]

COUNTY OF HARRIS       ]

### FAWN D. NGUYEN'S AFFIDAVIT

Before me is Fawn D. Nguyen, who is over eighteen (18) years of age, with sound and competent mind, after being duly SUBSCRIBED and SWORN to before me, makes the following statement:

*"My name is Fawn D. Nguyen. I am capable of making this affidavit.*
*I am a certified translator from Vietnamese to English and from English to Vietnamese. My Texas License number is 930.*
*The translation of Thoi Bao Magazine, issue 413, pages 36 - 37, the related statements of the lawsuit, was under my supervision and I hereby certify that the translation is true and correct from Vietnamese to English."*

SIGNED on this 7th day of November, 2014.

_____
Affiant: Fawn D. Nguyen

EXECUTED this document as true and correct on this ___7th___ day of November, 2014.

_____
Notary Public, State of Texas
Notary's printed name:

Notary's commission expires: _1-6-2018_



DONNA K SMITH
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 1/6/18

120

**Thoi Bao Houston Magazine, issue 413, page 36.**

## *The Second Article in Asking Not to Vote For Hoang Duy Hung - Unmask the Insider Hoang Duy Hung*

In the second interview with Thanh Nien Online (in Vietnam), Hoang Duy Hung responded to correspondent Do Hung: *"To me, fighting is to fight for the desires of the people inside the country, not for myself or for the people abroad. Meeting with people in the country, I found out that it is the will of the majority of the people here; therefore, I will do in accordance to their wish."*

Hung said *"fighting is to fight for the desires of the people inside the country;"* in reality, he is fighting for the Vietnamese Communist regime. He is playing sophism. This sophism has two contradictions. One, if he wants to fight for the people in Vietnam, he has to run for position in Vietnamese Communist Congress so that he can fight against the Vietnamese Communist in selling the land and the sea to Communist China, fighting against the Vietnamese Communist selling women to foreign countries to stand in the streets, not running in the U.S Legislature to get the Vietnamese Communist coming to the U.S? The second contradiction is this that he is fighting for the Vietnamese Communist, why is he trying to ask the votes from the Vietnamese Community in Houston, the victims of the Vietnamese Communist, so that after he got into the Texas Legislature, he would take the snake Vietnamese Communist here to bite and kill the chickens here - the Vietnamese American.

...

As a son of Republic of Vietnam's (South Vietnam) soldier, maybe Hung understands the word 'Insider,' a bad noun. Republic of Vietnam's soldiers despised it because it is specifically labeled for those Vietnamese Communist agents in camouflage infiltrating into the Vietnamese army to work as the spy for the Communist.

Hoang Duy Hung has opened the door of relationship with the middle rank of the Vietnamese Communist - Vice Minister of Foreign Affairs and officials in Da Nang. Not stopping at the welcoming of Vice Minister Nguyen Thanh Son coming to Houston, Hung wants to advance further on his road of "surrender" to the Vietnamese Communist by using the interview on Thanh Nien Online to bootlicking the Vietnamese Communist. Hung said: *"... talking to young folks in the country, they provided me many left-side information of the people abroad."* Hung acted as if the Vietnamese medias abroad is also controlled and censored like it is in the country.

This obvious lie is known by Hung and the Vietnamese Communist also knows it, but Hung still says it because he knows that the Vietnamese Communist like to hear it. Hung also brag to take credit that he has paid a huge price in serving the Vietnamese Communist.

...

121

Hung planned a scheme to put a death threat bomb killing him and his family members at his house and then called the police to blame on Vietnamese Nationalist activists, afterward he took the pictures to take credit with the Vietnamese Communists.

...

It could be said that Hung succeeded in his endeavor to open his heart to the Vietnamese Communist that he really admired them. He succeeded to an extent that the Thanh Nien Online raised the question that his father was so shameful of the betrayal son whereby he committed suicide by jumping himself to the oncoming 18-wheeler so that he could not witness the 'advancing' of Hung.

Hung could advance further by stop playing the two roles, choose one role only by coming back entirely to the Vietnamese Communist, then later on returning back here as the Consul General of the Vietnamese Communist to replace Nguyen Van Hoa in Houston or to replace the Vietnamese Communist Ambassador Nguyen Quoc Cuong.

In that decisive position, he still get the hatred and despise of the Vietnamese American; however, at that time, we have less despise for him, because by then he is only a Vietnamese Communist agent, no longer an insider "eating the rice of the Vietnamese Nationalist but worshipping the ghost of the Vietnamese Communist."

Nguyen Dat Thinh

CAUSE NO. 2014-59665

| | | |
|---|---|---|
| ALOYSIUS HOANG<br>aka HOANG DUY HUNG  Plaintiff | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| VS. | §<br>§ | 215TH JUDICIAL DISTRICT |
| THINH DAT NGUYEN, Individual<br>THOI BAO HOUSTON<br>THOI BAO | §<br>§<br>§<br>§ | |
| Defendants | § | HARRIS COUNTY, TEXAS |

**PLAINTIFF'S SUPPLEMENTAL ANSWER TO DEFENDANTS' MOTION TO DISMISS**

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW, Aloysius Hoang, aka Hoang Duy Hung, hereinafter referred to as Plaintiffs, and file this his Supplemental Answer to Defendant's Motion to Dismiss, and for reasons would show to the Court the following:

I.
**ADDITIONAL FACTS**

After Plaintiff filed the Answer to Defendant's Motion to Dismiss, on November 10, 2014, Defendant Thinh Dat Nguyen published a statement on the Vietnamese e-forums as follows: **"I was sued for calling a communist a communist."** Then he asked supporters to come to Court to **"witness the fighting spirit against the Communist of the Vietnamese People Abroad, the victims of the Communist."**

II.
**LEGAL AUTHORITIES AND ARGUMENTS**

The Texas Citizens Participation Act (the "Texas Anti-SLAPP statute"), Texas Civil Practice & Remedies Code, Chapter 27, protects an individual to speak out the opinion on public

1

123

issue by writing to the Editor of a newspaper, testifying before the Legislature, reporting official misconduct, circulating a Petition, or posting a comment on the internet. However, the Court cannot dismiss the case if Plaintiff can show on prima facie the elements of Defamation.

First, whether TCPR Chapter 27 applied to an Editor-in-chief and a magazine who almost every issue labels Plaintiff a Communist flaring hatred within an Anti-Communist Community against Plaintiff? If TCPR Chapter 27 applied to Defendants, the second issue is whether Defendants are protected under the Statute when Plaintiff can prove on prima facie the elements of Defamation?

The elements of Defamations are: 1. Defendant published a statement; 2. that was defamatory concerning the Plaintiff; 3. while acting with either actual malice, if the Plaintiff was a public figure, or negligence, if the Plaintiff was a private individual, regarding the truth of the statement. *Hearst Corp. vs. Skeen*, 130 S.W. 3d 910 (Tex. App. 2004), *review granted, judgment rev'd,* 159 S.W. 3d 633 (Tex. 2005). In *Musser vs. Smith Protective Services Inc.,* 723 S.W. 2d 653, 655 (Tex. 1987), the Court stated that *"to prove an action for defamation, the statement must also be false."*

1. **Statement of facts published by Defendants Concerning Plaintiff**: In this case, Defendants published at least three false statements about Plaintiff. Defendants published statements affirming that Plaintiff is *"a Communist," "an insider working for the Vietnamese Communist regime," "planned a scheme to put a death threat bomb killing him and his family members at his house and then called the police to blame on Vietnamese Nationalist activists, afterward he took the pictures to take credit with the Vietnamese Communists,"* and *"his father*

2

*was so shameful of the betrayal son whereby he committed suicide by jumping himself to the oncoming 18-wheeler."*

2. **The statements are false and defamatory:** Plaintiff came to the United States in 1975 when Plaintiff was 13. After graduating from the University of Houston, in 1990, Plaintiff came back to Vietnam to fight against the Communist and Plaintiff was imprisoned by the Vietnamese Communist for 16 months in solitary confinement. In 1993, in order to have the normalization with the United States, Vietnamese Communist had to release all U.S citizens of which Plaintiff was one of them. In November 2007, Plaintiff was elected as President of the Vietnamese Community of Houston & Vicinities. In 2009, Plaintiff was elected as Houston District F City Councilmember.

After September 11, 2001, Plaintiff changed the strategy in fighting against the Communist. Plaintiff sees that there is no way to use force to overthrow the Communist regime; therefore, Plaintiff promote "open dialogue" to make pressure on Vietnam to honor human rights and to have political change.

In the capacity as the City elected official, together with the Mayor, Plaintiff welcomed a Delegation from Vietnam, and in all meetings, besides doing the duty as a councilmember, Plaintiff always raised the issue of human rights with the Delegation. In early 2013, as a city elected official, Plaintiff visited 4 Asian countries to promote economic growth for the City of Houston and Vietnam was one of the four countries.

Plaintiff is the author of many articles and books, in Vietnamese and in English, criticizing and condemning the evilness of Communism and of the Vietnamese Communist regime. For over thirty years, Plaintiff has dedicated his life to fight against the Communist.

3

125

Labeling Plaintiff as a "Communist" or "insider working for the Communist regime" is not only an insult, but also a defamation flaring hatred within an anti-communist community against Plaintiff. Labeling Plaintiff to plan *"a scheme to put a death threat bomb killing him and his family members at his house and then called the police to blame on Vietnamese Nationalist activists, afterward he took the pictures to take credit with the Vietnamese Communists"* is a defamation turning a victim into the criminal mastermind. Making a false statement that *"his father was so shameful of the betrayal son whereby he committed suicide by jumping himself to the oncoming 18-wheeler"* is not only an insult to the decedent and the Plaintiff, but also a defamation discrediting Plaintiff in the public's eyes.

**3. The statements are made with actual malice:** At least three times, Plaintiff has asked Defendants for a public debate, Defendants can invite whomever Defendants want to join in, to show which method of fighting against the Vietnamese Communist regime more effective and pragmatic. Plaintiff also asserted that if Defendants can show a better way of fighting the Vietnamese Communist, Plaintiff would immediately bow down and revere Defendants as grand-masters, and Plaintiff would carry Defendants' shoes and to be Defendants' servants the rest of Plaintiff's life. Plaintiff informed Defendants that if Defendants do not accept the challenge, please do not label Plaintiff as "communist" or "insider working for the Vietnamese Communist regime," and please leave Plaintiff alone to fight against the Communist in according to Plaintiff's method.

Plaintiff respects Defendants' method of fighting the Vietnamese Communist, why would Defendants do the same to Plaintiff?

4

It all starts back in 2010 at a dinner hosted by Defendant Thinh Dat Nguyen at his residence. After Plaintiff was elected as Houston District F City Councilmember, Defendant Thinh Dat Nguyen invited Plaintiff and a couple of friends to his house for dinner. During dinner, Plaintiff disclosed that the Director of Houston Airport System, Mr. Mario Dias, has invited Plaintiff to accompany him for a trip to Vietnam. Plaintiff said Plaintiff is considering the pros and cons of the trip. Suddenly, to show the authority of a patriarch in the Vietnamese Community, Defendant Thinh Dat Nguyen made an order: *"I order you not to go to Vietnam. If you go, I will mobilize Thoi Bao to destroy you, to take your council seat away. That is my order."* Plaintiff replied: *"I am a councilman. I do things in accordance to my conscience, you cannot order me like that."* Plaintiff left the house. After this event, almost every issue of Thoi Bao, Defendant Thinh Dat Nguyen labels Plaintiff as "Communist" or "insider working for the Vietnamese Communist regime" and then disseminated those articles on the e-forums. The articles were to avenge Plaintiff because Plaintiff did not follow Defendant Thinh Dat Nguyen's order which made him "lose face" as a Patriarch in the Community.

## IV.
## PRAYERS

If the Court grant Defendant's Motion To Dismiss, Plaintiff anticipated that Defendants will have the headline on Thoi Bao: *"The Court affirmed Al Hoang is a Communist. The Court affirmed Al Hoang is an insider working for the Vietnamese Communist regime. The Court affirmed Al Hoang planned a cocktail bomb at his residence and blame on the Nationalist. The Court affirmed Al Hoang's father commit suicide because of shame when witnessing his son Al Hoang follows the Communist."* By that, the Court is going to send a wrong message to the Community that Freedom of Speech also includes freedom to make up facts libeling people.

5

127

WHEREFORE, Plaintiff respectfully request that the Court deny Defendants' Motion To Dismiss, Defendant take nothing, that the Court grant Plaintiff such other and further relief, at law or in equity, to which Plaintiff may by this pleading or proper amendment thereto show himself justly entitled.

Respectfully submitted

Hoang & Associates
Aloysius Duy-Hung Hoang
State Bar No. 24002295
801 Congress St. #350
Houston, TX 77002
Telephone: 713/229-8900
Telecopier: 713/224-3111
pro se

## CERTIFICATE OF SERVICE

I, Aloysius Duy-Hung Hoang, hereby certify that a true and correct copy of the above and foregoing was served in accordance with the Texas Rules of Civil Procedure on all counsel of record by placing same in the United States mail, certified mail, return receipt requested, by hand delivery or by telecopier, on this the 12th day of November, 2014.

Aloysius Hoang

6

No. 2014-59665

ALOYSIUS HOANG

VS.

THINH DAT NGUYEN

THOI BAO HOUSTON

IN THE 215TH DISTRICT COURT

HARRIS COUNTY, TEXAS

## ORDER ON DEFENDANTS'
## AMENDED MOTION TO DISMISS
## UNDER THE TEXAS CITIZENS PARTICIPATION ACT

On the defendants' motion, this case is DISMISSED.

The Court FINDS that the legal action was brought to deter or prevent the defendants from exercising constitutional rights and was brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation.

The Court ORDERS the plaintiff to pay the defendants' court costs, reasonable attorney's fees of $5,000, and interpreter fees within thirty days.

The Court AWARDS to each defendant _____ as sanctions against the plaintiff to deter the plaintiff from bringing similar actions described in the Texas Citizens Participation Act and orders the plaintiff to pay that amount to each defendant within thirty days.

_____
DATE

_____
JUDGE PRESIDING

129

11/14/2014 10:58:41 AM
Chris Daniel - District Clerk Harris County
Envelope No. 3179033
By: JEANETTA SPENCER
Filed: 11/14/2014 10:58:41 AM

No. 2014-59665

| | |
|---|---|
| ALOYSIUS HOANG | IN THE 215TH DISTRICT COURT |
| VS. | HARRIS COUNTY, TEXAS |
| THINH DAT NGUYEN | |
| THOI BAO HOUSTON | |

## BRIEF IN SUPPORT OF
## AMENDED MOTION TO DISMISS
## UNDER THE TEXAS CITIZENS PARTICIPATION ACT

JUDGE PALMER:

Defendants Thinh Dat Nguyen and *Thoi Bao Houston* file this brief in support of their *Amended Motion to Dismiss Under the Texas Citizens Participation Act* ("TCPA"), TEX. CIV. PRAC. & REM. CODE §§ 27.001 *et seq.*, and would show:

When a party files a motion under the TCPA, "a court shall dismiss a legal action against the moving party if the moving party shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of...the right of free speech" unless "the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." TCPA § 27.005(b)–(c).

"'Exercise of the right of free speech' means a communication made in connection with a matter of public concern." TCPA § 27.001(3).

130

> "Matter of public concern" includes an issue related to:
>
> (A) health or safety;
>
> (B) environmental, economic, or community well-being;
>
> (C) the government;
>
> (D) a public official or public figure; or
>
> (E) a good, product, or service in the marketplace.

TCPA § 27.001(7).

The plaintiff, Mr. Hoang, is a former Houston City Council member, and at the time of the defendants' complained-of speech was a candidate for the Texas Legislature, *see Plaintiff's Original Petition* at 3–4. Therefore he is both a public official and a public figure. *See, e.g., Ross v. Labatt*, 894 S.W.2d 393, 395 (Tex. App.—San Antonio 1994, writ dism'd w.o.j.) (candidate for city council is a public figure).

Criticism of public officials and political candidates ticks all of the "public concern" boxes of the TCPA: the qualifications and politics of public officials and candidates for office are issues related to health and safety; to environmental, economic, or community well-being; to the government; and to goods, products, or services in the marketplace.

This Court must dismiss Mr. Hoang's lawsuit unless Mr. Hoang "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." TCPA § 27.005(c).

2

131

"Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case." *Better Business Bureau of Metropolitan Houston, Inc. v. John Moore Services, Inc.*, 441 S.W.3d 345, ____ (Tex. App.—Houston [1st Dist.] 2013, pet. denied). "'Clear' means 'unambiguous,' 'sure,' or 'free from doubt.' 'Specific' means 'explicit' or 'relating to a particular named thing.'" *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

## MR. HOANG'S TWO CLAIMS

Mr. Hoang has pled two ostensible causes of action:

> Plaintiffs sue Defendant for Libel and Hate Crime. All conditions precedent to Plaintiffs recovery under the agreement have occurred.
>
> Libel: Plaintiff will show that Defendants are liable to Plaintiff for libel by making statements of facts that Plaintiff is a Communist Spy, a Communist Agent working for the interest of the Vietnamese Communist's government. under the contract. Defendant's actions constituting Libel were done with malice, as that term defined in Tex. Civ. Prac. & Rem. Code Sec.41.00I(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.
>
> 2. Hate Crime: In the alternative, Defendants are liable to Plaintiff under the Hate Crime Cause of Action. As a result of Defendants' hate crime and malicious revenge, Plaintiffs have suffered actual and consequential damages in excess of the minimum jurisdictional limits of this court. Defendant's actions constituting Misrepresentation were done with malice, as that term defined in Tex. Civ. Prac. & Rem. Code Sec.41.001(a)(1)&(2). Accordingly, Plaintiff is entitled to recover exemplary damages pursuant to the above Sections.

[sic]

3

132

## *"Hate Crime"?*

There is no "hate crime cause of action" in Texas. A Westlaw search of all civil cases in Texas produces no cases with "hate crime" and "cause of action" in the same sentence. Mr. Hoang has not "establishe[d] by clear and specific evidence a prima facie case for each essential element" of this made-up cause of action.

## *Libel*

Libel is a species of defamation. "To prevail in a defamation case, a plaintiff who is a public official or figure must prove that the defendant (1) published a false statement about the plaintiff, (2) that was defamatory, (3) while acting with actual malice." *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 433 (Tex. App.—Austin 2007).

### Is it false?

In his *Original Petition* Mr. Hoang claims that the defendants said that he was "a Communist spy, a Communist agent working for the interest of the Vietnamese Communist's government." Tellingly, he never outright *denies* being a communist spy or a communist agent working for the interest of the Vietnamese government under oath, much less does he establish by clear and specific non-conclusory evidence that the defendants' statements were false.

4

Is it defamatory?

> A statement is defamatory if it tends to injure the person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury, or if it tends to impeach that person's honesty, integrity, or virtue. A communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that hurts only the plaintiff's feelings, however, is not actionable. To be defamatory, a statement should be derogatory, degrading, and somewhat shocking, and contain "element[s] of personal disgrace." Thus, it is not defamatory to accuse a person of doing that which he has a legal right to do.

*Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App.—Austin 2010, _).

The defendants allegedly called Mr. Hoang a communist. Communism is a political philosophy. It may be wrongheaded, but is not illegal or disgraceful, to be a communist.

Mr. Hoang has failed to establish by clear and specific evidence that the defendants' statements were defamatory.

Was it published with *actual malice*?

Public figures such as Mr. Hoang cannot recover for defamatory statements made about them absent proof of actual malice. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003).

In his *Original Petition* Mr. Hoang states that "Defendant's actions constituting Libel were done with malice, as that term defined in TEX. CIV. PRAC. & REM. CODE SEC.41.001(A)(1)&(2)."

134

Malice *under Section 41.001* "means a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM. CODE § 41.001(7).

In the context of libel, however, actual malice is a term of art. "[t]he phrase *actual malice* ... has nothing to do with bad motive or ill will," but rather is "a shorthand to describe the First Amendment protections for speech injurious to reputation." *Bentley v. Bunton*, 94 S.W.3d 561, 590 (Tex. 2002); *Letter Carriers v. Austin*, 418 U.S. 264, 281 (1974) ("[I]mpos[ing] liability on the basis of the defendant's hatred, spite, ill will, or desire to injure [is] 'clearly impermissible.'").

To establish actual malice, "a public figure must prove that the defendant made the statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000). A public-figure plaintiff must prove that the defendant "entertained serious doubts as to the truth of his publication." *Forbes*, 124 S.W.3d at 171.

Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). The plaintiff must establish that the defendant "in fact entertained serious doubts as to the truth of his publication" or "had a

high degree of awareness of the probable falsity of the published information." *Forbes*, 124 S.W.3d at 171; *see also Bentley*, 94 S.W.3d at 591. Constitutional malice generally consists of calculated falsehood. *Id.*

Mr. Hoang alleges actual malice in his *Supplemental Answer to Defendants' Motion to Dismiss*, but then describes facts that, while they might arguably support a desire to injure Mr. Hoang, do not show *actual malice*. Assuming for the sake of argument that the defendants intended to harm the plaintiff, this is not evidence of actual malice. *See Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82 (1967) (noting that actual malice cannot be based merely on a defendant's "bad or corrupt motive," nor "personal spite, ill-will or a desire to injure plaintiff"); *Forbes*, 124 S.W.3d at 171 ("It is not ill will, spite, or evil motive"). Mr. Hoang has offered no evidence that the defendants entertained serious doubts as to the truth of their alleged publication, nor that they had a high degree of awareness of their probable falsity.

There are three possible stages to a motion under the TCPA: 1) the defendant shows that action relates to the exercise of the right of free speech; 2) the plaintiff tries to establish a prima facie case; 3) the defendant tries to establish a valid defense. Section 27.006(a) of the

7

TCPA counsels the court to "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a). In other words, "the facts on which the liability ... is based" must be stated in an affidavit. Pleadings are not evidence in the second or third stage, but may be used to make the initial showing. *See Rio Grande H2O Guardian v. Robert Muller Family P'ship Ltd.*, No. 04-13-00441-CV, 2014 WL 309776, at *3 (Tex. App.—San Antonio Jan. 29, 2014) ("Because we may consider the pleadings as evidence in this case, Rio Grande H2O Guardian's petition established that the appellants were exercising their right to petition in filing the lawsuit").

While Mr. Hoang's pleadings can be used to show that the action falls under the TCPA, his unsworn self-serving statements in his *Answer* and *Supplemental Answer* to the defendants' motion are not "clear and specific evidence." *See Cheniere Energy, Inc. v. Lotfi*, — S.W.3d —, 2014 WL 5011132, at *3 (Tex. App.—Houston Oct. 7, 2014) ("Souki and Rayford chose not to submit affidavits in support of their motion to dismiss; therefore, their contention that they communicated when joined together to act in furtherance of a

8

common interest remains unverified"). If unsworn self-serving pleadings were "evidence" then affidavits would never be needed.

Mr. Hoang's pleadings show that the action qualifies for dismissal under the TCPA; it is his responsibility to establish, by clear and specific *evidence*, a prima facie case. He has failed to do so. He provides no evidence that the defendants knew that their statements about him were false, nor that they made the statements with reckless disregard of whether they were false.

## CONCLUSION

Because the defendants have shown, through the words in Mr. Hoang's *Original Petition*, that the legal action is based on, relates to, or is in response to their exercise of the right of free speech; and because Mr. Hoang has failed to establish by clear and specific evidence a prima facie case for either his imaginary cause of action ("hate crime") or his legal cause of action (defamation), this Court must dismiss Mr. Hoang's suit against the defendants and order Mr. Hoang to pay the defendants' reasonable attorney's fees.

Because Mr. Hoang's suit was brought to harass, this court should also make the written findings described in TCPA §27.007(a).

138

Because Mr. Hoang has filed suit based on an imaginary cause of action and because the defendants have shown, through public records in other cases, that Mr. Hoang makes a practice of filing suits against his critics in response to their exercise of the right to free speech, this Court should also order the sanctions described in TCPA §27.009(a)(2).

**CERTIFICATE OF SERVICE**

I certify compliance with Texas Rule of Civil Procedure 21.

Thank you,

Mark Bennett
SBN 00792970
Bennett & Bennett
917 Franklin Street, Fourth Floor
Houston, Texas 77002
713.224.1747
mb@ivi3.com

10

139

No. 2014-59665

| | |
|---|---|
| ALOYSIUS HOANG <br> VS. <br> THINH DAT NGUYEN <br> THOI BAO HOUSTON | IN THE 215TH DISTRICT COURT <br> HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF THINH DAT NGUYEN

Before me, the undersigned authority, personally appeared Thinh Dat Nguyen. After I administered an oath to affiant, affiant testified:

"My name is Thinh Dat Nguyen. I am capable of making this affidavit.

"I am the editor of the magazine *Thoi Bao Houston*.

"Al Hoang was a public official and a public figure at the time of the events described in his lawsuit. Specifically, he was a Houston City Council member and a candidate for the Texas Legislature.

"Al Hoang's lawsuit against me and *Thoi Bao Houston* is based on, relates to, and is in response to my exercise of the right of free speech. Specifically, Mr. Hoang is suing me for statements he claims I made about his political affiliations in *Thoi Bao Houston*.

"This is a matter of public concern. Specifically, it is an issue related to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace.

"Al Hoang's allegation that I ordered him not to go to Vietnam is false. His allegation that I said that I would mobilize *Thoi Bao* to destroy him



TDN

140

or take his council seat is false. He has not spoken to me since before he went to Vietnam. He never challenged me to a debate. He never made a request for correction, clarification, or retraction from me or *Thoi Bao Houston.*"

Further Affiant sayeth naught.

_____
Thinh Dat Nguyen

SIGNED under oath before me on ___November 13, 2014___.

_____
Notary Public, State of Texas

ZULEMA PLATA
MY COMMISSION EXPIRES
July 22, 2016

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

▷

Court of Appeals of Texas,
Houston (1st Dist.).
The BETTER BUSINESS BUREAU OF METRO-
POLITAN HOUSTON, INC., Appellant
v.
JOHN MOORE SERVICES, INC. and John Moore
Renovation, LLC, Appellees.

No. 01–12–00990–CV.
July 16, 2013.

**Background:** Home repair and maintenance busi-
ness brought action against Better Business Bureau
(BBB) for defamation, business disparagement,
fraud, and tortious interference with business rela-
tionships after BBB gave the business an "F" rat-
ing. The 269th Judicial District Court, Harris
County, Dan Hinde, J., denied motion to dismiss.
BBB appealed.

**Holdings:** The Court of Appeals, Michael Massen-
gale, J., held that:

(1) BBB met its burden under Texas Citizen's Parti-
cipation Act (TCPA) to obtain dismissal of action;

(2) statement by BBB that business was not accred-
ited by BBB was not defamatory;

(3) "F" rating given by BBB to business was not
defamatory;

(4) business's allegation that BBB did not affirmat-
ively restrict its use of BBB's markings and award
insignia did not amount to a misrepresentation of a
material fact as required for fraud claim; and

(5) business failed to show by clear and specific
evidence the existence of a contract as required for
its claim against BBB for tortious interference with
a contract.

Reversed and remanded.

Sharp, J., dissented.

West Headnotes

**[1] Appeal and Error 30 ⊛70(5)**

30 Appeal and Error
    30III Decisions Reviewable
        30III(D) Finality of Determination
            30k67 Interlocutory and Intermediate De-
cisions
                30k70 Nature and Scope of Decision
                    30k70(5) k. On motion for dis-
missal or nonsuit. Most Cited Cases

Court of Appeals had interlocutory appellate
jurisdiction over appeal from denial of motion filed
by Better Business Bureau (BBB) to dismiss under
the Texas Citizen's Participation Act (TCPA).
V.T.C.A., Civil Practice & Remedies Code §
27.008.

**[2] Appeal and Error 30 ⊛170(2)**

30 Appeal and Error
    30V Presentation and Reservation in Lower
Court of Grounds of Review
        30V(A) Issues and Questions in Lower Court
            30k170 Nature or Subject-Matter of Is-
sues or Questions
                30k170(2) k. Constitutional questions.
Most Cited Cases

Home repair and maintenance business waived
argument on appeal that Texas Citizen's Participa-
tion Act (TCPA) was unconstitutional by failing to
raise it in the trial court. Rules App.Proc., Rule
33.1(a).

**[3] Appeal and Error 30 ⊛893(1)**

30 Appeal and Error
    30XVI Review
        30XVI(F) Trial De Novo
            30k892 Trial De Novo
                30k893 Cases Triable in Appellate
Court
                    30k893(1) k. In general. Most Cited
Cases

Court of Appeals reviews de novo, as an ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

plication of law to facts, determination of whether defendant showed by a preponderance of the evidence that action under Texas Citizen's Participation Act (TCPA) was based on, related to, or in response to a party's exercise of the right of free speech, right to petition, or right of association. V.T.C.A., Civil Practice & Remedies Code § 27.005(b).

**[4] Appeal and Error 30 ⬤➞893(1)**

30 Appeal and Error
  30XVI Review
    30XVI(F) Trial De Novo
      30k892 Trial De Novo
        30k893 Cases Triable in Appellate Court
          30k893(1) k. In general. Most Cited Cases

Court of Appeals reviews de novo questions of statutory construction.

**[5] Statutes 361 ⬤➞1091**

361 Statutes
  361III Construction
    361III(B) Plain Language; Plain, Ordinary, or Common Meaning
      361k1091 k. In general. Most Cited Cases

**Statutes 361 ⬤➞1405**

361 Statutes
  361IV Operation and Effect
    361k1402 Construction in View of Effects, Consequences, or Results
      361k1405 k. Relation to plain, literal, or clear meaning; ambiguity. Most Cited Cases

In interpreting statutes, court's primary purpose is to give effect to the legislature's intent by relying on the plain meaning of the text adopted by the legislature, unless a different meaning is supplied by statutory definition or is apparent from the context, or the plain meaning leads to absurd results.

**[6] Pleading 302 ⬤➞358**

302 Pleading

  302XVI Motions
    302k351 Striking Out Pleading or Defense
      302k358 k. Frivolous pleading. Most Cited Cases

Scope of the Texas Citizen's Participation Act (TCPA) is not limited only to protect speech directed toward the government. V.T.C.A., Civil Practice & Remedies Code § 27.005(b).

**[7] Pleading 302 ⬤➞358**

302 Pleading
  302XVI Motions
    302k351 Striking Out Pleading or Defense
      302k358 k. Frivolous pleading. Most Cited Cases

**Pleading 302 ⬤➞360**

302 Pleading
  302XVI Motions
    302k351 Striking Out Pleading or Defense
      302k360 k. Application and proceedings thereon. Most Cited Cases

Better Business Bureau (BBB) met its burden under Texas Citizen's Participation Act (TCPA) to obtain dismissal of action against BBB by home repair and maintenance business for defamation, business disparagement, fraud, and tortious interference with business relationships, which business brought after BBB gave the business an "F" rating, related to the exercise of its right of free speech, where BBB presented evidence that the legal actions at issue all related to or were in response to the expression of opinions regarding the quality of goods and services of the business, principally business ratings and associated commentary. V.T.C.A., Civil Practice & Remedies Code § 27.005(b).

**[8] Pleading 302 ⬤➞358**

302 Pleading
  302XVI Motions
    302k351 Striking Out Pleading or Defense
      302k358 k. Frivolous pleading. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

441 S.W.3d 345
(Cite as: 441 S.W.3d 345)

Exemption under Texas Citizen's Participation Act (TCPA) for action against a person primarily engaged in selling or leasing goods or services, if the conduct arose out of the sale or lease of goods, services, or a commercial transaction in which the intended audience was an actual or potential buyer or customer did not apply to action by home repair and maintenance business against Better Business Bureau (BBB) for defamation, business disparagement, fraud, and tortious interference with business relationships, which business brought after BBB gave the business an "F" rating, even if the BBB could be considered a business primarily engaged in selling membership services, where an actual or potential buyer or customer of those services would have been the accredited businesses, not the general public. V.T.C.A., Civil Practice & Remedies Code § 27.010(b).

**[9] Pleading 302 ⟨key⟩360**

302 Pleading
  302XVI Motions
    302k351 Striking Out Pleading or Defense
      302k360 k. Application and proceedings thereon. Most Cited Cases

The Legislature's use of the term "prima facie case" in the Texas Citizen's Participation Act (TCPA) implies a minimal factual burden of proof for the plaintiff to prove each essential element of the claim: "prima facie" evidence is the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true. V.T.C.A., Civil Practice & Remedies Code § 27.005(c).

**[10] Pleading 302 ⟨key⟩360**

302 Pleading
  302XVI Motions
    302k351 Striking Out Pleading or Defense
      302k360 k. Application and proceedings thereon. Most Cited Cases

Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case under the Texas Citizen's Participation Act (TCPA). V.T.C.A., Civil Practice & Remedies Code § 27.005(c).

**[11] Appeal and Error 30 ⟨key⟩919**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k915 Pleading
        30k919 k. Striking out or dismissal. Most Cited Cases

In determining whether plaintiff has established, by clear and specific evidence, a prima facie case for each essential element of claim in question, as required to avoid dismissal of claim covered by Texas Citizen's Participation Act (TCPA), Court of Appeals examines pleadings and evidence in light favorable to plaintiff. V.T.C.A., Civil Practice & Remedies Code § 27.005(c).

**[12] Libel and Slander 237 ⟨key⟩1**

237 Libel and Slander
  237I Words and Acts Actionable, and Liability Therefor
    237k1 k. Nature and elements of defamation in general. Most Cited Cases

Defamation is a false and injurious impression of a plaintiff published without legal excuse.

**[13] Libel and Slander 237 ⟨key⟩1**

237 Libel and Slander
  237I Words and Acts Actionable, and Liability Therefor
    237k1 k. Nature and elements of defamation in general. Most Cited Cases

To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) which was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement.

**[14] Libel and Slander 237 ⟨key⟩6(1)**

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k6 Actionable Words in General

237k6(1) k. In general. Most Cited Cases

Statements that are not verifiable as false cannot form the basis of a defamation claim.

**[15] Libel and Slander 237 ⬅6(1)**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k6 Actionable Words in General

237k6(1) k. In general. Most Cited Cases

To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace; but a communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts the plaintiff's feelings, is not actionable. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[16] Libel and Slander 237 ⬅123(2)**

237 Libel and Slander

237IV Actions

237IV(E) Trial, Judgment, and Review

237k123 Questions for Jury

237k123(2) k. Construction of defamatory language in general. Most Cited Cases

Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[17] Appeal and Error 30 ⬅893(1)**

30 Appeal and Error

30XVI Review

30XVI(F) Trial De Novo

30k892 Trial De Novo

30k893 Cases Triable in Appellate Court

30k893(1) k. In general. Most Cited Cases

Questions of law are subject to de novo review.

**[18] Libel and Slander 237 ⬅6(1)**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k6 Actionable Words in General

237k6(1) k. In general. Most Cited Cases

Whether a publication is an actionable statement of fact under law of defamation depends on its verifiability and the context in which it was made. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[19] Libel and Slander 237 ⬅19**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k19 k. Construction of language used. Most Cited Cases

Court of Appeals construes the allegedly defamatory statement as a whole based upon a reasonable person's perception of it. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[20] Libel and Slander 237 ⬅9(7)**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k9 Words Tending to Injure in Profession or Business

237k9(7) k. Merchants, tradesmen, and manufacturers. Most Cited Cases

Statement by Better Business Bureau (BBB) that home repair and maintenance business was not accredited by BBB was not defamatory, even if it was false, where statement did not impugn business's reputation by suggesting that it engaged in wrongful or unethical conduct, rather it merely suggested that business did not obtain accreditation with the BBB, a purely optional accolade. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[21] Libel and Slander 237 ⬦9(7)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k9 Words Tending to Injure in Profession or Business
            237k9(7) k. Merchants, tradesmen, and manufacturers. Most Cited Cases

Statement on Better Business Bureau (BBB) website that home repair and maintenance business was not rated was not defamatory, even if untrue; statement did not suggest that business committed some wrong or engaged in any nefarious activities, and it merely suggested that business had no rating. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[22] Libel and Slander 237 ⬦9(7)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k9 Words Tending to Injure in Profession or Business
            237k9(7) k. Merchants, tradesmen, and manufacturers. Most Cited Cases

Statements by Better Business Bureau (BBB) that home repair and maintenance business was not permitted to advertise that it won BBB awards of excellence were not defamatory; acknowledging that a dispute existed over the advertising of the awards was not defamatory, let alone a statement showing the BBB's negligent regard for the truth, as a defamation showing required. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[23] Libel and Slander 237 ⬦9(7)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k9 Words Tending to Injure in Profession or Business
            237k9(7) k. Merchants, tradesmen, and manufacturers. Most Cited Cases

Rating of "F" that Better Business Bureau (BBB) gave to home repair and maintenance business was not defamatory, where it was the BBB's self-described opinion of the quality of business's services, which lacked a high degree of verifiability, and, even to the extent such an opinion was verifiable based on the BBB's standards, it was not false and defamatory, as the BBB considered customer complaints regarding the business in its standards for determining the ratings, and the website identified customer complaints and advertising issues as the reason for business's low rating. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[24] Libel and Slander 237 ⬦130**

237 Libel and Slander
    237V Slander of Property or Title
        237k130 k. Nature and elements in general. Most Cited Cases

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff.

**[25] Libel and Slander 237 ⬦68**

237 Libel and Slander
    237IV Actions
        237IV(A) Right of Action and Defenses
            237k68 k. Nature and form of remedy. Most Cited Cases

**Libel and Slander 237 ⬦130**

237 Libel and Slander
    237V Slander of Property or Title
        237k130 k. Nature and elements in general. Most Cited Cases

A business disparagement claim and a defamation action differ in the interest protected: a defamation claim protects an injured party's personal reputation, while a business disparagement claim protects economic interests.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

**[26] Libel and Slander 237 �köö139**

237 Libel and Slander
   237V Slander of Property or Title
     237k139 k. Actions. Most Cited Cases

Failure by home repair and maintenance business to present clear and specific evidence that the Better Business Bureau (BBB) published a false and defamatory statement was fatal to business's business disparagement claim.

**[27] Fraud 184 ⊘3**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k2 Elements of Actual Fraud
      184k3 k. In general. Most Cited Cases

A person commits fraud by (1) making a representation of material fact (2) that is false (3) and was known to be false or asserted recklessly without knowledge of its truth (4) with the intent that the misrepresentation be acted upon, and (5) the person to whom the misrepresentation is made justifiably relies upon it and (6) is injured as a result.

**[28] Fraud 184 ⊘25**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k25 k. Injury and causation. Most Cited Cases

The defendant's acts or omissions alleged in a fraud claim must be a cause-in-fact of the plaintiff's injury, i.e., a substantial factor in bringing about an injury which otherwise would not have occurred.

**[29] Fraud 184 ⊘21**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k19 Reliance on Representations and Inducement to Act
      184k21 k. Persons who may rely on rep-

resentations. Most Cited Cases

The maker of the misrepresentation alleged in a fraud claim must have had reason to expect the plaintiff to rely on his statement when the statement was made.

**[30] Fraud 184 ⊘21**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k19 Reliance on Representations and Inducement to Act
      184k21 k. Persons who may rely on representations. Most Cited Cases

The transaction sued upon in a fraud claim must be of the type the defendant could have contemplated.

**[31] Fraud 184 ⊘12**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k8 Fraudulent Representations
      184k12 k. Existing facts or expectations or promises. Most Cited Cases

Promises of future performance generally do not constitute actionable fraud, as they are not representations of fact, but may be actionable if made with the intent and purpose to deceive and with no intention of performing.

**[32] Fraud 184 ⊘9**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k8 Fraudulent Representations
      184k9 k. In general. Most Cited Cases

Allegation by home repair and maintenance business that Better Business Bureau (BBB) did not affirmatively restrict its use of BBB's markings and award insignia did not amount to a misrepresentation of a material fact as required for fraud claim, even though business was encouraged to advertise

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

the awards in the past, where there was no allegation that the encouragement was tantamount to a perpetual license to use BBB trademarks, nor could it mean that BBB could never take a subsequent position that it would be misleading for a company with a current "F" rating to prominently feature BBB awards in its advertising.

**[33] Fraud 184 ⟳9**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k8 Fraudulent Representations
         184k9 k. In general. Most Cited Cases

Letter from Better Business Bureau (BBB) to home repair and maintenance business stating that business could continue to display BBB awards did not support business's fraud claim against BBB, where letter confirmed that business's use of BBB logo had been grandfathered, but also stated that the exemption would eventually end and that it was in effect to avoid saddling the business with the expense of repainting its fleet.

**[34] Fraud 184 ⟳58(1)**

184 Fraud
   184II Actions
      184II(D) Evidence
         184k58 Weight and Sufficiency
            184k58(1) k. In general. Most Cited Cases

Home repair and maintenance business did not offer clear and specific evidence to establish its fraud claim that the Better Business Bureau (BBB) made an actionable representation about the BBB's neutrality, where business presented no clear and specific evidence of when or how the BBB represented that it was independent and unbiased and provided no evidence that made any reference to the BBB's mission statement and values statement.

**[35] Torts 379 ⟳212**

379 Torts

379III Tortious Interference
   379III(B) Business or Contractual Relations
      379III(B)1 In General
         379k212 k. Contracts. Most Cited Cases

To establish a cause of action for tortious interference with contract, a plaintiff must prove that (1) a contract subject to interference exists, (2) the defendant committed a willful and intentional act of interference with the contract (3) the act proximately caused injury, and (4) the plaintiff sustained actual damages or loss.

**[36] Torts 379 ⟳213**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)1 In General
            379k213 k. Prospective advantage, contract or relations; expectancy. Most Cited Cases

To establish a cause of action for tortious interference with prospective contract or business relationships, a plaintiff must show that (1) there was a reasonable probability that the parties would have entered into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference.

**[37] Torts 379 ⟳242**

379 Torts
   379III Tortious Interference
      379III(B) Business or Contractual Relations
         379III(B)2 Particular Cases
            379k242 k. Contracts in general. Most Cited Cases

Home repair and maintenance business failed to show by clear and specific evidence the existence of a contract as required for its claim against

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

Better Business Bureau (BBB) for tortious interference with a contract, although some of business's customers mentioned on business's website that they would file complaints demanding their money back from business, where business offered no clear and specific evidence of any of the contracts or their terms.

**[38] Torts 379 ☞214**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k214 k. Existence of valid or identifiable contract, relationship or expectancy. Most Cited Cases

To prevail on a tortious interference claim, a plaintiff must present evidence that the defendant interfered with a specific contract.

**[39] Torts 379 ☞212**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k212 k. Contracts. Most Cited Cases

To establish tortious interference with a contract, the plaintiff must present evidence that some obligatory provision of a contract has been breached.

**[40] Torts 379 ☞242**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k242 k. Contracts in general. Most Cited Cases

Home repair and maintenance business failed to show by clear and specific evidence that Better Business Bureau (BBB) committed an independently tortious or unlawful act as required for claim

against BBB for tortious interference with a contract.

**\*350** Jeffrey R. Elkin, Lauren B. Harris, Porter & Hedges, LLP, Houston, TX, for Appellant.

Douglas Pritchett, Jr., Lori Hood, Tamara Madden, Johnson, Trent, West & Taylor, L.L.P., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices SHARP and MASSENGALE.

## OPINION
MICHAEL MASSENGALE, Justice.

This interlocutory appeal arises from a dispute between the Better Business Bureau of Metropolitan Houston, Inc. and John Moore, Inc. over a business quality rating and the right to display past awards. Asserting that a lawsuit John Moore filed against the Bureau was related to its exercise of free speech, the Bureau filed a motion to dismiss pursuant to the Texas Citizen's Participation Act (TCPA). *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 27.001–.011 (West Supp.2012). The trial court denied the motion. We reverse and remand for further proceedings consistent with this opinion.

### Background
The Better Business Bureau is a non-profit corporation that seeks to promote ethical business practices, and it espouses a mission of "advancing marketplace trust" by setting standards for trustworthy businesses, encouraging best business practices, promoting business role models, and denouncing substandard marketplace behavior. To these ends, the Bureau rates business in the greater Houston area on a letter-grade scale and publishes information about area businesses on its website. On its website, the Bureau notes that its letter grades represent its "opinion of the business" and that the "grades are not a guarantee of a business's reliability or performance." The Bureau also invites selected**\*351** businesses to become "accredited" members by asking them to abide by Bureau-pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

mulgated standards and to pay a membership fee. In exchange, the Bureau offers accredited members the use of the Better Business Bureau seal, a page for the business on the Bureau's website, and various services to help resolve disputes between businesses, such as a mediation program.

John Moore is in the business of providing home repair and maintenance services, such as air conditioner repair, pest control, and plumbing. Before December 2010, John Moore was an accredited business with the Houston Better Business Bureau, and it had received an "A+" rating on the Bureau's website. From 2003 to 2010, John Moore received the Bureau's "Award of Excellence," which the company displayed on its advertising materials. John Moore's president, Don Valentine, served as Chairman of the Houston Bureau from 2007 to 2008. In late 2010, however, John Moore resigned from the Houston Bureau, complaining about the methodology it used to determine its business ratings. The resignation coincided with the Houston Bureau's decision to revoke John Moore's accreditation in response to numerous consumer complaints. John Moore then informed the Houston Bureau that it moved its business headquarters to the Bryan–College Station area. Because the move of headquarters meant that the Houston Bureau no longer considered John Moore an area business, it changed its letter grade for the company to "NR" for "not rated."

In 2012, the Houston Bureau learned that John Moore was continuing to display a Houston address on its advertising and that the company's office in Bryan–College Station had no indications of actual business activity. John Moore had also continued to display Better Business Bureau markings, including the Award of Excellence logo, on the company's website, trucks, employee uniforms, and written invoices. After learning of these activities, the Houston Bureau once again considered John Moore as a Houston-area business, and it resumed publication of a business rating on its website. Additionally, the Houston Bureau filed a trademark infringement lawsuit in federal court to challenge John Moore's continued use of the Bureau markings. For its part, John Moore believed it had the right to continue to display the awards because no temporal restrictions on their use were imposed when it originally received the awards. The Houston Bureau gave John Moore an "F" rating for a high number of consumer complaints, the failure to address those complaints, and the company's allegedly misleading use of the Bureau's trademarks.

John Moore then filed this lawsuit, asserting numerous causes of action against the Houston Bureau. The Bureau filed a motion to dismiss pursuant to the TCPA, which applies to legal actions based on, related to, or in response to the exercise of the rights of free speech, petition, and association. See TEX. CIV. PRAC. & REM.CODE ANN. § 27.003(a). John Moore responded in support of the viability of only four of its causes of action: defamation, business disparagement, fraud, and tortious interference with business relationships. The trial court held a hearing and timely denied the motion to dismiss. The Bureau then filed this interlocutory appeal.

## Analysis

The TCPA provides a procedure for dismissing meritless suits that are based on the defendant's exercise of the rights of free speech, petition, or association as defined within the statute. TEX. CIV. PRAC. & REM.CODE ANN. § 27.003. If the legal action is "based on, relates to, or is in response*352 to" the exercise of those constitutional rights, a party may file to dismiss "the legal action." See id. § 27.003(a). In deciding whether to grant a motion under the TCPA and dismiss the lawsuit, the statute instructs a trial court to "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." Id. § 27.006(a).

## I. Appellate jurisdiction

John Moore challenges our appellate jurisdiction to review the trial court's ruling, so we address that as a threshold matter. The parties do not dis-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

pute that section 27.008(a) permits an interlocutory appeal when a motion to dismiss is denied by operation of law due to the trial court's failure to rule. *See id.* § 27.008(a). But the trial court in this case did timely rule on the Houston Bureau's motion. John Moore, relying on the opinion of the Second Court of Appeals in *Jennings v. WallBuilder Presentations, Inc.,* 378 S.W.3d 519, 525 (Tex.App.-Fort Worth 2012, pet. filed), contends that section 27.008 does not provide an interlocutory appeal under these circumstances.

[1] We disagree. This court has recently held, along with several other intermediate courts of appeal, that "section 27.008 permits an interlocutory appeal from the trial court's written order denying a motion to dismiss under the TCPA." *KTRK Television, Inc. v. Robinson,* 409 S.W.3d 682, 688 (Tex.App.-Houston [1st Dist.] 2013, no pet. h.) (citing *Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC,* No. 14–12–00896–CV, 2013 WL 407029 (Tex.App.-Houston [14th Dist.] Jan. 24, 2013, order); *Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, INC.,* 402 S.W.3d 299, 308 (Tex.App.-Dallas 2013, no pet. h.); *San Jacinto Title Svcs., LLC v. Kingsley Props., LP,* ——S.W.3d ——, ——, No. 13–12–00352–CV, 2013 WL 1786632, at *4 (Tex.App.-Corpus Christi Apr. 25, 2013, no pet. h.)). Accordingly, we have interlocutory appellate jurisdiction over this appeal, and thus we address the denial of the Bureau's motion to dismiss.

## II. Application of the TCPA

[2] The Bureau argues that dismissal of John Moore's suit was required because it demonstrated by a preponderance of the evidence that the claims are a response to the Bureau's exercise of its right to free speech, and John Moore failed to present clear and specific evidence to support each element of its claims to establish its prima facie case. John Moore disputes these points and also asserts that a business transaction exemption to the statute applies.[FN1] We address each contention in turn.

FN1. John Moore also argues that an inter-

pretation of the "clear and specific evidence" standard in the TCPA that requires a high burden of proof before trial would violate the open-courts provision of the Texas Constitution and the right to a trial by jury. To the extent that John Moore argues that the statute is unconstitutional, that argument was waived due to failure to present it to the trial court. *See* TEX.R.APP. P. 33.1(a); *see also Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 222 (Tex.2002) ("A litigant must raise an open-courts challenge in the trial court."); *In re Doe 2,* 19 S.W.3d 278, 284 (Tex.2000) (attacks on the presumption that a statute is constitutional should be raised as an affirmative defense through appropriate pleadings before the trial court).

## A. Exercise of "the right of free speech"

[3] To obtain dismissal under the TCPA, a defendant must show "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of the ***353** right of free speech; the right to petition; or the right of association." TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(b). We review this determination de novo as an application of law to facts. *See Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.,* No. 01–12–00581–CV, 2013 WL 1867104, at *6 (Tex.App.-Houston [1st Dist.] May 2, 2013, no pet. h.); *see also Rehak Creative Servs., Inc. v. Witt,* 404 S.W.3d 716, 725 (Tex.App.-Houston [14th Dist.] 2013, no pet. h.).

The TCPA defines "the exercise of the right of free speech" as "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM.CODE ANN. § 27.001(3). John Moore contends that the statute only applies to speech for the purpose of participation in government, and that the statute does not apply to lawsuits relating to commercial speech.

[4][5] We review questions of statutory construction de novo. *Tex. Lottery Comm'n v. First*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*State Bank of DeQueen,* 325 S.W.3d 628, 635 (Tex.2010). In interpreting statutes, our primary purpose is to give effect to the legislature's intent by relying on the plain meaning of the text adopted by the legislature, unless a different meaning is supplied by statutory definition or is apparent from the context, or the plain meaning leads to absurd results. *Id.*

The expressly stated purpose of the TCPA "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM.CODE ANN. § 27.002. John Moore's interpretation places great weight on the words "and otherwise participate in government" as a limitation on the preceding list of "constitutional rights" that the statute is intended to "encourage and safeguard." *Id.* But this interpretation would render completely meaningless the references to the constitutional rights to "speak freely" and "associate freely," if neither adds any additional meaning to the protection of the constitutional right "to petition" and to "otherwise participate in government." *Id.*

The right to free speech that is protected by the statute is expressly defined to include "communication made in connection with a matter of public concern," *id.* § 27.001(3), with a "matter of public concern" itself being defined to include, among other things, "a good, product, or service in the marketplace." *Id.* § 27.001(7)(E). These broadly defined references to speech rights do not support any inference that only a limited subclass of such communications is protected. John Moore's interpretation is further undermined by the statute's unqualified protection of the "exercise of the right of free speech," considering that the First Amendment protects speech conveying information about products and transaction in the commercial marketplace. *See 44 Liquormart, Inc. v. Rhode Island,* 517

U.S. 484, 503–04, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

[6][7] We conclude that the scope of the statute is not limited only to protect speech directed toward the government. *Accord BH DFW,* 402 S.W.3d at 309 (concluding that a Better Business Bureau's rating of a company was a communication relating to an issue of public concern within the meaning of the TCPA); *Newspaper Holdings,* 2013 WL 1867104, at *7 (applying TCPA to tort claims against a newspaper and its source). The exercise of the **\*354** right of free speech as contemplated by the TCPA includes a person's right to communicate reviews or evaluations of services in the marketplace. The Houston Better Business Bureau's rating system falls within this definition. Opinion of the quality of a business's products and services are published based on the Bureau's own criteria, including customer feedback and complaints about those products and services. The Bureau characterizes its business ratings as "opinions," and it discloses its criteria for determining those opinions.

Because the Houston Bureau presented evidence that the legal actions at issue all relate to or are in response to the expression of opinions regarding the quality of John Moore's goods and services, principally business ratings and associated commentary, the legal actions are necessarily "related to" a matter of public concern, John Moore's products and services in the marketplace. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 27.001, 27.005(b). Therefore, the Houston Bureau met its burden to prove that John Moore's legal action related to the exercise of its right of free speech.

**B. Applicability of statutory exclusion**

John Moore additionally argues that the TCPA does not apply because the Houston BBB is primarily engaged in the business of selling advertising and customer relations services. Section 27.010(b) provides that the TCPA "does not apply to a legal

action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services ... or a commercial transaction in which the intended audience is an actual or potential buyer or customer." *Id.* § 27.010(b)

[8] Because the intended audience of the Houston Bureau's statements and conduct that John Moore complains about in this case is the consumer public at large, not the businesses to which the Bureau attempts to "sell" its membership services, the exemption does not apply. The statements or conduct that John Moore complains of are (1) the rating system, (2) the rating the Houston Bureau gave John Moore on its website and in its customer service interactions, and (3) the notice on its website that John Moore is not entitled to display the Award of Excellence logo. The intended audience all of these statements is the public consumer, not businesses who may be eligible for accreditation.

Even if, based on the evidence John Moore presented, the Bureau could be considered a business primarily engaged in selling membership services, the actual or potential buyers or customers of those services would be the accredited businesses, not the general public. In its lawsuit, John Moore does not complain of or make allegations regarding the Houston Bureau's statements or conducts related to selling its membership services to businesses, which would be the potential buyers or customers of the Houston Bureau. Thus, we conclude that the exemption does not apply to John Moore's legal action in this case.

### C. Prima facie case

[9][10][11] To avoid dismissal of a claim covered by the TCPA, a plaintiff must establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). The Houston Bureau contends that John Moore failed to do so. The Legislature's use of the term "prima facie case" implies a minimal factual burden: "prima facie" evidence is "the minim-

um quantum of evidence*355 necessary to support a rational inference that the allegation of fact is true." *Newspaper Holdings,* 2013 WL 1867104, at *6; *see also Rodriguez v. Printone Color Corp.,* 982 S.W.2d 69, 72 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). Conclusory statements are not probative and accordingly will not suffice to establish a prima facie case. *See In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 223–24 (Tex.2004). The statute requires that the proof offered address and support each "essential element" of every claim asserted with "clear and specific evidence." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(c). Accordingly, we examine the pleadings and the evidence in a light favorable to John Moore to determine whether it marshaled "clear and specific" evidence to support each element of its causes of action. *See Newspaper Holdings,* 2013 WL 1867104, at *6.

As the statute does not define "clear and specific" evidence, these terms are given their ordinary meaning. *See TGS-NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011). "Clear" means "free from obscurity or ambiguity," "easily understood," "free from doubt," or "sure." MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 229 (11th ed. 2003); *see also* BLACK'S LAW DICTIONARY 287 (9th ed. 2009) ("unambiguous," "sure," or "free from doubt"). "Specific" means "constituting or falling into a specifiable category," "free from ambiguity," or "accurate." MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY, *supra,* at 1198; *see also* BLACK'S LAW DICTIONARY, *supra,* at 1528 ("explicit" or "relating to a particular named thing"). Clear and specific evidence has also been described as evidence that is "unaided by presumptions, inferences, or intendments." *Rehak Creative Servs.,* 404 S.W.3d at 726 (citing *McDonald v. Clemens,* 464 S.W.2d 450, 456 (Tex.Civ.App.-Tyler 1971, no writ)).

Attached to its response to the motion to dismiss, John Moore filed the affidavit of its president, Don Valentine, as evidence to support its claims.

John Moore also attached copies of relevant pages from the Houston Bureau's website to show the "F" rating, as well as copies of some customer complaints it had received along with the affidavit of its customer service director. [FN2]

> FN2. John Moore's brief also extensively relies on evidence that was excluded by the trial court, such as the transcript of a recorded conversation between John Moore's president and the president of the Houston Bureau. John Moore has not challenged the trial court's evidentiary rulings, and our analysis does not consider the excluded evidence.

We consider each cause of action to determine whether it has been supported by clear and specific evidence.

## I. Defamation

[12][13][14][15] Defamation is a false and injurious impression of a plaintiff published without legal excuse. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex.2000); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995). To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998); *see also Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex.2013). "[S]tatements that are not verifiable as false cannot form the basis of a defamation claim." *Neely*, 418 S.W.3d at 62 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21–22, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1 (1990)). A statement is defamatory if the words tend \*356 to injure the plaintiff's reputation, exposing it to public hatred, contempt, ridicule, or financial injury, or if it tends to impeach the person's honesty, integrity, or virtue. TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (West 2012)

. To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace. *Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex.App.-Austin 2010, no pet.) (citing 1 ROBERT D. SACK, SACK ON DEFAMATION 2–17 (3d ed. 2009)). But a communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts the plaintiff's feelings, is not actionable. *Id.*

[16][17][18][19] Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex.1989); *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654–55 (Tex.1987). Questions of law are subject to de novo review. *In re Humphreys*, 880 S.W.2d 402, 404 (Tex.1994). Whether a publication is an actionable statement of fact depends on its verifiability and the context in which it was made. *See Bentley v. Bunton*, 94 S.W.3d 561, 580–83 (Tex.2002). We construe the statement as a whole based upon a reasonable person's perception of it. *Vice v. Kasprzak*, 318 S.W.3d 1, 17 (Tex.App.-Houston [1st Dist.] 2009, pet. denied).

### a. *"Not accredited"*

John Moore alleges that it was defamed by statements that it was never accredited with the Houston Bureau and that it was not Better Business Bureau accredited in 2012. In his affidavit, Valentine identified a statement on the Houston Bureau's website that John Moore "is not BBB accredited" as misleading, untruthful, and harmful because the company "was BBB accredited with the Bryan–College Station BBB and in turn the Dallas BBB." For the same reasons, Valentine complained that the "NR" classification for "not rated" listed on the Houston Bureau website from 2010 to 2012 was false and misleading.

[20] A statement that a business is not Better Business Bureau "accredited," even if false, is not defamatory. Such a statement does not impugn John Moore's reputation by suggesting that it engaged in wrongful or unethical conduct. *See, e.g., Musser*,

723 S.W.2d at 655. Instead, these statements would merely suggest that John Moore did not obtain accreditation with the Better Business Bureau—a purely optional accolade. The printout from the Houston Bureau's website that John Moore included in its evidence explains:

Businesses are under no obligation to seek BBB accreditation, and some businesses are not accredited because they have not sought BBB accreditation.

To be accredited by BBB, a business must apply for accreditation and BBB must determine that the business meets BBB accreditation standards, which include a commitment to make a good faith effort to resolve any consumer complaints. BBB Accredited Businesses must pay a fee for accreditation review/monitoring and for support of BBB services to the public.

In short, accusing John Moore of not being accredited or never having been accredited does no more than characterize the company as abstaining from participation. Instead of portraying unaccredited businesses as worthy of public hatred, contempt, or ridicule, the Houston Bureau confirmed that businesses are not obligated to seek accreditation and must pay for the designation. Accordingly, the allegations regarding John Moore's purported non-accreditation are not defamatory.

[21] Likewise, the statement on the Houston Bureau website from 2010 to *357 2012 that listed John Moore as "not rated" is not defamatory. Even if untrue, not being rated does not expose John Moore "to public hatred, contempt, ridicule, or financial injury." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001. The statement does not suggest that John Moore committed some wrong or engaged in any nefarious activities. Like being unaccredited by the Bureau, having no rating on the website suggests merely that John Moore has no rating. *See Musser*, 723 S.W.2d at 655 (holding statement not defamatory as matter of law that does not charge plaintiff with commission of a crime, violation of any law or contract, or with any unethical acts and business dealings).

b. *Advertising excellence awards*

Next, John Moore alleges it was defamed by a statement that it was not permitted to advertise having won Bureau awards of excellence. In his affidavit, Valentine pointed to "bold and extra large language" on the website "which clearly and improperly implied that John Moore Services only 'claimed' to have won all the Education Foundation Awards for Excellence, but hadn't actually won them."

[22] The Houston Bureau's statements regarding John Moore's disputed right to display the "Award of Excellence" mark are non-defamatory because, as Valentine himself acknowledged, the website truthfully described the parties' opposing contentions concerning the use of the marks. The Houston Bureau explained on its website that John Moore "continue[s] to advertise winning numerous BBB Awards for Excellence for the years 2003–2010," despite the fact that the Bureau "has asked that this practice cease." Acknowledging that a dispute exists over these advertising of these awards is not a defamatory statement, let alone a statement showing the Bureau's negligent regard for the truth, as a defamation showing requires.

Moreover, despite characterizing the webpage as having "clearly and improperly implied" that the awards had not been actually won, John Moore did not present clear and specific evidence of the actual content of these statements—as opposed to what Valentine contends they "implied"—to facilitate a determination of whether they were defamatory. John Moore did not include a copy of that webpage, actually quote the allegedly offending language, or even describe in detail what the Houston BBB website stated, as opposed to Valentine's conclusory description of what he thought the website "implied."

c. *"F" rating*

[23] John Moore also complains about the publication of the "F" rating on the Houston Bureau

441 S.W.3d 345
(Cite as: 441 S.W.3d 345)

website. But the "F" rating itself cannot be defamatory because it is the Bureau's self-described "opinion" of the quality of John Moore's services, which lacks a high degree of verifiability. *See Neely*, 418 S.W.3d at 62; *Vice*, 318 S.W.3d at 18. Even to the extent such an opinion is verifiable based on the standards the Bureau uses to determine its ratings, the "F" is not a false and defamatory statement. The Bureau considers customer complaints regarding the business in its standards for determining the ratings, and the website identified customer complaints and advertising issues as the reason for John Moore's low rating. The consumer complaint evidence that John Moore itself filed in response to the motion to dismiss includes several complaints about the company's costly services and poor customer support, supporting the low opinion expressed on the website.

Accordingly, after carefully reviewing the record, we conclude that John Moore failed to adduce clear and specific evidence to establish a prima facie case that the *358 Houston Bureau made any actionable defamatory statements.

## 2. Business disparagement

[24][25][26] To prevail on a business disparagement claim, a plaintiff must establish that (*1*)the defendant published false and disparaging information, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex.2003); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987). "A business disparagement claim is similar in many respects to a defamation action." *Forbes*, 124 S.W.3d at 170. The two torts differ in the interest protected: a defamation claim protects an injured party's personal reputation, while a business disparagement claim protects economic interests. *Id.* "[A] business disparagement defendant may be held liable 'only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion.' " *Id.* (quoting

*Hurlbut*, 749 S.W.2d at 766). Accordingly, at a minimum, a statement must be defamatory to support a business disparagement claim. *See, e.g., Rehak Creative Servs.*, 404 S.W.3d at 728; *Means*, 315 S.W.3d at 212. John Moore makes the same allegations to support its business disparagement claim as it made regarding its defamation claim. But as explained above, it did not present clear and specific evidence establishing that the Houston Bureau published a false and defamatory statement, which is essential to a business disparagement claim. *See Hurlbut*, 749 S.W.2d at 766. Accordingly, John Moore did not present a prima facie case of business disparagement.

## 3. Fraud

[27][28][29][30][31] A person commits fraud by (1) making a representation of material fact (2) that is false (3) and was known to be false or asserted recklessly without knowledge of its truth (4) with the intent that the misrepresentation be acted upon, and (5) the person to whom the misrepresentation is made justifiably relies upon it and (6) is injured as a result. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex.2009). The defendant's acts or omissions must be a cause-in-fact of the plaintiff's injury, i.e., a substantial factor in bringing about an injury which otherwise would not have occurred. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors Inc.*, 960 S.W.2d 41, 47 (Tex.1998); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex.2003). The maker of the misrepresentation must have had reason to expect the plaintiff to rely on his statement when the statement was made. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 580 (Tex.2001). The transaction sued upon must be of the type the defendant could have contemplated. *See id.* Furthermore, promises of future performance generally do not constitute actionable fraud, as they are not representations of fact, but may be actionable if made with the intent and purpose to deceive and with no intention of performing. *Formosa Plastics*, 960 S.W.2d at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

In its original petition and response to the motion to dismiss, John Moore alleged specifically that the Houston Bureau falsely represented the following information to it:

(1) that John Moore could continue advertising its receipt of the Awards of Excellence, even after it was no longer a member of the Houston BBB, by not placing any restrictions on the awards when they were given to John Moore from 2003 to 2010; (2) that John Moore could not advertise with the BBB "trademark(s)" registered to the Council *359 of Better Business Bureaus, Inc., since it is no longer a member of the Houston BBB; (3) that the Houston BBB would not include price complaints in a business's complaint record, nor would it factor price complaints into the overall rating of a business; (4) that the Houston BBB is an independent and unbiased rating agency; and (5) that the Houston BBB follows its mission statement and values statement that claims its goal is to "[b]e honest and ethical in all of its business activities;" "[t]reat everyone with integrity[,] ... respect and dignity;" and "communicate with honesty."

John Moore referred to its affidavits as evidence of the damages it suffered as a result of these allegedly fraudulent representations. In those affidavits, John Moore stated that the Houston Bureau's "statements to John Moore's current and prospective customers are false and are causing John Moore to lose customers, valuable goodwill and revenue." Based on representations that it could continue to display Bureau markings, John Moore allegedly "continued to spend millions of dollars in advertising with the Awards." John Moore also stated it suffered a 20% decrease in business after the Houston BBB posted the "F" rating on its website.

**a. Alleged misrepresentations regarding advertising of awards**

The first category of misrepresentations alleged in support of the fraud claim relate to John Moore's advertising of its past awards from the Bureau. The allegations are that John Moore was told "that it could continue advertising its receipt of the Awards of Excellence, even after John Moore was no longer a member of the Houston BBB, by not placing any restrictions on the awards when they were given to John Moore from 2003 through 2010," yet it was subsequently told that it "cannot advertise with the BBB trademark(s), registered to the Council of Better Business Bureaus, Inc., since they are no longer members of the Houston BBB."

[32] The allegation that the Houston Bureau did not affirmatively restrict John Moore's use of the Bureau's markings and award insignia does not amount to a misrepresentation of a material fact. To the extent John Moore was "encouraged" to advertise the awards in the past, there is no allegation that this encouragement was tantamount to a perpetual license to use Bureau trademarks, nor could it mean that the Bureau could never take a subsequent position that it would be misleading for a company with a current "F" rating to prominently feature Bureau awards in its advertising. Even if John Moore was encouraged at one point to advertise its Better Business Bureau status and awards, that does not preclude the Houston Bureau from later taking the position that to continue such advertising is misleading in light of John Moore's current rating and status.

[33] John Moore also relies on a letter it received from the manager of the Education Foundation of the Better Business Bureau of Greater Houston and South Texas as a representation that it could continue to display the awards, but this letter actually undermines any claim of reasonable reliance. The letter confirmed "that John Moore Services has been 'grandfathered' to use the wreath version of the Awards for Excellence logo as a graphic element in its advertising as long as the current BBB logo is also displayed on the ad." The letter also acknowledged that John Moore "invested heavily in signage for its vehicles using the wreath graphic when the [award] program was first resurrected years ago." Nevertheless, the letter also stated: "Although this 'grandfather' exemption will eventually end, it is currently in effect to avoid sad-

dling*360 the Company with the expense of re-painting all its fleet and re-designing all of its advertising graphics." The full context of the letter defeats any justifiable reliance by John Moore on further investment in signage, uniforms, or other similar uses of the Bureau logo. The letter indicated that the "exemption" would not be permanent, and that it was intended to save John Moore the expense of repainting and redesigning existing materials—not to authorize fresh expenditures on promotional materials featuring the Bureau and Awards of Excellence logos. The letter also cannot be reasonably read to suggest that the Bureau was forfeiting its right to ever take the position in the future that it would be misleading for an F-rated or nonrated business to advertise Bureau awards it had won in the past.

John Moore also complains that the Houston Bureau represented that it "cannot advertise with the BBB trademark(s), registered to the Council of Better Business Bureaus, Inc., since they are no longer members of the Houston BBB." John Moore may disagree with the Bureau, but the statement is not an actionable misrepresentation of material fact. The statement reflects the Houston Bureau's legal position. The Houston Bureau sued John Moore in court for trademark infringement, so John Moore was presumably aware of the Houston Bureau's position regarding the display.

**b. *Alleged misrepresentations about rating based on price complaints***

John Moore alleges that the Houston Bureau represented that it "would not count price complaints" in its record of a complaints or factor such price complaints into the Bureau's rating. But John Moore failed to provide any evidence to establish that it reasonably relied on this alleged misrepresentation. John Moore did not present evidence that it acted or failed to act due to the Bureau's alleged misrepresentation. *See Ernst & Young*, 51 S.W.3d at 577 (plaintiff establishes reliance by showing that the defendant's acts and representations induced it to either act or refrain from acting to its detriment).

**c. *Alleged misrepresentations of independence and neutrality***

[34] The original petition and response to the motion to dismiss alleged that the Bureau committed fraud by misrepresenting that it "is an independent and unbiased rating agency" and that it follows its mission statement and values statement that claims the Houston Bureau's goal is to " '[b]e honest and ethical in all of its business activities;' '[t]reat everyone with integrity [,] respect and dignity;' and 'communicate with honesty.' " But John Moore presented no clear and specific evidence of when or how the Houston Bureau represented that it was "independent and unbiased," and it provided no evidence that made any reference whatsoever to the Bureau's "mission statement and values statement." For instance, John Moore did not provide any relevant context for the alleged misrepresentations, such as who made them, where and when they were made, or even how they were communicated (such as orally, in writing, or on the website). John Moore also presented no clear and specific evidence to establish the element that it justifiably relied on the alleged representation that the Bureau is a neutral and unbiased rating agency. In sum, John Moore did not offer clear and specific evidence to establish its claim that the Houston Bureau made an actionable misrepresentation about its neutrality.

Accordingly, John Moore's evidence does not clearly and specifically establish all of the essential elements of a prima facie fraud claim for the alleged misrepresentations made by the Houston Bureau.

**\*361 4. Tortious interference**

[35][36] To establish a cause of action for tortious interference with contract, a plaintiff must prove that (1) a contract subject to interference exists, (2) the defendant committed a willful and intentional act of interference with the contract (3) the act proximately caused injury, and (4) the plaintiff sustained actual damages or loss. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430

(Tex.1997). To establish a cause of action for tortious interference with prospective contract or business relationships, a plaintiff must show that (1) there was a reasonable probability that the parties would have entered into a business relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Richardson–Eagle, Inc. v. William M. Mercer, Inc.,* 213 S.W.3d 469, 475 (Tex.App.-Houston [1st Dist.] 2006, pet. denied).

[37] John Moore's tortious interference with contract claims fail for failing to establish by clear and specific evidence the essential element of the existence of a contract subject to interference. John Moore argues that the evidence showed that some complaining customers mentioned on the Bureau's website that they would file complaints demanding their money back from John Moore and that there was interference with its contracts with the Dallas and Bryan–College Station chapters. But John Moore offered no clear and specific evidence of any of these contracts or their terms.

[38][39] "To prevail on a tortious interference claim, a plaintiff must present evidence that the defendant interfered with a specific contract." *Funes v. Villatoro,* 352 S.W.3d 200, 213 (Tex.App.-Houston [14th Dist.] 2011, pet. denied). To establish interference, "the plaintiff must present evidence that some obligatory provision of a contract has been breached." *Id.* John Moore did not present evidence regarding the terms of any of contracts with customers or the other Better Business Bureau chapters, or how those contracts were breached. Instead, John Moore only alleged that such contracts exist. John Moore also did not clearly and specifically demonstrate what injuries or damages it suffered as a result of the interfer-

ence—two other necessary elements of the tortious interference claim. It only contended that its general revenues fell after the "F" rating was published. This does not amount to clear and specific evidence establishing the essential elements of a prima facie claim that the Houston Bureau willfully and intentionally interfered with John Moore's contracts with its customers and other Better Business Bureau chapters.

[40] John Moore's tortious interference with business relationships claim also fails because it did not present clear and specific evidence that the Houston BBB committed an "independently tortious or unlawful act." *Brown v. Swett & Crawford of Tex., Inc.,* 178 S.W.3d 373, 381–82 (Tex.App.-Houston [1st Dist.] 2005, no pet.). As discussed above, John Moore did not present clear and specific evidence to establish a prima facie claim that the Houston BBB committed any other tortious or unlawful acts. Thus, John Moore necessarily has failed to present a prima facie claim supported by clear and specific evidence of interference with business relationships. *See id.* at 382–83 (noting that this element *362 requires determining the validity of the plaintiff's only tort claim).

**Conclusion**

We hold that the Houston Better Business Bureau satisfied its burden under the TCPA to show that John Moore's claims against it are based on, relate to, or are in response to, the exercise of their free speech rights. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(b). We further hold that John Moore has failed to sustain its burden to show, by clear and specific evidence, a prima facie case for each essential element of its claims, or that its claims fall within the commercial-speech exemption. *See id.* §§ 27.005(c), 27.010(b). We therefore reverse the trial court's denial of the motion to dismiss and remand the case to the trial court for further proceedings. *See id.* § 27.009(a).

Justice SHARP, dissenting. Dissent to follow.

Tex.App.–Houston [1 Dist.],2013.

441 S.W.3d 345
**(Cite as: 441 S.W.3d 345)**

Better Business Bureau of Metropolitan Houston, Inc. v. John Moore Services, Inc.
441 S.W.3d 345

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

160

894 S.W.2d 393
**(Cite as: 894 S.W.2d 393)**

H

Court of Appeals of Texas,
San Antonio.

Philip M. ROSS, Appellant,
v.
Weir LABATT, III, Appellee.

No. 04–94–00008–CV.
Nov. 30, 1994.
Rehearing Denied Feb. 10, 1995.

City council candidate sued city council member for defamation, arising from member's false statements that candidate lived in purposed reservoir site that he opposed, rather than in district for which he was running, and that candidate owed federal government $40,000 in legal fees. The 225th District Court, Bexar County, J. Taylor Brite, J., granted member's motion for summary judgment. Candidate appealed. The Court of Appeals, Stone, J., held that: (1) candidate was "public figure," and (2) candidate failed to show "actual malice."

Affirmed.

West Headnotes

**[1] Libel and Slander 237 €═══48(3)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k48 Criticism and Comment on Public Matters; Public Figures
           237k48(3) k. Character of Candidates for Office. Most Cited Cases
Candidate for city council was "public figure" for purposes of his defamation action concerning, inter alia, statements about his opposition to proposed reservoir; he drew himself into middle of public controversy and was running for political office at time statements were made. Vernon's Ann.Texas Const. Art. 1, § 8.

**[2] Libel and Slander 237 €═══51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

**Libel and Slander 237 €═══112(2)**

237 Libel and Slander
    237IV Actions
        237IV(C) Evidence
           237k112 Weight and Sufficiency
               237k112(2) k. Intent, Malice, or Good Faith. Most Cited Cases
Public figure must prove by clear and convincing evidence that defendant made false and defamatory statement with actual malice; "actual malice" is false statement of fact made with knowledge that statement was false or with reckless disregard as to truth of statement. Vernon's Ann.Texas Const. Art. 1, § 8.

**[3] Libel and Slander 237 €═══51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases
City council candidate, who was "public figure" for purposes of his defamation action against council member who falsely stated that candidate lived in proposed reservoir site rather than in district for which he was running, failed to show that member acted with "actual malice" in making that statement, even though member voted to condemn candidate's land in reservoir site and personally visited that site; member's vote to condemn candidate's

894 S.W.2d 393
(Cite as: 894 S.W.2d 393)

property did not mean that he knew condemnation process was later completed, or that he knew candidate had been required to vacate that property. Vernon's Ann.Texas Const. Art. 1, § 8.

**[4] Libel and Slander 237 ☞101(4)**

237 Libel and Slander
  237IV Actions
    237IV(C) Evidence
      237k101 Presumptions and Burden of Proof
        237k101(4) k. Privilege. Most Cited Cases

Proof of malice cannot be inferred from falsity of statement alone.

**[5] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
  237II Privileged Communications, and Malice Therein
    237k51 Existence and Effect of Malice
      237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Defamation defendant's failure to stop newspapers and television stations from republishing his allegedly defamatory statements concerning public figure did not demonstrate that he acted with "actual malice"; republication occurred before defendant knew statements were false, and consequently had no bearing on issue of malice. Vernon's Ann.Texas Const. Art. 1, § 8.

*393 Philip M. Ross, Scott T. Staha, Vada L. Seward, San Antonio, for appellant.

*394 Bernard Campion, Campion & Campion, San Antonio, for appellee.

Before PEEPLES, LOPEZ and STONE, JJ.

**OPINION**

STONE, Justice.

This is an appeal from the grant of a general summary judgment against a public figure dismissing his entire cause of action in his defamation suit. We affirm.

Weir Labatt was a San Antonio city councilman when he called a news conference at City Hall on March 27, 1991 to discuss the credentials of three candidates for the city council and their involvement in the Applewhite reservoir controversy. One of the people he discussed during the conference was Philip Ross, a staunch opponent of the reservoir, and a candidate for the District 4 place on the city council. A candidate for city council is required to live in the district for which he is running. While referring to Ross, Labatt alleged that Ross did not live in District 4, but rather rented his house there to others. Labatt further claimed that Ross lied about his place of residence, and that he lived on Jett Road, which is a part of the proposed Applewhite site. Labatt also stated that Ross owed the federal government $40,000 in legal fees. Labatt refused to apologize or retract these statements, even after Ross provided him with proof that his statements were wrong. Consequently, Ross brought this suit seeking actual and punitive damages for defamation.

Labatt moved for summary judgment contending that Ross could not prove that Labatt had made the statements with "actual malice" as required by both state and federal law. The trial court granted Labatt's motion and entered a summary judgment dismissing the suit. Because Ross is suing Labatt for defamation, this case raises questions under both the Texas and United States Constitutions concerning freedom of speech.

Freedom of speech in this country is derived from a "background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11

L.Ed.2d 686, 701 (1964).

Texas has long been committed to free speech. Indeed, the determination of Texans to have the freedom of speech was one of the contributing factors which led to the Texas revolution for independence from Mexico.[FN1] Throughout all of the versions of the Texas Constitution, the framers consistently rejected language similar to the United States Constitution, which is written only as a restriction on the government. Instead, Texans decided on a version which granted to the people an affirmative right to free speech. This "inclusion of [an] expansive freedom of expression clause and rejection of more narrow protections indicates a desire in Texas to ensure broad liberty of speech." *Davenport v. Garcia*, 834 S.W.2d 4, 8 (Tex.1992); *Casso v. Brand*, 776 S.W.2d 551, 556 (Tex.1989); *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex.1988).

> FN1. For a comprehensive discussion on the freedom of speech in Texas and its origins, see Justice Doggett's majority opinion in *Davenport v. Garcia*, 834 S.W.2d 4, 7–11 (Tex.1992) and the daily reports of the Galveston Daily News which kept a close journal of everything said, and all versions of the laws proposed, at the numerous constitutional conventions of Texas, especially the 1875 convention. These newspaper reports and the books cited below are available at the Lyndon Baines Johnson Library at the University of Texas in Austin. *See*, ROBERT A. CALVERT AND ARNOLDO DE LEON, THE HISTORY OF TEXAS,XAS, 56–58 (1990); JOURNAL OF THE CONSTITUTIONAL CONVENTION,ION, 62 (1875); JOHN SAYLES, INTRODUCTION TO THE TEXAS CONSTITUTION, 129–35 (4th ed. 1893); Robert E. Hall, *Remonstrance—Citizen's Weapon Against Government's Indifference*, 68 TEX.L.REV. 1409, 1412–21 (1990); Arvel Ponton III,

*Sources of Liberty in the Texas Bill of Rights*, 20 ST. MARY'S L.J. 93, 100 (1988).

The final version of article I, section 8, of the Texas Constitution provides in relevant part:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be **\*395** passed curtailing the liberty of speech or of the press.

TEX. CONST. art. I, § 8.

Because we find that Labatt's actions were protected under the Texas Constitution, we need not address federal law. *Davenport v. Garcia*, 834 S.W.2d at 11–14 ("Having found that the trial court's gag orders violate article I, section 8 of the Texas Constitution, this court need not consider whether the United States Constitution has also been violated."); *LeCroy v. Hanlon*, 713 S.W.2d 335, 338–39 (Tex.1986); *Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76 S.W.2d 1007, 1010–11 (1934). We will, however, look to federal law for helpful guidance because we see no reason at this time for our state standard regarding defamation to differ from the federal standard, but emphasize that federal law is not the basis of our decision. *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983).

[1] It is uncontested that Ross is a public figure for purposes of this suit because he drew himself into the middle of a public controversy and was running for political office. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789, 812 (1974); *Casso v. Brand*, 776 S.W.2d at 554; *Einhorn v. LaChance*, 823 S.W.2d 405, 411–13 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). Ross was a candidate for the city council and actively involved in the political campaign against the Applewhite reservoir at the time the statements were made.[FN2]

FN2. The Applewhite reservoir controversy was a heated political debate, resulting in two local public referendums.

[2] Because he was a public figure, it would have been Ross' duty at trial to prove by clear and convincing evidence that Labatt made a false and defamatory statement about him with actual malice. *Casso v. Brand*, 776 S.W.2d at 554. Actual malice is defined as a false statement of fact made with knowledge that the statement was false or with reckless disregard as to the truth of the statement. *Gertz v. Robert Welch, Inc.*, 418 U.S. at 349, 94 S.Ct. at 3011, 41 L.Ed.2d at 813; *New York Times Co. v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706; *Hagler v. Proctor & Gamble Mfg. Co.*, 38 Tex.Sup.Ct.J. 11, 11 (October 6, 1994) (per curiam); *Casso v. Brand*, 776 S.W.2d at 554. Reckless disregard "requires proof that a false defamatory statement was made with a high degree of awareness of its probable falsity." *Holly v. Cannady*, 669 S.W.2d 381, 384 (Tex.App.—Dallas 1984, no writ); *see also, Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex.1989) (Plaintiff must prove Defendant had serious doubts as to the truth of his statement); *Casso v. Brand*, 776 S.W.2d at 558. "It is not enough for a fact finder to disbelieve a defendant's testimony, rather, the plaintiff must offer clear and convincing affirmative proof [of actual malice] to support a recovery." *Howell v. Hecht*, 821 S.W.2d 627, 630 (Tex.App.—Dallas 1991, writ denied) (citing *Casso v. Brand*, 776 S.W.2d at 558). This stringent standard is imposed upon plaintiffs to prevent a chilling effect on the "uninhibited, robust and wide-open" debate of public issues.

[3][4] Labatt provided sufficient proof to support the summary judgment because he negated the essential element of actual malice. In his affidavit, Labatt stated that he had no knowledge or even suspicions that his statements about Ross were false. The fact that his statements proved to be false is immaterial. Proof of malice cannot be inferred from the falsity of a statement alone. *Marathon Oil Co.*

*v. Salazar*, 682 S.W.2d 624, 631 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Cheatwood v. Jackson*, 460 S.W.2d 528, 530 (Tex.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.). Negligence, failure to investigate the truth of a statement prior to publication, and failure to act as a reasonable, prudent person have also been held insufficient by themselves to establish actual malice. *El Paso Times, Inc. v. Trexlar*, 447 S.W.2d 403, 406 (Tex.1969); *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 924 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.); *Marathon Oil Co. v. Salazar*, 682 S.W.2d at 631.

**\*396** Texas law permits a summary judgment to rest solely upon the affidavit of an interested party if it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *Casso v. Brand*, 776 S.W.2d at 558–59; *see also* TEX.R.CIV.P. 166a(c). "Could have been readily controverted" means that the "testimony at issue is of a nature which can be effectively countered by opposing evidence." *Casso v. Brand*, 776 S.W.2d at 558.

In support of his motion for summary judgment, Labatt stated in his affidavit that he relied upon Ross' own assertions before the city council that he lived on Jett Road. Labatt also relied upon City Councilman Frank Wing who said he thought Ross resided on Jett Road and rented his property in District 4 to others. The sources of information which Labatt relied upon were identified and easily verifiable. Labatt also stated:

Whatever comments I made at the news conference on March 27, 1991, about Philip Ross, I made in good faith believing that they were true. I was not aware that anything I said about Mr. Ross may have been false, nor did I have any reason to have doubts about the validity of any such statement, and certainly I had no serious doubts about same.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

With respect to the legal fees owed, Labatt stated that he had believed in good faith that Ross owed the fees to the federal government because Ross had been involved in a federal law suit. He admitted that he had since been informed that the legal fees had been assessed by a state court, but stated that he had a good faith belief in the truth of his statements at the time they were made. Because Labatt's affidavit is clear, convincing, and readily controvertible, it was incumbent upon Ross to offer sufficient summary judgment proof to raise an issue of fact on the question of actual malice. TEX.R.CIV.P. 166a(c); *Howell v. Hecht*, 821 S.W.2d at 630. Ross did not offer any evidence as to Labatt's knowledge concerning the legal fees.

Ross presented the following evidence which he contends raises a fact question as to Labatt's knowledge of the falsity of his other statements: Ross' property on Jett Road at the Applewhite site had been condemned previously by the city council. Labatt was present and voted at this meeting. The condemnation process was then completed by June of 1990 and the house was vacated. A few weeks later the property was vandalized, after which Labatt personally visited the site. All of this occurred before Labatt made his statements. Further, Ross' address could be verified by the documents on file with his application for city council.

Ross does not provide any proof, however, that when Labatt visited the Applewhite site he made anything more than a cursory look at the property. There was no evidence that he stopped anywhere near Ross' house. Labatt testified in his deposition that he thought the property looked occupied. Labatt's vote to condemn Ross' Applewhite property also does not mean that he knew the condemnation process was later completed, nor that he knew Ross had been required to vacate the property. Ross also did not provide any proof that Labatt knew that a different address was listed on Ross' application for the city council. We cannot impose a duty to investigate all possible leads upon individuals before they make public statements.

Labatt had two sources for his belief that Ross resided on Jett Road, including Ross himself.

Ross further argues that internal inconsistencies in Labatt's statements prove malice. This argument has been rejected previously by a Texas court. *Holly v. Cannady*, 669 S.W.2d at 384 (Plaintiff "simply relies upon the broadcast itself, arguing that the internal inconsistencies therein necessarily prove a reckless disregard of its truth or falsity. We disagree."). Also, we do not believe the statement is in fact contradictory because a person could have his property condemned and still live there for a time.

[5] Ross also argues that Labatt acted with malice because he did not stop the newspapers and television stations from republishing his statements. Ross cites *Howell v. Hecht*, 821 S.W.2d 627 (Tex.App.—Dallas 1991, writ denied), for this contention. In *Howell*, the court ruled that the defendant's republication of a statement constituted no **\*397** evidence on the issue of actual malice because the letter Howell sent to Hecht had not sufficiently alerted Hecht of facts which proved his statements were false. *Id.* at 631. In the instant case, Ross states that he told Labatt that his statements were false, but not until after the statements had been broadcast by the media. The republication, therefore, occurred before Labatt knew the statements were false and consequently has no bearing on the issue of malice.

Ross has failed to produce evidence that Labatt entertained any serious doubts as to the truthfulness of his statements. Ross' blanket assertion in his response to the motion for summary judgment that Labatt should have known the statements were false does not qualify as competent summary judgment proof. *Mercer v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex.1984). Ross was required to offer affirmative proof that Labatt in fact knew his statements were false, or at least knew they were probably false. If we were to rule that what Labatt "should have known" is sufficient proof, we would be applying a negligence standard which has been spe-

894 S.W.2d 393
**(Cite as: 894 S.W.2d 393)**

cifically rejected for suits by public officials.

Finally, Ross argues the trial court required him to prove his case by clear and convincing evidence. The record reflects, however, that the trial court only inquired as to how Ross was going to do so at trial. This was a permissible inquiry on the court's behalf. The record does not indicate that the trial court applied the clear and convincing standard to Ross at the summary judgment hearing. The summary judgment is affirmed.

Tex.App.–San Antonio,1994.
Ross v. Labatt
894 S.W.2d 393

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2014 WL 309776 (Tex.App.-San Antonio)
**(Cite as: 2014 WL 309776 (Tex.App.-San Antonio))**

H
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**

Court of Appeals of Texas,
San Antonio.
RIO GRANDE H2O GUARDIAN and Albert F.
Muller, Jr., Appellants
v.
ROBERT MULLER FAMILY PARTNERSHIP
LTD., d/b/a Robert Muller, Ltd. and Muller's
Rosetta Stone, LLC, Appellees.

No. 04–13–00441–CV.
Jan. 29, 2014.

From the 111th Judicial District Court, Webb County, Texas, Trial Court No. 2013CVQ001860D2; Monica Z. Notzon, Judge Presiding.

Brad Rockwell, Lowerre, Freedrick, Allmon & Rockwell, Austin, TX, Albert F. Muller, III, Albert F. Muller, III, P.C., Laredo, TX, for Appellant.

Baldemar Garcia, Jr., Richard G. Morales, Jr., Person, Whitworth, Borchers & Morales, L.L.P., Laredo, TX, Raul Casso, IV, Assistant District Attorney, Laredo, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, KAREN ANGELINI, Justice, PATRICIA O. ALVAREZ, Justice.

**MEMORANDUM OPINION**

Opinion by CATHERINE STONE, Chief Justice.

**\*1** This is an accelerated interlocutory appeal of the trial court's order denying a motion to dismiss under the Texas Citizens Participation Act which is an anti-SLAPP (Strategic Lawsuits

Against Public Participation) law. Appellants, Rio Grande $H_2O$ Guardian and Albert F. Muller, Jr., contend the trial court erred in denying their motion because: (1) their actions in filing the underlying lawsuit are protected by the Act; and (2) the appellees, Robert Muller Family Partnership Ltd. d/b/a Robert Muller, Ltd. and Muller's Rosetta Stone, LLC, failed to establish a prima facie case to support their counterclaims and third-party claims by clear and specific evidence. We agree with appellants.

**BACKGROUND**[FN1]

FN1. Many of the facts set forth in this section are based on this court's prior opinion in *City of Laredo v. Rio Grande $H_2O$ Guardian*, No. 04–10–00872–CV, 2011 WL 3122205 (Tex.App.-San Antonio July 27, 2011, no pet.), which disposed of an appeal, arising from the same underlying lawsuit, that challenged the trial court's denial of a plea to the jurisdiction.

By state law, all zoning ordinances adopted by the City of Laredo must be in accordance with the Comprehensive Plan the City adopted in 1991. *City of Laredo v. Rio Grande $H_2O$ Guardian*, 2011 WL 3122205, at \*1 (cited hereinafter as *Rio Grande $H_2O$ Guardian I* ). In 2009, Rio Grande $H_2O$ Guardian, a non-profit corporation, "filed a declaratory judgment action against the City challenging the legality of [two] new zoning ordinances as violative of the City's Comprehensive Plan."[FN2] *Id.* The City filed a plea to the jurisdiction asserting that Rio Grande $H_2O$ Guardian lacked standing to bring the suit, its claims were not ripe for consideration, and its claims were moot. *Id.* at \*2. The trial court denied the City's plea, and the City filed an interlocutory appeal challenging the ruling in this court. *Id.* This court affirmed the trial court's order. *Id.* at \*11.

FN2. Rio Grande $H_2O$ Guardian also

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

named the following as additional defendants: Robert Muller Family Partnership, Ltd., Muller's Rosetta Stone, LLC, and other companies with an interest in the rezoned property.

Almost a year and a half after this court issued its opinion, the appellees, Robert Muller Family Partnership Ltd. d/b/a Robert Muller, Ltd. and Muller's Rosetta Stone, LLC, filed counterclaims against Rio Grande $H_2O$ Guardian and third-party claims against Albert F. Muller, Jr., alleging claims for tortious interference with an existing contract, tortious interference with prospective business relations, aiding and abetting, and civil conspiracy. The appellees also alleged that the corporate form of Rio Grande $H_2O$ Guardian should be disregarded based on an alter ego theory. The basis for the appellees' claims against Rio Grande $H_2O$ Guardian was that its lawsuit opposing the zoning ordinances was *ultra vires* because it was beyond the purposes for which Rio Grande $H_2O$ Guardian was formed as stated in its Certificate of Formation and was "not germane to the organization's purpose." With regard to Albert F. Muller, Jr., the petition alleges, "Rio Grande $H_2O$ Guardian, by and through Albert F. Muller, Jr., continue [sic] to attempt to challenge and oppose the zoning ordinances at issue."

Rio Grande $H_2O$ Guardian and Albert F. Muller, Jr. filed a motion to dismiss under the Act to which the appellees filed a response and supplemental response. After a hearing, the trial court denied the motion, and this appeal was filed challenging that ruling.

## OVERVIEW OF THE ACT AND STANDARD OF REVIEW

*2 Among other purposes, the Act is designed to "encourage and safeguard the constitutional rights of persons to petition ... and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM.CODE ANN. § 27.002 (West Supp.2013). The Act is to "be construed liberally to effectuate its purpose and intent fully." *Id.* at §

27.011(b).

In order to promote these purposes, the Act "creates an avenue at the early stage of litigation for dismissing unmeritorious suits that are based on the defendant's exercise of the rights of free speech, petition, or association" as the Act defines those rights. *In re Lipsky*, 411 S.W.3d 530, 539 (Tex.App.-Fort Worth 2013, orig. proceeding [mand. pending] ) (citing TEX. CIV. PRAC. & REM.CODE ANN. § 27.003(a) (West Supp.2013)). In this regard, the Act contains "a burden-shifting mechanism" in seeking and defending against a dismissal. *See Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 723 (Tex.App.-Houston [14th Dist.] 2013, pet. denied). The moving party must show by a preponderance of the evidence that the legal action it seeks to dismiss is "based on, relates to, or is in response to the party's exercise of" the right of free speech, petition, or association. TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(b) (West Supp.2013); *see also In re Lipsky*, 411 S.W.3d at 539; *Rehak*, 404 S.W.3d at 723. If the moving party meets this burden, the burden shifts to the party bringing the legal action to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(c); *see also In re Lipsky*, 411 S.W.3d at 539; *Rehak*, 404 S.W.3d at 723–24.

We agree with the Houston court that we review both steps in this analysis under a *de novo* standard of review. *See Rehak*, 404 S.W.3d at 724–27. Under the second step, the Act "does not define what sort of evidence satisfies the 'clear and specific' qualitative standard, but it expresses that in determining the propriety of dismissal, courts may consider 'the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based.' " *In re Lipsky*, 411 S.W.3d at 539 (quoting TEX. CIV. PRAC. & REM.CODE ANN. § 27.006(a) (West Supp.2013)). " 'Clear and specific evidence' has been described as evidence that is 'unaided by presumptions, infer-

ences, on intendments." ' *Rehak,* 404 S.W.3d at 726 (quoting *McDonald v. Clemens,* 464 S .W.2d 450, 456 (Tex.App.-Tyler 1971, no writ)). " 'Prima facie evidence is evidence that, until its effect is overcome by other evidence, will suffice as proof of a fact in issue.' " *Id.* (quoting *Duncan v. Butterowe, Inc.,* 474 S.W.2d 619, 621 (Tex.Civ.App.-Houston [14th Dist.] 1971, no writ)). " 'In other words, a prima facie case is one that will entitle a party to recover if no evidence to the contrary is offered by the opposite party.' " *Id .* (quoting *Duncan,* 474 S.W.2d at 621). Therefore, in analyzing the second step, "we determine de novo whether the record contains a minimum quantum of clear and specific evidence that, unaided by inferences, would establish each essential element of the claim in question if no contrary evidence is offered." *Id.* at 727.

### EXERCISE OF RIGHT TO PETITION

**\*3** Focusing on the first step in our analysis, the crux of the claims by the appellees clearly relates to the filing of the underlying lawsuit. The "exercise of the right to petition" includes a "communication in or pertaining to a judicial proceeding" and "a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial or other governmental body or in another governmental or official proceeding." TEX. CIV. PRAC. & REM.CODE ANN. § 27.001(4) (West Supp.2013). In this case, the lawsuit was filed to encourage the trial court to consider whether the City's two new zoning ordinances were invalid because they were adopted in violation of the City's Comprehensive Plan.

The appellees contend that the appellants failed to meet their burden of proving that the underlying lawsuit related to the exercise of their right to petition because they presented no evidence. Unlike other types of cases where pleadings are not considered evidence, section 27.006 of the Act, which is entitled "Evidence," expressly provides, "In determining whether a legal action should be dismissed under this chapter, the court shall consider

the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* at § 27.006(a). Because we may consider the pleadings as evidence in this case, Rio Grande H$_2$O Guardian's petition established that the appellants were exercising their right to petition in filing the lawsuit.

The appellees next contend Rio Grande H$_2$O Guardian had no right to petition because the filing of the lawsuit was not within the powers it was formed to exercise. In its pleadings, the appellees specifically asserted, "the diminution in property values due to hypothetical water pollution, litter, noise, light traffic, dust and/or odor because of the zoning are not germane to the organization's purpose." This argument fails for three reasons.

First, section 20.002(b)(1) of the Texas Business Organizations Code provides that an act of a corporation is not invalid because the act was beyond the purposes of the corporation as expressed in the corporation's certificate of formation. TEX. BUS. ORGS.CODE ANN. § 20.002(b) (West 2012). Second, the fact that an act is beyond the scope of a corporation's stated purpose can be asserted in a proceeding brought only by a shareholder or member of the corporation, the corporation itself, or the attorney general. *Id.* at § 20.002(c)(1). Finally, the appellees' argument is contrary to this court's holding in *Rio Grande H$_2$O Guardian I* that the filing of the lawsuit was germane to Rio Grande H$_2$O Guardian's organizational purpose because the lawsuit was within its stated goals of " 'preserving and enhancing the water quality of the Rio Grande and its local tributaries,' and 'preservation of ... low-density residential area near the Rio Grande.' " 2011 WL 3122205, at \*5.

**\*4** In addressing this third basis for our holding in its response, the appellees sought to rely on the absence of a specific reference to these stated goals in Rio Grande H$_2$O Guardian's certificate of formation. The certificate of formation stated, however, that Rio Grande H$_2$O Guardian was formed for the specific purpose of "Land and water restoration/

management/conservation/guardianship." The certificate of formation further stated "The purposes of land and water restoration/management/conservation/guardianship" included "provid[ing] for conservation of the natural water resources of the Rio Grande River basin in the Laredo–Nuevo–Laredo region; and to provide resources either through itself or funding for other organizations that will act as guardians of the water quality of the watershed of the Rio Grande River tributaries in and around the Laredo–Nuevo–Laredo region." These stated purposes are consistent with the goals considered by this court in our earlier decision.

Accordingly, appellants have met their burden of showing that the underlying lawsuit is based on or related to their exercise of the right to petition.

## CLEAR AND SPECIFIC EVIDENCE OF PRIMA FACIE CASE

Because the appellants satisfied the first step of our analysis, the burden shifts to the appellees to establish "by clear and specific evidence a prima facie case for each essential element" of their counterclaims and third-party claims. TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(c) (West Supp.2013); *see also In re Lipsky*, 411 S.W.3d at 539; *Rehak*, 404 S.W.3d at 723–24. The primary claims asserted by the appellees were tortious interference with contract and tortious interference with prospective business relations. One element of these claims required the appellees to establish a willful and intentional act of interference with a contract or a tortious or unlawful act by the appellants that prevented a reasonably probable business relationship. *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex.1995); *Dunham Engineering, Inc. v. Sherwin–Williams Co.*, 404 S.W.3d 785, 797 n.7 (Tex.App.-Houston [14th Dist.] 2013, no pet.) (quoting *Bary v. ProTech Ins. Agency*, 63 S.W.3d 841, 860 (Tex.App.-Houston [14th Dist.] 2001, pet. denied)); *Newman v. Kock*, 274 S.W.3d 697, 702 (Tex.App.-San Antonio 2008, no pet.).

In their motion to dismiss, appellants asserted

that the tortious act alleged in support of the appellees' claims was that Rio Grande $H_2O$ Guardian's claims challenging the City's zoning ordinance "were not properly a function of [its] organizational purpose." In their response to the appellants' motion, the appellees conceded that the basis for their claims "[b]riefly, and stated simply" was Rio Grande $H_2O$ Guardian's "fil[ing][of] a lawsuit that it had neither the legal power, the authority, nor the right to file." For the reasons previously stated, we hold that Rio Grande $H_2O$ Guardian had the legal authority, power, and right to file the lawsuit. Therefore, the filing of the lawsuit was not a tortious act, and appellees failed to satisfy their burden of providing clear and specific evidence of any tortious act. Because appellees' claims for civil conspiracy and aiding and abetting [FN3] depend on participation in some underlying tort, those claims also fail. *Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex.2001); *In re Lipsky*, 411 S.W.3d at 549, 552. Finally, piercing the corporate veil and alter ego are "means of imposing on an individual a corporation's liability for an underlying cause of action;" "these theories ... are not substantive causes of action." *Phillips v. United Heritage Corp.*, 319 S.W.3d 156, 158–59 (Tex.App.-Waco 2010, no pet.). Because the appellees failed to meet their burden on their tortious interference claims, no underlying cause of action exists to support an alter ego theory of liability.

> FN3. We note that some uncertainty exists as to "whether Texas recognizes a cause of action of 'aiding and abetting' separately from a civil conspiracy claim." *In re Lipsky*, 411 S.W.3d at 552 n.26. Because we reject this claim for other reasons, we need not decide whether aiding and abetting is a viable, separate cause of action.

## CONCLUSION

**\*5** The appellants met their burden of proving that the appellees' claims relate to the appellants' exercising their right to petition. Even if the filing of the lawsuit was beyond the scope of Rio Grande

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in S.W.3d, 2014 WL 309776 (Tex.App.-San Antonio)
**(Cite as: 2014 WL 309776 (Tex.App.-San Antonio))**

$H_2O$ Guardian's purposes, the filing was not invalid or *ultra vires,* and the appellees did not have standing to assert such a contention. TEX. BUS. ORGS.CODE ANN. §§ 20.002(b), 20.002(c)(1) (West 2012). Moreover, this court previously held that the lawsuit was germane to Rio Grande $H_2O$ Guardian's organizational purpose, *Rio Grande $H_2O$ Guardian I,* 2011 WL 3122205, at *5, and our holding is supported by the purposes stated in Rio Grande $H_2O$ Guardian's Certificate of Formation.

The appellees failed to establish a prima facie case for each essential element of their tortious interference claims by clear and specific evidence. Because the civil conspiracy, aiding and abetting, and alter ego theories of liability required the establishment of an underlying tort, appellees also failed to establish those claims.

For the foregoing reasons, we reverse the trial court's order and dismiss the appellees' claims against appellants. The cause is remanded to the trial court to determine the amount of the expenses, attorney's fees, and court costs to be awarded to the appellants in accordance with section 27.009(a) of the Act.

Tex.App.-San Antonio,2014.
Rio Grande H2O Guardian v. Robert Muller Family Partnership Ltd.
Not Reported in S.W.3d, 2014 WL 309776 (Tex.App.-San Antonio)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

219 S.W.3d 425, 35 Media L. Rep. 1449
**(Cite as: 219 S.W.3d 425)**

H

Court of Appeals of Texas,
Austin.
COX TEXAS NEWSPAPERS, L.P. d/b/a The
Smithville Times; Cox Texas Partners, Inc. d/b/a
The Smithville Times; and Tyanna Tyler, Appel-
lants,
v.
Charles PENICK, Appellee.

No. 03–05–00504–CV.
Feb. 13, 2007.
Rehearing Overruled March 20, 2007.

**Background:** District attorney filed defamation
suit against newspaper owner and reporter, alleging
he had been defamed by 13 publications appearing
in the newspaper. The District Court, 21st Judicial
District, Bastrop County, Vann Culp, J., granted de-
fendants' summary judgment motion regarding nine
of the publications, but denied their motion regard-
ing four of the publications. Defendants appealed.

**Holdings:** The Court of Appeals, W. Kenneth Law,
C.J., held that:

(1) editorial containing reporter's criticism of the
prosecution of a capital murder case, but which did
not mention district attorney's name or office, was
not "of and concerning" the district attorney;

(2) newspaper's omission of the fact that no actual
investigation had been opened from an article con-
cerning fraud allegations made against district at-
torney and other prosecutorial officials was not
evidence of actual malice;

(3) defendants did not act with actual malice in re-
lying on an allegedly biased source;

(4) newspaper's omission from a prior article of cer-
tain complimentary statements about district attor-
ney was no evidence of actual malice with regard to
the publications at issue; and

(5) reporter's failure to interview district attorney
and other prosecutorial officials prior to publishing
the articles at issue was not evidence of actual

malice.

Reversed and rendered.

West Headnotes

**[1] Appeal and Error 30 863**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in
General
            30k862 Extent of Review Dependent on
Nature of Decision Appealed from
                30k863 k. In General. Most Cited
Cases

When a party seeks both a traditional and a no-
evidence summary judgment, the Court of Appeals
first reviews the trial court's summary judgment un-
der the no-evidence standards; if the nonmovant
failed to produce more than a scintilla of evidence
raising a genuine fact issue on the challenged ele-
ments of his claims, then there is no need to ana-
lyze whether the movant's summary judgment proof
satisfied the traditional summary judgment burden
of proof. Vernon's Ann.Texas Rules Civ.Proc., Rule
166a(c, i).

**[2] Appeal and Error 30 863**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in
General
            30k862 Extent of Review Dependent on
Nature of Decision Appealed from
                30k863 k. In General. Most Cited
Cases

Summary judgment is reviewed in public-fig-
ure or public-official defamation cases under the
same standard as in other cases.

**[3] Libel and Slander 237 1**

237 Libel and Slander

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

219 S.W.3d 425, 35 Media L. Rep. 1449
**(Cite as: 219 S.W.3d 425)**

237I Words and Acts Actionable, and Liability Therefor

237k1 k. Nature and Elements of Defamation in General. Most Cited Cases

To prevail in a defamation case, a plaintiff who is a public official or figure must prove that the defendant (1) published a false statement about the plaintiff, (2) that was defamatory, (3) while acting with actual malice.

**[4] Libel and Slander 237 ⬚21**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k20 Certainty

237k21 k. Person Defamed. Most Cited Cases

To prevail on a defamation claim, the plaintiff must produce evidence that the disputed publications were "of and concerning" him; there must be evidence showing that the attack was read as specifically directed at the plaintiff.

**[5] Libel and Slander 237 ⬚21**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k20 Certainty

237k21 k. Person Defamed. Most Cited Cases

To support a defamation claim, the publication at issue must refer to some ascertained or ascertainable person and that person must be the plaintiff.

**[6] Libel and Slander 237 ⬚21**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k20 Certainty

237k21 k. Person Defamed. Most Cited Cases

Even if the plaintiff is not expressly named in a publication, the plaintiff may satisfy his burden of showing that the publication was "of and concerning" him, as element of defamation claim, by offering proof that persons acquainted with the plaintiff would understand the publication to refer to him.

**[7] Libel and Slander 237 ⬚21**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k20 Certainty

237k21 k. Person Defamed. Most Cited Cases

Newspaper editorial containing reporter's criticism of the prosecution of a capital murder case, but which did not mention district attorney's name or office, was not "of and concerning" the district attorney, as required for defamation claim by district attorney against the newspaper, though district attorney was responsible for supervising prosecutions in the county, and other earlier publications included in the newspaper had identified the district attorney; the editorial did not make even an oblique reference to district attorney.

**[8] Libel and Slander 237 ⬚21**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k20 Certainty

237k21 k. Person Defamed. Most Cited Cases

An impersonal attack criticizing the actions of a governmental agency without referring specifically to its agents, without more, will not support a claim of libel by the head of that agency.

**[9] Libel and Slander 237 ⬚21**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k20 Certainty

237k21 k. Person Defamed. Most Cited Cases

219 S.W.3d 425, 35 Media L. Rep. 1449
**(Cite as: 219 S.W.3d 425)**

A newspaper's individual reference to a public figure in an article published months earlier cannot be used to transform a subsequent article, which never mentions the public figure, into one that is "of and concerning" him, as element of defamation claim; rather, the test requires court to determine whether a person would understand the individual publication at issue to implicate the public figure.

[10] **Judgment 228** ⟷185.3(21)

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.3 Evidence and Affidavits in Particular Cases
                228k185.3(21) k. Torts. Most Cited Cases

At the summary judgment stage in public-figure defamation case against media defendant, the media defendant can negate that it acted with actual malice, as a matter of law, by proving that it did not publish the articles at issue with knowledge of falsity or a reckless disregard for the truth.

[11] **Judgment 228** ⟷185.3(21)

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.3 Evidence and Affidavits in Particular Cases
                228k185.3(21) k. Torts. Most Cited Cases

Reckless disregard for the truth, for purposes of proving actual malice, is a subjective standard that, to be disproved at the summary judgment stage in public-figure defamation case, requires evidence that the media defendant did not entertain any serious doubts about the truth of the article at the time it was published.

[12] **Judgment 228** ⟷185.1(4)

228 Judgment
    228V On Motion or Summary Proceeding

        228k182 Motion or Other Application
            228k185.1 Affidavits, Form, Requisites and Execution of
            228k185.1(4) k. Matters of Fact or Conclusions. Most Cited Cases

**Judgment 228** ⟷185.3(21)

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.3 Evidence and Affidavits in Particular Cases
                228k185.3(21) k. Torts. Most Cited Cases

In public-figure defamation cases requiring showing of actual malice on the part of the defendant, summary judgment affidavits submitted by defendant to disprove actual malice must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief; such affidavits will not be deemed "conclusory" if they provide a detailed explanation of the affiants' state of mind and descriptions of the steps taken to ensure that the article was not published with knowledge of falsity or with a reckless disregard for the truth.

[13] **Judgment 228** ⟷185.3(21)

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.3 Evidence and Affidavits in Particular Cases
                228k185.3(21) k. Torts. Most Cited Cases

At the summary judgment stage in public-figure defamation case against media defendant, once the defendant produces some evidence that it did not act with actual malice, the burden shifts to the plaintiff to produce evidence of the contrary; if the public-figure plaintiff fails to produce a scintilla of evidence to create a genuine issue of material fact about the existence of actual malice, then summary judgment for the defendant is appropriate, pursuant

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

219 S.W.3d 425, 35 Media L. Rep. 1449
**(Cite as: 219 S.W.3d 425)**

to either a traditional or no-evidence analysis. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c, i).

**[14] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Newspaper's omission from article concerning citizen's filing of fraud complaint against district attorney and other prosecutorial officials, the fact that no active investigation had been opened into the citizen's allegations, was not evidence of actual malice, as element of district attorney's defamation claim against newspaper owner and reporter; truth of the article was not grossly distorted by the omission.

**[15] Libel and Slander 237 ☞22**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k20 Certainty
            237k22 k. Matter Imputed. Most Cited Cases

**Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

A media defendant's omission of facts from a publication may be actionable in a defamation suit if it so distorts the readers' perception that they receive a substantially false impression of the event; however, for a public figure to demonstrate that such an omission constitutes actual malice, he must present evidence that the defendant was aware that the omission could create a substantially false impression.

**[16] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

If the omission of certain facts from a media publication does not grossly distort the story, then the media defendant's failure to capture accurately all the story's details suggests only an error in judgment, which is no evidence of actual malice as element of public-figure defamation case.

**[17] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Newspaper and reporter did not act with actual malice in relying on local citizen, who had previously conducted his own independent investigations of public employees, as the source for allegedly defamatory articles regarding citizen's fraud allegations against district attorney and other prosecutorial officials involved in a capital murder trial, though editor of another newspaper believed the citizen was untrustworthy; reporter did not blindly rely on citizen's investigation, and reporter and managing editor concluded, after reviewing trial evidence, that reasonable doubt existed as to the accused's guilt in the murder prosecution at issue.

**[18] Libel and Slander 237 ☞51(5)**

237 Libel and Slander

237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Evidence that a media defendant's report was mistaken, even if negligently so, is no evidence of actual malice, as element of public-figure defamation case, unless the public-figure plaintiff presents evidence that the defendant purposefully published mistaken facts or that the circumstances were so improbable that only a reckless publisher would have made the mistake.

[19] **Libel and Slander 237 ⬅51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

An understandable misinterpretation of ambiguous facts does not show actual malice, as element of public-figure defamation case.

[20] **Libel and Slander 237 ⬅51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

As long as a newspaper article presents a rational interpretation of the actual events, the article standing alone will not establish actual malice, as element of public-figure defamation case.

[21] **Libel and Slander 237 ⬅51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice

Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

A media defendant's failure to fully investigate does not constitute actual malice, as element of public-figure defamation case, although its purposeful avoidance of the truth does.

[22] **Libel and Slander 237 ⬅51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Evidence that an article was written from a particular point of view, even when the article is hard-hitting or sensationalistic, is no evidence of actual malice, as element of public-figure defamation case.

[23] **Libel and Slander 237 ⬅51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Even if newspaper that published articles regarding fraud allegations against district attorney and other prosecutorial officials involved in murder prosecution "hid" from its readers the fact that reporter had asked the citizen who made the fraud allegations to investigate the murder case, this was no evidence of actual malice, as element of district attorney's defamation suit against newspaper owner and reporter; reporters were not required to reveal every source of information upon which they relied, and reporter's use of the citizen as a source was not reckless.

**[24] Libel and Slander 237 ⬥51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Fact that newspaper, when reporting candidate's announcement of his candidacy for district attorney, omitted the candidate's complimentary statements about the incumbent district attorney provided no evidence that the newspaper acted with actual malice in subsequently publishing allegedly defamatory articles regarding fraud allegations against the district attorney and other prosecutorial officials involved in a capital murder trial; newspaper had discretion to cover only the relevant facts about the candidate, and newspaper had previously published favorable statements about the district attorney.

**[25] Libel and Slander 237 ⬥51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Fact that newspaper reporter had previously stated in an editorial that the Attorney General's office had launched an investigation into alleged mishandling of capital murder prosecution by prosecutorial officials, and then newspaper subsequently published article regarding fraud allegations filed against district attorney and other prosecutorial officials, was no evidence that newspaper and reporter acted with actual malice in publishing the subsequent article, as element of district attorney's defamation claim, despite district attorney's claim that newspaper had predetermined to publish the article, where article accurately reported that the allegations had been filed and were pending.

**[26] Libel and Slander 237 ⬥51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Failure of newspaper reporter to interview district attorney and other prosecutorial officials involved in capital murder trial, prior to publishing articles accusing prosecutorial officials of mishandling the murder prosecution and concerning fraud allegations filed against the district attorney and prosecutorial officials, was not evidence of actual malice, as element of district attorney's defamation claim against newspaper owner and reporter; reporter expressed no doubt about the veracity of her accusations and had performed enough research to have a reasonable belief in her viewpoint.

**[27] Libel and Slander 237 ⬥51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Although the failure of a newspaper to fully investigate allegations before publishing them will not alone support a finding of actual malice, as element of public-figure defamation case, purposeful avoidance of the truth will.

**[28] Libel and Slander 237 ⬥51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

219 S.W.3d 425, 35 Media L. Rep. 1449
(Cite as: 219 S.W.3d 425)

Evidence of a media defendant's knowledge that a public-figure plaintiff has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations for purposes of establishing actual malice, as element of defamation claim, because in the world of politics, such denials are so commonplace that they hardly alert the conscientious reporter to the likelihood of error.

**[29] Libel and Slander 237 ⬤══51(5)**

237 Libel and Slander
  237II Privileged Communications, and Malice Therein
    237k51 Existence and Effect of Malice
      237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

While a media defendant may purposefully avoid the truth, and thus act with actual malice as element of public-figure defamation claim, by failing to investigate obviously crucial and reliable sources of information, the public figures themselves need not be interviewed due to their personal bias and the likelihood of a denial.

**[30] Libel and Slander 237 ⬤══51(5)**

237 Libel and Slander
  237II Privileged Communications, and Malice Therein
    237k51 Existence and Effect of Malice
      237k51(5) k. Criticism and Comment on Public Matters and Publication of News. Most Cited Cases

Even if the "gist" of allegedly defamatory articles concerning prosecutorial officials' handling of capital murder prosecution conveyed a false impression to readers, this was no evidence of actual malice, as element of district attorney's defamation claim against newspaper owner and reporter, in the absence of evidence that newspaper and reporter knew or should have known that their choice of published facts would convey a substantially false impression or grossly distort the truth of the story

to a reasonable reader.

*429 John J. McKetta, III, William Christian, Graves, Dougherty, Hearon & Moody, P.C., Austin, for appellants.

Gregory C. Anderson, Anderson, Anderson, Bright & Crout, P.C., El Paso, for appellee.

Before Chief Justice LAW, Justices PEMBERTON and WALDROP.

*OPINION*

W. KENNETH LAW, Chief Justice.

Appellants Cox Texas Newspapers, L.P. d/b/a the *Smithville Times,* Cox Texas Partners, Inc., d/b/a the *Smithville Times,* and Tyanna Tyler ("Cox Newspapers" and "Tyler" or, collectively, "appellants") [FN1] *430 bring this interlocutory appeal challenging the district court's partial denial of appellants' motion for summary judgment in a defamation action brought by appellee Charles Penick. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(6) (West Supp.2006).

> FN1. The *Smithville Times* is owned by Cox Texas Newspapers, L.P.

District Attorney Penick, a public figure, filed suit claiming that he had been defamed in thirteen publications (including articles, an editorial series, and letters to the editor regarding a murder trial prosecuted in part by Penick) appearing in the *Smithville Times* between August 2, 2001, and January 3, 2002. The district court granted appellants' summary judgment motion regarding nine of the publications but denied their motion regarding four of the publications, which appeared on October 18, December 13 and 20, and January 3. [FN2] On appeal, Cox Newspapers and Tyler assert that the district court erred in concluding that a genuine issue of material fact remained about whether these four publications were of a libelous nature because (1) the October 18 editorial was not "of and concerning" Penick, (2) the December 13 and January

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 articles and the December 20 letter to the editor were substantially true, and (3) Penick failed to present any evidence of actual malice regarding any of these four publications.

> FN2. Summary judgment was granted as to one article published on August 2 because Penick failed to file suit on this article within the one-year statute of limitations. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.002 (West 2002). Summary judgment was granted on eight of the remaining editorials and letters to the editor because there was not sufficient evidence to raise a genuine issue of material fact on any of the elements essential to maintain a defamation action by a public figure. *See Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 423 (Tex.2000) (setting forth elements).

Interlocutory appeal of the portion of the order granting appellants' summary judgment motion is not permitted by section 51.014(a)(6). Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(6) (West Supp.2006). Our review is therefore limited to whether summary judgment was appropriately denied on Penick's claims related to the October 18 editorial, the December 13 and January 3 articles, and the December 20 letter to the editor.

Because Penick fails to present any evidence to demonstrate that the October 18 article was "of and concerning" him or that any of the disputed publications were published with actual malice, we will reverse the portion of the district court's order that denied appellants' summary judgment motion as to these four publications and render a take-nothing judgment in favor of appellants.

## BACKGROUND

This action arises out a series of articles, editorials, and letters to the editor published in late 2001 and early 2002 in the *Smithville Times* regard-

ing the investigation of Stacey Stites's murder and the subsequent trial of her accused murderer, Rodney Reed. On April 23, 1996, the body of Stacey Stites, a 19–year–old woman, was discovered partially undressed beside a country road in Bastrop County. Stites had been sexually assaulted and strangled. Initially, the victim's fiancé, Jimmy Fennell, Jr., a Giddings police officer, was a suspect, but DNA evidence from semen found in Stites's body diverted the focus to Rodney Reed. Reed was arrested, tried, and convicted of capital murder. He was then sentenced to death in 1998.[FN3] Appellee Charles Penick was the Bastrop County District Attorney at the time of Reed's trial. Penick enlisted the Attorney General's*431 office to lead the prosecution. Assistant Attorney General Lisa Tanner was assigned to the case and acted as chief prosecutor.

> FN3. Reed continues to appeal the verdict. His application for writ of habeas corpus is currently pending before the Texas Court of Criminal Appeals. *Ex parte Reed,* Cause No. WR–50, 961–03.

The *Smithville Times* covered the story of the murder investigation and Reed's trial from 1996 through 2002.[FN4] Appellant Tyanna Tyler, a reporter for the *Smithville Times,* was initially assigned in 2001 to cover a writ of habeas corpus proceeding in which Reed's attorney asserted that DNA evidence from saliva found on beer cans near Stites's body had been suppressed during the trial by the prosecution. Testing of the DNA evidence ruled out Reed as a donor but could not exclude two police officers who were friends of Fennel, the initial suspect in the murder.

> FN4. Many other local and state publications reported the story, including the developing allegations of official misconduct. These included the *Bastrop Advertiser,* the *Austin American–Statesman,* the *Austin Chronicle, Texas Monthly,* and others.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Thereafter, Tyler continued to research Reed's case. She read the trial record and investigative files and interviewed Reed, his family, friends, and defense counsel. Tyler also asked David Fisher—a local citizen who had previously conducted his own independent investigations of public employees—to look into the "inconsistencies" of the Reed case. Tyler used some of Fisher's research in her articles.

Tyler authored a series of ten editorial articles highlighting why "reasonable doubt" existed in the Reed case and who may have acted inappropriately in their official capacity. The *Smithville Times* ran the editorial series from August 2 to October 18, 2001. Eight of the editorials present a detailed review of the evidence and are void of commentary about the prosecution. Only the opening and closing editorials, published on August 2 and October 18, contain Tyler's criticism of the prosecution. In both, Tyler refers expressly to Assistant Attorney General Lisa Tanner. Penick is never mentioned in the ten-part editorial series by name or by title.

In early December 2001, Fisher filed a complaint with the Travis County District Attorney's Special Prosecution Public Integrity Unit against Penick, Tanner, Attorney General Greg Abbott, and the Capital Litigation Division of the Attorney General's office. Fisher's complaint alleged violations of Reed's constitutional rights, prosecutorial misconduct, and a "conspiracy to commit fraud." The *Smithville Times* reported Fisher's filing on December 13, 2001, in an article with the headline "Fraud Charges filed on DA in Reed Case." This article was not part of the ten-part editorial series, which had concluded on October 18. Although the December 13 article accurately reported the substance of Fisher's complaint, it is undisputed that this article contained three errors—namely, that (1) Fisher's complaint had been filed with the Attorney General's office, (2) Tanner had asserted at trial that she had made every effort to deliver a May 13 lab report to the defense, and (3) the chief counsel for the court of criminal appeals had advised Fisher to contact the FBI or Judge Towslee.

In the next issue published on December 20, 2001, the *Smithville Times* printed a letter to the editor written by Fisher titled, "Fisher appologizes [sic] for errors." [FN5] **432** The letter thanked the paper for reporting on the charges that he filed against Penick and Tanner and offered corrections to the three errors contained in the December 13 article. Specifically, Fisher's December 20 letter stated that "the resulting few errors that need to be restated are my fault":

> FN5. Fisher had first written a letter to the editor published on August 23, 2001, in which he acknowledged that "a reporter" had requested that he look into the Reed case and presented the readers with some of his findings about inconsistencies in the evidence presented at Reed's trial. In this letter, Fisher also commented on Penick's decision not to seek reelection. The letter was titled "Reader asks DA Penick, 'Which is it?'"

> First, I filed the complaint with the Travis County District Attorney's Special Prosecution/Public Integrity Unit, not with the Attorney General's Office.

> Second, it was at the hearing that Lisa Tanner asserted that she made every effort to deliver the May 13th lab report to the Defense, not at the trial.

> Third, George Wetzel, Counsel of the Court of Criminal Appeals did not advise me to contact the FBI or Judge Towslee. The FBI asked that I notify Judge Towslee and [Reed's] attorney of my findings.

On January 3, 2002, the *Smithville Times* published a year-in-review article that highlighted prominent headlines from the year 2001, catalogued by month. Under the "December" heading, one headline read "Fraud charges filed on D.A. in Reed case by citizen in county." The headline had been altered from its original publication to include "by

citizen in county." Otherwise, there was no further explanation of the content of the article as originally printed.

Penick filed suit against Cox Newspapers and Tyler asserting that he had been defamed by the articles, editorial series, and letters to the editor published in the *Smithville Times* between August 2, 2001, and January 3, 2002. Appellants sought both a traditional and a no evidence summary judgment on all of Penick's claims. *See* Tex.R. Civ. P. 166a(c), (i). The district court granted partial summary judgment in appellants' favor on nine of the thirteen disputed publications but ruled that a genuine issue of material fact remained as to the defamatory character of the four publications on October 18, December 13 and 20, and January 3.

Cox Newspapers and Tyler now bring this interlocutory appeal of the district court's order, urging that the court erred by not granting summary judgment as to these four publications on the basis that Penick failed to produce any evidence on at least one element of his defamation claims regarding each publication or, alternatively, because appellants conclusively disproved at least one element of each of his claims as a matter of law. Specifically, appellants claim that no genuine issue of fact remains about the defamatory nature of any of the four publications because (1) the October 18 editorial is not "of and concerning" Penick, (2) the December 13 and January 3 articles and the December 20 letter to the editor and are substantially true, and (3) none of these publications was published with actual malice.

## ANALYSIS

### Standard of Review

[1] When a party seeks both a traditional and a no evidence summary judgment, we first review the trial court's summary judgment under the no evidence standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004). If the nonmovant failed to produce more than a scintilla of evidence raising a genuine fact issue on the challenged elements of his claims, then there is no need to analyze whether the movant's summary judgment proof satisfied the traditional summary judgment burden of proof under rule 166a(c). *Id.*

A no evidence motion for summary judgment must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense*433 on which an adverse party would have the burden of proof at trial, and (2) the nonmovant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements. Tex.R. Civ. P. 166a(i). In a case where the trial court's judgment does not specify the grounds relied upon for its ruling, the summary judgment must be affirmed if any of the theories advanced is meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989); *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 692 (Tex.App.-Austin 2005, pet. denied).

[2] In reviewing a no evidence summary judgment, we "must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion" to determine whether more than a scintilla of evidence was presented on the challenged elements of the nonmovant's claim. *City of Keller v. Wilson*, 168 S.W.3d 802, 825 (Tex.2005); *Perdue v. Patten Corp.*, 142 S.W.3d 596, 604 (Tex.App.-Austin 2004, no pet.). More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)). Because the propriety of granting a summary judgment is a question of law, we review the trial court's decision *de novo*. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994). Likewise, summary judgment is reviewed in public figure or public official defamation cases under the

same standard as in other cases. *See Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 423 (Tex.2000) (holding that "we decline to adopt the clear-and-convincing standard at the summary judgment stage of a public-figure defamation case").

[3] To prevail in a defamation case, a plaintiff who is a public official or figure must prove that the defendant (1) published a false statement about the plaintiff, (2) that was defamatory, (3) while acting with actual malice. *Id.* at 420; *see also Grotti v. Belo Corp.,* 188 S.W.3d 768, 774 (Tex.App.-Fort Worth 2006, pet. denied).

**"Of and Concerning"**

[4][5][6] As Penick concedes, to prevail on his defamation claim, he must produce evidence that the disputed publications were "of and concerning" him. *See New York Times v. Sullivan,* 376 U.S. 254, 288, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Robert D. Sack, *Sack on Defamation* § 2.9 (3d ed.2006). "There must be evidence showing that the attack was read as specifically directed at the plaintiff." *Rosenblatt v. Baer,* 383 U.S. 75, 81, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). In other words, the publication "must refer to some ascertained or ascertainable person and that person must be the plaintiff." *Newspapers, Inc. v. Matthews,* 161 Tex. 284, 339 S.W.2d 890, 893 (1960); *see also Huckabee,* 19 S.W.3d at 429 (documentary film's false statement regarding "single family court" was not expressly or implicitly directed at plaintiff in particular, so was not defamatory). Even if the plaintiff is not expressly named, the plaintiff may satisfy his burden on the "of and concerning" element by offering proof that persons acquainted with the plaintiff would understand the publication to refer to him. *Matthews,* 339 S.W.2d at 894; *see also Harvest House Publs. v. The Local Church,* 190 S.W.3d 204, 213-14 (Tex.App.-Houston [1st Dist.] 2006, pet. denied); *Eskew v. Plantation Foods, Inc.,* 905 S.W.2d 461, 462 (Tex.App.-Waco 1995, no writ); **\*434***Poe v. San Antonio Express–News Corp.,* 590 S.W.2d 537, 542 (Tex.App.-San Antonio 1979, writ

ref'd n.r.e.).

[7] Here, Penick does not deny that he was never mentioned by name or office in the October 18 article, nor in any of the other nine editorials authored by Tyler from August 2 to October 18. In relevant part, the October 18 article reads:

Reasonable doubt exists in this case. In fact, I am of the opinion that the whole case is flawed from the word go, and that the U.S. Justice Department needs to launch an investigation. I am aware that the Attorney General's Office has launched a criminal investigation into this case. I have heard rumors of jury rigging, evidence tampering, witness intimidation, document fraud, and illegal magistration [sic] charges, which could prove to be true. I have overheard Judges and Attorneys make statements like, they "wouldn't touch this case with a ten-foot pole because it had Towslee's fingerprints all over it," and "it was not something that they even wanted to think about."

\* \* \* \* \* \*

The entire prosecution's case was based on a false premise. A dead body found in a partial state of undress does not constitute aggravated sexual assault resulting in murder. Minimal semen cells logically don't support recent or 'fresh' semen nor do they prove sexual assault. Anytime there is prosecutorial and defensive evidence sealed during the pre-trial phase obviously there are some problems evident. Anytime you have one law enforcement agency keeping evidence from another one, which supersedes it, you have problems with evidence and the investigation.

The article then details several actions by various police officers that Tyler felt demonstrated why the "case is flawed from the word go." For example, the article discusses that the original suspect's vehicle was not properly inventoried, that crime scene photos went undeveloped for fifteen months, that DNA testing was never conducted on available samples, and that multiple police reports

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

were flawed or inconsistent with other evidence. In so doing, the article specifically names four officers, refers multiple times to "the DPS," and references the medical examiner by title. The article then discusses the actual evidence presented in the case, with Tyler's commentary about various inconsistencies. The article specifically names Judge Towslee, noting problems with the orders he had entered in the case, and names the "State's Appointed Special Prosecutor, Lisa Tanner," stating that she "had been brought before the State Bar for prosecutorial misconduct and allegations about the evidence suppression in this case." The article concludes by characterizing the Rodney Reed case as one that could become the "case in point" to "fix the problems of the indigent defense practices in the State of Texas." Although the article criticizes the manner in which the prosecution was conducted, only the Attorney General's office and Tanner are named in this critique. Nowhere in the October 18 article is Penick mentioned, either by name, title, or implication.

At best, a connection could be drawn between Penick and the October 18 article on the basis that, as the District Attorney, he was responsible for supervising prosecutions in Bastrop County. Penick cites *Sellards v. Express-News Corporation* for support. *See* 702 S.W.2d 677, 680 (Tex.App.-San Antonio 1985, writ ref'd n.r.e.) ("When a group is named and the plaintiff is a readily identifiable member of the group, a cause of action for defamation exists if those who know and are acquainted with the plaintiff understand the article*435 refers to the plaintiff."). In *Sellards*, a private citizen sued for defamation when a car crash, in which she was a passenger, was described by a reporter as a "drug-induced suicide." *Id.* at 678. The wording of the publication could have been interpreted as meaning that all passengers of the car were involved in drugs or suicide. *Id.* at 680. Though the plaintiff was not named as a passenger in the car, those who knew her were aware that she was a passenger in the car. *Id.* Thus, the article was "of and concerning" the plaintiff. *Id.*

[8] However, the United States Supreme Court has set a separate standard for public officials who supervise government agencies. *Sullivan*, 376 U.S. at 289, 84 S.Ct. 710. An impersonal attack criticizing the actions of a governmental agency without referring specifically to its agents, without more, will not support a claim of libel by the head of that agency. *Id.* (statements criticizing police operations were insufficient to establish libel against county commissioner who was responsible for oversight of police department). In *Sullivan*, the Court held that "the bare fact that the [county commissioner plaintiff] was in overall charge of the Police Department and, thus, bore official responsibility for police conduct" was insufficient to support the plaintiff's claim that he had been personally attacked by an article criticizing police operations. *Id.* The *Sullivan* Court further explained that:

> to the extent that some of the witnesses thought the [plaintiff] to have been charged with ordering or approving the conduct or otherwise being personally involved in it, they have based this notion not on any statements in the [publication], and not on any evidence that he had in fact been so involved, but *solely on the unsupported assumption that, because of his official position, he must have been.*

*Id.* at 289 n. 28, 84 S.Ct. 710 (emphasis added). Because the statements in *Sullivan* referred to only the governmental agency supervised by the plaintiff, without "mak[ing] even an oblique reference to [plaintiff] as an individual," they were not defamatory as a matter of law. *Id.* at 289, 84 S.Ct. 710; *see also Huckabee*, 19 S.W.3d at 429 (statement that "was [ ] a criticism of the family courts in general and not of Judge Huckabee in particular" was not actionable).

The Supreme Court reaffirmed its *Sullivan* holding in *Rosenblatt v. Baer*, stating that a public figure plaintiff may not prevail in a defamation claim based on an article criticizing "a small group acting for an organ of government, only some of whom were implicated, but all of whom were

219 S.W.3d 425, 35 Media L. Rep. 1449
(Cite as: 219 S.W.3d 425)

tinged with suspicion." *See* 383 U.S. at 82, 86 S.Ct. 669. According to the Court, "[a] theory that the column cast indiscriminate suspicion on the members of the group responsible for the conduct of this governmental operation is tantamount to a demand for recovery based on libel of government, and therefore is constitutionally insufficient." *Id.* at 83, 86 S.Ct. 669.

The holdings of *Sullivan* and *Rosenblatt* were succinctly summarized by the Supreme Court of Virginia, as follows:

[T]he use of the "small group theory" alone as the basis for satisfying the "of and concerning" element of a common law defamation action against a governmental actor does not survive constitutional scrutiny.... A member of a governmental group against which an allegedly defamatory statement is made can sustain a common law action for defamation only if that member can show the statement specifically implicated that member or each member of the group. Such implication can be shown by extrinsic evidence, but evidence that others "understood" the implication **\*436** based solely upon a plaintiff's membership in the referenced group will not satisfy the "of and concerning" requirement.

*Dean v. Dearing,* 263 Va. 485, 561 S.E.2d 686, 689 (2002) (citations omitted).

Although Penick was involved in the prosecution, there is no evidence to show that readers would associate the article's criticism with him individually. *Newspapers,* at 289–290, 339 S.W.2d 890; *Sellards,* 702 S.W.2d at 680. Accordingly, under the standard announced in *Sullivan* and *Rosenblatt,* Penick cannot establish that the October 18 article is "of and concerning" him based solely on the fact that he supervised those specifically named or because he assumed that his status as a public figure would cause people to associate him with the article. *See Rosenblatt,* 383 U.S. at 82–83, 86 S.Ct. 669; *Sullivan,* 376 U.S. at 289, 84 S.Ct. 710.

Acknowledging that the October 18 article never mentions him, Penick urges this Court to look outside the four corners of the article and consider whether a reader would have associated the article with him based on other publications in the *Smithville Times* that were not included in the ten-part editorial series—namely, an August 23 letter to the editor written by Fisher and a September 20 article written by editor Metta Johnson.[FN6] Penick cites *Buck v. Savage,* 323 S.W.2d 363 (Tex.App.-Houston 1959, writ denied), and *Gibler v. Houston Post Co.,* 310 S.W.2d 377 (Tex.App.-Houston 1958, writ denied), in support. Both *Buck* and *Gibler* involved articles that made reference to an individual who, by the "circumstances" in the article, might be readily identified. *See Buck,* 323 S.W.2d at 376–77; *Gibler,* 310 S.W.2d at 385. Penick uses these cases to support quite a different assertion—that one article referencing a governmental group may be deemed "of and concerning" an unidentified member of the group if that individual's name has been used in past articles appearing in the same periodical.

> FN6. As support for the "of and concerning" element, Penick also points to the subsequently-published December 13 and January 3 "Fraud Charges Filed on D.A." article and headline. Even if we were to consider other publications in determining whether the October 18 article was "of and concerning" Penick, we could not include the December and January articles in such a review because they had not been published at the time of the October 18 article.

Penick has cited no authority for this theory. Examining all related publications is an accepted practice when evaluating the issue of actual malice because it can illuminate a personal vendetta of the defendant, which demonstrates the defendant's state of mind at the time of publication. *Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 858 (Tex.2005). However, applying the same technique to determine whether a particular publication is "of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and concerning" the plaintiff—when the focus remains on whether the specific publication is defamatory at all—is novel. Rather, the Supreme Court has established that the specific publication cannot be "of and concerning" the plaintiff if it does not "make even an oblique reference to [the plaintiff] as an individual." *Sullivan,* 376 U.S. at 289, 84 S.Ct. 710.

[9] Although we recognize that defamation claims should be reviewed in context, our concern is where the inquiry would stop under Penick's analysis. Penick is a public figure who is likely to be mentioned frequently by the media. The rule cannot be that a newspaper's individual reference to a public figure in an article published months earlier could be used to transform a subsequent article, which never mentions the public figure, into one that *437 is "of and concerning" him.[FN7] Rather, the test requires us to determine whether a person would understand the individual publication at issue to implicate Penick. *See Newspapers,* at 289–290, 339 S.W.2d 890.

> FN7. Although not controlling, we find *Early v. Toledo Blade,* 130 Ohio App.3d 302, 720 N.E.2d 107 (1998), instructive because of its factual similarities to this case. There, the *Toledo Blade* ran a multi-part editorial series investigating the internal affairs of the local police department. *Id.* at 113–14. Several police officers sued for defamation, and the trial court granted summary judgment in favor of the *Toledo Blade. Id.* at 114. The appellate court held that statements about "drug and alcohol abuse by public servants, misplaced values, and the corruption of our systems, ... alcohol cases where officers were carrying guns, ... [and] neglect of duty cases" were not actionable because they were "not 'of and concerning' any one individual." *Id.* at 121–22. Further, regarding one particular plaintiff, the court held that a subsequent publication several

days later specifically naming that plaintiff did not turn the prior article into one "of and concerning" that plaintiff. *Id.* at 122. Moreover, regarding each of the defamation plaintiffs, the appellate court considered the multiple publications collectively to determine whether they were of a defamatory character and published with actual malice, but declined to consider them collectively in determining whether any article in particular was of and concerning the plaintiffs. *See generally id.* at 123–35.

Here, the October 18 article does not make even an oblique reference to Penick, either as an individual or in his capacity as the District Attorney. *See Sullivan,* 376 U.S. at 289, 84 S.Ct. 710. Accordingly, Penick has failed to produce any evidence to demonstrate that the October 18 article was "of and concerning" him. The district court, therefore, erred in denying appellants' summary judgment motion as to this article. We sustain appellants' first issue.

With regard to the remaining publications—the December 13 and January 3 articles and the December 20 letter to the editor—we turn to appellants' third issue because the lack of evidence of actual malice is dispositive.

**Actual Malice**

The Texas Supreme Court has articulated standards for analyzing the existence of actual malice in public figure defamation cases against media defendants. *See, e.g., Cantu,* 168 S.W.3d at 849 (media defendants entitled to summary judgment on public figure's defamation claim because no evidence of actual malice); *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 639 (Tex.2005) (same); *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 168 (Tex.2004) (same); *Huckabee,* 19 S.W.3d at 417 (same). To establish defamation, a public figure plaintiff carries the burden to prove that the defendant published the statements with actual malice. *Skeen,* 159 S.W.3d at 637 n. 1; *Huckabee,* 19

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

219 S.W.3d 425, 35 Media L. Rep. 1449
**(Cite as: 219 S.W.3d 425)**

S.W.3d at 420. The purpose of requiring public figures to overcome this high burden is to protect uninhibited debate on public issues. *Isaacks,* 146 S.W.3d at 161–62, 165.

[10][11] At the summary judgment stage, the media defendant can negate that it acted with actual malice, as a matter of law, by proving that it did not publish the articles at issue with knowledge of falsity or a reckless disregard for the truth. *Cantu,* 168 S.W.3d at 853; *Huckabee,* 19 S.W.3d at 420. Actual malice has been described as "calculated falsehood." *Isaacks,* 146 S.W.3d at 162. Whereas "knowledge of falsity is a relatively clear standard, [ ] reckless disregard is ... a subjective standard" that, to be disproved, requires evidence that the media defendant did not entertain any serious doubts about the truth of the article at the time it was published. *Skeen,* 159 S.W.3d at 637.

[12] The defendant can establish such proof through the submission of affidavits, **\*438** so long as they are "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex.R. Civ. P. 166a(c); *Isaacks,* 146 S.W.3d at 163–64. "In actual malice cases, such affidavits must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief." *Huckabee,* 19 S.W.3d at 424. Such affidavits will not be deemed "conclusory" if they "provide [a] detailed explanation of the affiants' state of mind and descriptions of the steps taken to ensure that the article [was not published with knowledge of falsity or with a reckless disregard for the truth]." *See Isaacks,* 146 S.W.3d at 165.

[13] Once the defendant produces some evidence that it did not act with actual malice, the burden shifts to the plaintiff to produce evidence of the contrary. *Cantu,* 168 S.W.3d at 853; *Huckabee,* 19 S.W.3d at 420. At this stage, we assume all facts favorable to the nonmovant are true and draw all reasonable inferences in its favor. *Huckabee,* 19 S.W.3d at 424. If the plaintiff fails to produce a scintilla of evidence to create a genuine issue of

material fact about the existence of actual malice, then summary judgment is appropriate, pursuant to either a traditional or no-evidence analysis. *See* Tex.R. Civ. P. 166a(c), (i).[FN8]

> FN8. Although the United States Supreme Court has ruled that the clear and convincing standard of proof is required for actual malice in summary judgment cases under Federal Rule of Civil Procedure 56, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Texas Supreme Court has not adopted this view for summary judgment proceedings under Texas Rule of Civil Procedure 166a, *see Freedom Newspapers of Tex. v. Cantu,* 168 S.W.3d 847, 859 n. 49 (Tex.2005).

Here, the appellants supported their motions for summary judgment with affidavits from Tyler, the author of the articles in question, and from Metta Johnson, the managing editor of the *Smithville Times* at the time of the disputed publications. Tyler averred that, in preparation for the series, she researched the police reports, medical examiner's report, trial transcripts, appeals, investigative reports of the Texas Rangers, and press articles from other publications. She also interviewed Reed's family, friends, attorneys, and private investigators. Tyler acknowledged that she solicited Fisher's viewpoint on the Reed case and stated that she trusted him based on his prior success investigating public officials. Tyler further averred that she had no contempt for Penick and, in fact, never mentioned Penick's name in her editorial series. Tyler stated in her affidavit that she believed all the facts represented in her articles to be true at the time of publication and, with the exception of the few nonmaterial facts that Fisher corrected in his December 20 letter to the editor, she still believes them to be true.

Johnson's affidavit expresses that she believed the Reed case was an important news event in Bastrop County. According to her affidavit, John-

219 S.W.3d 425, 35 Media L. Rep. 1449
**(Cite as: 219 S.W.3d 425)**

son assigned Tyler to report on a habeas corpus hearing in March 2001, but Tyler continued researching the Reed case on her own initiative. After Tyler explained to Johnson many of the inconsistencies that Tyler saw in the case and the reasons for her opinions, Johnson agreed that an editorial series would be appropriate because these inconsistencies "had not gotten much coverage during the Reed trial." Johnson averred that she did not have any animosity toward Penick and that, in her opinion, Penick was excluded from the editorial series because he was not relevant to the inconsistencies discovered by Tyler. Johnson further *439 averred that, as editor, she published letters to the editor on both sides of the issue.[FN9] Additionally, Johnson's affidavit noted that the errors contained in Tyler's December 13 article were corrected by publishing Fisher's December 20 letter to the editor. Johnson believes that the editorial series expressed "honest opinions" about the Reed case and that the December 13 article "accurately recount[ed]" Fisher's allegations concerning Penick.

> FN9. This is confirmed by the record, which includes letters to the editor appearing in the *Smithville Times* on September 20 and October 25 criticizing Tyler's editorial series and espousing views that Reed is guilty beyond a reasonable doubt.

In their respective affidavits, both Tyler and Johnson aver that they believed the reports to be accurate at the time of publication, explain what their state of mind was at the time, and provide descriptions of why they had a reasonable belief in the truth of the articles. *Isaacks,* 146 S.W.3d at 165; *Huckabee,* 19 S.W.3d at 424. These affidavits satisfy appellants' initial burden on negating actual malice as a matter of law in order to shift the burden to Penick to present evidence establishing a genuine issue of material fact about the existence of actual malice in this case. *Cantu,* 168 S.W.3d at 853.

Penick raises seven points that he believes support his assertion of actual malice: the appellants

(1) failed to tell the reader that Travis County was not investigating Fisher's letter, (2) printed dubious information from a biased source, (3) hid from the reader the relationship between the *Smithville Times* and Fisher, (4) omitted complimentary statements about Penick from a candidate's campaign announcement published in the *Smithville Times,* (5) predicted future publications and events, (6) failed to talk to Penick, Tanner, or other members of the prosecution team, and (7) omitted and juxtaposed facts to create an overall false impression. We will address each in turn.

### Failure to tell readers that Travis County was not investigating Fisher's letter

[14] Penick claims that, by not clarifying in the December 13 article, which was headlined "Fraud charges filed on DA in Reed case," that the Travis County District Attorney's office had not opened an "active investigation," the appellants published the article with actual malice. In support of this argument, Penick relies on the fact that Mary Farrington from the Public Integrity Unit of the Travis County District Attorney's office had informed the *Smithville Times* on November 14 or 15 that complaints similar to Fisher's were received frequently and that, at that time, no active investigation had been opened on the allegations filed by Fisher against Penick. Penick asserts that the truth of the December 13 article was grossly distorted by the omission of Farrington's November statement that no active investigation had been opened. We disagree.

[15][16] A media defendant's "omission of facts may be actionable if it so distorts the [readers'] perception that they receive a substantially false impression of the event." *Huckabee,* 19 S.W.3d at 425. For a public figure to demonstrate that such an omission constitutes actual malice, however, he must present evidence that the defendant was aware that the omission could create a substantially false impression. *Id.* at 426 (plaintiff could satisfy test with evidence that defendant selectively omitted facts to purposefully create false

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

portrayal of events). If the omission of certain facts does not grossly distort the story, then the defendant's "failure to capture accurately all the story's details suggests [only] an error in judgment, which is no evidence of actual malice." *Id.*

**\*440** Penick presented no evidence that appellants were or should have been aware that the omission of Farrington's November comment from the December 13 article would create a substantially false impression of the relevant events. After Farrington spoke with the newspaper in November, Fisher amended his complaint on December 7, and the newspaper never received an updated report from Farrington about the status of the investigation following Fisher's amended filing. In the December 13 article, appellants reported that Fisher had filed the allegations (both the original and amended ones), without discussion as to whether the Public Integrity Unit was actively investigating them or not. Penick does not dispute the truth of the article's report that Fisher "filed a formal complaint" charging Penick and others with "conspiracy to commit fraud ... in connection with the Rodney Reed case," and Penick acknowledges that, at the time of publication, these charges were still pending.

Moreover, Farrington swore in her deposition that she informed the newspaper only that "we [do] not have an open investigation at this time and [ ] we receive[ ] complaints all the time from lots of different people."[FN10] She did not tell the newspaper that the complaint was baseless or frivolous, nor did she say that an investigation would never be opened. Indeed, in her deposition Farrington clarified that, "[the office] receives complaints from lots of different people, and we take those complaints, and we, of course, review them." Thus, appellants could have reasonably inferred at the time of publication that Fisher's complaint was still in some preliminary review stage, especially taking into account that Fisher had recently amended the complaint. The presumption that the investigation was still open at some level was substantially true be-

cause Farrington did not consider the matter closed until December 18 when she sent a letter stating such to Fisher.

> FN10. The wording of Farrington's phone call is not disputed. Both parties rely upon Farrington's recollection of her words in her deposition.

The truth of the December 13 report (that Fisher had filed allegations against Penick) was not grossly distorted by appellants' omission of the fact that the pending complaint had not yet been actively investigated by the Travis County Public Integrity Unit. The omission of Farrington's November statement is not evidence of actual malice. *See Huckabee,* 19 S.W.3d at 425–26.

### *Publication of dubious information from a biased source*

[17][18][19][20][21][22] Next, Penick claims that actual malice is demonstrated by the fact that appellants printed "dubious information" obtained from a "biased source"— *i.e.,* Fisher. Yet, Penick offers no evidence to support this claim. Evidence that a media defendant's "report was mistaken, even if negligently so, is no evidence of actual malice" unless the plaintiff presents evidence that the defendant purposefully published mistaken facts or that the circumstances were "so improbable that only a reckless publisher would have made the mistake." *Cantu,* 168 S.W.3d at 855. "An understandable misinterpretation of ambiguous facts does not show actual malice." *Id.* As long as the article presents a "rational interpretation" of the actual events, the article standing alone will not establish actual malice. *Id.* at 857. Likewise, a media defendant's failure to fully investigate does not constitute actual malice, although its purposeful avoidance of the truth does. *Skeen,* 159 S.W.3d at 637. In addition, evidence that an article was written "from a particular point of view, even **\*441** when [the article is] hard-hitting or sensationalistic, is no evidence of actual malice." *Huckabee,* 19 S.W.3d at 425

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

219 S.W.3d 425, 35 Media L. Rep. 1449
(Cite as: 219 S.W.3d 425)

Penick fails to present evidence that appellants acted recklessly or purposefully avoided the truth in relying on Fisher as a source. Penick relies primarily on a statement by Davis McAuley, editor of *The Bastrop Advertiser*, that he believed Fisher was untrustworthy. Even assuming that someone else regarded Fisher as an outlandish conspiracy theorist, evidence of another person's opinion, who has no connection to the instant case, is not evidence (1) that Fisher was so untrustworthy that it would be reckless for anyone to believe him or (2) that appellants were aware of Fisher's lack of trustworthiness and chose to ignore it or purposefully avoided the truth. Thus, it is not evidence of actual malice on behalf of appellants. *See St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (although defendant reported some mistaken information provided by source, failure to investigate source's credibility was not evidence of reckless publication; record failed to demonstrate "a low community assessment of [source's] trustworthiness"); *Beck v. Lone Star Broad. Co.*, 970 S.W.2d 610, 617 (Tex.App.-Tyler 1998, pet. denied) ("failure of a defendant to fully investigate ... the credibility of a source does constitute actual malice").

Similarly, even assuming the publications were authored from a hard-hitting conspiracy theorist's perspective, this too provides no evidence of actual malice. *See Huckabee*, 19 S.W.3d at 425; *New Times, Inc. v. Wamstad*, 106 S.W.3d 916, 928 (Tex.App.-Dallas 2003, pet. denied) ("reporter may rely on statements by a single source, even though they reflect only one side of the story, without manifesting a reckless disregard for the truth"). Evidence of Fisher's prior investigations into other alleged conspiracies is also not evidence that Fisher provided unreliable information to appellants concerning the Reed case or that appellants were aware the information was unreliable. There is simply no evidence in this record that would allow a reasonable fact-finder to conclude that, in using Fisher as a source, appellants acted with actual malice, whether consciously or recklessly.

Finally, it is not disputed that Tyler did not blindly rely on Fisher's investigation. According to Tyler's and Johnson's deposition testimony, they concluded that, based on their review of the trial evidence, reasonable doubt existed about Reed's guilt. Fisher's deposition reflects that he formed the same conclusion from his independent investigation. While Tyler and Johnson could have done more investigating, there is no evidence that they "purposefully avoided the truth" and no evidence that only a reckless publisher would have published the information they reported. *See Skeen*, 159 S.W.3d at 637 (reporter's five months of research, including interviews and reading court records, coupled with absence of source that could have easily disproved statements showed no purposeful avoidance of the truth to constitute actual malice in reporter's criticisms of district attorney's office); *see also Cantu*, 168 S.W.3d at 855.

### Failure to disclose relationship between the Smithville Times and Fisher

[23] In support of his claim of actual malice, Penick argues that the *Smithville Times* hid the fact that Tyler asked Fisher to investigate the case in order to use Fisher's independent assessment as corroboration for Tyler's own theories. This argument is without merit for two reasons. First, Penick has failed to demonstrate that appellants "hid" this relationship from the readers. To the contrary, the newspaper published Fisher's August 23 letter to **\*442** the editor stating that he had been asked by a reporter to investigate the Reed case.[FN11] Second, even taking as true Penick's claim that appellants "hid" the fact that Fisher aided in the investigation, this is no evidence of actual malice because journalists are not required to reveal every source of information upon which they have relied. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 123 (Tex.2000). Because appellants' use of Fisher as a source was not reckless, regardless of whether this relationship was revealed or kept confidential, it does not demonstrate that the articles were published with knowledge of falsity or a reckless disregard for the truth.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

219 S.W.3d 425, 35 Media L. Rep. 1449
(Cite as: 219 S.W.3d 425)

FN11. *See supra* footnote 5.

These facts are akin to the ones found in *Turner. Id.* There, the media defendant failed to reveal that one of its sources for a news story, which implicated a mayoral candidate in a possible insurance fraud scandal, was a member of the opposing campaign. There was evidence that the defendant knew of the source's affiliation. *Id.* However, the court ruled that the defendant's failure to reveal its source was not clear and convincing evidence of actual malice because (1) the plaintiff failed to produce sufficient evidence that the media defendant intended to endorse the opposing candidate, and (2) the defendant may have believed in the truth of the story. *Id.* Similarly, Penick's claim that appellants "hid" the fact that Fisher was a source provides no evidence that appellants had serious concerns about the veracity of the publication.[FN12]

> FN12. We recognize that *Turner* involved a clear and convincing standard that is higher than the level of evidence required in the case at hand, but we find the analysis persuasive.

### Omission of complimentary statements about Penick

[24] Penick argues that actual malice is demonstrated by the fact that, on September 13, 2001, when the Smithville Times reported that Bryan Goertz had announced his candidacy for District Attorney, appellants failed to include complimentary statements made in Goertz's campaign announcement about Penick. We disagree.

The September 13 story is solely about Goertz's candidacy: his background, qualifications, and reasons for seeking office. The only mention of Penick in the article is that "[t]he position is currently being held by veteran prosecutor Charles Penick, who previously announced that after 25 years in office, he will not be seeking re-election." Penick does not allege that any information in this statement is false and/or that it was damaging to his character or reputation. The newspaper had discretion to edit its story to cover only the relevant facts about the current candidate and to omit the candidate's favorable statements about the incumbent. Such an omission by appellants provides no evidence of actual malice toward Penick. *See Turner,* 38 S.W.3d at 122–23 (Tex.2000) (journalist entitled to edit story as necessary, and omission of favorable comments about plaintiff, when remainder of report is not otherwise false, is not evidence of actual malice); *HBO v. Harrison,* 983 S.W.2d 31, 42 (Tex.App.-Houston [14th Dist.] 1998, no pet.) (quoting *Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974)) (editorial choice to exclude favorable comments about public figure in otherwise truthful report is not actual malice).

Moreover, appellants had previously published favorable statements about Penick. On August 16, Johnson authored a report about Penick's decision to not seek **\*443** re-election, which included Penick's quote that, "I have enjoyed the 24 years I have spent representing the people of Bastrop County; however, it is now time to move on to new endeavors. I am proud of the work my professional staff has accomplished. I want to thank all of the voters and friends that have supported me in past elections and wish only the best to my successor."

A news organization cannot be required to print or air the viewpoint of everyone who might speak on a public figure's behalf. *Turner,* 38 S.W.3d at 122. Also, there is no evidence that the omission of these favorable statements grossly distorted the articles at issue or created a substantially false impression of Penick. *See Huckabee,* 19 S.W.3d at 425–26 (because omission of facts that more clearly explained plaintiff's judicial decisions did not grossly distort story, it was not evidence of actual malice). Hence, appellants' omission of Goertz's favorable statements about Penick provides no evidence of actual malice. *See Cantu,* 168 S.W.3d at 858.

### Prediction of future publications and events

[25] Penick's fifth argument for actual malice is based on his claim that the *Smithville Times* had

predetermined to publish the December 13 article headlined "Fraud charges filed on DA" article, regardless of whether the story turned out to be true or false, because Tyler had previously stated in an October 18 editorial that the Attorney General's office had launched an investigation. Like Penick's first actual malice argument, this claim hinges on whether the allegations filed by Fisher were being "actively investigated." In other words, Penick asserts that actual malice is demonstrated because Tyler reported that an investigation had been launched before actually finding out whether Fisher's allegations of fraud would be investigated.

Penick cites *Harte-Hanks Communications, Inc. v. Connaughton* as support. 491 U.S. 657, 684, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). In *Harte-Hanks,* a newspaper editorial predicted the discovery of information damaging the integrity of candidates for municipal judge before publishing allegations about one of the candidates a few days later. *Id.* Subsequent interviews all contradicted the allegations, yet the newspaper chose to publish the allegations as predicted. *Id.* at 683, 109 S.Ct. 2678. The United States Supreme Court held that this demonstrated a reckless disregard for the truth. *Id.* at 684, 109 S.Ct. 2678. Penick argues that, like the defendants in *Harte-Hanks,* appellants acted with actual malice by publishing the December 13 article based on a predetermined decision regardless of the article's truth.

However, Penick cannot show that the primary contents of the December 13 article were false. Other than the three misstated errors, which were minor and were corrected by Fisher's December 20 letter to the editor, the December 13 article accurately reported that the allegations had been filed by Fisher and were pending. Thus, this provides no evidence of actual malice. *See Grotti,* 188 S.W.3d at 775 ("to prove substantial truth, the defendants need only prove that the third party allegations were in fact made and accurately reported and that the allegations were under investigation").

***Failure to talk to Penick, Tanner, or other prosec-***

***utorial members***

[26][27][28][29] Penick argues that the *Smithville Times* and Tyler acted with actual malice because they intentionally avoided the truth by failing to interview Penick and others on the prosecution side of the Reed case. Although the failure of a **\*444** newspaper to fully investigate allegations before publishing them will not alone support a finding of actual malice, purposeful avoidance of the truth will. *Harte-Hanks,* 491 U.S. at 692, 109 S.Ct. 2678. Evidence of a media defendant's knowledge that a public figure plaintiff has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations for purposes of establishing actual malice, because "[i]n the world of politics, 'such denials are so commonplace [that] ... they hardly alert the conscientious reporter to the likelihood of error.' " *Cantu,* 168 S.W.3d at 858; *see also Harte-Hanks,* 491 U.S. at 692 n. 37, 109 S.Ct. 2678; *Skeen,* 159 S.W.3d at 639; *Huckabee,* 19 S.W.3d at 427. Also, a news organization is not required to publish the interviews of everyone who might speak on a public figure's behalf. *See Turner,* 38 S.W.3d at 122. While a media defendant may purposefully avoid the truth by failing to investigate obviously crucial and reliable sources of information, the law is clear that the public figures themselves need not be interviewed due to their personal bias and the likelihood of a denial. *See Harte-Hanks,* 491 U.S. at 692 n. 37, 109 S.Ct. 2678; *Cantu,* 168 S.W.3d at 858; *Skeen,* 159 S.W.3d at 639; *Huckabee,* 19 S.W.3d at 427.

As support for his position, Penick cites *Bentley v. Bunton,* 94 S.W.3d at 602. In *Bentley,* the court ruled that the defendant had displayed actual malice by hounding a public figure relentlessly for months with ruthless corruption accusations on television, while privately expressing doubts about the charges, and by "deliberately ignor[ing] people who could have answered all his questions." *Id.* The instant case is distinguishable, however, because the defendant in *Bentley* went beyond the mere failure to consult with the plaintiff or invest-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

igate other sources; he broadcast severe accusations about which he had privately expressed serious doubt. *Id.* Thus, in *Bentley,* the defendant's actions fell squarely within the definition of "reckless disregard" because the defendant had expressed doubt for the veracity of his defamatory claims and had ignored obvious and unbiased sources of information as a means of purposefully avoiding the truth. *Id.* at 590, 602.

In the case at hand, Tyler expressed no such doubt about the veracity of her accusations. Tyler interviewed defense attorneys and investigators to determine what practices or procedures in the Reed case were inconsistent with a proper investigation. She researched the public record on the Reed case. She viewed crime scene reports, pictures, and videotapes reflecting the views of the law enforcement officers involved in the original investigation. She read the trial and hearing transcripts displaying the arguments and theories of the prosecution. Although Tyler did not seek the comments of those she accused of prosecuting a flawed case against an innocent man, she was not required to do so. *See El Paso Times v. Trexler,* 447 S.W.2d 403, 406 (Tex.1969) (even "[negligence] or failure to act as a reasonably prudent man [in investigating a story] is [ ] insufficient" to establish actual malice); *Cloud v. McKinney,* No. 03–04–00656–CV, 2006 WL 2504383, at *9, 2006 Tex.App. LEXIS 7658, at *28–29, ––– S.W.3d ––––, ––––) (Tex.App.-Austin Aug. 30, 2006, no pet.) (opinion) (Spokeswoman's failure "to check [facts] with McKinney or Cloud prior to making the statements does not mean that [spokeswoman] made the statement knowing that it was false or with reckless disregard as to the truth or the statement."). The fact that Tyler had done enough research to have a reasonable belief in her viewpoint is sufficient to disprove a reckless disregard for the truth. ***445***Trexler,* 447 S.W.2d at 406; *see also Fort Worth Star–Telegram v. Street,* 61 S.W.3d 704, 713 (Tex.App.-Fort Worth 2001, pet. denied).

Tyler's actions are also unlike the defendant's

actions in *Harte–Hanks,* which the Supreme Court deemed to involve actual malice. *See* 491 U.S. at 692, 109 S.Ct. 2678. There, the Court held that the defendant purposefully avoided the truth by publishing accusations against a mayoral candidate when the defendant was aware of tape-recordings by other witnesses that clearly showed the accusations to be false. The Court held that the defendant's choice to ignore the tapes was likely "a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the grand juror's] charges." *Id.* Penick presented no evidence that Tyler had received significant information contrary to her theories or that there was some clear way she may have verified the truth of her claims.

Penick produced no evidence showing that Tyler doubted the veracity of her claims, as did the defendant in *Bentley,* 94 S.W.3d at 590, 602, or that Tyler purposefully avoided the truth, as did the defendant in *Harte–Hanks,* 491 U.S. at 692, 109 S.Ct. 2678. Thus, Tyler's failure to interview Penick and other prosecutors is not evidence of actual malice.

### Modification of facts to create a false impression

[30] In his final actual malice argument, Penick alleges that the "gist" of the defamatory articles as a whole conveyed a false impression to the readers, which he argues was "so glaring as to serve as proof of malice." *See Turner,* 38 S.W.3d at 116; *see also Huckabee,* 19 S.W.3d at 426. As support, Penick lists several facts that he claims were either improperly omitted from or juxtaposed within appellants' publications. However, whether or not the "gist" of the articles could be proven to be false, actual malice requires evidence that appellants knew of or recklessly disregarded the false impression created by the articles. *See Huckabee,* 19 S.W.3d at 426.

Penick cites *Huckabee v. Time Warner Entertainment* as support for the idea that "glaring" falsehoods are stand-alone evidence of actual malice. *Id. Huckabee* provided a single example of a case where the omission of facts may be stand-alone

219 S.W.3d 425, 35 Media L. Rep. 1449
**(Cite as: 219 S.W.3d 425)**

evidence of actual malice. *Id.* at 426 (citing *Schiavone Constr. Co. v. Time, Inc.,* 847 F.2d 1069, 1092 (3rd Cir.1988)). In *Schiavone,* the Third Circuit ruled that a newspaper's omission of exculpatory statements from a story reporting about an FBI memorandum that linked the plaintiff to the disappearance of Jimmy Hoffa was evidence of actual malice because four unbiased FBI sources corroborated the statements to the newspaper before publication, and the omission so changed the character of the story that the defendant likely knew or suspected that it would convey a false impression. *Schiavone Constr.,* 847 F.2d at 1092.

Although the court in *Huckabee* acknowledged that in some cases an omission of fact could be proof of actual malice, it did not go so far as to say that all omissions of fact would serve as evidence of actual malice. *Huckabee,* 19 S.W.3d at 426. In fact, the court in *Huckabee* held that the defendant's omission of facts, which would have made the plaintiff's judicial decisions appear less arbitrary, was not evidence of actual malice without additional evidence that the defendant omitted the facts with knowledge that it may convey a substantially false impression. *Id. Huckabee* set the bar high to protect a media defendant's choice of what material to include in its broadcasts. "Although the facts omitted might or might not have led a reasonable viewer to suspend judgment or even to reach an opposite conclusion **\*446** regarding [the plaintiff], their omission did not grossly distort the story" and, thus, was not stand-alone proof of actual malice. *Id.* Here, there is no evidence that appellants knew or should have known that their choice of published facts would convey a substantially false impression or grossly distort the truth of the story to a reasonable reader.

In his seven arguments, Penick fails as a matter of law to raise a genuine issue of material fact regarding actual malice.

## CONCLUSION

The district court erred by denying the appellants' motion for summary judgment regarding the October 18 article because the article was not "of and concerning" Penick. Furthermore, the district court erred by denying the appellants' motion regarding the October 18, December 13 and 20, and January 3 articles because Penick failed to present a scintilla of evidence to demonstrate that any of these articles was published with actual malice.

Accordingly, we reverse the portion of the district court's order that denied summary judgment for the appellants regarding these four articles, and we render a take-nothing judgment in favor of appellants on Penick's claims related to these four articles.

Tex.App.–Austin,2007.
Cox Texas Newspapers, L.P. v. Penick
219 S.W.3d 425, 35 Media L. Rep. 1449

END OF DOCUMENT

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

▷

Supreme Court of Texas.
Bascom W. BENTLEY, III, Petitioner,
v.
Joe Ed BUNTON and Jackie Gates, Respondents.

No. 00–0139.
Argued Feb. 21, 2001.
Decided Aug. 29, 2002.
Rehearing Denied Feb. 13, 2003.

Local district judge sued host and cohost of call-in talk show televised on public-access channel for defamation. The Third Judicial District Court, Anderson County, entered judgment on jury verdict awarding judge actual and punitive damages against each defendant separately. Host and cohost appealed. The Tyler Court of Appeals affirmed judgment against talk show host, but reversed judgment against cohost. Talk show host and judge filed petitions for review. The Supreme Court, Hecht, J., held that: (1) host's repeated accusations that judge was corrupt, as a matter of verifiable fact, were defamatory; (2) jury could have reasonably concluded that cohost, by listing his own examples of judge's alleged corruption, made defamatory statement; (3) evidence conclusively established that host's charges that judge was corrupt were utterly and demonstrably false; (4) evidence supported finding that host acted with actual malice; (5) evidence of cohost's actual malice was not clear and convincing; and per an equally divided court; (6) judge was entitled to recover actual damages for injury to his reputation and for mental anguish and punitive damages against host; (7) First Amendment required appellate review of amounts awarded for non-economic damages; and (8) award of $7 million in mental anguish damages was excessive.

Judgment accordingly.

Phillips, C.J., filed an opinion concurring in part and dissenting in part, and concurring in the judgment, in which Enoch and Hankinson, JJ., joined.

Baker, J., concurred in part and filed a dissenting opinion.

West Headnotes

**[1] Constitutional Law 92 ☞1493**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
        92XVIII(A)1 In General
            92k1493 k. Relation between state and federal rights. Most Cited Cases
    (Formerly 92k90(1))

Nothing in the language or purpose of the state constitution's free expression clause authorizes the Supreme Court to afford greater weight in the balancing of interests to free expression than the Court would under the First Amendment. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

**[2] Constitutional Law 92 ☞984**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
        92VI(C)2 Necessity of Determination
            92k984 k. Examination of state constitution before federal constitution. Most Cited Cases
    (Formerly 92k46(1))

Where parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, the Supreme Court would limit its analysis to the First Amendment and simply assume that its concerns are congruent with those of the state constitution's free expression clause. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

**[3] Libel and Slander 237 ☞19**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k19 k. Construction of language used. Most Cited Cases

The meaning of a "publication," and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.

**[4] Constitutional Law 92 ☞1622**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(D) False Statements in General
            92k1621 Opinion
                92k1622 k. In general. Most Cited Cases
    (Formerly 92k90.1(5))

Whether a publication is an actionable statement of fact or a constitutionally protected expression of opinion depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

**[5] Constitutional Law 92 ☞963**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
            92VI(C)1 In General
                92k963 k. Questions of law or fact. Most Cited Cases
    (Formerly 92k45)

How principles for distinguishing between an actionable statement of fact and a constitutionally protected expression of opinion apply in a given case are questions of law. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

**[6] Constitutional Law 92 ☞1622**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(D) False Statements in General
            92k1621 Opinion
                92k1622 k. In general. Most Cited Cases
    (Formerly 92k90.1(5))

The analysis for distinguishing between an actionable statement of fact and a constitutionally protected expression of opinion focuses on a statement's verifiability and the entire context in which it was made. U.S.C.A. Const.Amend. 1; Vernon's Ann.Texas Const. Art. 1, § 8.

**[7] Libel and Slander 237 ☞10(1)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k10 Words Imputing Unfitness for or Misconduct or Criminal Acts in Office or Employment
            237k10(1) k. Public officers in general. Most Cited Cases

Accusing a public official of corruption is ordinarily defamatory per se.

**[8] Libel and Slander 237 ☞10(4)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k10 Words Imputing Unfitness for or Misconduct or Criminal Acts in Office or Employment
            237k10(4) k. Judicial officers. Most Cited Cases

Repeated accusations of host of call-in talk show televised on public-access channel that judge was corrupt, as a matter of verifiable fact, were defamatory; even though host's ravings were often classic soapbox oratory and host often said that it was his opinion that judge was corrupt, host plainly

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

and repeatedly stated that his accusations of corruption were based on objective, provable facts, he cited specific cases and occurrences and pointed to court records and public documents, he claimed to have made lengthy investigations and interviews, and he invited judge to appear on show, not to debate issues, but to answer factual allegations and disprove that he was corrupt.

**[9] Libel and Slander 237 ☜49**

237 Libel and Slander
 237II Privileged Communications, and Malice Therein
  237k49 k. Publication and discussion of news. Most Cited Cases

Statements are not incapable of defamation or absolutely protected from liability merely because they are made on public access television; a soap box, electronic or wooden, does not lift a speaker above the law of liability for defamation.

**[10] Libel and Slander 237 ☜10(4)**

237 Libel and Slander
 237I Words and Acts Actionable, and Liability Therefor
  237k10 Words Imputing Unfitness for or Misconduct or Criminal Acts in Office or Employment
   237k10(4) k. Judicial officers. Most Cited Cases

Even assuming that cohost's response of "yeah" to statement of host of cable television show that judge was corrupt was ambiguous, jury could have reasonably concluded that cohost, by listing his own examples of judge's alleged corruption, examples which host had not mentioned but immediately endorsed, was expressing statements that were capable of defamatory meaning.

**[11] Libel and Slander 237 ☜30**

237 Libel and Slander
 237I Words and Acts Actionable, and Liability Therefor

237k30 k. Falsity. Most Cited Cases

To recover for defamation, a public official must prove that defamatory statements made about him were false.

**[12] Libel and Slander 237 ☜54**

237 Libel and Slander
 237III Justification and Mitigation
  237k54 k. Truth as justification in general. Most Cited Cases

Host and cohost of call-in talk show televised on public-access channel were not required, in defamation action brought by judge, to prove as an affirmative defense that their statements that judge was corrupt were true.

**[13] Libel and Slander 237 ☜6(1)**

237 Libel and Slander
 237I Words and Acts Actionable, and Liability Therefor
  237k6 Actionable Words in General
   237k6(1) k. In general. Most Cited Cases

**Libel and Slander 237 ☜30**

237 Libel and Slander
 237I Words and Acts Actionable, and Liability Therefor
  237k30 k. Falsity. Most Cited Cases

That a statement is defamatory, that is, injurious to reputation, does not mean that it is false, and vice versa.

**[14] Libel and Slander 237 ☜30**

237 Libel and Slander
 237I Words and Acts Actionable, and Liability Therefor
  237k30 k. Falsity. Most Cited Cases

Evidence regarding eight situations in which host of local cable television show accused judge of dishonest, unethical, shady, and unscrupulous conduct in office conclusively established that host's charges that judge was corrupt were utterly and demonstrably false as a matter of law.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

**[15] Evidence 157 ☜383(12)**

157 Evidence
   157X Documentary Evidence
      157X(D) Production, Authentication, and Effect
         157k383 Conclusiveness and Effect
            157k383(12) k. Effect of introducing part of document or record. Most Cited Cases

Fact that two videotapes containing about 60 minutes of broadcasts of cable public-access television show, in which show's host and cohost repeatedly stated judge was corrupt, were excerpted from 12 90–minute programs and that results of viewer polls on whether judge was corrupt were not offered into evidence in defamation action did not render excerpts misleading; host of show did not explain how his assertions that judge was corrupt could have appeared less offensive if viewed as part of a longer broadcast.

**[16] Constitutional Law 92 ☜2164**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and Press
      92XVIII(X) Defamation
         92k2160 In General
            92k2164 k. Public employees and officials. Most Cited Cases
   (Formerly 92k90.1(5))

First Amendment protections for speech about a public official turn on the speaker's degree of awareness that the statements made are false. U.S.C.A. Const.Amend. 1.

**[17] Constitutional Law 92 ☜2164**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and Press
      92XVIII(X) Defamation
         92k2160 In General
            92k2164 k. Public employees and officials. Most Cited Cases
   (Formerly 92k90.1(5))

"Actual malice," within context of First Amendment's prohibition against a public official's recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice, means knowledge of, or reckless disregard for, the falsity of a statement. U.S.C.A. Const.Amend. 1.

**[18] Libel and Slander 237 ☜51(5)**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein
      237k51 Existence and Effect of Malice
         237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

Reckless disregard for the falsity of an allegedly defamatory statement about a public official, as an element of actual malice, requires more than a departure from reasonably prudent conduct and mere negligence is not enough.

**[19] Libel and Slander 237 ☜51(5)**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein
      237k51 Existence and Effect of Malice
         237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

To establish reckless disregard for the falsity of an allegedly defamatory statement about a public official, as an element of actual malice, there must be evidence that the defendant in fact entertained serious doubts as to the truth of his publication, that is, evidence that the defendant actually had a high degree of awareness of the probable falsity of his statements.

**[20] Libel and Slander 237 ☜51(5)**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein

237k51 Existence and Effect of Malice
237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

The failure to investigate the facts before speaking as a reasonably prudent person would do is not, standing alone, evidence of a reckless disregard for the truth, as an element of actual malice in defamation action brought by public official for a defamatory falsehood relating to his official conduct, but evidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice.

**[21] Constitutional Law 92 2164**

92 Constitutional Law
92XVIII Freedom of Speech, Expression, and Press
92XVIII(X) Defamation
92k2160 In General
92k2164 k. Public employees and officials. Most Cited Cases
(Formerly 92k90.1(5))

In determining whether the First Amendment standard for actual malice in defamation action brought by public official for a defamatory falsehood relating to his official conduct has been satisfied, the reviewing court must consider the factual record in full. U.S.C.A. Const.Amend. 1.

**[22] Libel and Slander 237 51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

The boundaries of actual malice, and particularly reckless disregard, in defamation action brought by public official for a defamatory falsehood relating to his official conduct cannot be fixed by the defining words alone but must be determined by the applications of those words to particular circumstances.

**[23] Libel and Slander 237 51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

The actual malice standard in defamation action brought by public official for a defamatory falsehood relating to his official conduct requires that a defendant have, subjectively, significant doubt about the truth of his statements at the time they are made.

**[24] Libel and Slander 237 112(2)**

237 Libel and Slander
237IV Actions
237IV(C) Evidence
237k112 Weight and Sufficiency
237k112(2) k. Intent, malice, or good faith. Most Cited Cases

To disprove actual malice in defamation action brought by public official for a defamatory falsehood relating to his official conduct, a defendant may certainly testify about his own thinking and the reasons for his actions, and may be able to negate actual malice conclusively, but the defendant's testimony that he believed what he said is not conclusive, irrespective of all other evidence.

**[25] Libel and Slander 237 112(2)**

237 Libel and Slander
237IV Actions
237IV(C) Evidence
237k112 Weight and Sufficiency
237k112(2) k. Intent, malice, or good faith. Most Cited Cases

The defendant's state of mind can and, indeed, must usually be proved by circumstantial evidence

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

of actual malice in a defamation action brought by public official for a defamatory falsehood relating to his official conduct.

**[26] Libel and Slander 237 ⚷51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

A lack of care or an injurious motive in making a statement is not alone proof of actual malice in defamation action brought by public official for a defamatory falsehood relating to his official conduct, but care and motive are factors to be considered.

**[27] Libel and Slander 237 ⚷51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

An understandable misinterpretation of ambiguous facts does not show actual malice, in defamation action brought by public official for a defamatory falsehood relating to his official conduct, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice.

**[28] Libel and Slander 237 ⚷51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
           237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

For purposes of establishing actual malice in defamation action brought by public official for a defamatory falsehood relating to his official conduct, imagining that something may be true is not the same as belief.

**[29] Constitutional Law 92 ⚷2164**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(X) Defamation
           92k2160 In General
                92k2164 k. Public employees and officials. Most Cited Cases
    (Formerly 92k90.1(5))

The First Amendment not only protects a public official's critics from liability for defamation absent proof that they acted with actual malice, it also requires that such proof be made by clear and convincing evidence. U.S.C.A. Const.Amend. 1.

**[30] Appeal and Error 30 ⚷840(3)**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
           30k838 Questions Considered
                30k840 Review of Specific Questions and Particular Decisions
                    30k840(3) k. Review of constitutional questions. Most Cited Cases

A fact finder's determinations at trial as to actual malice in defamation action brought by public official for a defamatory falsehood relating to his official conduct must reviewed independently on appeal.

**[31] Appeal and Error 30 ⚷840(3)**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
           30k838 Questions Considered

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

30k840 Review of Specific Questions and Particular Decisions

30k840(3) k. Review of constitutional questions. Most Cited Cases

The independent review of evidence of actual malice required by the First Amendment in defamation action brought by public official for a defamatory falsehood relating to his official conduct is unlike the evidentiary review to which appellate courts are accustomed in that the deference to be given the fact finder's determinations is limited. U.S.C.A. Const.Amend. I.

**[32] Appeal and Error 30 ☞842(1)**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in General
      30k838 Questions Considered
      30k842 Review Dependent on Whether Questions Are of Law or of Fact
        30k842(1) k. In general. Most Cited Cases

On questions of law, the Supreme Court ordinarily does not defer to a lower court at all, but the sufficiency of disputed evidence to support a finding cannot be treated as a pure question of law when there are issues of credibility.

**[33] Appeal and Error 30 ☞999(3)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)2 Verdicts
        30k999 Conclusiveness in General
          30k999(3) k. Questions of fraud or negligence. Most Cited Cases

**Appeal and Error 30 ☞1001(1)**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts
  30k1001 Sufficiency of Evidence in Support
    30k1001(1) k. In general. Most Cited Cases

An independent review of evidence of actual malice in defamation action brought by public official for a defamatory falsehood relating to his official conduct should begin with a determination of what evidence the jury must have found incredible and, as long as the jury's credibility determinations are reasonable, that evidence is to be ignored; next, undisputed facts should be identified, and, finally, a determination must be made whether the undisputed evidence along with any other evidence that the jury could have believed provides clear and convincing proof of actual malice.

**[34] Libel and Slander 237 ☞112(2)**

237 Libel and Slander
  237IV Actions
    237IV(C) Evidence
      237k112 Weight and Sufficiency
        237k112(2) k. Intent, malice, or good faith. Most Cited Cases

A defendant in a defamation action brought by a public official cannot automatically insure a favorable verdict by testifying that he published with a belief that the statements were true; the finder of fact must determine whether the publication was indeed made in good faith.

**[35] Libel and Slander 237 ☞112(2)**

237 Libel and Slander
  237IV Actions
    237IV(C) Evidence
      237k112 Weight and Sufficiency
        237k112(2) k. Intent, malice, or good faith. Most Cited Cases

Jury did not act unreasonably in rejecting testimony of host of call-in talk show televised on public-access channel regarding his motives and beliefs in repeatedly making defamatory statements that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

judge was corrupt and in finding that host acted with "actual malice" and "malice," even though host testified that whenever he had made statements about judge he believed them to be true and that his intent was not to embarrass or defame judge but only to promote good government, provide information, and correct any perception of injustice.

**[36] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

Evidence that host of call-in talk show televised on public-access channel never made his allegations of corruption against judge in good faith, that he expressed doubt to friend that there was any basis for charges, that he deliberately ignored people who could have answered all of his questions, that he dared judge to appear on his show but made no attempt to hear him privately, and that he hounded judge relentlessly and ruthlessly for months supported findings that host carried on personal vendetta against judge without regard for truth of his allegations and that he acted with actual malice, even though host attempted to make some minimal investigation before airing his allegations.

**[37] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

While a defendant's ill will toward a public official does not equate to, and must not be confused with, actual malice, such animus may suggest actual malice required for official to maintain defamation action.

**[38] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

Evidence of actual malice of cohost of call-in talk show televised on public-access channel regarding statements that judge was corrupt was not clear and convincing; cohost's reaction on only two instances in which he chimed in during host's allegations was ambiguous, and even in context of host's ongoing verbal assaults against judge in cohost's presence, evidence did not establish that cohost knew or had reckless disregard for whether he was himself communicating a falsehood.

**[39] Libel and Slander 237 ☞117**

237 Libel and Slander
    237IV Actions
        237IV(D) Damages
            237k115 Elements of Compensation
                237k117 k. Injury to reputation. Most Cited Cases

**Libel and Slander 237 ☞119**

237 Libel and Slander
    237IV Actions
        237IV(D) Damages
            237k115 Elements of Compensation
                237k119 k. Mental suffering and emotional distress. Most Cited Cases

As a matter of law, judge was entitled to recover actual damages for injury to his reputation and for mental anguish caused by statements of host of call-in talk show televised on public-access channel that judge was corrupt, which statements were defamatory per se. (Per an equally divided court.)

**[40] Libel and Slander 237 ☞120(2)**

237 Libel and Slander

237IV Actions
2371V(D) Damages
237k120 Exemplary
237k120(2) k. On ground of malice or recklessness. Most Cited Cases

Judge was entitled to punitive damages in defamation action without proving that host of call-in talk show, televised on public-access channel, who broadcast statements that judge was corrupt was personally vindictive toward him, based on finding that they acted with actual malice. (Per an equally divided court.)

**[41] Libel and Slander 237 ⟨⟩121(2)**

237 Libel and Slander
237IV Actions
237IV(D) Damages
237k121 Amount Awarded
237k121(2) k. Slander. Most Cited Cases

Jury's award of $7 million in mental anguish damages to judge in defamation action strongly suggested its disapprobation of conduct of host of cable television show, who broadcast that judge was corrupt, more than a fair assessment of judge's injury and, thus, First Amendment required appellate review of amounts awarded for non-economic damages to ensure that any recovery only compensated judge for actual injuries and was not a disguised disapproval of host. (Per an equally divided court.) U.S.C.A. Const.Amend. 1.

**[42] Libel and Slander 237 ⟨⟩121(2)**

237 Libel and Slander
237IV Actions
237IV(D) Damages
237k121 Amount Awarded
237k121(2) k. Slander. Most Cited Cases

Although testimony of judge and his friends that corruption accusations repeatedly leveled against him on local cable access television show deprived judge of sleep, caused him embarrassment, impugned his honor and integrity, disrupted

his family, and caused judge to be depressed supported finding that judge suffered mental anguish as a result of statements of show's host and cohost, none of this was evidence that judge suffered mental anguish damages in the amount of $7 million, more than 40 times the amount awarded him for damage to his reputation. (Per an equally divided court.)

**\*566** Mike A. Hatchell, Molly H. Hatchell, Hatchell P.C., Tyler, George Chandler, Reich Chandler, Chandler Law Offices, Lufkin, Darrin M. Walker, Law Office of Darrin Walker, Kingwood, for Petitioner.

Robert L. Crider, Palestine, Armando De Diego, The Law Office of Armando De Diego, Dallas, Ronald D. Wren, Bedford, for Respondents.

Justice HECHT delivered the opinion for the Court with respect to Parts I, III, IV, and V, in which Justice OWEN, Justice BAKER (except for Part V–D), Justice JEFFERSON, and Justice RODRIGUEZ joined, with respect to Part II, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, Justice BAKER, Justice HANKINSON, Justice JEFFERSON, and Justice RODRIGUEZ joined, and with respect to Part VII, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, Justice HANKINSON, Justice JEFFERSON, and Justice RODRIGUEZ joined, and an opinion with respect to Part VI, in which Justice OWEN, Justice JEFFERSON, and Justice RODRIGUEZ joined.

For months, the host of a call-in talk show televised on a public-access channel **\*567** in a small community repeatedly accused a local district judge of being corrupt. A co-host on some of the shows expressed agreement with the accusations but never himself used the word "corrupt". The judge sued both of them for defamation. Based on conclusive proof that the accusations were false and defamatory, and on jury findings that the defendants acted with actual malice as well as a specific intent to cause injury, the trial court rendered judgment awarding the plaintiff actual and punitive damages

assessed by the jury against each defendant separately. Notwithstanding the jury's finding that the defendants conspired together, the court refused to hold them jointly liable for the actual damages each caused. The plaintiff and both defendants appealed. The court of appeals affirmed the judgment against the talk show host who made the repeated accusations and reversed the judgment against his co-host.[FN1] The liable defendant and the plaintiff seek review here.

FN1. 176 S.W.3d 1 (Tex.App.-Tyler 1999)

The legal and evidentiary issues raised by the parties are too numerous and varied to summarize at this point, but principal among them are these:

• Does article I, section 8 of the Texas Constitution restrict liability for defamation of a public official more than the First Amendment to the United States Constitution?

• Under the circumstances presented here, are accusations that a public official is corrupt actionable statements of fact or protected expressions of opinion?

• Can a person be liable for defamation if all he does is express agreement with another's defamatory statements?

• Were the accusations of corruption in this case false as a matter of law?

• Can a person who falsely accuses a public official of being corrupt be proved by clear and convincing evidence to have acted with actual malice despite his assertions that he sincerely believed the accusations?

• Under the circumstances, are awards of $7 million for mental anguish damages and $1 million punitive damages excessive as a matter of law either under Texas common law or the First Amendment?

We agree with the court of appeals that only the one defendant is liable for defamation, but we conclude that the jury's finding of $7 million in mental anguish damages has no evidentiary support and is excessive as a matter of law by constitutional standards. We remand the case to the court of appeals for further proceedings.

**I**

"Q&A", a live, ninety-minute, call-in television talk show, began broadcasting weekly in 1990 on a public-access channel available to cable subscribers in and between Palestine and nearby Elkhart, two towns in Anderson County in East Texas. At that time, the population of Palestine, the county seat, was about 18,000, and the population of Elkhart was just over 1,100.[FN2] All of the participants in "Q&A"—including the self-described hosts, producer, director, investigators, reporters, and cameraman—were unpaid volunteers. The privately produced programs generally consisted of one or two hosts talking about various subjects of local interest, either by themselves or with guests or callers. Programs were often rerun during the week. *568 Program content ranged from informational to editorial.

FN2. TEXAS ALMANAC 157 (1995).

Defendant Joe Ed Bunton, a Palestine native, helped start "Q&A". Bunton had returned to Palestine several years earlier after college and fifteen years in the army, and had been elected to one term on the city council. He was defeated in his bid for re-election, as well as in three successive attempts to regain a seat on the council. After his first defeat, he became interested in public-access television as a means of increasing his involvement in grass-roots politics. Bunton began hosting "Q&A" programs in 1994. In his brief in this Court, Bunton describes "Q&A" as "a wide-open, sometimes caustic and/or an uncivilized public forum, which has become the electronic soapbox for Palestine, Texas."

In the spring of 1995, Bunton learned of a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

criminal case that had been pending for two years in the 369th District Court before Judge Bascom Bentley III, one of four judges whose districts included Anderson County. Bentley, himself a lifelong resident of the county, had been appointed to the district court in 1989, elected in 1990, and re-elected in 1994. He had previously served as Palestine city attorney, county attorney, and judge of the county court at law. The defendant in the case, a young man named Curbo, had been charged with robbery (purse-snatching), and in March 1993, Judge Bentley had placed him on what the Texas Code of Criminal Procedure calls "community supervision"—a kind of probation—for five years with his adjudication of guilt deferred.[FN3] Barely eight weeks later, Curbo had been arrested for credit card abuse.[FN4] Court records reflected that in June 1993 the district attorney filed a motion to adjudicate Curbo's guilt on the robbery charge and that Judge Bentley released Curbo on his personal recognizance—that is, without a surety bond[FN5] —without ruling on the motion. From these records, Bunton surmised, without discussing the case with Curbo's lawyer or the district attorney, that Bentley's release of Curbo was improper, and furthermore, that Bentley had left the motion pending for criminal design: so that he could use the threat of further proceedings against Curbo to pressure Curbo's father, then a mayoral candidate, into acting as directed in the event he became mayor. Bentley, Bunton supposed, could control Curbo's father by threatening to adjudicate Curbo and sentence him to prison. Had Bentley been so motivated, his conduct would undisputedly have been criminal.[FN6] In fact, however, Curbo's release without a surety bond had been requested by Curbo's lawyer without objection from the district attorney and was clearly within Bentley's discretion,[FN7] and the case had remained pending because neither Curbo's probation officer nor the district attorney believed that Curbo, who suffered from learning disabilities, should be incarcerated. Accordingly, neither Curbo's lawyer nor the district attorney had ever requested a ruling on the motion to adjudicate. Moreover, Curbo's father was not

elected mayor.

> FN3. *See* TEX.CODE CRIM. PROC. art. 42.12, § 5(a).
>
> FN4. *See* TEX. PENAL CODE § 32.31.
>
> FN5. *See* TEX.CODE CRIM. PROC. arts. 17.03, 17.031, 17.04.
>
> FN6. *See, e.g.,* TEX. PENAL CODE §§ 36.02 (bribery), 36.03 (coercion of public servant or voter), 39.02 (abuse of official capacity).
>
> FN7. *See* TEX.CODE CRIM. PROC. art. 17.03(a) (stating that with certain exceptions not applicable here, "a magistrate may, in the magistrate's discretion, release the defendant on his personal bond without sureties or other security").

**\*569** Bunton also learned early in 1995 that Anderson County Sheriff Mickey Hubert had refused to arrest one of his own deputies, Danny Harding, on a warrant that an assistant district attorney had helped procure without the approval of the district attorney, who had determined that evidence concerning Harding should first be presented to the grand jury. After what Bunton called an "investigation" of the circumstances, he concluded that Hubert had violated article 2.18 of the Texas Code of Criminal Procedure ("Custody of Prisoners")[FN8] and section 39.02(a)(1) of the Texas Penal Code ("Abuse of Official Capacity"),[FN9] even though the district attorney had had the warrant recalled. Bunton also concluded that Bentley, who had not issued the warrant and was in no way involved in the matter, was responsible for failing to convene a court of inquiry to determine whether Hubert had violated the law[FN10] and to have him arrested.[FN11]

> FN8. *Id.* art. 2.18 ("When a prisoner is committed to jail by warrant from a magistrate or court, he shall be placed in jail by the sheriff. It is a violation of duty on the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

part of any sheriff to permit a defendant so committed to remain out of jail, except that he may, when a defendant is committed for want of bail, or when he arrests in a bailable case, give the person arrested a reasonable time to procure bail; but he shall so guard the accused as to prevent escape.").

FN9. TEX. PENAL CODE § 39.02(a)(1) ("A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly ... violates a law relating to the public servant's office or employment....").

FN10. See TEX.CODE CRIM. PROC. art. 52.01(a) ("When a judge of any district court of this state, acting in his capacity as magistrate, has probable cause to believe that an offense has been committed against the laws of this state, he may request that the presiding judge of the administrative judicial district appoint a district judge to commence a Court of Inquiry.").

FN11. See id. art. 2.10 ("It is the duty of every magistrate to preserve the peace within his jurisdiction by the use of all lawful means; to issue all process intended to aid in preventing and suppressing crime; to cause the arrest of offenders by the use of lawful means in order that they may be brought to punishment.").

On the "Q&A" program broadcast on June 6, 1995, a videotape excerpt of which is in the record, Bunton announced that the topic for discussion would be "corruption at the courthouse". He charged that Bentley's release of Curbo and the delay in resolving the case "makes the system look corrupt". He asserted that his accusations against the judicial system in Anderson County were "true". He admonished Bentley to "clear this case off your docket and quit hanging it over these people's heads". He also discussed the Harding

matter and explained why he thought Bentley and Hubert had both acted illegally. Bunton claimed to have made lengthy investigations of both matters, reviewing records and interviewing employees at the courthouse. He dared Bentley and Hubert to call in or come on the program and show that his allegations were untrue:

> Bascom, you and Mickey call in and say it ain't true. Say, "Joe Ed, you're lying. You're telling untrue things about it." I dare you. You're welcome to come in here. You can come out here. You can call in here. The fact is, y'all are corrupt, y'all are the criminals, y'all are the ones that oughta be in jail.

After the program, Bentley telephoned Bunton's home and left word for him to call back. Bunton did not return the call. Bentley also called "Q&A" and asked a volunteer there to tell Bunton to stop calling him corrupt. The volunteer acknowledged that Bunton was "going too far" but said that Bunton was "out of control" and there was nothing to be done.

*570 A videotape of the "Q&A" program two weeks later, on June 20, shows Bunton reporting that Bentley had threatened to sue for defamation based on the June 6 program. In fact, Bentley did not sue until almost eight months later. On the program, Bunton asserted: "I stand by everything that I said that night and I'm gonna give you more tonight about this issue." Bunton again challenged Bentley to come on the program and deny the allegations. Bunton repeatedly stated that Bentley was not doing his job or earning his salary. He asserted that his accusations were supported by records at the courthouse. Holding up copies of some records that he had obtained, Bunton said: "You can't sue anybody for slander when they're telling the truth, and this is the truth, and there is no libel or slander in this, not on our part. If it is, it's on the part of the records in the courthouse, and I don't believe that's the case." Later in the program, Bunton referred to a "clique" of public officials and others in Palestine, Bentley included, who often lunched to-

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

gether. Bunton finished by saying that "the five most corrupt political officials at the county level, in alphabetical order, would be Bentley, [District Judge Sam] Bournias, [District Judge Jerry] Calhoon, [District Attorney Jeffrey] Herrington, and [Sheriff Mickey] Hubert—top five, the most corrupt public officials."

The videotape of the June 27 "Q&A" program shows Bunton inviting viewers to call in and register their views on whether Bentley was corrupt. At the bottom of the television screen was this legend: "Q&A POLL: IS JUDGE BENTLEY CORRUPT?" Bunton then told viewers he would again discuss Bentley's "corruptness, my opinion, but you'll have to make up your own opinion." Bunton recounted his version of the Curbo case as he had on the June 6 and June 20 broadcasts, based on what he again said was an "investigation" of the facts and records which he said could be obtained at the courthouse. He reiterated that he had invited Bentley to be on the program to disprove the allegations of corruption but that Bentley had not accepted the invitation and had instead threatened suit. Bunton said he welcomed the suit because "the facts are with us and this is the truth, and therefore it is not slander." He repeated that his assertions were based on public records and complained that although he had provided copies to the local newspaper, it had not written a story.

On the same program, Bunton again referred to "self-confessed clique-ers" who were Bentley's "cronies" and continued: "You know, last week one of the things that we did, or I did, was that I came up with what I think are the five most corrupt elected officials in Anderson County, and in alphabetical order they are Judge Bentley, Judge Bournias, Judge Calhoon, District Attorney Jeff Herrington, and Sheriff Mickey Hubert." In response to reports he had heard that Judge Bentley was, in Bunton's words, "rather nervous and upset and just not himself" because of the allegations on "Q&A", Bunton stated: "Well, Judge, you can expect this kind of pressure to stay on you, the full-court 'Q&A' press

is gonna stay onto you until you straighten up, or what really'd be better, Bascom, is just resign and get off the bench, would be the best thing you could do for Anderson County." Again referring to public records, Bunton said Bentley "is corrupt, that's my opinion."

When a person called in to say that he did not see why Bentley should be criticized for being lenient with a young offender like Curbo, Bunton responded: "This is my suspicion—there's no way to prove this, but this is what my concern is." Bunton then reiterated his allegation that Bentley had delayed resolution of the Curbo*571 case to "use" Curbo's father, who had been a candidate for mayor. He hypothesized that

> [Curbo's] father would be told, "We need you to vote for this this way," and he says, "No, I don't want to do that," and they'll say, "Look, your son is looking at forty years in the state pen, and I, we could have him sentenced, and he will not get out of prison while you're alive, and you know what kind of ties we have within the Texas Department of Criminal Justice, and we can pick his roommate, and it will not be an enjoyable time in the Texas Department of Correction."

Importantly, Bunton added this:
> Judge Bentley has been one of the hardest people for 'Q&A' to finally get some things that we could really dig our teeth in and were confident to go on the air on and go after him on because he is very, very slick. Okay? And we've known this, and we've known what he's been doing for a long time, but it's been difficult to pin down.

However, Bunton claimed, court records showed that his allegations were factual. "The center of evil," he said, "is in that courthouse."

Another caller, who described herself as "a good friend of Judge Bentley's", stated that the judge was "a wonderful man" and "a wonderful father". In response, Bunton asked: "All right, let me ask you this: Have you seen these records of

what's gone on in this case?" When the caller said she had not, Bunton offered to make the records he had available to her, saying: "I think when you see the facts, you will have only one opinion." "The question is," Bunton went on, "is Judge Bentley corrupt? And my opinion is, based on the facts, he is."

About the same time as these broadcasts, during the summer of 1995, Bunton happened to meet a long-time friend going into a store. At trial, the friend testified as follows:

We—like I say, I've known [Bunton] for quite some time, and we spoke to each other as we came in [the store]. And as we began to talk, he began to speak more and more about the injustices in Palestine and Anderson County politics, and that there was some—a particular group of people referred to as "the clique" that were responsible for some of the shortcomings that we had in our government. And he was—he was telling me that he was wanting to expose all of them, and he'd bring it all to the surface, and anything that was not right with the system, he wanted to bring it out.... [H]e said that he had investigated and done a lot of research on all of the members—on a lot of the members he said were a part of this clique here in Palestine, and he was able to get quite a bit of information on quite a few of them that had done something that he felt like was wrong and needed to be aired. He said that the one that he really couldn't get anything on that bothered him was old Bascom Bentley.... [M]y response was that I told him I didn't think he would ever find anything on him because I didn't really think there was anything to find. But he said, "No, he's—he's in with that clique, and he has—he's known to associate with them. He goes out to eat with them at lunch. He's right in there with them, and he's doing something. I just don't know what it is."

Notably, Bunton did not deny this account of the conversation at trial.

Defendant Jackie Gates first appeared on "Q&A" on July 11 as a guest, discussing the local Crime Stoppers' list of most wanted criminals. He soon joined the program as Bunton's co-host. The two shared a military background, Gates having retired*572 from the Air Force as a colonel with thirty-two years' service. Gates had lived in Palestine since 1990. Like Bunton and the others involved in "Q&A", Gates was an unpaid volunteer, acting from time to time as host, investigator, reporter, director, and cameraman.

Gates had never seen "Q&A" before July 11 because he was not a cable television subscriber, so he was not at first aware of the allegations Bunton had made in June that Bentley was corrupt and criminal. But he was soon made aware by Bentley himself. On October 2, Gates attended a hearing on a criminal case over which Judge Bentley was presiding. The defendant, Gerald Battles, was complaining of ineffective assistance of counsel in prior proceedings, and Gates, who was not an attorney, had been advising him. When the hearing concluded, Bentley asked Gates to step into his chambers, where they engaged in what both later recalled was a "cordial" conversation. Bentley began by warning Gates that "it was a dangerous, dangerous game for him to get involved in giving advice to inmates". Bentley then turned to "Q&A" and Bunton. He complained to Gates that Bunton's accusations of corruption were "not right". Gates agreed and told Bentley that Bunton was "a lot of times out of control" and that he, Gates, had joined the program to clean it up and stop the name-calling. At trial, Gates testified consistently that he disagreed with Bunton's accusations that Bentley was corrupt and criminal but that he could not control what Bunton said on television. Although Gates testified that he once told Bunton off the air not to call Bentley corrupt, in fact Gates appeared on many "Q&A" programs when Bunton repeated the accusation, and on the air Gates never protested.

Gates was on "Q&A" on January 30, 1996, when Bunton repeatedly referred to Bentley as "the

most corrupt", "the number one corrupt", and "the ultimate corrupt" elected official in Anderson County. On that program, Bunton made four additional allegations against Bentley. One was that Bentley, along with the other district judges in Anderson County, had failed to supervise the county auditor [FN12] and county commissioners court, [FN13] who, Bunton said, should have discovered years earlier that the district attorney was not properly depositing money paid on "hot checks" and forfeited property funds in the county treasury. Another allegation was that Bentley had failed to report two other district judges, Judge Bournias and Judge Calhoon, for judicial misconduct [FN14] for dismissing petitions Bunton had filed to remove the district attorney. [FN15] A third allegation was that Bentley had contributed to the election campaigns of candidates for county judge, an officer who presides over the county commissioners court and is thus *573 subject to the general supervisory control of the district court. [FN16] Finally, Bunton alleged that Bentley had given a criminal defendant, Carroll Neal too light a sentence for cattle theft and then refused to recognize Neal's "good time" credit given by the sheriff. Bentley, Bunton said, was "the most corrupt elected official, and if you don't believe that, all you need to do is start digging around the courthouse".

> FN12. *See* TEX. LOC. GOV'T CODEE §§ 84.002 (providing for the appointment of a county auditor in certain counties by the district judges), 84.009 (providing for removal of the county auditor by the appointing judges).

> FN13. *See* TEX. CONST. art. V, § 8 ("The District Court shall have ... general supervisory control over the County Commissioners Court...."); TEX. GOV'T CODE § 24.020 ("The district court has ... general supervisory control over the commissioners court....").

> FN14. *See* TEX.CODE JUD. CONDUCT Canon 3(D)(1) ("A judge who receives in-

formation clearly establishing that another judge has committed a violation of this Code should take appropriate action. A judge having knowledge that another judge has committed a violation of this Code that raises a substantial question as to the other judge's fitness for office shall inform the State Commission on Judicial Conduct or take other appropriate action.").

> FN15. *See* TEX. LOC. GOV'T CODEE § 87.015 (providing for petitions for the removal of a district attorney and other officers).

> FN16. See note 13, *supra.*

On the February 1 "Q&A" program, Bunton repeated, with Gates present, that Bentley had made contributions to candidates for county judge. "That really raises a question about his integrity," Bunton stated. "It's just more to prove that he deserves to be in the number one position of corrupt elected officials. We can talk about the Curbo deal, but it's one thing on top of the other. Judge Bascom Bentley III is the most corrupt elected official." Two weeks later Gates co-hosted the show as Bunton announced a "Bentley Hot Line"—a telephone number viewers could call to report anything Bentley had done that was "outrageous that might put a bad light on his profession as a judge or his character". Bunton coached callers on how to report on Bentley without revealing their identity. Gates testified at trial that he remembered encouraging viewers at one point to call the "hot line" with both good and bad information about Bentley to give "the entire story," but the videotapes in the record do not contain any such statement by Gates.

Gates never himself used the word "corrupt" with reference to Bentley, but there is evidence that he nevertheless expressed agreement with Bunton's accusations, despite having told Bentley during their meeting in Bentley's chambers that he did not think Bentley was corrupt. During the March 7 program, a videotape shows that Bunton looked dir-

ectly at Gates, who was seated beside him, while he listed the top five corrupt officials in Anderson County, with Bentley being number one. Later in the program, when Bunton told a caller that district attorney Herrington was the number one corrupt official, she reminded him that he had earlier said Herrington was number two. "He is," Bunton replied. When Gates attempted to correct him with, "Well, you said ....," Bunton interrupted, "Bascom Bentley's number one." "Yeah," Gates replied. Asked at trial to explain what he had meant by saying "yeah", Gates testified, "I think it was a spontaneous reaction more than anything, is all I can say."

As the program continued, Bunton again returned to the Curbo case. Looking over at Gates, Bunton admonished an imaginary Bentley thus: "Now either you're just grossly incompetent or you're awful lazy, and we believe that it has to do with why you're number one on our corrupt list—is because we believe that this is corruption and cronyism tied to the mayor's race last year." Told that Bentley's sister had called in to complain that her brother was being slandered, Bunton replied: "I'm not slandering her brother because the fact of it is to be slander it has to not be true.... Unfortunately, your brother is corrupt. He is the most corrupt elected official in Anderson County, in my opinion."

On one occasion, Gates seemed to join Bunton in his accusations against Bentley. The videotape of the December 26, 1996 "Q&A" program shows Bunton stating:

There's judges in this town that says their kids come home from school and say, "Daddy, the kids at school are saying you're corrupted." Well, I'm sorry that Judge Bentley's children [he has four] say that to him. But you know **\*574** what? He is corrupted, and it's a shame that your parents disgrace you like that. And they can change. All they gotta do is do right. But Judge Bentley's been caught big-time....

Bunton and Gates, together, then listed occurrences that showed Bentley was corrupt:

BUNTON: Bascom Bentley is exactly the same way. He is corrupt. The Curbo deal does it. The Neal deal does it. I mean it's one thing after another:—

GATES: Clarence George Gray [who had not previously been mentioned], Gerald Battles [the criminal defendant Gates had advised the day Gates met with Bentley in chambers]—

BUNTON: —Clarence Gray, Gerald—

GATES: —and there's some others besides—

BUNTON: —and there's others.

GATES: —Gerald Battles.

BUNTON: And it's broken a lot of people's belief that Bascom Bentley is a shining star of Anderson County. But let me tell you what: Bascom Bentley is the most corrupt elected official other than maybe [District Attorney] Jeff Herrington.

On February 6, 1996, Bentley sued Bunton, Gates, and others associated with "Q&A". The case came to trial a year later. At trial, Gates admitted that he never had any knowledge that Bentley was corrupt or criminal, but Bunton continued to assert that Bentley was both corrupt—by which he testified he meant dishonest, unethical, shady, and unscrupulous, as the word is commonly defined[FN17]—and criminal. To prove that his accusations of corruption and criminal conduct were in fact true, Bunton testified to the six matters that had been discussed on various Q&A programs—the Curbo and Neal cases, the Harding warrant, the political contributions, and the several failures to oversee county officials and to report judicial misconduct—and to two other cases in which Bentley had revoked a criminal defendant's probation—that of Rory Beavers in one and Nathan Meyer in the other—and another judge had granted a new trial. Bentley testified at length, reviewing the details of these assertions and explaining how his conduct

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

had been proper. Bentley also offered expert testimony by Cindy Garner, the district attorney in neighboring Houston County, and Sam Hicks, Curbo's lawyer. The evidence regarding all eight matters asserted by Bunton to show that Bentley was corrupt may be fairly summarized as follows:

> FN17. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY at 512 (1961) (defining "corrupt" as "depraved, evil: perverted into a state of moral weakness or wickedness", "of debased political morality: characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements").

• *The Curbo case.* Although it is unusual for a court to release a defendant on personal recognizance pending a hearing on a motion to adjudicate guilt following a probation violation, it is clearly within a court's discretion to do so.[FN18] A hearing on the motion was postponed by agreement of the district attorney and Hicks to give the boy a chance to mend his ways before facing incarceration. The agreement was not in writing, and Bunton was not aware of it because he did not talk with the district attorney or Hicks, which he could have done. Hicks testified that the pendency*575 of the motion was to Curbo's benefit and could not reasonably have been construed as an effort to coerce Curbo's father in any way.

> FN18. *See* TEX.CODE CRIM. PROC. arts. 17.03, 17.031, 17.04.

• *The Harding warrant.* Bentley was not involved in any way in either the issuance or the recall of the warrant for Harding's arrest, and he had no duty to have the sheriff arrested for not executing the warrant or to convene a court of inquiry.

• *The "hot check" and forfeited property funds.* Although for a time the district attorney did not deposit payments made by defendants on hot checks and forfeited property funds in the county treasury as required by law,[FN19] the mistake was

thoroughly investigated and no wrongdoing was found. Garner testified that Bentley had nothing to do with these funds and was not required by law to force the county auditor or the commissioners court to take remedial action sooner.

> FN19. *See id.* arts. 59.06 ("Disposition of Forfeited Property"), 103.004 ("Disposition of Collected Money").

• *The petitions to remove the district attorney.* Bunton filed two petitions to remove the district attorney. After an investigation, both were dismissed, one by Judge Calhoon and the other by Judge Bournias. Bentley had nothing to do with either petition, and he was not required to report Judge Calhoon and Judge Bournias to the Judicial Conduct Commission for acting illegally. On the contrary, neither petition had merit; both were found to have been based on personal vendettas, unfounded rumors, and a lack of knowledge of the criminal justice system.

• *Bentley's campaign contributions.* After a run-off primary election for county judge, Bentley contributed $100 to both the winner and the loser. The winner was not opposed in the general election. Bentley's campaign treasurer received oral approval for such contributions from the Texas Ethics Commission.

• *The Neal, Meyer, and Beavers cases.* In each of these criminal cases, Bentley's rulings were set aside. In the Neal case, Bentley erroneously attempted to issue an order nunc pro tunc correcting a sentencing order that failed to recite the plea bargain that the defendant would not be given "good time" credit. Neal was ordered released. In the Meyer case, the defendant's lawyer misunderstood Bentley to say that he would not grant a motion to revoke probation and therefore did not offer evidence. When Bentley denied the motion, Meyer moved for a new trial, and Bentley recused. Judge Calhoon ordered that Meyer be given a new trial. In the Beavers case, after senten-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

cing the defendant, Bentley recused, and another judge granted the defendant a new trial. None of the cases involved anything other than at most an error of law by Bentley. Garner testified that it would not be reasonable for anyone to conclude that Bentley was corrupt on account of his handling of the Neal case, and Judge Calhoon testified to the same effect regarding the Meyer case.

Bentley acknowledged at trial that he had not incurred any monetary loss as a result of Bunton's and Gates's conduct, but he offered evidence regarding the injury to his reputation and the mental stress he *576 had suffered. Bunton and Gates, he testified,

have taken time from me. They have ruined moments with my family, with my friends. They have—they have put a cloud over my home, my four children. And Jackie Gates, yes, sir, Mr. Gates—perhaps even more than Mr. Bunton—they have—I have—I have agonized because my name means something to me.... In a lot of ways, it's all I've got, and I've—the day I became judge, I appreciated that I had a position of trust, and that of all people I needed to maintain my integrity and try to be a virtuous man. I've got four children that I don't want embarrassed, and every time Mr. Gates or the rest of them opened their mouth, I know how it hurt them, how it hurt my sister, how it hurt my family.

Bentley testified that the accusation against him had been "the worst thing that's happened to me in my life", going "to the very heart of what my whole life is about." Everywhere he went, he said, people would say that they had heard him called corrupt, although "most of them are well-meaning and a lot of them said it was joking". Bentley testified that he spent time worrying at home about the accusations, and that he worried about the effect on his family and the treatment of his children by their peers at school. Bentley's wife testified that the entire episode had been a "tragedy" that had "ruined Bascom's life and my children's life". Her husband,

she said, had lost sleep, suffered stress, and would never be the same. A long-time friend of Bentley's testified:

Well, I think it's impacted him a lot. I've known him, like I said, for fifteen or twenty years, and I think—I think he's been downcast. I think he's been depressed and he's been sad. It's unfortunate, but I've seen a major change in the demeanor of the judge. I don't know what else I can say, but it's kinda sad the way it has affected him and his family as well.

When Bentley rested his case-in-chief, the court directed a verdict for all of the defendants except Bunton and Gates. At the close of all of the evidence, the trial court granted Bentley's motion for a partial directed verdict that Bunton's accusations of corruption and criminality were defamatory per se. The jury then found that:

• Bunton published defamatory statements about Bentley with "actual malice" and with "malice";

• Gates agreed with Bunton's defamatory statements and published his agreement with "actual malice" and with "malice";

• Bunton and Gates conspired to publish defamatory statements about Bentley;

• Bunton's conduct caused Bentley to suffer $150,000 damages in past and future loss of character and reputation, and $7 million in past mental anguish;

• Gates's conduct caused Bentley to suffer $25,000 damages in past loss of character and reputation and $70,000 in past mental anguish; and

• punitive damages should be assessed, $1 million against Bunton and $50,000 against Gates.

Based on this verdict, the trial court rendered judgment awarding Bentley actual and punitive damages and prejudgment interest totaling $9,560,410.40 against Bunton and $163,739.72

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

against Gates. The trial court refused to hold the defendants jointly liable for all of the damages, despite the jury's finding that they had conspired to defame Bentley.

**\*577** Bunton and Gates appealed from the judgment against them, and Bentley appealed from the denial of joint liability. The court of appeals affirmed the judgment against Bunton but reversed the judgment against Gates.[FN20] The court concluded that:

> FN20. 176 S.W.3d 1 (Tex.App.-Tyler 1999).

• the jury's finding that Bunton acted with actual malice was supported by clear and convincing evidence;[FN21]

> FN21. *Id.* at ———.

• Bunton had the burden of proving that his statements were true, and failed to do so;[FN22]

> FN22. *Id.* at ———.

• the jury's findings of actual damages caused by Bunton were supported by legally and factually sufficient evidence;[FN23]

> FN23. *Id.* at ———.

• there is no evidence that Gates defamed Bunton;[FN24] and

> FN24. *Id.* at ———.

• Bunton and Gates were not jointly liable as co-conspirators because Bentley did not request a jury finding on what damages were caused by the conspiracy itself and the evidence did not conclusively establish that all of the damages Bunton caused were attributable to the conspiracy, such as damages resulting from statements made before the conspiracy was formed and never ratified by Gates.[FN25]

> FN25. *Id.* at ———.

Bentley and Bunton petitioned for review, and we granted both petitions.[FN26] They, along with respondent Gates, have raised numerous issues. We begin (in Part II) with the defendants' threshold claim that the Texas Constitution affords them greater protection than the First Amendment. We then consider the issues related to liability: whether the defendants' statements were capable of defamatory meaning (Part III), whether those statements were false (Part IV), and whether the defendants acted with actual malice (Part V). Next we turn to the issues related to damages (Part VI). Finally, we consider the appropriate action in light of our conclusions (Part VII).

> FN26. 44 Tex. Sup.Ct. J. 196–197 (Dec. 21, 2000).

## II

Bunton and Gates claim the protections of article I, section 8 of the Texas Constitution, as well as those of the First Amendment to the United States Constitution. Article I, section 8 states:

Freedom of speech and press; libel

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.[FN27]

> FN27. TEX. CONST. art. I, § 8.

Both defendants point out that this Court has sometimes called the state guarantee of free speech "broader",[FN28] but neither of **\*578** them explains how differences in the two constitutional provisions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

affect this case. The mere assertion that the state provision is broader than the federal means nothing. As we said in *Commission for Lawyer Discipline v. Benton:*

> FN28. *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 116 (Tex.2000) ( "we have recognized that the Texas Constitution's free speech guarantee is in some cases broader than the federal guarantee"); *Commission for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 434 (Tex.1998) ("This Court has recognized that 'in some aspects our free speech provision is broader than the First Amendment.' "); *Cain v. Hearst Corp.,* 878 S.W.2d 577, 584 (Tex.1994) ("this Court [has] recognized that in some aspects our free speech provision is broader than the First Amendment"); *Ex parte Tucci,* 859 S.W.2d 1, 5 (Tex.1993) (" 'article one, section eight ... provides greater rights of free expression than its federal equivalent' "); *Davenport v. Garcia,* 834 S.W.2d 4, 8 (Tex.1992) ("we have recognized that in some aspects our free speech provision is broader than the First Amendment"); *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989) ("our state free speech guarantee may be broader than the corresponding federal guarantee"); *O'Quinn v. State Bar of Tex.,* 763 S.W.2d 397, 402 (Tex.1988) ("it is quite obvious that the Texas Constitution's affirmative grant of free speech is more broadly worded than the first amendment's proscription of Congress from abridging freedom of speech").

This Court has recognized that "in some aspects our free speech provision is broader than the First Amendment." However, to assume automatically "that the state constitutional provision *must* be more protective than its federal counterpart illegitimizes any effort to determine state constitutional standards." If the Texas Constitution is more protective of a particular type of speech, "it must be because of the text, history, and purpose of the provision." FN29

> FN29. 980 S.W.2d at 434 (citations omitted, emphasis in original).

Bunton and Gates make no attempt to show how the text, history, or purpose of the state constitutional provision affords them greater protection than the First Amendment.

[1] If anything, in the context of defamation, the First Amendment affords more protection. Recently, in *Turner v. KTRK Television, Inc.,* we explained:

> Although we have recognized that the Texas Constitution's free speech guarantee is in some cases broader than the federal guarantee, we have also recognized that "broader protection, if any, cannot come at the expense of a defamation claimant's right to redress." Unlike the United States Constitution, the Texas Constitution expressly guarantees the right to bring reputational torts. The Texas Constitution's free speech provision guarantees everyone the right to "speak, write or publish his opinions on any subject, *being responsible for abuse of that privilege.*" Likewise, the Texas Constitution's open courts provision guarantees that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person *or reputation,* shall have remedy by due course of law." While we have occasionally extended protections to defamation defendants greater than those offered by the United States Constitution, we have based these protections on the common law, not the Texas Constitution. FN30

> FN30. 38 S.W.3d at 116–117 (citations omitted, emphasis in original).

As CHIEF JUSTICE PHILLIPS correctly stated several years ago, after thoroughly reviewing the history of article 1, section 8, "[N]othing in the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

language or purpose of the Texas Free Expression Clause authorizes us ... to afford greater weight in the balancing of interests to free expression than we would under the First Amendment...."[FN31]

> FN31. *Tucci*, 859 S.W.2d at 32 (Phillips, C.J., concurring).

**\*579** [2] In some cases we have applied state constitutional provisions before considering similar provisions of the federal constitution,[FN32] but in others we have not.[FN33] No rigid order of analysis is necessary, despite occasional language to the contrary in some of our opinions.[FN34] Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the First Amendment and simply assume that its concerns are congruent with those of article I, section 8.

> FN32. *E.g.*, *HL Farm Corp. v. Self*, 877 S.W.2d 288, 290 (Tex.1994); *R Communications, Inc. v. Sharp*, 875 S.W.2d 314, 315 (Tex.1994); *Tucci*, 859 S.W.2d at 5 (plurality opinion).

> FN33. *E.g.*, *Commission for Lawyer Discipline*, 980 S.W.2d at 429–430; *Operation Rescue v. Planned Parenthood, Inc.*, 975 S.W.2d 546, 556 (Tex.1998); *Tilton v. Marshall*, 925 S.W.2d 672 (Tex.1996); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440 (Tex.1993).

> FN34. *See, e.g., Davenport*, 834 S.W.2d at 17–18.

### III

We now turn to Bunton's and Gates's arguments that their statements were expressions of opinion rather than statements of fact and were not capable of defamatory meaning.

### A

[3][4] It is well settled that "the meaning of a publication, and thus whether it is false and defam-

atory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements."[FN35] This is also true in determining whether a publication is an actionable statement of fact or a constitutionally protected expression of opinion.

> FN35. *Turner*, 38 S.W.3d at 115.

[5] To distinguish between fact and opinion, we are bound to use as our guide the United States Supreme Court's latest word on the subject, *Milkovich v. Lorain Journal Co.*[FN36] In that case a newspaper, the *Lorain Journal*, reported that a high school wrestling coach, Milkovich, had "lied" during a judicial proceeding which overturned a state athletic association's sanction imposed on his team. The Court rejected the newspaper's argument that its statements were constitutionally protected opinion. The Court began its analysis by explaining that early common law did not distinguish between factual statements and opinions in imposing liability for defamation, but

> FN36. 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *cf. Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex.1989) (noting at that time that the United States Supreme Court had not provided guidance on the issue).

due to concerns that unduly burdensome defamation laws could stifle valuable public debate, the privilege of "fair comment" was incorporated into the common law as an affirmative defense to an action for defamation. "The principle of 'fair comment' afforded legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact."[FN37]

> FN37. 497 U.S. at 13, 110 S.Ct. 2695.

After surveying the constitutional limitations on defamation liability in its own opinions, the Court concluded that it was unnecessary to create a separate privilege for "opinion" defined by some

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

multi-factor test, as some courts had done.[FN38] "[W]e **\*580** think the ' " 'breathing space' " ' which ' " '[f]reedoms of expression require in order to survive,' " ' " the Court said, "is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and fact."[FN39] Included in that doctrine, the Court explained, are the following principles:

> FN38. *See, e.g., Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc) (announcing a four-part test for distinguishing assertions of fact from expressions of opinion): *see also* Robert D. Sack, *Protection of Opinion Under the First Amendment: Reflections on Alfred Hill, "Defamation and Privacy Under the First Amendment",* 100 COLUM. L.REV. 294, 323–325 (2000); *cf. Carr,* 776 S.W.2d at 570 (noting but not applying the *Ollman* factors).

> FN39. 497 U.S. at 19, 110 S.Ct. 2695 (quoting *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 772, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964))).

• "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved" and "where public-official or public-figure plaintiffs [are] involved;"[FN40]

> FN40. *Id.* at 19–20, 20 n. 6, 110 S.Ct. 2695 (citing *Hepps,* 475 U.S. at 779, 106 S.Ct. 1558).

• the Constitution protects "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" made in debate over public matters in order to "provide[ ] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation;"[FN41]

> FN41. *Id.* at 20, 110 S.Ct. 2695 (citing *Greenbelt Coop. Pub. Ass'n, Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); and *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).

• "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth", and "where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault";[FN42] and

> FN42. *Id.* (citing *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Pub. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion); and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

• "the enhanced appellate review required by *Bose Corp.* [*v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ] provides assurance that the foregoing determinations will be made in a manner so as not to 'constitute a forbidden intrusion of the field of free expression.' "[FN43]

> FN43. *Id.* at 21, 110 S.Ct. 2695.

How these principles apply in a given case are, of course, questions of law.[FN44]

> FN44. *Id.* at 19–21, 110 S.Ct. 2695; *see Carr,* 776 S.W.2d at 570; *see also* ROBERT D. SACK, SACK ON DEFAMATION § 4.3.7, at 4–54 (3d ed. 2002)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

("The vast majority of courts, and all of the federal circuits, agree that whether a statement is fact or opinion is a matter of law for the court to decide.").

[6] The analysis prescribed by *Milkovich* supplants various proposed dichotomies between fact and opinion. For example, more than a decade before *Milkovich,* section 566 of the *Restatement (Second) of Torts* set out a rule making a statement of ***581** opinion actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."[FN45] Six years before *Milkovich, Prosser and Keeton on Torts* proposed a three-part classification of opinions as either deductive, evaluative, or informational.[FN46] About the same time, the United States Court of Appeals for the District of Columbia Circuit in *Ollman v. Evans* designed a four-part test for distinguishing between fact and opinion.[FN47] In lieu of such distinctions, *Milkovich* focuses the analysis on a statement's verifiability and the entire context in which it was made.[FN48]

FN45. RESTATEMENT (SECOND) OF TORTS § 566 (1977).

FN46. W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 113A, at 813–814 (5th ed. 1984).

FN47. 750 F.2d 970 (D.C.Cir.1984) (en banc); *cf. Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex.1989) (noting but not applying the *Ollman* factors).

FN48. *See* RODNEY A. SMOLLA, LAW OF DEFAMATION § 6.12[1] at 6.44–6.47 (2d ed. 2001); BRUCE W. SANFORD, LIBEL & PRIVACY § 5.3.2, at 148–149 (2d ed. 2001).

With this direction, we examine the evidence in this case.

**B**

Bunton referred to Bentley's actions as "criminal" only once, which was during the June 6 "Q&A" broadcast. After describing the Curbo case, in which he faulted Bentley for having released the defendant on a personal bond and delayed final adjudication, Bunton suddenly exclaimed: "y'all"—referring to Bentley and Sheriff Hubert—"are corrupt, y'all are the criminals, y'all are the ones that oughta be in jail." Nothing that preceded this statement would have led a reasonable person to think that Bunton was asserting that Bentley had actually committed a crime. Bunton barely alluded to the theory he later espoused that Bentley had handled the case in a way to pressure the defendant's father, which, if true (it was not), would undoubtedly have been criminal. All Bunton said on this subject during the June 6 program was that Bentley should "quit hanging [the case] over these people's heads". By itself, Bunton's single, excited reference to Bentley as a "criminal" might be taken to be rhetorical hyperbole, although hardly of any sort that, in the words of *Milkovich,* "has traditionally added much to the discourse of our Nation."[FN49] In context, however, Bunton's characterization of Bentley's conduct as criminal is only part of Bunton's efforts over many months to prove Bentley corrupt.

FN49. 497 U.S. at 20, 110 S.Ct. 2695 (citation omitted).

[7] By calling Bentley "corrupt", Bunton testified that he intended the word's ordinary meaning—dishonest, unethical, shady, and unscrupulous—and we think that is what any reasonable viewer would have understood. While the word may be merely epithetic in the context of amorphous criticism,[FN50] it may also be used as a ***582** statement of fact that can be proved true or false,[FN51] just like the word "liar" applied to Coach Milkovich. Examples abound. When the Athenian court accused Socrates of corrupting the minds of the young, it intended to indict, not merely insult.[FN52] Corrupt conduct, determined as a matter of fact, may be punished under Texas law in numerous

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

situations.[FN53] Accusing a public official of corruption is ordinarily defamatory *per se*. As *Prosser and Keeton on the Law of Tort* states: "it is actionable without proof of damage to say of a ... public officer that he has ... used his office for corrupt purposes ... since these things obviously discredit [one] in his chosen calling."[FN54] Consistent with this rule, we held in *A.H. Belo & Co. v. Looney* that detailed accusations of corruption against a public official are not protected opinion, explaining:

> FN50. *See, e.g., 600 West 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 589 N.Y.S.2d 825, 603 N.E.2d 930, 937 (1992) (concluding that statement made at public hearing on a building permit application that the plaintiff's conduct " 'is as fraudulent as you can get and it smells of bribery and corruption' " was merely opinion, given the lack of factual specificity and the tenor of its presentation, a "rambling, table-slapping monologue" and "angry, unfocused diatribe"); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1306–1308 (1977) (suggesting that statements that a judge was "probably corrupt" were opinions that had not been proven factually false); *Maynard v. Daily Gazette Co.*, 191 W.Va. 601, 447 S.E.2d 293, 299 (1994) (holding that editorial stating that college athletic director's conduct was part of the "corruption of college athletics" did not actually accuse the director of corruption and was thus merely opinion); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1445 (8th Cir.1989) (holding that author's quotation of an attorney calling an FBI agent "corrupt and vicious" was unverifiable opinion); *Silvester v. American Broad. Cos.*, 650 F.Supp. 766, 772 (S.D.Fla.1986) (holding that an unspecific claim that " 'jai alai is a totally corrupt industry' " was "a statement of opinion ... too general to support an action for libel"); *cf. Greenbelt*

> *Coop. Pub. Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (concluding that accurate newspaper reports of heated debates before city council in which the plaintiff's negotiating efforts were criticized as "blackmail" could not have been reasonably understood by any reader to refer to the commission of a crime).

> FN51. *See, e.g., Moore v. Leverett*, 52 S.W.2d 252, 255 (Tex. Comm'n App.1932, holding approved) ("To make a statement that a public officer is actuated by evil or corrupt motives in a public undertaking is to make a statement of fact which should be justified like any other statement of fact in order to exonerate the person making the statement."); *Silsdorf v. Levine*, 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716, 720–721 (1983) (holding that accusations of "corruptness" in an open letter were not merely opinion because they purported to be factual); *Kelly v. Schmidberger*, 806 F.2d 44, 49 (2d Cir.1986) (stating that assertions of mishandling church property were factual, suggesting corrupt or criminal conduct, and were therefore actionable).

> FN52. PLATO, SOCRATES' DEFENSE 24b (in THE COLLECTED DIALOGUES OF PLATO 10 (edited by Edith Hamilton and Huntington Cairns, Pantheon Books 1961)) ("Socrates is guilty of corrupting the minds of the young, and in believing in deities of his own invention instead of the gods recognized by the state. Such is the charge.").

> FN53. *See, e.g.,* TEX. AGRIC. CODEE § 59.003 (stating that a farm and ranch finance program board member may be liable for an official act or omission that is corrupt); TEX. CIV. PRAC. & REM.CODE § 171.088(a) (stating that an arbitration

award may be set aside if obtained by corruption or if an arbitrator was corrupt); TEX. FIN.CODE § 12.106 (stating that an employee of the banking department is not liable for an official act or omission unless it is corrupt); *id.* § 14.055 (same for an employee of the consumer credit commission); *id.* § 89.006 (same for an employee of the savings and loan department); TEX. GOV'T CODE § 52.024 (stating that the court reporter certification board may refuse to certify an applicant convicted of a crime involving corruption); *id.* § 52.029(a) (stating that a court reporter may be sanctioned for corruption); TEX. LOC. GOV'T CODEE § 22.077(a) (stating that a municipal officer may be removed for corruption).

FN54. W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 112, at 791–792 (5th ed.1984).

"There is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the ... character of a public man, and to ascribe to him base and corrupt motives, he must do so at *583 his peril; and must either prove the truth of what he says, or answer in damages to the party injured." FN55

FN55. 112 Tex. 160, 246 S.W. 777, 783 (1922) (quoting *Negley v. Farrow*, 60 Md. 158 (1883)).

Although *Looney's* allocation of the burden of proof is no longer correct, FN56 in other respects the opinion appears to express the sentiment of most courts. The Maryland Supreme Court has observed:

FN56. See note 62, *infra*.

The greater number of Courts have held that the imputation of a corrupt or dishonorable motive in connection with established facts is itself to be classified as a statement of fact and as such not to be within the defense of fair comment. FN57

FN57. *A.S. Abell Co. v. Kirby*, 227 Md. 267, 176 A.2d 340, 343 (1961) (citing PROSSER ON TORTS 622 (2d ed.1955) and THAYER, LEGAL CONTROL OF THE PRESS § 66 (3d ed.1956)), cited in SACK, *supra* note 44. § 4.3.6, at 4–52 n. 220.

[8] Whether Bunton's repeated accusations that Bentley was corrupt were statements of fact or expressions of opinion depends, according to *Milkovich*, on their verifiability and the context in which they were made. As the court in *Ollman* stated: "It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service." FN58 But much ground lies between these two extremes. While "Q&A" certainly never delivered anything approaching a research monograph on Bentley's conduct in office, and Bunton's ravings were often classic soapbox oratory, Bunton plainly and repeatedly stated that his accusations of corruption were based on actual fact. He cited specific cases and occurrences and pointed to court records and public documents. He claimed to have made lengthy investigations and interviewed courthouse employees and others. It had been hard, he told a friend and one viewer who called in to the program, to find a basis for accusing Bentley. He claimed to have looked into the law pertaining to personal bonds, case disposition guidelines, judicial ethics, the sheriff's responsibilities, and the district court's supervisory responsibility over the county auditor and county commissioners court. When challenged by viewers who called in, Bunton refused to argue about whether Bentley was a good or bad judge or person; on the contrary, he told one

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

218

caller that Bentley's personal character was irrelevant. Bunton constantly insisted that his charges were borne out by objective, provable facts. Indeed, he invited Bentley to appear on the show, not to debate the issues, but to answer the factual allegations and disprove that he was corrupt. It is true that Bunton often also said that it was his opinion that Bentley was corrupt. But as the Supreme Court explained in *Milkovich:*

> FN58. *Ollman v. Evans,* 750 F.2d 970, 983 (D.C.Cir.1984) (en banc).

If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: **\*584** "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.' " See *Cianci* [*v. New Times Publishing Co.,* 639 F.2d 54, 64 (2d Cir., 1980) ]. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts. § 566, Comment *a* (1977).[FN59]

> FN59. *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695.

Furthermore, Bunton repeatedly insisted that evidence he had seen but had not disclosed supported his assertions. He had reviewed many public records, he said, and talked with courthouse employees. Much other information was publicly available,

he continually assured viewers, to substantiate Bentley's corruption in office. He encouraged callers to investigate this information for themselves and to report other misconduct that he strongly suggested could be found for the looking. Even under the common law rule stated in section 566 of the *Restatement (Second) of Torts* (to which *Milkovich* referred) that requires an implication of undisclosed facts for an opinion to be actionable, Bunton's statements were defamatory.

Throughout the trial, Bunton insisted that his statements that Bentley was corrupt were verifiably true and could be proved. Bunton's attorney told the jury in his opening statement:

> We're going to prove the truth of each and every statement, or we're going to prove that there was an investigation in an attempt to learn the truth, the truth was concealed. There was no disregard for the truth. There was an attempt to get it.

During the presentation of the evidence, Bunton identified eight discrete instances that he said showed Bentley's corrupt conduct in office. He cited to details himself, and attempted to elicit factual and expert testimony from other witnesses, not merely to substantiate his personal opinions, but to prove his statements true. In his summation, Bunton's attorney went over each instance on which Bunton had based his charges of corruption and attempted to show how they had been proved true. Bunton's consistent position at trial that his accusations of corruption were true is a compelling indication that he himself regarded his statements as factual and not mere opinion, right up until the jury returned its verdict.

[9] An important part of the context of the defendants' statements here is that they were made on public access television. Federal law permits local authorities to require cable television operators to provide public access channels.[FN60] Commenting on that law, a committee of the U.S. House of Representatives observed:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN60. 47 U.S.C. § 531.

Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas. [Public, educational, and governmental] channels also contribute to an informed citizenry by bringing local schools into the home, and by showing the public local government at work. FN61

FN61. *Report of the Committee on Energy and Commerce on the Cable Franchise Policy and Communications Act of 1984*, H.R.Rep. No. 98-934, at 30 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4667, *and cited in Denver Area Educ. Telecomm. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 734, 739, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996).

**\*585** Public access programming is not network news. Usually, it is informal and is not professionally scripted or produced. It often does not project the credibility that other television broadcasts have. "Q&A" was in this mold—in Bunton's words, "a wide-open, sometimes caustic and/or an uncivilized public forum". Bunton's accusations on "Q&A" must be considered in that context. By the same token, however, statements are not incapable of defamation or absolutely protected from liability merely because they are made on public access television. A soap box, electronic or wooden, does not lift a speaker above the law of liability for defamation. Besides, as the congressional committee noted, public access television is not only a "soap box" forum but also provides educational and governmental information.

The clear import of Bunton's statements on "Q&A" was that Bentley was corrupt as a matter of verifiable fact, as Bunton continued to assert at trial. Accordingly, we reject Bunton's argument on appeal that his accusations of corruption were constitutionally protected opinion.

**C**

[10] Gates also argues that his own comments on two "Q&A" programs were opinion and in any event were not capable of defamatory meaning.

The videotapes of "Q&A" program excerpts played at trial showed Gates and Bunton sitting side by side numerous times while Bunton asserted that Bentley was corrupt. For the most part, Gates exhibited no reaction to Bunton's statements, but on two programs Gates seemed to express his agreement with Bunton's statements that Bentley was corrupt. On one occasion, Gates attempted to correct Bunton's misstatement to a caller that district attorney Herrington was the most corrupt official in Anderson County. Bunton interrupted that Bentley was "number one", and Gates replied, "Yeah." On the other occasion, Bunton stated that "one thing after another" showed that Bentley was corrupt, citing two situations he had previously described. Gates then named two other situations, adding "and there's some others besides." At trial, Gates explained that he did not intend to express agreement with Bunton on either occasion. The first time, Gates said, his "yeah" was merely an acknowledgment that Bunton had corrected himself. In Gates's words: "I think it was a spontaneous reaction more than anything, is all I can say." The second time, Gates explained, he was merely helping Bunton list the examples Bunton had cited without meaning to endorse any of them himself.

The jury did not believe Gates; rather, they found that "Jackie Gates agreed with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt". The jury saw Gates on the videotaped programs and on the witness stand, and they were entitled to judge his credibility by his demeanor and testimony. Even if we assume that Gates's "yeah" on the one occasion was ambiguous, the jury could reasonably conclude that on the second occasion when Gates not only appeared to concur in Bunton's assertions but listed examples

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

of his own, examples which Bunton had not mentioned but immediately endorsed. Gates was expressing his agreement with Bunton's defamatory statements.

The jury was not, of course, entitled to base their conclusion simply on Gates's *586 and Bunton's joint appearances on "Q&A" programs. We do not suggest for a moment that a talk show host is liable for a guest's statements to which the host does not voice objection. The mere fact that people appear together is no evidence that they agree; on the contrary, television interviews more often than not indicate nothing about the host's views, much less the broadcaster's. But the jury had much more than mere joint appearances to support their finding. The jury could reasonably have determined that Gates was not being truthful in discounting his statement since he had been present on many "Q&A" programs when Bunton accused Bentley of corruption and had never protested, even though he testified that he told Bentley that he was joining "Q&A" to discourage Bunton from continuing to make the accusations. The evidence permitted the jury to find that Gates did not merely hold Bunton's coat at the stoning of Bentley, but threw rocks himself.

Judging Gates's words from the perspective of a reasonable listener, as we must, we conclude that they could easily have been considered defamatory as the jury found.

### IV

Next, we consider Bunton's and Gates's arguments that their statements were not false.

### A

[11][12] Bunton and Gates contend that Bentley has the burden of proving that they made false statements about him because he is a public official and also because they are media defendants. We agree that to recover for defamation, a public official like Bentley must prove that defamatory statements made about him were false.[FN62] Accordingly, we need not consider whether Bunton and

Gates's use of public access television casts them as "media defendants" or whether, if it did, a plaintiff against them who was not a public figure would also be required to prove falsity.[FN63] The court of appeals erred in holding that the defendants were required to prove as an affirmative defense that *587 their statements were true.[FN64] We have not required proof of falsity to be by more than a preponderance of the evidence,[FN65] and neither has the United States Supreme Court.[FN66] If the evidence is disputed, falsity must be determined by the finder of fact.

FN62. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (requiring that a public figure or public official prove falsity); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 117–120 (Tex.2000). *See also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (stating that if the defamatory speech is of public concern and the defendant is a member of the media, the plaintiff has the burden of proving falsity, but reserving the question of who has the burden if the defendant is not a member of the media); *Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 19–20, 20 n. 6, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (same); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990) (applying *Hepps*, 475 U.S. at 787, 106 S.Ct. 1558). *Cf. Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995) ("In suits brought by private individuals, truth is an affirmative defense to slander."); TEX. CIV. PRAC. & REM.CODE § 73.005 ("The truth of the statement in the publication on which an action for libel is based is a defense to the action."); SACK, *supra* note 44, § 3.3.2.2, at 3–9 to 3–12 (3d ed. 2001) (stating that the plaintiff may have the burden of proving the falsity of a statement of public interest even if the defend-

ant is not a member of the media, but that the common law rule that truth is a defense to be pleaded and proved by the defendant may apply in cases where the speech is about a nonpublic subject); SMOLLA, *supra* note 48, § 5.07 at 5.11–.13 (2d ed. 2001) (stating that the assignment of the burden of proof of falsity is an unresolved question in many contexts); BRUCE W. SANFORD, LIBEL & PRIVACY § 6.3–6.3.3, at 213–219 (2d ed. 2001).

FN63. *See* Sack, *supra* note 38, at 326–327 (stating that the burden of proof on a plaintiff who is not a public official or a public figure suing media defendants is an open question, and citing cases).

FN64. 176 S.W.3d at ——.

FN65. *Turner*, 38 S.W.3d at 117.

FN66. *See Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. We express no view on this issue." (citations omitted)).

[13] In this case, the trial court refused Gates's request to inquire of the jury whether statements about Bentley were false. The court appears to have been of the view that the issue was subsumed in Bentley's motion for a partial directed verdict that Bunton's statements were defamatory per se, even though the falsity of those statements was not mentioned in the argument or ruling on the motion. That a statement is defamatory—that is, injurious to reputation—does not mean that it is false, and vice versa. After the verdict was returned, the defendants argued that the issue of falsity had not been raised by Bentley's motion. The court disagreed, reciting in its judgment that by granting Bentley's motion it had "ruled as a matter of law that

[Bunton] had published false and defamatory statements about [Bentley] by accusing him of being corrupt and a criminal."

The defendants argue that because the trial court denied them a jury finding on falsity and the evidence on that issue was disputed, they are entitled to a new trial. Bentley argues that no finding was necessary because the evidence conclusively established that the statements about him were false, as the trial court determined by granting his motion for partial directed verdict. Alternatively, Bentley argues that by finding that Bunton and Gates acted with actual malice—that is, knowledge of, or reckless disregard for, the falsity of their statements—the jury implicitly found that their statements were false, and that implicit finding is supported by at least some evidence.

Strictly as a matter of logic, the jury's finding that Bunton and Gates acted with actual malice does not necessarily imply that the statements made were false, inasmuch as the jury could have believed, as they were instructed, that Bunton and Gates acted "with reckless disregard as to [the] *truth or* falsity" of the statements. As a practical matter, however, it is highly unlikely that the jury would have found that Bunton and Gates made true statements with actual malice—that is, with reckless disregard for whether the statements were true. Bentley's implied finding argument is therefore not without force. But we need not determine whether a finding of falsity can be implied from the verdict in this case because, as we explain below, Bentley proved conclusively that the statements that he was corrupt and criminal were false. Accordingly, we accept the trial court's statement in its judgment that it determined the issue as a matter of law.

**B**

[14] Bunton based his statements that Bentley was corrupt—by which Bunton meant dishonest, unethical, shady, and unscrupulous—on the eight situations we have already described in detail, and nothing else. Accordingly, the issue before us is whether Bentley proved without contradiction that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

none of those situations **\*588** showed that he was criminal or corrupt in any way. Without repeating unnecessarily the evidence we have already set out, we examine each of the eight bases Bunton has claimed for his accusations:

*The Curbo case:* First, Bunton suggested on the June 6, 1995 "Q&A" program that Bentley acted improperly in releasing Curbo without a surety bond, although Bunton now tells us in his brief that he "never made the allegation that the bond matter made Bentley corrupt." Bentley's action was authorized by statute,[FN67] and Curbo's attorney, Hicks, testified that there was nothing unusual about Curbo's release without bond. Next, Bunton asserted on various programs that Bentley delayed a final adjudication in the case to pressure Curbo's father in the event he was elected mayor. Bentley testified that he had no such motive, Hicks testified that the charge was "a load of bull", and in any event, Curbo's father was not elected mayor. Further, Bunton argues that the case should not have been delayed so long or at the request of the district attorney. Bentley and Hicks testified that the delay was proper and benefitted Curbo by giving him one last chance to correct his ways. Their testimony was supported by letters in the court file from Curbo's probation officer. There was no evidence that delay was improper. Finally, Bunton makes two arguments he did not raise at trial: that Bentley had improper ex parte discussions with Curbo's probation officer, and that it was illegal for the district attorney and Curbo's attorney to revise the terms of Curbo's probation. There is no evidence to support either argument; on the contrary, Hicks testified that Bentley did "absolutely nothing" improper in handling the Curbo case, and that the charge that Bentley's conduct in the case was corrupt was "a lie."

FN67. See note 5, *supra.*

*The Harding warrant:* Bunton asserts that Bentley had a legal duty to require the sheriff to execute an arrest warrant that Bentley did not issue and that the district attorney caused to be withdrawn. Bentley testified that he was not connected with the incident in any way, and as a matter of law, he had no legal duty to require the sheriff to execute a warrant that had been withdrawn.

*The "hot check" and confiscated property funds:* Bunton contends that if Bentley had properly supervised the county auditor and the county commissioners court, they would have discovered sooner that the district attorney was not properly depositing the money that defendants paid on "hot checks" and the money obtained from property forfeitures in the county treasury as the law required, but was administering those funds himself. While district courts have general supervisory control over county commissioners courts,[FN68] there is no suggestion or claim that this jurisdiction was invoked, much less that any district court exercised it improperly. And while district courts in most counties, including Anderson County, have the power to appoint and remove a county auditor, under certain circumstances,[FN69] there is no evidence that Bentley or the other district judges in Anderson County exercised their authority improperly. On the contrary, Houston County District Attorney Garner, who investigated the handling of the funds, testified that Bentley had "nothing to do" with them, that there was "no possibility" that he could have been corrupt on account of the way they were handled, and that in fact there was no wrongdoing at all in connection with the funds, either on the **\*589** part of Anderson County District Attorney Herrington or anyone else. No evidence contradicts Garner's testimony.

FN68. See note 13, *supra.*

FN69. See note 15, *supra.*

*The petitions to remove the district attorney:* Bunton complains that Bentley should have reported two of his colleagues, Judge Bournias and Judge Calhoon, for judicial misconduct in denying petitions Bunton filed to remove the district attorney. Bentley testified that he had nothing to do with either petition. Garner, who investigated the peti-

tions, reported that there was no basis for them, and that they had been motivated entirely by personal vendettas, unfounded rumors, and a lack of knowledge of the criminal justice system. There is no evidence or authority that the rulings were incorrect, or that Bentley would have had a duty to report the judges even if they had ruled in error.

*Bentley's campaign contributions:* Bentley contributed to both the winner and loser of the runoff election in the Democratic primary for county judge of Anderson County, after that election was over. Bunton argues that the contributions were improper because the district judges supervise the county judge.[FN70] Bentley testified that his contributions were meant to help each candidate defray lingering expenses and were proper. Bentley volunteered that he would not have contributed to any opposed candidate. Bunton testified that even though the winning primary candidate had no announced opposition in the general election, the possibility of a write-in campaign remained. No such campaign occurred, and there is no evidence that it was ever more than an abstract possibility. There is no evidence or legal basis for thinking that Bentley's contributions were corrupt, even if they had been made to opposed candidates. Moreover, Bentley's campaign treasurer testified that he received oral approval for the contributions from the Texas Ethics Commission. As a matter of law, Bentley's contributions were not improper, let alone corrupt.

FN70. See note 13, *supra.*

*The Neal, Meyer, and Beavers cases:* Bentley's rulings in each of these three cases was determined to have been erroneous. In the *Neal* case, he improperly attempted to issue a nunc pro tunc sentencing order. District Attorney Garner testified that it was "totally unreasonable" to think that Bentley's conduct in the case was criminal or corrupt. In the *Meyer* case, Judge Calhoon ordered a new trial after Bentley revoked Meyer's probation, based upon counsel's asserted misunderstanding of Bentley's rulings. Judge Calhoon testified at trial that it "makes no sense" that anyone, even a layman,

would "interpret[ ]", "interpolate[ ]", or "pull[ ] out" of his decision that Bentley was corrupt or criminal. In the *Beavers* case, Bentley testified that he had only made an error in judgment, and there was no other evidence regarding the case. As to all three cases, there was evidence that Bentley's actions were not criminal or corrupt, and no evidence that his rulings were dishonest or unethical. In each case, all that can be said is that Bentley was found, on ordinary review, to have committed an error in judgment. As one court has noted: "Where an official having discretion in a certain matter acts upon his judgment in good faith, although erroneously, such act is not corrupt".[FN71]

FN71. *State v. District Court*, 206 Wis. 600, 240 N.W. 406, 409 (1932).

[15] Bunton also contends that his statements about Bentley were taken out of context. The trial court admitted into evidence two videotapes containing about sixty minutes of "Q&A" broadcasts excerpted**590** from twelve ninety-minute programs. One of the excerpts received in evidence was twenty-one minutes long, one was eleven minutes long, and three others were more than five minutes long. Bunton argues that the excerpts misleadingly lifted his statements out of context, but he does not explain how his assertions that Bentley was corrupt could have appeared less offensive if viewed as part of a longer broadcast. His only specific complaint is that Bentley did not offer in evidence the results of the "Q&A" viewer polls on whether he was corrupt. That omission does not make the videotapes misleading. Nothing about the excerpts themselves, which we have reviewed, indicates that they are misleading in any way. Moreover, Bunton did not offer into evidence tapes or transcripts of the entire programs that were excerpted or of other programs not shown at all that would cast his comments in a different light. Gates offered a videotape of one program that was excluded because it had not been timely produced during discovery. That tape is not in our record, and there is no indication that it would have shed a dif-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ferent light on the others. Bunton's argument that the broadcast excerpts were misleading simply has no support in the record, and therefore we reject it.

In sum, the evidence not only supports but conclusively establishes that Bunton's charges that Bentley was corrupt were utterly and demonstrably false as a matter of law. As Garner testified, in twelve years of practice she had never known Bentley to engage in any conduct that could remotely be called criminal or corrupt. At trial, Gates did not disagree, and Bunton offered no evidence whatever to the contrary.

## V

Next, we consider Bunton's and Gates's arguments that they did not act with actual malice.

## A

[16][17] In the seminal case of *New York Times Co. v. Sullivan,* [FN72] the United States Supreme Court held that to protect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," [FN73] the First Amendment precludes a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice. [FN74] Since then, the Supreme Court has explained that "[t]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will" [FN75]—common connotations of the word "malice"—but rather is "a shorthand to describe the First Amendment protections for speech injurious to reputation". [FN76] Those protections for speech about a public official turn on the speaker's degree of awareness that the statements made are false. In the Supreme Court's words:

> FN72. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

> FN73. *Id.* at 270, 84 S.Ct. 710.

> FN74. *Id.* at 279–280, 84 S.Ct. 710. *See also Huckabee v. Time Warner Entertainment Co.,* 19 S.W.3d 413, 420 (Tex.2000).

> FN75. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). *See Huckabee,* 19 S.W.3d at 420.

> FN76. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

**\*591** Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection. [FN77]

> FN77. *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).

Thus, actual malice means knowledge of, or reckless disregard for, the falsity of a statement. [FN78]

> FN78. *New York Times v. Sullivan,* 376 U.S. at 279–280, 84 S.Ct. 710; *Huckabee,* 19 S.W.3d at 420.

[18][19][20][21] Knowledge of falsehood is a relatively clear standard; reckless disregard is much less so. Reckless disregard, according to the Supreme Court, is a subjective standard [FN79] that "focus[es] on the conduct and state of mind of the defendant." [FN80] It requires more than "a departure from reasonably prudent conduct." [FN81] Mere negligence is not enough. [FN82] There must be evidence " 'that the defendant in fact entertained serious doubts as to the truth of his publication,' " [FN83]

evidence "that the defendant actually had a 'high degree of awareness of ... [the] probable falsity' "[FN84] of his statements. Thus, for example, the failure to investigate the facts before speaking as a reasonably prudent person would do is not, standing alone, evidence of a reckless disregard for the truth,[FN85] but evidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice.[FN86] As the Supreme Court has observed, "Although courts must be careful not to place too much reliance on such factors [i.e., motive and care], a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."[FN87] "In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full."[FN88]

FN79. *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678.

FN80. *Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

FN81. *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678; *Herbert,* 441 U.S. at 160, 99 S.Ct. 1635; *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

FN82. *Garrison,* 379 U.S. at 79, 85 S.Ct. 209.

FN83. *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678 (quoting *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323).

FN84. *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)).

FN85. *St. Amant,* 390 U.S. at 733, 88 S.Ct.

1323 (citing *New York Times,* 376 U.S. at 287–288, 84 S.Ct. 710).

FN86. *Harte–Hanks,* 491 U.S. at 667–668, 109 S.Ct. 2678.

FN87. *Id.* at 668, 109 S.Ct. 2678 (citations omitted).

FN88. *Id.* at 688, 109 S.Ct. 2678.

[22] While these concepts assist in understanding and applying the "reckless disregard" standard, the Supreme Court has cautioned that the phrase "cannot be fully encompassed in one infallible definition."[FN89] "The mental element of 'knowing ***592** or reckless disregard' required under the *New York Times* test ... is not always easy of ascertainment."[FN90] "Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases".[FN91] This does not mean that courts must

FN89. *St. Amant,* 390 U.S. at 730, 88 S.Ct. 1323.

FN90. *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 276, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971).

FN91. *St. Amant,* 390 U.S. at 730–731, 88 S.Ct. 1323.

"scrutinize carefully every jury verdict in every libel case, in order to ascertain whether the final judgment leaves fully protected whatever First Amendment values transcend the legitimate state interest in protecting the particular plaintiff who prevailed." [T]his approach would lead to unpredictable results and uncertain expectations....[FN92]

FN92. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 343, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (quoting *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 63, 91 S.Ct.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

1811, 29 L.Ed.2d 296 (1971) (Harlan, J., dissenting)).

The import of the Supreme Court's admonitions is that the boundaries of actual malice, and particularly reckless disregard, cannot be fixed by the defining words alone but must be determined by the applications of those words to particular circumstances. Actual malice is defined in important part by example. Necessarily, then, to more fully understand "reckless disregard", we must survey the Supreme Court's application of the standard in concrete cases.

The Supreme Court's most recent application of the "reckless disregard" standard was in *Harte–Hanks Communications, Inc. v. Connaughton.*[FN93] Connaughton, a candidate for judicial office, had persuaded a certain Stephens a few weeks before the election to give him a recorded statement regarding instances in which she had bribed an employee in the incumbent judge's office. Stephens's sister, Thompson, was present along with a number of other people when Stephens gave Connaughton her statement. A few days before the election Thompson told the local newspaper that Connaughton had used "dirty tricks" to get Stephens's statement, intending to present it to the incumbent judge privately and force the judge's resignation before the election. The newspaper published Thompson's account of the events as true. Connaughton sued, and a jury found that the newspaper had acted with actual malice. The jury awarded Connaughton $5,000 in compensatory damages and $195,000 in punitive damages, the trial court rendered judgment on the verdict, and the court of appeals affirmed. The Supreme Court held that while "[t]here is little doubt that 'public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the [actual malice standard],' "[FN94] the newspaper acted with actual malice because: it ignored the fact that all of the persons present when Stephens gave her statement denied that Connaughton had acted improperly; it declined

to listen to the Stephens tape itself and did not interview Stephens; Thompson's story was highly improbable given that Connaughton had not misused the tape but had simply turned it over to law enforcement authorities; and Thompson's hesitating demeanor at the newspaper offices reflected in her taped interview suggested a lack of veracity**593** as compared with Connaughton.[FN95]

FN93. 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

FN94. *Id.* at 686, 109 S.Ct. 2678 (quoting *Ocala Star–Banner Co. v. Damron,* 401 U.S. 295, 300, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971)).

FN95. *Harte–Hanks,* 491 U.S. at 691, 109 S.Ct. 2678.

The Supreme Court in *Harte–Hanks* noted how similar the facts in that case were to those in *Curtis Publishing Co. v. Butts.*[FN96] In *Curtis Publishing,* the *Saturday Evening Post* published an article accusing Wally Butts, the athletic director of the University of Georgia, of having fixed a football game with Paul "Bear" Bryant, football coach at the University of Alabama. The story was based on an affidavit by an insurance salesman who claimed to have overheard a telephone conversation a week before the game in which Butts described for Bryant his plays and game plan. Butts had retired before the story ran. The article concluded:

FN96. 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

The chances are that Wally Butts will never help any football team again.... The investigation by university and Southeastern Conference officials is continuing; motion pictures of other games are being scrutinized; where it will end no one so far can say. But careers will be ruined, that is sure.[FN97]

FN97. *Id.* at 137, 87 S.Ct. 1975 (plurality opinion).

Butts sued. To prove that the magazine had acted with actual malice, Butts offered evidence at trial that although the editors recognized the seriousness of the charges being made and the importance of a full investigation, they ignored elementary precautions; that they ignored the fact that their informant was on probation for bad check charges and sought no independent corroboration, even though another person also claimed to have overheard the conversation; that the reporter did not view films of the game or consult with football experts to determine whether the game appeared to have been fixed the way it was played; and that "the Saturday Evening Post was anxious to change its image by instituting a policy of 'sophisticated muckraking,' and the pressure to produce a successful expose might have induced a stretching of standards."[FN98] The jury awarded Butts $60,000 in actual damages and $3 million in punitive damages, but the trial court reduced the total to $460,000 by remittitur. The court of appeals affirmed. The Supreme Court also affirmed, concluding that the evidence clearly showed that the magazine had acted with actual malice in publishing the article after a "grossly inadequate" investigation,[FN99] despite Butts's denial of the allegations, and "with full knowledge of the harm that would likely result from publication of the article."[FN100]

> FN98. Id. at 158, 87 S.Ct. 1975 (plurality opinion).

> FN99. Id. at 156, 87 S.Ct. 1975 (plurality opinion).

> FN100. Id. at 170, 87 S.Ct. 1975 (Warren, C.J., concurring).

By contrast, the Supreme Court just as readily concluded that actual malice had not been proved in a companion case to Curtis Publishing, Associated Press v. Walker.[FN101] There, a reporter had provided an eyewitness account of the violence that occurred when federal marshalls attempted to enforce a federal court decree that James Meredith be permitted to enroll at the University of Mississippi.

The reporter stated that Walker, a private citizen and retired army veteran, had led a riot against the marshalls. Walker claimed that this was false and that in fact, while *594 he was present at the time, he had counseled restraint. A jury found that Walker had been defamed, had suffered $500,000 in actual damages, and should have been awarded $300,000 in punitive damages. The trial court rendered judgment for the actual damages but not the punitive damages, concluding that there was no evidence of malice to support such an award. The Supreme Court determined that Walker was a public figure subject to the actual malice standard because he had purposefully thrust himself "into the 'vortex' of an important public controversy;"[FN102] that discrepancies in the published account were insignificant; that the reporter was experienced and reliable; and that the evidence supported the trial court's determination that there was no evidence of ill will, a complete lack of care, or conscious indifference of Walker's rights.

> FN101. 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

> FN102. Id. at 155, 87 S.Ct. 1975 (plurality opinion).

In Time, Inc. v. Pape,[FN103] Time Magazine reported on a federal commission's study of police brutality. The study stated in essence that allegations in specific cases demonstrated a problem that demanded discussion, thus encouraging the reader to believe that the allegations were probably true while stressing that they were only allegations—a statement the Supreme Court said could "fairly be characterized as extravagantly ambiguous."[FN104] In its story, Time set out some of the circumstances described in the study but did not state that they were merely allegations. One officer mentioned in the story sued. The trial court directed a verdict for the defendant, but the court of appeals reversed. The Supreme Court upheld the trial court, concluding:

> FN103. 401 U.S. 279, 91 S.Ct. 633, 28

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

L.Ed.2d 45 (1971).

FN104. *Id.* at 287, 91 S.Ct. 633.

*Time's* omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under *New York Times.*[FN105]

FN105. *Id.* at 290, 91 S.Ct. 633.

In a very different context, the Supreme Court reiterated its view that actual malice cannot be based on a misinterpretation of ambiguous facts that is not unreasonably erroneous. In *Bose Corp. v. Consumers Union of United States, Inc.,*[FN106] a writer for *Consumer Reports* described a Bose sound system as making instruments sound as if they were "wander[ing] about the room."[FN107] Bose sued for product disparagement. At trial, the writer testified that the system actually made instruments sound as if they were moving along the wall, which he said meant the same thing as what he had published. The trial court found that the two descriptions were plainly at odds, that the published comment was false, that the defendant's efforts at trial to explain away the error showed actual malice, and that Bose should recover about $125,000 in actual damages. The Supreme Court agreed with the court of appeals' reversal of the judgment, concluding that the writer's adoption of a new description of the system at trial proved only that he had "a capacity for rationalization",[FN108] not that he knew he was wrong at the time he first reviewed the sound *595 system. The earlier description merely "reflect[ed] a misconception,"[FN109] the Supreme Court said, which was not the equivalent of actual malice.

FN106. 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

FN107. *Id.* at 488, 104 S.Ct. 1949.

FN108. *Id.* at 512, 104 S.Ct. 1949.

FN109. *Id.* at 513, 104 S.Ct. 1949.

As already noted, the mere failure to investigate the facts, by itself, is no evidence of actual malice. Thus, in *Beckley Newspapers Corp. v. Hanks,*[FN110] the Supreme Court held that a newspaper's failure to conduct an investigation before criticizing a county clerk for opposing fluoridation of the local water supply was no evidence of actual malice. The Supreme Court cited its decision in the *New York Times* case, which concluded that the newspaper's failure to check its own files to determine the accuracy of an advertisement critical of the local government's handling of racial unrest before having it published was no evidence of actual malice, especially since the newspaper had relied on a number of credible people in making the statements it did.[FN111] But there was other evidence of actual malice in *New York Times:* the statements made, though reasonable, were not entirely true, and when the newspaper was confronted with the errors, it at first refused to retract the statements. The Supreme Court did not dismiss the libel claims in that case but remanded them for a new trial.[FN112]

FN110. 389 U.S. 81, 84–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967) (per curiam).

FN111. *New York Times Co. v. Sullivan,* 376 U.S. 254, 287–288, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

FN112. *Id.* at 284, 84 S.Ct. 710.

Finally, in *St. Amant v. Thompson,*[FN113] Thompson, a deputy sheriff, sued St. Amant, a candidate for public office, for quoting Albin, a member of a local union involved in an internal union dispute, as saying that Thompson had misused his office to help the union president. A jury awarded Thompson $5,000. The Supreme Court held that Thompson had not proved actual malice with evidence that St. Amant had no personal knowledge of

Albin's statements, that he had made no attempt to verify those statements, and that he had acted without regard for the injury Thompson might suffer. On the contrary, the Court reasoned, the evidence showed that St. Amant reasonably believed Albin, whom he had known for several months, because "Albin seemed to St. Amant to be placing himself in personal danger by publicly airing the details of the dispute." [FN114] Reflecting on the consequences of the actual malice standard, the Supreme Court explained:

FN113. 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

FN114. Id. at 733, 88 S.Ct. 1323.

It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First *596 Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. [FN115]

FN115. Id. at 731–732, 88 S.Ct. 1323.

While insisting that evidence of actual malice be convincing, the Supreme Court stressed that proof of actual malice could not be defeated with simply the defendant's self-serving protestations of sincerity:

The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [FN116]

FN116. Id. at 732, 88 S.Ct. 1323.

[23][24][25][26][27][28] To summarize, the actual malice standard requires that a defendant have, subjectively, significant doubt about the truth of his statements at the time they are made. To disprove actual malice, a defendant may certainly testify about his own thinking and the reasons for his actions, and may be able to negate actual malice conclusively. [FN117] But his testimony that he believed what he said is not conclusive, irrespective of all other evidence. The evidence must be viewed in its entirety. The defendant's state of mind can—indeed, must usually—be proved by circumstantial evidence. A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoid-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ance of the truth is. Imagining that something may be true is not the same as belief.

FN117. *See WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998).

**B**

[29][30] The First Amendment not only protects a public official's critics from liability for defamation absent proof that they acted with actual malice, it also requires that such proof be made by clear and convincing evidence [FN118] and that the fact finder's determinations at trial be reviewed independently on appeal. [FN119] The Supreme Court has not defined "clear and convincing evidence" for purposes of determining actual malice but has noted that in *597 other contexts the phrase has been used to mean "evidence which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.' " [FN120] Similarly, we have held, generally as well as for the purpose of proving actual malice, that evidence is clear and convincing if it supports a firm conviction that the fact to be proved is true. [FN121] We apply that standard in this case. The Supreme Court has explained the requirement of independent appellate review of the evidence regarding actual malice as follows:

FN118. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 55, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (proof must be with "convincing clarity", citing *New York Times v. Sullivan,* 376 U.S. at 285, 84 S.Ct. 710); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 119 (Tex.2000).

FN119. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685–686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Bose Corp. v. Consumers Union,* 466 U.S. 485, 510–511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

FN120. *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 285 n. 11, 110

S.Ct. 2841, 111 L.Ed.2d 224 (1990) (citing *In re Jobes,* 108 N.J. 394, 529 A.2d 434, 441 (1987), regarding the proof necessary to justify the withdrawal of life support).

FN121. *Huckabee v. Time Warner Entertainment Co.,* 19 S.W.3d 413, 422(Tex.2000).

The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage. It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice." [FN122]

FN122. *Bose,* 466 U.S. at 510–511, 104 S.Ct. 1949.

[31][32] The independent review required by the First Amendment is unlike the evidentiary review to which appellate courts are accustomed in that the deference to be given the fact finder's determinations is limited. Indeed, the Supreme Court has stated that "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." [FN123] On questions of law we ordinarily do not defer to a lower court at all. [FN124] But the sufficiency of disputed evidence to support a finding cannot be treated as a pure question of law when there are issues of credibility. No constitutional im-

perative can enable appellate courts to do the impossible—make crucial credibility determinations without the benefit of seeing witnesses' demeanor. If the First Amendment precluded consideration of credibility, the defendant would almost always be a sure winner as long as he could bring himself to testify in his own favor. His assertions as to his own state of mind, if they could not be disbelieved on appeal, would surely prevent proof of actual malice by clear and convincing evidence absent a "smoking gun"—something like a defendant's confession on the verge of making a statement that he did not believe it to be true. The First Amendment does not afford even a media defendant such protection. In the Supreme Court's words, "[w]e have not gone so far ... as to accord the press absolute immunity in its coverage of public figures or elections." *598 [FN125] The independent review on appeal required by the First Amendment does not forbid any deference to a fact finder's determinations; it limits that deference. How far is the difficulty.

> FN123. *Harte–Hanks*, 491 U.S. at 685, 109 S.Ct. 2678 (citing *Bose*, 466 U.S. at 510–511, 104 S.Ct. 1949).

> FN124. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992).

> FN125. *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678.

For practical direction, we have the Supreme Court's review of the evidence in *Harte–Hanks*. There, as we have already explained, a newspaper reported that Connaughton, a judicial candidate, had used "dirty tricks" to obtain a recorded statement from one Stephens concerning her efforts to bribe an employee in the office of Connaughton's opponent, the incumbent judge, and that he intended to present the statement to the judge privately to force him to resign. The newspaper report was based almost entirely on information provided by Stephens's sister, Thompson. A jury found that the newspaper had acted with actual malice. The Supreme Court described the independent review process as follows:

> In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed [in the federal courts] under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," the reviewing court must " 'examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect.' " [FN126]

> FN126. *Id.* (citation omitted).

Following this procedure, the Court first determined that the jury must have disbelieved the following testimony by newspaper employees in order to find that the newspaper had acted with actual malice:

- that the reason the newspaper did not interview Stephens herself was that Connaughton did not put her in contact with the newspaper;

- that the reason the newspaper did not listen to the tapes of Stephens's statements was that it did not believe the tapes would provide any additional information; and

- that they had believed that Thompson's allegations were substantially true. [FN127]

> FN127. *Id.* at 690, 109 S.Ct. 2678.

The jury could not have found this evidence credible and still have found that the newspaper had acted with actual malice. That is, had the jury believed that the newspaper thought that Thompson's allegations were true or that no further investigation of the facts would be productive, it could not have found actual malice. These credibility determina-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

tions were not clearly erroneous. The Supreme Court then determined that the following evidence was undisputed:

• Connaughton and others had denied Thompson's allegations;

• the newspaper knew before it published the story that "Thompson's most serious charge—that Connaughton intended to confront the incumbent judge with the tapes to scare him into resigning and otherwise not to disclose the existence of the tapes—was not only highly improbable, but inconsistent with the fact that Connaughton had actually arranged a lie detector test for Stephens and then delivered the tapes to the police"; FN128 and

FN128. *Id.* at 691, 109 S.Ct. 2678.

**\*599** • Thompson's "hesitant, inaudible, and sometimes unresponsive and improbable tone" in her interview with the newspaper (which was taped) raised "obvious doubts about her veracity." FN129

FN129. *Id.*

Finally, disregarding what the jury reasonably found to be incredible and considering only what was undisputed or what the jury could have believed, the Supreme Court concluded:

Accepting the jury's determination that petitioner's explanations for [its failure to interview Stephens or listen to her recorded statement] were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category. FN130

FN130. *Id.* at 692, 109 S.Ct. 2678 (citation omitted).

In sum, the Supreme Court explained, "[w]hen [the findings the jury must have made to reach the verdict it did] are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inexorably follows." FN131

FN131. *Id.* at 690–691, 109 S.Ct. 2678.

[33] We are constrained, of course, to follow this same approach. Hence, an independent review of evidence of actual malice should begin with a determination of what evidence the jury must have found incredible. In *Harte–Hanks,* that evidence comprised the defendant's self-serving assertions regarding its motives and its belief in the truth of its statements. As long as the jury's credibility determinations are reasonable, that evidence is to be ignored. Next, undisputed facts should be identified. In *Harte–Hanks,* those facts included the denial of Thompson's allegations by Connaughton and others, and the improbability of those allegations given other facts and what the Supreme Court itself could tell from Thompson's taped interview was an obvious lack of credibility. FN132 Finally, a determination must be made whether the undisputed evidence along with any other evidence that the jury could have believed provides clear and convincing proof of actual malice.

FN132. *Id.*

[34] This process goes a long way toward avoiding the possibility foreseen and discounted by the Supreme Court in *St. Amant* that, because the actual malice standard focuses on a defendant's subjective state of mind, a defendant could insulate himself from liability by his own self-serving testimony. "The defendant in a defamation action brought by a public official cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the pub-

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

lication was indeed made in good faith." [FN133] The fact finder may choose with reason to disregard the defendant's testimony, and if it does, so must the appellate court in its independent review. That does not mean, of course, that the plaintiff can prevail merely because the jury chooses not to believe the defendant. The jury's decisions regarding credibility must be reasonable. Moreover, it remains the plaintiff's burden to adduce clear and convincing evidence of actual malice. The evidence may well not rise to **\*600** that level even apart from the defendant's own testimony.

>  FN133. *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

With this understanding of actual malice, clear and convincing evidence, and the review we are required to undertake, we turn to the evidence of this case.

### C

After five days of trial, at which Bentley, Bunton, and Gates all appeared and testified extensively in person, the jury found clear and convincing evidence that Bunton had published defamatory statements about Bentley with "actual malice". The jury also found from a preponderance of the evidence that Bunton had acted with "malice". The trial court correctly defined "actual malice" and "clear and convincing evidence" for the jury as follows:

> A defamatory statement is made with "actual malice" if it is made with actual knowledge that it is false or with reckless disregard as to its truth or falsity.

> "Reckless disregard as to its truth or falsity" means a high degree of awareness of probable falsity, to an extent that the person publishing the statement entertained serious doubts as to the truth of the publication.

> "Clear and convincing evidence" is that measure or degree of proof that will produce in the mind

of the jury a firm belief or conviction as to the truth of the allegations sought to be established.

The trial court defined "malice" as follows: "Malice" means a specific intent by the defendant to cause substantial injury to the claimant, or an act or omission which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. [FN134]

>  FN134. *See* TEX. CIV. PRAC. & REM.CODE § 41.001(7).

[35] We begin our review of the evidence by determining what testimony the jury necessarily rejected in finding that Bunton acted with "actual malice" and "malice". Bunton testified at trial that whenever he had made statements about Bentley he believed them to be true at the time and that he still believed they were true. In this regard at least, the jury must have found Bunton not to be a credible witness. His testimony concerning his subjective beliefs is inconsistent with the jury's verdict. Furthermore, the jury must have disbelieved Bunton's testimony that his intent was not to embarrass or defame Bentley but only to promote good government, provide information, and correct any perception of injustice. Bunton's testimony about his intentions is likewise inconsistent with the jury's verdict. We see nothing unreasonable in the jury's decision not to believe Bunton. Thus, just as the Supreme Court in *Harte-Hanks* disregarded the defendant's testimony regarding its motives and beliefs, we must disregard Bunton's testimony of the same sort here.

[36] Next, we determine what facts were established conclusively. First, Bunton knew by his own admission, at least after the June 6, 1995 "Q&A"

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

broadcast, that Bentley denied the allegations that had been made. Bentley telephoned Bunton to discuss the allegations, but Bunton did not return the call. Instead, Bunton dared Bentley to appear on a "Q&A" show. Bentley testified that he feared he could not appear with Bunton on the show without being further unfairly abused. Also, **\*601** the videotapes of "Q&A" broadcasts in evidence establish that Bunton knew that others besides Bentley believed the allegations to be false. Second, it is undisputed that Gates told Bunton that he, Gates, did not believe Bentley was corrupt. Third, Bunton does not dispute his friend's account of their conversation, in which Bunton stated that "he really couldn't get anything on ... old Bascom Bentley", and that Bentley was "doing something", "I just don't know what it is." This occurred after Bunton had "investigated" the Curbo case and during the same time that he was accusing Bentley of being corrupt. Thus, while Bunton was telling the "Q&A" viewing audience that Bentley was corrupt in his handling of the Curbo case, he was confiding in a friend that "he really couldn't get anything on ... old Bascom Bentley" except that he ate lunch with "that clique". Bunton also acknowledged in one broadcast that it had been "difficult to pin down" any misconduct by Bentley. Fourth, the occurrences on which Bunton based his allegations of corruption did not prove those charges, as a matter of law. Remarkably, long after Curbo's father was defeated in his bid for mayor, Bunton continued to accuse Bentley of delaying the Curbo case to pressure Curbo's father as mayor. Fifth, in broadcasts stretching over many months, Bunton repeatedly accused Bentley not only of being corrupt—by which he meant dishonest, unethical, shady, and unscrupulous—but also of not doing his job or earning his salary, going to lunch with a "clique", and being "grossly incompetent or ... awful lazy" and a "disgrace" to his children.

Finally, we consider this undisputed evidence in light of the entire record. Apart from Bunton's own self-serving assertions that are inconsistent with the jury's verdict and must therefore be ig-

nored, the only evidence that he did not act with actual malice is that he attempted to make some investigation before airing his allegations. Specifically, Bunton stated that he obtained court records and did legal research to support his allegations. The jury could have believed this testimony and still found that he acted with actual malice, and therefore we must credit this evidence in our own assessment of the record. But we do not consider it to have much weight when there is no evidence that Bunton's investigation ever led him to contact any one of a number of other people involved in the circumstances he criticized. He did not ask the district attorney, defense counsel, or the probation officer about the delay in the Curbo case. Curbo's lawyer testified at trial that the delay benefitted his client, and the probation officer wrote the court that the case was being handled appropriately. Bunton did not ask the sheriff, the county auditor, or any member of the county commissioners court about the handling of the "hot check" and confiscated property funds, he did not call the Texas Ethics Commission about the propriety of Bentley's contributions to two county judge candidates, he did not ask a lawyer about any of the rulings for which he faulted Bentley in various cases, and he ignored the investigation into his own charges of misconduct against the district attorney. We are mindful that a failure to investigate the facts is not, by itself, any evidence of actual malice, but what is so striking about the record in this case is the complete absence of any evidence that a single soul, besides Gates, ever concurred in Bunton's accusations of misconduct against Bentley. All those who could have shown Bunton that his charges were wrong Bunton deliberately ignored. Even after Bunton encouraged "Q&A" viewers to report any misconduct by Bentley, and went so far as to instruct on how that could be done anonymously,**\*602** the record is silent as to whether anyone ever responded.

From our thorough review of the record and our detailed recitation of the evidence, whether Bunton's actual malice has been proved by clear and convincing evidence is not, we think, a close

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

question. We are convinced, by no small margin, that Bunton never made his allegations against Bentley in good faith, that he expressed doubt to a friend that there was any basis for the charges he was making, and that he deliberately ignored people who could have answered all of his questions. The fact that Bunton dared his victims to appear on his show but made no attempt to hear them privately strongly supports our conclusion.

[37] Moreover, while a defendant's ill will toward a plaintiff does not equate to, and must not be confused with, actual malice, such animus may suggest actual malice.[FN135] Bunton hounded Bentley relentlessly and ruthlessly for months, despite the threat of suit and at least one entreaty from Gates, asserting that Bentley was not earning his salary, that he was part of a clique of local leaders who lunched together, that he should resign, that he had been "very, very slick" to avoid being caught, and that he was "either ... just grossly incompetent, or ... awful lazy". Bunton told Bentley's sister that Bentley was corrupt and stated that Bentley had disgraced his own children. Bunton even coached callers on how to register complaints about Bentley anonymously. This evidence that Bunton carried on a personal vendetta against Bentley without regard for the truth of his allegations also indicates actual malice.

> FN135. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n. 10 (5th Cir.1995); *see* SACK, *supra* note 44, § 5.5.2, at 5–77 to 5–78; SMOLLA, *supra* note 48, §§ 3.15–3.16, at 3 –42.1 to 3–42.2.

Accordingly, we conclude that the evidence that Bunton acted with actual malice in defaming Bentley was clear and convincing. CHIEF JUSTICE PHILLIPS's contrary conclusion is, in our view, the product of faulty analysis that granulates the evidence tending to show actual malice but amalgamates all of the contrary evidence. Because no single piece of evidence proves actual malice, and there is some evidence to the contrary, he concludes that Bentley has not met his burden. We think, however, that when the evidence is viewed as a whole, as it must be, it convincingly shows Bunton's actual malice. It is simply unfair for CHIEF JUSTICE PHILLIPS to dismiss what he describes as Bunton's "protracted verbal barrage"[FN136] of "defamatory falsehoods"[FN137] against Bentley as "ill manners, legal mistakes, and ineffective investigation."[FN138] Nor were Bunton's erroneous charges merely due to a lack of legal training, as CHIEF JUSTICE PHILLIPS suggests; on the contrary, there was unchallenged testimony at trial that no reasonable person could have believed Bunton's accusations.

> FN136. *Post* at 608.

> FN137. *Id.*

> FN138. *Id.*

**D**

[38] Unlike Bunton, Gates testified that he never believed Bentley was corrupt. Gates never used the word "corrupt" in discussing Bentley's conduct, but there is evidence to support the jury's finding that he agreed with Bunton's allegations on two "Q&A" broadcasts. If he knew he was communicating a falsehood, then there can be no question that he acted with actual malice because he himself\*603 acknowledges that he did not believe the allegations of corruption. But a defendant cannot be said to have made a statement with actual malice if he did not know or have reckless disregard for whether the statement communicated a falsehood. In *Turner v. KTRK Television, Inc.*, we held that while a message may be false and defamatory as a whole, even though no single statement is false, proof of actual malice requires clear and convincing evidence that the defendant "knew or strongly suspected that the publication as a whole could present a false and defamatory impression...."[FN139] Here, too, we think that the actual malice standard focuses on the defendant's state of mind regarding the import of the statements actually made. If in response to the statement that P is a felon, D says, "Yes, indeed," knowing full well that P is not a felon, the evidence

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

is clear and convincing that D has acted with actual malice. Even though his own words are neutral in isolation, in context he can hardly deny that he knew he was communicating agreement with what he knew was false. But had D replied only, "Do tell," the evidence of actual malice is nil. D could quite credibly argue that his response was but a polite acknowledgment of the statement and that he had no reasonable idea he would be taken to have endorsed it. Thus, with respect to Gates, we think that the actual malice standard requires clear and convincing evidence that on one of the two occasions in question, either he knew that what he said communicated that Bentley was corrupt, or else he had reckless disregard for whether he had communicated that message.

> FN139. 38 S.W.3d 103, 120 (Tex.2000) (citation omitted).

We have already described the two occasions, both of which occurred on "Q&A" broadcasts, a videotape of which was before the jury. In one, Bunton had told a caller that the district attorney, not Bentley, was the most corrupt official in Anderson County. As Gates started to correct Bunton, Bunton interrupted and corrected himself, saying "Bascom Bentley's number one." "Yeah," Gates replied. At trial, Gates testified that he thought "yeah" "was a spontaneous reaction more than anything". On the other occasion, Bunton listed two situations showing that Bentley was corrupt. Gates then named two other situations and added, "and there's some others besides." Gates did not offer an explanation of this occasion at trial, but he now says, in argument on appeal, that he was merely helping Bunton list the situations Bunton had himself mentioned in the past. Gates did testify that he bore Bentley no ill will, and that he had told Bunton that he did not believe Bentley was corrupt.

The jury found that Gates's remarks communicated his agreement with Bunton's allegations that Bentley was corrupt, and that in so doing Gates acted with "actual malice" and "malice", as those words were defined by the trial court in the charge

(which we have quoted above). In reviewing the evidence following the procedure set out in *Harte–Hanks*, we must first disregard Gates's testimony that "yeah" was only a spontaneous reaction, that he ever told Bunton that Bentley was not corrupt, and that he bore Bentley no ill will; all of this testimony is inconsistent with the verdict and could not have been believed by the jury. The jury reasonably refused to believe Gates. Thus, we must consider the effect of Gates's statements on their face, without benefit of Gates's explanations, in light of the undisputed evidence and the remainder of the record.

Two facts are undisputed. One is that Gates never believed Bentley was corrupt. **\*604** Gates admits this himself. The other is that Gates participated with Bunton on numerous "Q&A" programs over a period of many months, listening to Bunton repeatedly accuse Bentley of being corrupt, and never took issue with one of Bunton's accusations. Indeed, on one occasion Gates helped Bunton list examples of Bentley's corrupt conduct. In addition, except for Gates's testimony, which we must disregard, the record is silent on whether Gates ever disagreed with Bunton that Bentley was corrupt. Gates's counsel asked Bunton whether Gates "disagree[d] with you on occasion when discussing Judge Bentley on the air." Bunton answered: "Colonel Gates and I have had a lot of disagreements, not about the facts, but a disagreement in direction, in technique." Although Gates did not dispute that he told Bentley he would ask Bunton to stop calling Bentley corrupt, Gates did not adduce any evidence to show that he did so.

Were the two "Q&A" shows in which Gates chimed in during Bunton's allegations isolated instances, we certainly could not find clear and convincing evidence in this record that Gates either knew or had reckless disregard for whether he was communicating that Bentley was corrupt, something he knew was false. But the two shows cannot be viewed in isolation. Gates knew what Bunton's allegations were. He had sat next to

Bunton as Bunton repeated them on many occasions. Still, Gates remained silent all but twice, and both times his reaction was ambiguous. From the videotapes of those two occasions, we cannot say, even in the context of Bunton's ongoing verbal assaults against Bentley in Gates's presence, that Gates knew or had reckless disregard for whether he was himself communicating a falsehood.

The jury's finding of Gates's ill will and spite toward Bentley cannot prove actual malice by itself and does not alter our conclusion. Although the issue is a close one, we hold that the evidence of Gates's actual malice was not clear and convincing.

## VI

Regarding damages, Bunton argues that the evidence does not support any award of actual or punitive damages to Bentley, and alternatively, that the amounts of actual and punitive damages determined by the jury are without support in the evidence and exceed First Amendment limitations.

[39][40] The first argument need not long detain us. Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish. FN140 Bunton does not contest that if, as we have now held, Bunton's statements were false statements of fact and not merely expressions of opinion, then they were defamatory per se, as the trial court ruled. As a matter of law then, Bentley was entitled to recover actual damages for injury to his reputation and for mental anguish. Moreover, from the evidence we have summarized above, the jury could readily have found that Bentley's reputation was in fact injured and that he in fact suffered mental anguish on account of the defendants' conduct. Also, because the defendants acted with actual malice, Bentley is entitled to punitive damages without proving that the defendants *605 were personally vindictive toward him, FN141 although again, the evidence supports the jury's finding that in fact Gates and Bunton acted "with specific intent ... to cause substantial injury", as found by the jury.

FN140. *See Leyendecker & Assoc., Inc. v. Wechter,* 683 S.W.2d 369, 374 (Tex.1984); *City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex.1997).

FN141. *Leyendecker,* 683 S.W.2d at 374–375.

Bunton's second argument—that the amounts of damages awarded are not supported by the evidence or permitted by the First Amendment—requires more analysis.

## A

[41] The jury found that Bunton caused Bentley $7 million in mental anguish damages and $150,000 in damages to his character and reputation. Non-economic damages like these cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment. But the necessity that a jury have some latitude in awarding such damages does not, of course, give it carte blanche to do whatever it will, and this is especially true in defamation actions brought by public officials.

In *Gertz v. Robert Welch, Inc.,* the United States Supreme Court held that state law may set a lesser standard of culpability than actual malice for holding a media defendant liable for defamation of a private plaintiff, but under any lesser standard the plaintiff can recover "only such damages as are sufficient to compensate him for actual injury." FN142 Noting that damages may be presumed without proof of injury in certain defamation cases, such as those involving defamation per se, the Court expressed concern that "[t]he largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms." FN143 The Court expressed the same concern regarding punitive damages. FN144

FN142. 418 U.S. 323, 349–350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

FN143. *Id.* at 349, 94 S.Ct. 2997.

FN144. *Id.* at 350, 94 S.Ct. 2997.

Although the Court did not consider whether limitations should be placed on damage awards when a defendant is shown to have acted with actual malice, we think that similar concerns are raised. Damage awards left largely to a jury's discretion threaten too great an inhibition of speech protected by the First Amendment. This case is a prime example. The jury's award of $7 million in mental anguish damages strongly suggests its disapprobation of Bunton's conduct more than a fair assessment of Bentley's injury. The possibility that a jury may exercise such broad discretion in determining the amount to be awarded unrestrained by meaningful appellate review poses a real threat to all members of the media.

Accordingly, we conclude that the First Amendment requires appellate review of amounts awarded for non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant. Exercising that review in this case, we conclude that while the record supports Bentley's recovery of some amount of mental anguish damages, it does not support the amount of those damages found by the jury.

**B**

[42] Moreover, under our common law the latitude necessarily accorded a jury in assessing non-economic damages does not *606 insulate its verdict from appellate review for evidentiary support. Just as a jury's prerogative of assessing the credibility of evidence does not authorize it to find liability when there is no supporting evidence or no liability in the face of unimpeachable evidence, so a large amount of mental anguish damages cannot survive appellate review if there is no evidence to support it, or a small amount of damages when the evidence of larger damages is conclusive. The jury is bound by the evidence in awarding damages, just as it is bound by the law.

Our law distinguishes between appellate review for no evidence and insufficient evidence. The courts of appeals are authorized to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable. We have rejected the view that that authority displaces their obligation, and ours, to determine whether there is any evidence at all of the *amount* of damages determined by the jury. In *Saenz v. Fidelity & Guaranty Insurance Underwriters*, we explained:

Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. We disagree with the court of appeals that "[t]ranslating mental anguish into dollars is necessarily an arbitrary process for which the jury is given no guidelines." [ *Fidelity & Guaranty Insurance Underwriters v. Saenz*, 865 S.W.2d 103, 114 (Tex.App.-Corpus Christi 1993) ]. While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes "substantial disruption in ... daily routine" or "a high degree of mental pain and distress". *Parkway* [*v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995) ]. There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations. One court of appeals has suggested the contrary. *See State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 601 (Tex.App.-El Paso 1991, writ denied);

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

*Daylin, Inc. v. Juarez,* 766 S.W.2d 347, 352 (Tex.App.-El Paso 1989, writ denied); *Brown v. Robinson,* 747 S.W.2d 24, 26 (Tex.App.-El Paso 1988, no writ). We disapprove that language in those cases.[FN145]

> FN145. 925 S.W.2d 607, 614 (Tex.1996).

We concluded in *Saenz* that there was no evidence to support the $250,000 damages for mental anguish awarded by the jury.

This case is far clearer than *Saenz.* The record leaves no doubt that Bentley suffered mental anguish as a result of Bunton's and Gates's statements. Bentley testified that the ordeal had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, disrupted his family, and distressed his children at school. The experience, he said, was the worst of his life. Friends testified that he had been depressed, that his honor and integrity had been impugned, that his family**607** had suffered, too, adding to his own distress, and that he would never be the same. Much of Bentley's anxiety was caused by Bunton's relentlessness in accusing him of corruption. But all of this is no evidence that Bentley suffered mental anguish damages in the amount of $7 million, more than forty times the amount awarded him for damage to his reputation. The amount is not merely excessive and unreasonable; it is far beyond any figure the evidence can support.

The other amounts of actual damages found by the jury are well within a range that the evidence supports. We do not consider whether the awards were unreasonable; that issue was for the lower courts. We conclude only that no evidence permitted the jury to make the findings it did.

### C
Gates and Bunton argue that the amounts of punitive damages determined by the jury were excessive by constitutional standards, but they clearly were not. Punitive damages were a fraction of the actual damages found by the jury. Even if mental anguish damages were reduced, as we conclude they must be, there is evidence to support the punitive damages set by the jury. However, because we conclude that there is no evidence to support part of the actual damage award, punitive damages must be reassessed as well.[FN146]

> FN146. *Tatum v. Preston Carter Co.,* 702 S.W.2d 186, 187–188 (Tex.1986).

### VII
We come finally to what our judgment should be, given the division of the Court. Seven of the eight MEMBERS of the Court participating in the decision of this case agree that the judgment of the court of appeals that Bentley take nothing from Gates should be affirmed. Only JUSTICE BAKER disagrees. Judgment will be rendered accordingly. Regarding Bunton, the Court is more deeply divided. JUSTICE BAKER would render judgment against Bunton and Gates, jointly and severally, for all the damages found by the jury. Three MEMBERS of the Court—CHIEF JUSTICE PHILLIPS, JUSTICE ENOCH, and JUSTICE HANKINSON—would render judgment that Bentley take nothing from Bunton or Gates. The other four MEMBERS of the Court—JUSTICE OWEN, JUSTICE JEFFERSON, JUSTICE RODRIGUEZ, and I—would remand the case to the court of appeals to reconsider the excessiveness of the jury's award of mental anguish damages against Bunton in view of this opinion. It may be that Bentley's action against him must be retried, but the court of appeals is free to suggest a remittitur.

The Court has faced similar divisions before. In *Diamond Shamrock Refining and Marketing Co. v. Mendez,*[FN147] three JUSTICES would have rendered judgment for the plaintiff, three would have rendered judgment for the defendant, and three would have remanded the case for a new trial. A majority of the Court nevertheless joined in a judgment remanding the case as being the judgment most consistent with their respective views. Also, in *National County Mutual Fire Insurance Co. v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

*Johnson,*[FN148] four JUSTICES concluded that an insurance policy provision was valid, four concluded that it was entirely invalid, and one concluded that the provision was only partially invalid. A majority of the Court joined in a judgment invalidating the provision in part. Likewise, today a majority of the Court—all but JUSTICE BAKER—join in the judgment **\*608** remanding this cause to the court of appeals for further proceedings, although the reasons for the remand are advanced by only four justices.

> FN147. 844 S.W.2d 198 (Tex.1992).

> FN148. 879 S.W.2d 1 (Tex.1993).

*Judgment accordingly.*

Chief Justice PHILLIPS filed an opinion concurring in part and dissenting in part, and concurring in the judgment, in which Justice ENOCH and Justice HANKINSON joined.
Justice BAKER filed a dissenting opinion.
Justice O'NEILL did not participate in the decision.
Chief Justice PHILLIPS, joined by Justice ENOCH and Justice HANKINSON, concurring in part and dissenting in part.

I

A

The United States Supreme Court has long recognized "the privilege for the citizen-critic of government," declaring: "It is as much his duty to criticize as it is the official's duty to administer." *New York Times Co. v. Sullivan,* 376 U.S. 254, 282, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Constitution therefore protects any speech about public officials and public figures unless it is both 1) provably false, *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), and 2) made with either knowledge of its falsity, *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710, or serious doubt as to its truth, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Obviously, this high degree of protection "exacts a correspondingly high price from the victims of defamatory falsehood" who may be "unable

to surmount the barrier" of that privilege. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

> "It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great."

*New York Times,* 376 U.S. at 281, 84 S.Ct. 710 (quoting with approval *Coleman v. MacLennan,* 78 Kan. 711, 98 P. 281, 286 (1908)).

Undoubtedly, Joe Ed Bunton subjected Judge Bascom Bentley III to a protracted verbal barrage. I agree with the Court that as a matter of law at least some of these statements were defamatory falsehoods. But I also believe that Bentley failed to prove by clear and convincing evidence that Bunton made his statements with actual malice, as that term is used in defamation jurisprudence.

In my own independent appellate review, as required in *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), I cannot find clear and convincing evidence that Bunton either knew that his statements were false or entertained serious doubts about their truth. The Court's opinion is a judicial miscellany of Bunton's ill manners, legal mistakes, and ineffective investigation, from which a conclusion is concocted that Bunton did not believe his allegations that Bentley was corrupt. Taken separately or together, the incidents the Court recites establish only objective unreasonableness, not the subjective state-of-mind required to prove actual **\*609** malice. I would reverse the court of appeals' judgment and render judgment that Bentley take nothing against Bunton.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

B

Unlike Bunton's words, Colonel Jackie Gates' public statements on the Q&A cable-access call-in show were not false and defamatory on their face. However, a reasonable listener could have understood two of Gates' comments to express a defamatory meaning—agreement that Judge Bascom Bentley was corrupt—due to their juxtaposition with Joe Ed Bunton's words.

To prove public-official defamation when the defendant's words could be understood as defamatory or as not, the plaintiff must prove by clear and convincing evidence that the defendant either knew or strongly suspected at the time he spoke that his words would carry a defamatory meaning to the ordinary listener. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex.2000); *see also Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[O]nly those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions."). If this showing is made, the public-official plaintiff must also prove by clear and convincing evidence that the defendant either knew the defamatory meaning was false, *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710, or seriously doubted its truth, *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323. I agree that Bentley has failed to carry his burden as to Gates.

II

The United States Supreme Court tailored the actual malice test to discourage the self-censorship that libel law might otherwise impose on political speech. In *New York Times*, the Times had published a defamatory advertisement containing significant factual errors. *New York Times*, 376 U.S. at 256–59, 84 S.Ct. 710. The Times possessed the correct information in its own news files but failed to consult them. *Id.* at 287, 84 S.Ct. 710. This evidence, the Court held, "support[ed] at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show

the recklessness that is required for a finding of actual malice." *Id.* at 288, 84 S.Ct. 710. This new "actual malice" standard was entirely distinct from common law malice, focusing on knowledge rather than motive.

The *New York Times* Court believed the Constitution required the actual malice test in order to protect free debate and preserve political liberty. Quoting from *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), the Court observed:

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred.... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which "steer far wider of the unlawful zone." The rule thus dampens the vigor and limits the variety of public debate.

*New York Times*, 376 U.S. at 279, 84 S.Ct. 710. The Court rejected the notions that either the reputations of public officials or the desirability of accurate information **\*610** were sufficiently important to justify traditional defamation standards. Thus, the Court observed:

Where judicial officers are involved, this Court has held that concern for the dignity and reputation of the courts does not justify the punishment as criminal contempt of the judge or his decision. This is true even though the utterance contains "half-truths" and "misinformation." Such repression can be justified, if at all, only by a clear and present danger of the obstruction of justice ... [J]udges are to be treated as men of fortitude,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

able to thrive in a hardy climate.

*New York Times,* 376 U.S. at 272-73, 84 S.Ct. 710 (citations omitted).

Truthful speech has value. False speech mistakenly believed to be true, while valueless, should be protected to avoid self-censorship of truthful speech. Known falsehood is neither valuable nor necessary to preserve free debate and thus has no constitutional protection.

### III
### A

To recover for defamation, the public-official plaintiff must prove by clear and convincing evidence that the defendant spoke with actual malice. Actual malice is a legal term of art, wholly distinct from the more venerable common law malice. The actual malice inquiry is subjective, focused on the defendant's actual state of mind regarding truth, not the reasonableness of or the reasons for his speech. Thus, the plaintiff must prove that when the defendant spoke he either knew his statements were false or had reckless disregard for their truth. *New York Times,* 376 U.S. at 280, 84 S.Ct. 710. Reckless disregard is also a subjective standard that is not synonymous with common law recklessness. For reckless disregard to exist, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323. Or put another way, the defendant must have made his false and defamatory allegations with a "high degree of awareness of their probable falsity." *Garrison,* 379 U.S. at 74, 85 S.Ct. 209.

When reviewing public-official defamation cases for clear and convincing evidence of actual malice, we defer to the jury only on credibility issues. After determining what testimony the jury must have disbelieved to reach its verdict, we review those findings for clear error. *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Otherwise, the New York Times standard mandates

a searching independent review of all factual evidence. *Id.; Bose Corp.,* 466 U.S. at 511, 104 S.Ct. 1949; *New York Times,* 376 U.S. at 285, 84 S.Ct. 710. This federal constitutional standard takes precedence over the limitations on our factual review established in the Texas Constitution. *Turner,* 38 S.W.3d at 120.[FN1]

> FN1. The jury in our case arguably made inconsistent factual findings. In its first three answers, the jury found that "Gates agreed with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt," that he "publish[ed] his agreement with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt," and that "Gates acted with actual malice in publishing his agreement with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt" by "clear and convincing evidence." If the first question inquires about Gates' objective conduct on Q&A, it duplicates the second question about publication. If the first question asks about Gates' actual subjective agreement, then his publication could not have involved actual malice, a standard which requires Gates to have disbelieved or seriously doubted that Bentley was corrupt. Because I believe that there is not clear and convincing evidence of actual malice against either defendant, I need not decide whether a conflict exists, and, if so, what legal implications would follow.

#### *611 B

In finding clear and convincing evidence of actual malice, this Court offers several facts that "were established conclusively" to support its conviction "by no small margin," that Bunton acted with actual malice. 94 S.W.3d at 602. None of these facts, taken singly or together, come close to proving the Court's case that Bunton doubted the truth of his allegations. That Bunton dared Bentley on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

television to appear live on Q&A rather than return-ing a private telephone call may establish a breach of etiquette, but it is not evidence of a public figure defamation.[FN2] That Bunton knew that others dis-agreed with his allegations is also no evidence of actual malice.[FN3] That Bunton confessed uncer-tainty to a friend that "[Bentley's] doing something; I just don't know what it is," and that he acknow-ledged on a broadcast that Bentley was "difficult to pin down," suggests that he firmly believed Bentley was, in fact, doing *something* wrong.[FN4] Far from showing by clear and convincing evidence that he was consciously indifferent to the truth, these re-marks indicate that he was trying, in his own lim-ited way, to bring to his viewing audience the truth. The Court also points to other harsh, though nondefamatory, epithets that Bunton hurled at Bent-ley in the course of his broadcasts. But even Bent-ley does not claim that accusations that he dis-graced his children, was lazy, or lunched with a clique are any proof that Bunton did not really be-lieve that Bentley was corrupt.

> FN2. On the air, Bunton mentioned receiv-ing a telephone call from "somebody ... claiming to be Judge Bentley," which sug-gests that he did not realize that Bentley himself had placed the call.

> FN3. Although the Court erroneously claims that there is no evidence anyone other than Gates agreed with Bunton's al-legations, 94 S.W.3d at 590, the record does suggest that some of his viewers agreed with him. While testifying at trial about Q&A's periodic viewer polls asking whether or not Bentley was corrupt, Bent-ley testified: "I nearly won one time, I think."

> FN4. The Court claims that this conversa-tion proves that Bunton was privately ad-mitting his lack of evidence against Bent-ley to a friend, "while he was telling the Q&A viewing audience that Bentley was corrupt." 94 S.W.3d at 601. In fact, the

witness testified at the 1997 trial that the conversation took place "sometime in the summer of 1995." Without a specific date, I cannot assume that it occurred after Bunton's June 6, 1995 broadcast, during which he first accused Bentley of corrup-tion.

Most disturbingly, the Court finds clear and convincing evidence of actual malice because "the occurrences on which Bunton based his allegations of corruption did not prove those charges, as a mat-ter of law." *Id.* at 600. I agree that Bentley conclus-ively established that at least some of Bunton's charges were false as a matter of law. But I strenu-ously disagree that the falsity of some or all of Bunton's charges proves that Bunton *knew* they were false at the time he made them. *See Bose Corp.,* 466 U.S. at 491 n. 6, 512–13, 104 S.Ct. 1949 (holding that trial court erred when it reasoned that speaker must have known his statements were false at the time he made them because they were, in fact, clearly false).

Moreover, the Court points to evidence of per-sonal animus to suggest that Bunton acted with ac-tual malice. Even if there were such evidence, it would not satisfy the *New York Times* standard. *See* **\*612***Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (noting actual malice cannot be based merely on defendant's " 'bad or corrupt motive,' " " 'personal spite, ill will or a desire to injure plaintiff' "). But, in fact, there is not a shred of evidence in the record to suggest that Bunton had a pre-existing feud with Bentley, or that his desire to harm Bentley's career came from any source except his mistaken belief that Bentley was corrupt. Thus, the Court uses Bunton's erro-neous statements to prove that he acted with ill will, then points to that ill will to establish motive for his false statements. The Court substitutes circular reasoning for constitutional analysis.

### C

Most of all, the Court relies on the purposeful-avoidance doctrine of *Harte–Hanks Communica-*

*tions, Inc.*, 491 U.S. at 692–93, 109 S.Ct. 2678. *Harte–Hanks* was a narrow holding, grounded in facts more egregious than those presented here. Before publishing a story attacking the integrity of a candidate for public office, the defendant newspaper was offered access to a tape of a conversation that would have shown whether the story was true or false. *Id.* at 683, 109 S.Ct. 2678. The paper's reporters deliberately chose not to listen to it. *Id.* The Supreme Court concluded that the newspaper's purposeful avoidance of the truth was sufficient to prove that it in fact had serious doubts about the truth of its story. *Id.* at 683–84, 692, 109 S.Ct. 2678.

There is no evidence here that Bunton knew of and had access to a specific piece of evidence that he knew would prove or disprove his allegations, yet consciously chose not to learn of its contents. The Court points out that Bunton did not call either the district attorney or the defense lawyer for further information in the Curbo case. 94 S.W.3d at 601. But unlike the newspaper reporters in *Harte–Hanks*, who inexplicably refused to review independent documentary evidence, Bunton repeatedly went to the courthouse and reviewed the official public documents on the Curbo case. There is no evidence that Bunton knew of the off-the-record agreement between the attorneys and the probation officer, and thus no evidence that he had any reason to suspect that he needed to contact them in order to obtain additional, dispositive information that could not be found in the public records.

The Court further argues that Bunton deliberately avoided the truth because he did not contact the county commissioners' court about the hot check and confiscated property funds. 94 S.W.3d at 601. But Bentley himself testified about a Q&A letter to the county commissioners' court requesting information about the funds. Bentley was further questioned about the letter's complaint that the district attorney had responded to Q&A's freedom of information request by notifying Q&A that it would have to pay a $45,000 copying bill before a representative could view the fund records.

In addition, the Court asserts that Bunton "ignored the investigation into his own charges of misconduct against the district attorney." *Id.* at 601. The outside prosecutor, Garner, who investigated Bunton's complaints did recommend that no action be taken against the district attorney. But she also testified at trial that the district attorney had indeed failed to deposit the funds properly, and that his "mistakes" could be considered "official misconduct."

Although the Court claims that Bunton "deliberately ignored" "all those who could have shown Bunton that his charges were wrong," *id.* at 601, Bunton chose to publish his allegations on Q&A, a live call-in show **\*613** that neither screened nor time-delayed its viewer calls and afforded him no opportunity to avoid or suppress the views of any person who chose to publicly contradict his comments. Bentley himself testified at trial that he refused to appear on Q&A and deliberately chose to respond to Bunton only through this lawsuit, rather than by exercising his own First Amendment right to confront and correct Bunton before the public. *See Gertz*, 418 U.S. at 344, 94 S.Ct. 2997 ("The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significant[ ] ... access to the channels of effective communication.").

*Harte–Hanks* did not base its actual malice finding on the reporters' general failure to investigate all possible sources of information, but on their conscious avoidance of specific evidence that would conclusively establish the truth or falsity of their story. Bunton's actions are at most the failure to investigate held not to be actual malice in *St. Amant*, not the purposeful avoidance held to establish subjective doubt in *Harte–Hanks*.

The actual malice test is not a cookbook, in

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

which three teaspoons of objective unreasonableness can automatically substitute for one teaspoon of subjective doubt. In *St. Amant*, the Court held that the circumstantial evidence of objective unreasonableness proved only that—unreasonableness, not subjective doubt. 390 U.S. at 731, 88 S.Ct. 1323. The Court reached this conclusion despite evidence that the defendant had no personal knowledge of the truth or falsity of his comments and had completely failed to conduct any investigation of his allegations before publishing them. *Id.* at 730–33, 88 S.Ct. 1323. By contrast, the circumstantial evidence that reporters purposefully avoided dispositive evidence in *Harte–Hanks* tended to show, not only objectively unreasonable behavior, but subjective doubt. The tendency to confuse these cases and use objective evidence as an automatic *substitute* for subjective doubt, rather than a possible *indicator* of subjective doubt, has prompted the Supreme Court to admonish: "[C]ourts must be careful not to place too much reliance on such factors." *Harte–Hanks*, 491 U.S. at 668, 109 S.Ct. 2678. "The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of ... probable falsity.' " *Id.* at 688, 109 S.Ct. 2678 (quoting *Garrison*, 379 U.S. at 74, 85 S.Ct. 209).

In the end, circumstantial evidence of falsity must prove, by clear and convincing evidence, not merely that the defendant's actions were objectively unreasonable or that a prudent man would not have published his allegations, but that he in fact knew his statements were false or seriously doubted that they were true. *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323 (quoted in *Harte–Hanks*, 491 U.S. at 667, 109 S.Ct. 2678). And circumstantial evidence of ill will must prove not that the defendant intended to harm the plaintiff and perhaps did not investigate as thoroughly as he might have, but that he intended to harm the plaintiff by publishing known or probable lies. *Garrison*, 379 U.S. at 74, 85 S.Ct. 209. Only such "calculated falsehood" is actual malice. *Id.* at 75, 85 S.Ct. 209.

**D**

Looking at the record as a whole, I find much evidence, not dependent on Bunton's credibility at trial, suggesting that he believed his charges were true and that he did not recklessly disregard the truth or *614 falsity of his charges.[FN5] Bunton's specific allegations were made after extensive, if not very effective, research. He filed open records requests with local officials, then filed follow-up complaints when some of those requests were denied. He made numerous trips to the courthouse to read and copy public records. Often, he went on the day of his Q&A broadcast to obtain the most current information, displaying his latest photocopies in front of the television camera as he spoke. He publicly dared Bentley to either telephone Q&A or appear live on the show to refute the charges. He told callers they were "welcome" to come on the show and demonstrate that his allegations were untrue and invited them to review the facts for themselves, expressing his certainty that they could come to only one conclusion about Bentley—that he was corrupt. When Bentley threatened to sue for defamation, Bunton responded on air that he would welcome a lawsuit, because Bentley would have to testify under oath. Bunton told a friend, Tucker Farris, that he believed Bentley's clique was responsible for injustices in local government, and that Bunton wanted to bring to the surface "anything that was not right with the system." On the air, he insisted, "You can't sue anybody for slander when they're telling the truth. And this is the truth, and there is no libel or slander in this." Bunton knew that only truthful charges were absolutely protected from suit and was trying to meet that standard. On one show, Bunton described Bentley as "one of the hardest people for Q&A to finally get some things that we could really dig our teeth in and were confident to go on the air on and go after him on because he is very, very slick." Far from making unfounded or untruthful accusations, this statement suggests that Bunton did not air his accusations until he had confidence in them.

FN5. Rather than determining which testi-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

mony the jury must have disbelieved in order to find actual malice and then accepting those findings if not clearly erroneous, as required by *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678, the Court has disregarded all of Bunton's exculpatory testimony even though it is not all inconsistent with the jury's verdict. Further, the jury's inconsistent findings regarding Gates, discussed in note 1, *supra*, raise the significant possibility that the jury may have also erroneously found actual malice against Bunton despite crediting his exculpatory testimony claiming subjective belief. Because I believe that there is not clear and convincing evidence of actual malice against Bunton with or without his exculpatory testimony, I proceed using only the evidence the Court has not disputed.

At trial, Bentley's lawyers would not allow Bunton to outline for the jury Bentley's obligations under the Code of Judicial Conduct because he had no legal training and was "not qualified" to give opinions on such "highly complicated" legal issues. Yet this Court finds clear and convincing evidence of actual malice because Bunton misunderstood Bentley's obligations under the laws of the state and that Code.

Most, though not all, of the underlying facts Bunton used to support his accusations were accurate. It was only Bunton's conclusions that were faulty. To a layperson, it might well be plausible that dormant case dockets, individuals erroneously thrown back into jail after finishing their sentences, campaign contributions to candidates for judicial positions Bentley supervised, and appellate court reversals would suggest corruption. Bunton was also correct when he complained that Bentley did not order an audit despite receiving monthly reports revealing that a county official over whom he had supervisory authority had not deposited public funds as required by law, and that Bentley took no action after learning that a local sheriff had refused

to exercise an arrest **\*615** warrant. However clear it may be to attorneys that none of these actions prove corrupt or criminal behavior, surely there is not clear and convincing evidence that no member of the public could genuinely suspect corruption.

To insist that ordinary citizens understand the legal system's intricacies (perhaps by consulting a lawyer, as the Court helpfully suggests, 94 S.W.3d at 601) before they comment on a judge's performance is an unconstitutional restriction on free speech. A misunderstanding that no rational and responsible lawyer could make may still be made by laypeople. *See Time, Inc. v. Pape*, 401 U.S. 279, 289–92, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (misrepresenting allegations contained in a complaint as true facts was not actual malice); *Turner*, 38 S.W.3d at 121 (juxtaposing true facts to create defamatory false impression was not actual malice because nonlawyer may not have understood legal significance of chosen words and omitted information). As the Supreme Court explained:

> And since "... erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive,' ..." only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government.

*Garrison*, 379 U.S. at 74–75, 85 S.Ct. 209 (quoting *New York Times*, 376 U.S. at 271–72, 84 S.Ct. 710).

## IV

### A

I agree with the Court that Judge Bascom Bentley has failed to prove by clear and convincing evidence that Colonel Jackie Gates acted with actual malice. Gates' words were not defamatory on their face, and could only be understood as defamatory due to their juxtaposition with Bunton's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

words, which the trial court held were defamatory as a matter of law. Gates' words carry two possible meanings, one innocent, which Gates claims, and one defamatory, which Bentley advocates.

To find actual malice when the defamation is not evident on the face of the comments but a reasonable listener could have understood the words to be defamatory, our independent *Bose* review requires the public-official plaintiff to prove by clear and convincing evidence not only that the speaker had at least serious doubts of the truth of that defamatory interpretation, *see St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323, but also that the speaker knew or strongly suspected that his words would convey that defamatory meaning. *See Turner*, 38 S.W.3d at 120; *see also Garrison*, 379 U.S. at 75, 85 S.Ct. 209 ("[O]nly those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions."). As one scholar explains:

> [W]hether the speaker means to say something true and it is understood to mean something false, or to say something benign and it is understood to mean something defamatory, innocent or negligent misstatement is fully protected by the "actual malice" standard. It is for this reason that implications perceived in a statement but not intended by the speaker cannot be actionable in public official or public figure cases.

SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 5.5.1.2 (3d ed.2002) (citing *Turner*, 38 S.W.3d at 120). **\*616** Under common law, statements are judged by the meaning reasonably understood by listeners. Under the First Amendment, statements must be judged by what the publisher intended them to mean. *See id.* § 5.5.1.2.

Several notable cases have required the same showing. In *Saenz v. Playboy Enters., Inc.*, an article in the defendant magazine said:

And the U.S. adviser who had been Mitrione's predecessor for four years, whose office was on the first floor of the Montevideo *jefatura*, where torture reportedly took place and the screams of the victims reverberated, who by his own account had intimate and influential relations with the Uruguayan police, was Adolph Saenz.

From Montevideo, allegations of torture by his police clients would follow Saenz through subsequent assignments....

841 F.2d 1309, 1312 (7th Cir.1988). According to the court, this could have meant either that Saenz was complicit with torture, which was defamatory, or that he was in a position to know about it, which was not. *Id.* at 1315.

The court held that to prove actual malice, a public figure plaintiff must prove not only that the defendant had at least serious doubts about the truth of his statements, but also that "where the plaintiff is claiming defamation by innuendo, he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material." *Id.* at 1318. If anything, evidence that no reasonable person could have concluded that Saenz was involved in torture bolsters the defendants' claim that they did not intend to accuse him. *See id.* at 1318–19.

In *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 667 (9th Cir.1990), which we cited in *Turner*, the district court had found actual malice where a broadcast created the impression that Newton, a famous entertainer, held a hidden ownership in a Las Vegas hotel for Mafia sources and deceived state gaming authorities under oath. In merely limiting but not completely overturning a large jury verdict for Newton, the district court concluded that even if NBC had left a defamatory impression unintentionally, it "should have foreseen" that viewers could perceive the defamatory impression. *Newton*, 930 F.2d at 680. Therefore, NBC showed a reckless disregard for the truth.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Ninth Circuit reversed. "Negligence, weighed against an objective standard like the one used by the district court, can never give rise to liability in a public figure defamation case" under *New York Times. Id.* "Such an approach eviscerates the First Amendment protections established by *New York Times.* It would permit liability to be imposed not only for what was not said but also for what was not intended to be said." *Id.* at 681.

In *Fong v. Merena,* 66 Haw. 72, 655 P.2d 875, 876 (1982), Merena displayed a sign on his lawn and around town which read:

Ushijima/Fong Voted "Yes" Pension/Pay Raise
Merena claimed that the sign meant that Ushijima had voted for the pension bill and Fong had voted for the pay raise legislation. *Id.* at 877. He did not realize, he said, that readers might think both politicians had voted for both bills. *Id.* Fong argued that Merena knew that he had not voted for the pension bill, and that the sign could reasonably be interpreted to say that he had. The Hawaii Supreme Court, reversing a lower court judgment, held:

**\*617** It has not been clearly and convincingly shown that in making the publication, Merena believed it was false. On the contrary, he claims that it was accurate, and depending on how one views the sign there is merit to his contention. The fact that it could have been construed otherwise is not, we think, sufficient to prove that Merena acted with actual malice.

*Id.*

### B

Bentley argues that Gates made two on-air defamatory statements. In the first, Gates interrupted Bunton's exchange with a caller, who was unsuccessfully trying to point out to Bunton that he had just called another local official, not Bentley, the most corrupt local government official. When Bunton corrected himself and clarified that Bentley was in fact the most corrupt, Gates said, "yeah." In the second exchange, Bunton was listing the reasons he believed Bentley was corrupt, and Gates added two items to Bunton's list and noted there were others.

I conclude that both of these statements are genuinely ambiguous; it is possible that Gates intended to express agreement with Bunton's defamatory comments, but it is also plausible that he did not. As I have discussed, Bentley bears the burden to show by clear and convincing evidence that Gates knew or strongly suspected that listeners would interpret his statements as agreement with the substance of Bunton's comments.

Bentley has failed to meet this burden. He has not even argued, let alone proved, that Gates intended his comments to convey an accusation that Bentley was corrupt. Here, as in *Saenz,* Bentley has tried to prove only that a reasonable listener could have understood Gates' words to convey a defamatory meaning that Gates could not reasonably have believed, *see Saenz,* 841 F.2d at 1318–19, in part because Gates admitted that he had no personal knowledge of Bentley's corruption. *See St. Amant,* 390 U.S. at 730, 733, 88 S.Ct. 1323 (lack of personal knowledge of basis for defamatory statement is not evidence of actual malice). That is no evidence of Gates' subjective intent. The First Amendment does not permit a defendant to be liable for a defamatory meaning he did not either know or strongly suspect his words would convey. I conclude that Bentley has not carried his burden to clearly and convincingly prove actual malice against Gates.

### V

*New York Times* and its progeny are designed to encourage valuable public debate by protecting false, defamatory speech that is made in error. Bentley has not clearly and convincingly proved that Bunton published the type of calculated falsehood about a public official that is beyond the protection of the First Amendment. Therefore, I believe that Bentley is just the type of public official who must, so that vigorous public debate can be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

guaranteed, forfeit the civil recovery a private citizen might obtain if similarly defamed. While the Court reaches the correct result in rendering judgment for Gates, it errs in failing to render judgment for Bunton as well.

Justice BAKER dissenting.

I agree with the Court's conclusion that there is clear and convincing evidence that Bunton acted with actual malice in defaming Bentley. However, I disagree with the Court's conclusion that such evidence does not exist to support Gates's liability. And, contrary to the court of appeals' determination, I would hold that Gates and Bunton are jointly and severally liable based **\*618** on the jury's finding that they conspired to defame Bentley. Finally, I am appalled at the Court's remarkable holding about the mental anguish damages award. Specifically, the Court improperly conducts a factual sufficiency review on mental anguish damages based on a tenuous and entirely incorrect conclusion that the United States Supreme Court requires such a review. Because I, for one, cannot ignore our well-established legal principles that (1) impose joint and several liability on co-conspirators, and (2) preclude this Court from conducting factual sufficiency reviews and issuing advisory opinions, I dissent.

## I. GATES'S LIABILITY: DEFAMATION, CONSPIRACY, AND JOINT AND SEVERAL LIABILITY

I disagree with the Court's holding that no clear and convincing evidence exists to support the jury's finding that Gates acted with actual malice. To the contrary, though Gates contends he never believed Bentley was corrupt, he participated on Bunton's program numerous times when Bunton repeatedly talked about Bentley's alleged corruption. And, on at least two of those occasions, Gates agreed with Bunton's statements, and Gates even listed additional examples of Bentley's alleged corruption. Based on the Court's extensive discussion about defamation jurisprudence and the actual malice standard, I conclude that this is clear and convincing

evidence to support the jury's finding that Gates acted with actual malice.

The jury also found that Bunton and Gates conspired to defame Bentley. The jury assessed the damages Bunton and Gates each caused individually, but the trial court refused to hold them jointly and severally liable for the total damages. In response to Bentley's argument that the trial court erred in refusing to impose joint and several liability on Bunton and Gates, the court of appeals conceded that conspirators can be held jointly liable for acts done in furtherance of a conspiracy. 94 S.W.3d at 577. However, the court of appeals concluded that, "[i]n order to be entitled to judgment for joint and several liability, Bentley was required to secure a jury finding on the amount of damages he suffered as a result of the conspiracy itself." 94 S.W.3d at 577 (citing *Belz v. Belz*, 667 S.W.2d 240, 243 (Tex.App.-Dallas 1984, writ ref'd n.r.e.)). The court of appeals explained that Gates could not be liable for the damages the jury awarded against Bunton, because many of the defamatory acts occurred before Gates's involvement in the Q&A program. 94 S.W.3d at 577. The court of appeals concluded that, to impose joint and several liability, a separate finding on the conspiracy damages was required but not submitted, and Bentley waived any objection to the charge as submitted. 94 S.W.3d at 577. Consequently, the court of appeals rejected Bentley's argument that the trial court should have held Gates and Bunton jointly and severally liable. 94 S.W.3d at 607.

### A. APPLICABLE LAW

A civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Firestone Steel Products Co. v. Barajas,* 927 S.W.2d 608, 614 (Tex.1996); *see also State v. Standard Oil Co.,* 130 Tex. 313, 107 S.W.2d 550, 559 (Tex.1937). "The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983) (citations omitted).

**\*619** A party who joins in a conspiracy is jointly and severally liable "for *all acts done by any of the conspirators* in furtherance of the unlawful combination." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979) (quoting *State v. Standard Oil*, 107 S.W.2d at 559) (emphasis added); *see also Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex.1983) ("[O]nce a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination."). Thus, if a conspiracy is proven, it can extend liability in tort beyond the active wrongdoer to those conspirators who may have merely planned, assisted, or encouraged the wrongdoer's acts. *See Carroll*, 592 S.W.2d at 926. All the plaintiff must show for the alleged conspirators to be held jointly and severally liable is that they acted "in pursuance of the *common purpose* of the conspiracy." *Carroll*, 592 S.W.2d at 928 (citing *Berry v. Golden Light Coffee Co.*, 160 Tex. 128, 327 S.W.2d 436, 440 (Tex.1959)) (emphasis added). "The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968).

## B. ANALYSIS

The court of appeals' holding ignores the fact that all members of a conspiracy are liable for their co-conspirators' wrongful acts. And, even if a co-conspirator's acts occurred before the conspiracy formed, all the conspiring parties are liable for those acts, as long as those acts are made in furtherance of the "common goal" of the conspiracy-in this case, defaming Bentley. *See Akin*, 661 S.W.2d at 921; *Carroll*, 592 S.W.2d at 926.

Here, the jury found that Bunton published defamatory statements about Bentley with "actual malice" and "malice." The jury also found that Gates agreed with Bunton's defamatory statements and published his agreement with "actual malice" and "malice." Finally, the jury found that Bunton and Gates conspired to publish defamatory statements about Bentley. Thus, both Bunton and Gates acted with actual malice, and Bentley established the elements of the conspiracy. Accordingly, under Texas law, Gates and Bunton are jointly and severally liable "for all acts done by any of the conspirators" in furtherance of the "common purpose" of the conspiracy. *Carroll*, 592 S.W.2d at 926; *see also Akin*, 661 S.W.2d at 921. In other words, our jurisprudence does not require the trial court to separately submit each co-conspirator's civil conspiracy damages. When the jury found that liability for a civil conspiracy existed, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators.

Because the co-conspirators' common purpose in this case was to defame Bentley, the trial court was obligated to impose joint and several liability on Gates for all the damages arising from the common purpose, including those damages arising from defamatory statements made before Gates "joined" the conspiracy. *See Akin*, 661 S.W.2d at 921; *Carroll*, 592 S.W.2d at 926. Therefore, I would reverse the court of appeals' holding about Bunton's and Gates's joint and several liability and render the judgment the trial court should have rendered based on the jury's verdict. That is, Bunton and Gates, as co-conspirators, were jointly and severally liable for the total damages the jury found against each individual co-conspirator defendant.

## II. MENTAL ANGUISH DAMAGES
### A. APPLICABLE LAW

The United States Supreme Court has held that plaintiffs in state courts may not **\*620** recover presumed or punitive damages for defamation if they do not show liability based on actual malice, which is "knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Thus, defamed plaintiffs who need only prove a lower culpability standard than actual malice may

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

only recover compensation for "actual injury." *Gertz*, 418 U.S. at 349. However, actual injuries are not limited to out-of-pocket losses. *Gertz*, 418 U.S. at 350. "Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and *mental anguish and suffering.*" *Gertz*, 418 U.S. at 350 (emphasis added); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 460, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

In Texas, the standard for reviewing an excessive damages complaint is factual sufficiency of the evidence. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.1998); *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 847–48 (Tex.1990); *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). Further, Texas jurisprudence dictates that the standard for reviewing whether a trial court should have ordered a remittitur is factual sufficiency. *Rose*, 801 S.W.2d at 847–48; *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex.1987). Because whether damages are excessive and whether a remittitur is appropriate are factual determinations that are final in the court of appeals, this Court lacks jurisdiction to review such findings, consider excessive damages complaints, and suggest remittiturs. TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a); TEX.R.APP. P. 46; *Akin*, 661 S.W.2d at 921; *Sweet v. Port Terminal R.R. Ass'n*, 653 S.W.2d 291, 295 (Tex.1983); *Hall v. Villarreal Dev. Corp.*, 522 S.W.2d 195, 195 (Tex.1975).

### B. ANALYSIS

Because the Court concludes that clear and convincing evidence exists to prove Bunton acted with actual malice in defaming Bentley, the Court's remaining constitutionally appropriate inquiry is solely whether there is legally sufficient evidence to support the damages awarded. *See* TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a); *see also Hall*, 522 S.W.2d at 195 (Texas Supreme Court lacks jurisdiction to entertain factual insufficiency points.). But, ignoring our jurisprudence and the constitutional restraints on this

Court's appellate review power, the Court impermissibly conducts a factual sufficiency review of the record—heavily putting its thumb on the scale—to conclude that the mental anguish damages award "is not merely excessive and unreasonable; it is far beyond any figure the evidence can support." 94 S.W.3d at 606. The Court explains that "while the record supports Bentley's recovery of some amount of mental anguish damages, it does not support the amount of those damages found by the jury." 94 S.W.3d at 605. And then, based on no authority whatsoever, the Court remands the case to the court of appeals "to reconsider" the excessiveness of the jury's mental anguish damages award or "to suggest" a remittitur. 94 S.W.3d at 607.

The Court asserts two reasons for why this case permits the Court to review the excessiveness of the jury's mental anguish damages award. First, relying on *Gertz*, the Court holds that "the First Amendment requires appellate review of amounts awarded for non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant." 94 S.W.3d at 605. The Court reasons that the possibility that a jury may award significant damages "unrestrained**621 by meaningful appellate review" poses a threat to First Amendment speech. 94 S.W.3d at 605.

But the Court misreads and misapplies *Gertz* and can only have done so purposely. Thus, the Court uses this First Amendment case as a mere guise to reach a damages issue that this Court otherwise cannot consider. In *Gertz*, the U.S. Supreme Court expressly limited its holding that defamed private plaintiffs may recover compensation only for "actual injuries" to situations in which state law sets a lower culpability standard than actual malice. *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997. The Supreme Court stated: "[T]he private defamation plaintiff who established liability *under a less demanding standard* than [that stated by *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ] may recover only such damages as are

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
(Cite as: 94 S.W.3d 561)

sufficient to compensate him for *actual injury.*" *Gertz,* 418 U.S. at 349, 94 S.Ct. 2997 (emphasis added). Thus, a reviewing court is authorized to review damage awards and limit a defamed plaintiff's damages to those reflecting "actual injury" when the culpability standard is less than actual malice. *Gertz,* 418 U.S. at 349, 94 S.Ct. 2997.

In contrast, when a state court applies the actual malice standard the Supreme Court announced in *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710, for determining liability for defaming public figures, *Gertz's* concern about the type and amount of damages is no longer an issue. Under the *New York Times* test, the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710. Thus, a public figure plaintiff who shows the defamatory statements were made with actual malice can recover both actual and punitive damages, as long as "competent evidence" supports the damages award. *Herbert v. Lando,* 441 U.S. 153, 164 & n. 12, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

Here, Bentley is a public figure, and the trial court required the jury to find actual malice before imposing liability on Bunton and Gates. Consequently, *Gertz's* requirement that state courts limit damages to those reflecting actual injury when the state's law creates a lower culpability standard for private plaintiff defamation cases simply does not apply.

Additionally, even if we assume that *Gertz's* constitutional concerns about damages applies in a public figure defamation case in which actual malice is the culpability standard, the Court improperly relies on *Gertz* to reverse the mental anguish damages award. The Court assumes that "actual injury" under *Gertz* excludes mental anguish, and therefore, *Gertz* authorizes the Court to specially scrutinize the mental anguish damages

here. However, the Court refuses to recognize that, in the face of its desire to apply First Amendment rights to limit damages, the Gertz Court explicitly included mental anguish damages as "actual injuries" that a private defamed plaintiff can recover. *Gertz,* 418 U.S. at 349–50, 94 S.Ct. 2997. And, in a later case, the Supreme Court reaffirmed that a private plaintiff may recover mental anguish damages even under a lower culpability standard and required only that the actual damages awarded be supported by "competent evidence." *See Time, Inc.,* 424 U.S. at 460, 96 S.Ct. 958.

In *Time, Inc.,* the U.S. Supreme Court did not apply the *New York Times* actual malice test because the plaintiff was not a public figure. **\*622** *Time, Inc.,* 424 U.S. at 454–55. After refusing to apply the actual malice standard, the Supreme Court flatly rejected Time's argument that *Gertz* did not permit a recovery for mental anguish damages, because, according to Time, "the only compensable injury in a defamation case is that which may be done to one's reputation." *Time, Inc.,* 424 U.S. at 460, 96 S.Ct. 958. The Supreme Court stated: "In [ *Gertz*] we made it clear that States could base awards on elements other than injury to reputation, specifically listing 'personal humiliation, and mental anguish and suffering' as examples of injuries which might be compensated consistently with the Constitution upon a showing of fault." *Time, Inc.,* 424 U.S. at 460, 96 S.Ct. 958.

Here, the Court does not go so far as the defendant in *Time, Inc.* to assert that *Gertz* does not allow a defamed plaintiff to recover mental anguish damages. The Court instead reads *Gertz* to mandate "appellate review of non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries." 94 S.W.3d at 605. But again, even if we assume *Gertz* applies to public figure defamation cases, nothing in *Gertz* even suggests that this Court must apply special appellate scrutiny other than the review this Court typically conducts when examining mental anguish damages awards. The Supreme Court ex-

pressly held in *Time, Inc.* that mental anguish is an actual injury for which defamed private plaintiffs may recover damages.

In sum, the Court relies on a defamation case that holds contrary to what the Court reads it to say, and stretches that case's holding beyond recognition, to impermissibly review the mental anguish damages award in a manner contrary to the Court's established no evidence review. Furthermore, *Gertz*'s constitutional concern that a jury's discretion in awarding damages not "inhibit the vigorous exercise of First Amendment freedoms" is not an issue here, because that case and its progeny recognize that a defamed private plaintiff may recover mental anguish damages as actual injury even when state law does not require an actual malice showing. *See Gertz*, 418 U.S. at 349, 94 S.Ct. 2997; *see also Time, Inc.*, 424 U.S. at 460, 96 S.Ct. 958; *Herbert*, 441 U.S. at 164 & n. 12, 99 S.Ct. 1635. Finally, and most importantly, *Gertz*'s concern that damage awards for defamed private plaintiffs not chill First Amendment rights is otherwise protected in First Amendment cases (like the present case) that involve public figures. That is because, before imposing liability, the Supreme Court requires that a public figure defamation plaintiff produce clear and convincing evidence that the defendant acted with actual malice. *See, e.g., New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710. And, when a public figure defamation plaintiff has met this onerous burden of proving actual malice, the Supreme Court has upheld the compensatory and punitive damages awarded. *See, e.g., Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 661, 693, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

The Court also relies on Texas common law to impermissibly conduct a factual sufficiency review of the mental anguish damages award. The Court acknowledges that courts of appeals have authority to consider excessive damages complaints, but it further contends that this Court has "rejected the view that [the courts of appeals'] authority displaces [this Court's] obligation to determine whether there

is any evidence at all of the amount of damages determined by the jury." 94 S.W.3d at 606 (citing and quoting *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 612 (Tex.1996)). But *Saenz* is totally inapplicable.

**\*623** In *Saenz*, this Court applied a traditional no evidence review to a $250,000 mental anguish damages award that a plaintiff recovered against her workers' compensation insurance carrier. *Saenz*, 925 S.W.2d at 612. The Court acknowledged the *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995), factors for proving mental anguish and discussed the limited evidence the plaintiff offered to show her mental anguish. Then, the Court concluded that there was "no evidence ... that Saenz suffered mental anguish or that $250,000 would be fair and reasonable compensation." *Saenz*, 925 S.W.2d at 614. Thus, the Court rendered judgment that the plaintiff take nothing. *Saenz*, 925 S.W.2d at 614.

Here, unlike *Saenz* where the Court held there was no evidence of mental anguish at all, the Court observes that "[t]he record leaves no doubt that Bentley suffered mental anguish as a result of Bunton's and Gates's statements." 94 S.W.3d at 606. As the Court explains, Bentley testified that the ordeal had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, disrupted his family, and distressed his children at school. Bentley said this experience was the worst of his life. Friends testified that Bentley had been depressed, that his honor and integrity had been impugned, that his family had suffered, too, adding to his own distress, and that he never would be the same. And Bunton's relentlessness in accusing Bentley of corruption caused him much anxiety. 94 S.W.3d at 606.

But, after listing this parade of horribles, the Court remarkably holds that, while this evidence supports Bentley's recovering "some amount of mental anguish damages," this is no evidence that Bentley suffered mental anguish damages amount-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

ing to $7 million. 94 S.W.3d at 606, –07. Then, based on this amazing conclusion, the Court holds that a remand is necessary for the court of appeals to "reconsider" the excessiveness of the jury's mental anguish damages award, advises that the court of appeals suggest a remittitur, and opines that the case may need to be retried. 94 S.W.3d at 607. It is no surprise to me that the Court cites no authority for remanding the case with these instructions. For there is none. And, the Court entirely glosses over the fact, as it must to reach its conclusion, that the court of appeals already considered the excessive damages complaint. Indeed, the court of appeals concluded, "[t]here is nothing in the record to suggest that the jury was guided by anything other than a conscientious consideration of the evidence and the instructions of the trial court. We conclude that the evidence is legally and factually sufficient to support the jury's award of $7,150,000." 94 S.W.3d at 607. Yet the Court ignores this holding, inappropriately assumes a fact-finder role, and sends the case back to the court of appeals.

The U.S. Supreme Court has recognized that the Constitution does not "impose upon the States any limitations as to how, within their own judicial systems, factfinding tasks shall be allocated." *Time, Inc.*, 424 U.S. at 461, 96 S.Ct. 958. A state may apply its methods for making factual determinations, as long as some element of the state court system determines that the defendants are at fault. *Time, Inc.*, 424 U.S. at 464, 96 S.Ct. 958. This statement certainly demonstrates that our state's rules for appellate courts' reviewing claims of excessive damages—factual sufficiency in the courts of appeals only—applies to reviewing mental anguish damage awards in defamation cases. TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a); *Sweet*, 653 S.W.2d at 294–95; *see also Maritime Overseas*, 971 S.W.2d at 406; ***624***Rose*, 801 S.W.2d at 847–48; *Pope*, 711 S.W.2d at 624.

Thus, contrary to the Court's holding, it is clear that the First Amendment does not require this Court to review the evidence supporting the mental

anguish damages award to determine if it is "reasonable"—a proxy for factual sufficiency review. Simply put, the Court oversteps its constitutional appellate review boundaries to conduct what effectively results in a factual sufficiency review of the mental anguish damages award and issues a wholly advisory opinion to the court of appeals about those damages. Applying our traditional legal sufficiency standard for reviewing damages awards, I would hold that there is some evidence to support the damages the jury awarded. *See Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex.2001).

### III. DISPOSITION

The Court's writings in this case suggest three different views about this case's final disposition: (1) JUSTICE HECHT holds that Bunton is liable while Gates is not and that a remand is required for the court of appeals to reconsider the mental anguish damages award; (2) CHIEF JUSTICE PHILLIPS holds that Bunton and Gates are not liable and thus the Court should enter a take nothing judgment against Bentley; and (3) I would hold that Bunton and Gates are liable and thus the Court should enter the judgment the trial court should have rendered based on the jury's verdict and determine Bunton and Gates jointly and severally liable.

Despite these three clearly distinctive, non-majority positions about the case's final outcome, JUSTICE HECHT'S remand disposition wins the day, because seven Justices join in the judgment "remanding this cause to the court of appeals for further proceedings." *See* 94 S.W.3d at 607. It completely escapes me how three Justices who agree with this remand disposition can join CHIEF JUSTICE PHILLIPS' opinion that neither Gates nor Bunton are liable. Though these Justices agree that no liability exists whatsoever, they join in a judgment that remands to the court of appeals solely to reassess the damages awarded.

The Court's split on the disposition certainly suggests that this case, particularly JUSTICE HECHT'S writing about why a remand is necessary, should not carry any precedential value. Indeed,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172
**(Cite as: 94 S.W.3d 561)**

when the U.S. Supreme Court is dead-locked in a case because a Justice is recused, the Supreme Court renders a judgment that affirms the lower court's judgment "by an equally divided Court" and that "judgment is without force as precedent." *See Ohio ex rel. Eaton v. Price,* 364 U.S. 263, 264, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960). Similarly, because JUSTICE HECHT does not have a majority for his remand rationale, this case should have no precedential value.

### IV. CONCLUSION

"Oh what a tangled web we weave, When first we practise to deceive!"

SIR WALTER SCOTT,*Marmion,* canto vi., stanza 17.

The Court's writing is nothing more than an epistle of the First Amendment Gospel according to JUSTICE HECHT, the effect of which is to transmogrify Texas law about reviewing mental anguish damages awards in defamation cases. I would hold that there is clear and convincing evidence to support the jury's findings that Gates and Bunton acted with actual malice in defaming Bentley. And, because the jury found Bunton and Gates were co-conspirators, I would impose joint and several liability for the damages the jury *625 awarded. Because the Court holds otherwise, I dissent.

Tex.,2002.
Bentley v. Bunton
94 S.W.3d 561, 45 Tex. Sup. Ct. J. 1172

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

315 S.W.3d 209
**(Cite as: 315 S.W.3d 209)**

H

Court of Appeals of Texas,
Austin.
Bertha MEANS and Harlem Cab Company d/b/a
Austin Cab, Appellants,
v.
ABCABCO, INC. d/b/a Lone Star Cab Co., and So-
lomon Kassa, Appellees.

No. 03–08–00426–CV.
June 3, 2010.

**Background:** Taxicab company brought action for
defamation and other claims against petitioner who
sought his own taxicab franchise and petitioner's
company. The 200th Judicial District Court, Travis
County, Paul R. Davis, Jr., J., granted petitioner's
motion for no-evidence summary judgment on de-
famation claim, and taxicab company appealed.

**Holdings:** The Court of Appeals, David Puryear, J.,
held that:
(1) whether statements by petitioner's attorney at
hearing on application for taxicab franchise were
capable of defamatory meaning as matter of law
was appropriate consideration on no-evidence sum-
mary judgment motion, and
(2) statements by petitioner's attorney lacked de-
famatory meaning.

Affirmed.

West Headnotes

**[1] Judgment 228 ⟺178**

228 Judgment
  228V On Motion or Summary Proceeding
    228k178 k. Nature of summary judgment.
Most Cited Cases
    The purpose of summary judgment is to permit
the trial court to promptly dispose of cases that in-
volve unmeritorious claims or untenable defenses.
Vernon's Ann.Texas Rules Civ.Proc., Rule 166a.

**[2] Judgment 228 ⟺178**

228 Judgment
  228V On Motion or Summary Proceeding
    228k178 k. Nature of summary judgment.
Most Cited Cases
    No-evidence summary judgment allows a court
to pierce the pleadings and evaluate the evidence to
see if there is a genuine need for trial. Vernon's
Ann.Texas Rules Civ.Proc., Rule 166a(i).

**[3] Judgment 228 ⟺181(33)**

228 Judgment
  228V On Motion or Summary Proceeding
    228k181 Grounds for Summary Judgment
      228k181(15) Particular Cases
        228k181(33) k. Tort cases in general.
Most Cited Cases
    Whether statements by petitioner's attorney at
hearing on application for taxicab franchise were
capable of defamatory meaning as matter of law
was appropriate consideration on no-evidence sum-
mary judgment motion, in action brought by cab
company for which petitioner had previously
worked as driver. Vernon's Ann.Texas Rules
Civ.Proc., Rule 166a(i); V.T.C.A., Civil Practice &
Remedies Code § 73.001.

**[4] Libel and Slander 237 ⟺9(1)**

237 Libel and Slander
  237I Words and Acts Actionable, and Liability
Therefor
    237k9 Words Tending to Injure in Profession
or Business
      237k9(1) k. In general. Most Cited Cases
    Statements by petitioner's attorney at city coun-
cil hearing on application for taxicab franchise, es-
sentially that taxicab company for which petitioner
had worked as driver terminated petitioner's con-
tract as soon as it found out that petitioner was
seeking franchise that would compete with com-
pany, lacked defamatory meaning; statement did

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

not suggest that taxicab company's decision to terminate contract was wrong, unethical, or breach of contract, and statements did nothing more than accuse company of doing that which it had legal right to do, namely, terminate contract. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[5] Libel and Slander 237 ⚷6(1)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k6 Actionable Words in General
          237k6(1) k. In general. Most Cited Cases

**Libel and Slander 237 ⚷123(2)**

237 Libel and Slander
    237IV Actions
        237IV(E) Trial, Judgment, and Review
          237k123 Questions for Jury
            237k123(2) k. Construction of defamatory language in general. Most Cited Cases

In an action for defamation, the court construes as a matter of law language that is unambiguous on its face and will find it not actionable if it lacks defamatory meaning. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[6] Libel and Slander 237 ⚷19**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k19 k. Construction of language used. Most Cited Cases

When considering whether a statement is defamatory, the court will construe the statement as a whole, in light of the surrounding circumstances, based on how a person of ordinary intelligence would perceive the entire statement. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[7] Libel and Slander 237 ⚷6(1)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability

Therefor
        237k6 Actionable Words in General
          237k6(1) k. In general. Most Cited Cases

A communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that hurts only the plaintiff's feelings is not actionable as defamatory. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**[8] Libel and Slander 237 ⚷6(1)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k6 Actionable Words in General
          237k6(1) k. In general. Most Cited Cases

It is not defamatory to accuse a person of doing that which he has a legal right to do. V.T.C.A., Civil Practice & Remedies Code § 73.001.

**\*210** William T. Peckham, Austin, TX, for appellants.

Malcolm Greenstein, Greenstein & Kolker, Austin, TX, for appellees.

**\*211** Before Chief Justice JONES, Justices PURYEAR and HENSON.

*OPINION*

DAVID PURYEAR, Justice.

    Bertha Means and Harlem Cab Company d/b/a Austin Cab (collectively, "Austin Cab") sued AB-CABCO, Inc. d/b/a Lone Star Cab Co. and Solomon Kassa (collectively, "Kassa") for slander and several other claims based on allegedly defamatory comments Kassa made regarding Austin Cab. The trial court granted Kassa's no-evidence motion for summary judgment on Austin Cab's claims on the ground that Kassa's statements were not defamatory. Austin Cab's single point of error on appeal is that the trial court erred in granting summary judgment as to Austin Cab's claim for slander. Because we hold that the statements are not defamatory as a matter of law, we affirm the trial court's order.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

315 S.W.3d 209
(Cite as: 315 S.W.3d 209)

## FACTUAL AND PROCEDURAL BACKGROUND

Kassa worked as a taxicab driver for Austin Cab as an independent contractor between 1998 and 2003. While he was driving for Austin Cab, Kassa formed his own cab company, Lone Star Cab, and began efforts to gain a taxicab franchise from the City of Austin. At the time, only three cab companies held franchises, but the City was considering granting an additional franchise. As part of his efforts, Kassa appeared at City of Austin committee and council meetings to advocate on behalf of his cab company. Meanwhile, Kassa's relationship with Austin Cab ended in May 2003 when Austin Cab terminated his contract because of Kassa's repeated failure to comply with certain contractual terms. Kassa told others, however, that Austin Cab had terminated his contract because he had started his own cab company and was trying to gain a franchise to compete with Austin Cab.[FN1] Specifically, at an April 5, 2007 Austin City Council meeting at which the award of a new taxicab franchise was under consideration, Doug Young, Kassa's attorney and agent, made the following comments:

> FN1. Austin Cab maintains that Kassa's efforts to gain a competing taxicab franchise were not a factor in the termination of the contract and that the sole reason for termination was his failure to pay a deposit required by the contract. Kassa does not dispute the basis for his termination.

I do want to point out ... that you are not going to see a lot of the drivers from Lone Star and here's why, you will hear from Solomon [Kassa], one of the officers of Lone Star. He has been the public face since 2003. The first time he talked at an Urban Transportation Committee in 2003, his contract with one of the three existing cab companies was summarily terminated within days of his appearance at that meeting.... The point was made to the drivers, if you are currently a driver for one of the existing companies and it's no secret that the existing companies have all been

on the record and the Urban Transportation Commission and I think they will be before you today, that they favor Mr. Fodo, their subcontractor for the award of this franchise. It's not safe for Lone Star's drivers to come and advocate for Lone Star today.

Six days after these comments, Austin Cab sued Kassa for declaratory judgment, tortious interference, libel, slander and defamation, and business disparagement. Austin Cab's claims were based on the statements made by Kassa or his agent regarding the reasons Austin Cab terminated its contract with Kassa, including **\*212** the agent's April 5, 2007 statement to the Austin City Council. After a short time for discovery, Kassa filed a no-evidence motion for summary judgment as to each of Austin Cab's claims, arguing that Austin Cab had no evidence that: (1) the statements were defamatory, (2) the statements were false, (3) the statements were directed at Austin Cab, (4) Austin Cab suffered actual damages, (5) the statements constitute defamation per se, (6) the statements constitute slander per se, (7) the statements were published within one year of the date suit was filed, and (8) the statements were published maliciously. Austin Cab filed a response to Kassa's motion, attaching both documentary and testimonial evidence, and amended its pleadings to add claims for reckless infliction of emotional distress and negligence. After a hearing on Kassa's motion, the trial court rendered partial summary judgment as to Austin Cab's claims for declaratory judgment, tortious interference, libel, slander and defamation, and business disparagement on the ground that the April 5, 2007 statement to the Austin City Council was not defamatory.

Austin Cab next filed a motion to modify or vacate the trial court's partial summary judgment, and Kassa filed a motion for no-evidence summary judgment as to Austin Cab's remaining claims. After examining the pleadings and hearing argument from counsel on Austin Cab's motion to modify or vacate and Kassa's second motion for summary judgment, the trial court modified the previ-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ous partial summary judgment "to reflect that [Kassa's] Motion for Summary Judgment is granted solely as to the statements made by [Kassa's agent] but further finds that said statements are not defamatory and that the Motion to Vacate Summary Judgment is denied." The trial court then addressed Kassa's second motion for summary judgment and granted it "as to any and all other allegedly defamatory statements that were made by or attributed to" Kassa and dismissed all of Austin Cab's remaining claims without specifying the grounds relied on for its ruling. Austin Cab's single point of error on appeal is that the district court erred in granting Kassa's motion for summary judgment on the slander claim stemming from Kassa's April 5, 2007 statement to the Austin City Council. Austin Cab does not appeal the trial court's dismissal of its other claims.

## STANDARD OF REVIEW

We review summary judgments de novo. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156 (Tex.2004). Under the "no-evidence" rule 166a(i) standard, a defendant may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim on which the plaintiff would have the burden of proof at trial. *See* Tex.R. Civ. P. 166a(i). A no-evidence summary judgment is essentially a pretrial directed verdict and we apply the same legal-sufficiency standard. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750 (Tex.2003). We review the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences. *Id.* at 751. We will affirm a no-evidence summary judgment if the non-movant fails to produce more than a scintilla of probative evidence raising a genuine issue of fact as to an essential element of a claim on which the non-movant would have the burden of proof at trial. *Holmstrom v. Lee,* 26 S.W.3d 526, 530 (Tex.App.-Austin 2000, no pet.). More than a scintilla of evidence exists when reasonable and fair-minded people could differ in their conclusions based on that evidence. *Forbes Inc. v. Granada Biosciences,* 124 S.W.3d 167, 172

(Tex.2003).

## *213 DISCUSSION

Austin Cab contends that Kassa's statement to the Austin City Council is slander because it accuses Austin Cab of firing Kassa for trying to compete with Austin Cab. To prove a cause of action for slander, a plaintiff must prove that the defendant orally communicated a defamatory statement to a third person without justification or excuse. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). The issue for our determination is whether the words used by Kassa's agent are "reasonably capable of a defamatory meaning." *Musser v. Smith Protective Serv., Inc.,* 723 S.W.2d 653, 655 (Tex.1987). Because Kassa's words are unambiguous, this determination is a question of law for the court. *Id.*

### Proper Use of No–Evidence Summary Judgment

Before we reach the issue of whether the statement is defamatory, we address *sua sponte* whether it was proper for the trial court to grant a no-evidence summary judgment on a question of law. Questions of law are proper subjects of traditional motions for summary judgment, *see, e.g., Johnson v. City of Fort Worth,* 774 S.W.2d 653, 655–56 (Tex.1989), but Kassa raised the issue in a no-evidence motion for summary judgment and the trial court granted summary judgment on that ground. The Dallas Court of Appeals has held that purely legal issues can never be the subject of a no-evidence motion for summary judgment. *Harrill v. A.J.'s Wrecker Serv., Inc.,* 27 S.W.3d 191, 194 (Tex.App.-Dallas 2000, pet. dism'd w.o.j); *but see Cone v. Fagadau Energy Corp.,* 68 S.W.3d 147, 156 (Tex.App.-Eastland 2001, no pet.) (holding that purely legal issue may be addressed as part of no-evidence summary judgment). *Harrill,* however, cites no authority for its bright-line proposition, nor does the court offer reasoning to support its conclusion. *Harrill,* 27 S.W.3d at 194. Furthermore, *Harrill* is distinguishable because the motion for summary judgment there involved a movant who had the burden of proof on the legal issue. *Id.; see also*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tex.R. Civ. P. 166a(i) (movant cannot have burden of proof on subject of no-evidence summary judgment).

[1][2] The purpose of summary judgment is to permit the trial court to promptly dispose of cases that involve unmeritorious claims or untenable defenses. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 n. 5 (Tex.1979); *see also Gaines v. Hamman*, 163 Tex. 618, 358 S.W.2d 557, 563 (1962) (summary judgment "provide[s] a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine issue of fact"). Likewise, the no-evidence summary judgment allows a court to "pierce the pleadings" and evaluate the evidence to see if there is a genuine need for trial. *Benitz v. Gould Group*, 27 S.W.3d 109, 112 (Tex.App.-San Antonio 2000, no pet.). In the absence of an articulated reason or further support, we decline to follow *Harrill's* lead and instead review the legal issue on appeal to determine if it was properly presented to the trial court and is susceptible to review under no-evidence summary judgment standards.

[3] Kassa's no-evidence motion asserted that Austin Cab could not produce any evidence of a defamatory statement, which is an element of Austin Cab's slander claim. *See Randall's Food Markets, Inc.*, 891 S.W.2d at 646. Kassa's motion meets the requirements of Rule 166a(i). *See* Tex.R. Civ. P. 166a(i). To defeat Kassa's motion, Austin Cab had to present evidence raising a genuine issue of material fact regarding the existence of a defamatory statement. *Id.* Austin Cab produced a transcript of the statement and witness **\*214** affidavits regarding the effect of the statement on those who heard it. After reviewing the evidence, the trial court found that the statement was not defamatory. If the statement produced by Austin Cab as evidence of a defamatory statement is not capable of defamatory meaning as a matter of law, then, logically, Austin Cab failed to produce evidence of a defamatory statement. Thus, summary judgment was proper. *See King Ranch*, 118 S.W.3d at 751 (no-evidence

summary judgment should be sustained when there is complete absence of evidence of vital fact). Because the question of defamatory meaning was presented to the trial court within the framework of rule 166a(i) and because it is subject to a proper analysis under the no-evidence summary-judgment standards, we hold that it was not improper for the trial court to consider this legal issue under a no-evidence motion for summary judgment.

### Analysis of Statement

[4][5][6] Next we address de novo whether the words used by Kassa's agent were reasonably capable of a defamatory meaning. *See Musser*, 723 S.W.2d at 654. We construe as a matter of law language that is unambiguous on its face and find it not actionable if it lacks defamatory meaning. *See Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex.1989); *Musser*, 723 S.W.2d at 655 (if ambiguous, trier-of-fact must determine statement's meaning and effect on listener). When considering whether a statement is defamatory, we construe the statement as a whole, in light of the surrounding circumstances, based on how a person of ordinary intelligence would perceive the entire statement. *Id.*

[7][8] A statement is defamatory if it tends to injure the person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury, or if it tends to impeach that person's honesty, integrity, or virtue. *See* Tex. Civ. Prac. & Rem.Code Ann. § 73.001 (West 2005) (libel); Restatement (Second) of Torts § 559 (1977) (defamation). A communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that hurts only the plaintiff's feelings, however, is not actionable. *H.O. Merren & Co., Ltd. v. A.H. Belo Corp.*, 228 F.Supp. 515, 517 (N.D.Tex.1964), *aff'd*, 346 F.2d 568 (5th Cir.1965); *Rawlins v. McKee*, 327 S.W.2d 633, 635 (Tex.Civ.App.-Texarkana 1959, writ ref'd n.r.e.); *see also* 1 Robert D. Sack, *Sack on Defamation* 2–12 (3d ed.2009). To be defamatory, a statement should be derogatory, degrading, and somewhat shocking, and contain "element[s] of personal dis-

315 S.W.3d 209
(Cite as: 315 S.W.3d 209)

grace." Sack, *supra* at 2–17 (quoting W. Page Keeton, *et al., Prosser & Keeton on the Law of Torts* § 111 (5th ed.1984)). Thus, it is not defamatory to accuse a person of doing that which he has a legal right to do. *Associated Press v. Cook,* 17 S.W.3d 447, 456 n. 8 (Tex.App.-Houston [1st Dist.] 2000, no pet.) ("[E]xercising a legal right is not defamatory as a matter of law."); *see also Musser,* 723 S.W.2d at 655 (accusing someone of doing that which they had right to do is not defamatory).

The statement in this case was made at an Austin City Council meeting during public comments regarding the award of a new taxicab franchise by the City. The speaker was advocating on behalf of Kassa to encourage the Austin City Council to award the franchise to Kassa's cab company. The unambiguous meaning of Kassa's statement and, in fact, the meaning ascribed to it by Austin Cab, is that Austin Cab terminated Kassa's contract as soon as it found out that Kassa was seeking the award of a taxicab franchise that would *215 compete with Austin Cab.[FN2] The statement does not suggest some wrongful or unethical conduct by Austin Cab. It does not suggest that Austin Cab violated a law or the term of a contract or that Austin Cab breached its contractual obligations. What it does state is that Austin Cab terminated its contract with Kassa because he was supporting a competitor.

> FN2. Although we do not necessarily agree that "one of the existing companies" refers to either appellant as Austin Cab asserts, we assume it does for purposes of review because our finding that the statement is not defamatory is dispositive of the appeal.

The ability to terminate a contract is a legal and ethical option often available to parties to a contract. *See, e.g.,* Tex. Bus. & Com.Code Ann. § 2.106(c) (West 2009)(" 'Termination' occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach."). It is similar to the right of an employer or an employee to terminate the employment relationship at any time, with or without

cause, absent agreement to the contrary. *See County of Dallas v. Wiland,* 216 S.W.3d 344, 347 (Tex.2007). For the same reasons, the suggestion that the action was retaliation for Kassa's support of a competitor does not make the statement defamatory. The decision to terminate a contract or to fire an employee because the contractor or employee actively supports a competitor is an option available to a business absent agreement to the contrary. Businesses in a free-enterprise system are expected to protect and promote their best interests. *See Wilkow v. Forbes, Inc.,* 241 F.3d 552, 557 (7th Cir.2001) ( "[S]edulous pursuit of self-interest is the engine that propels a market economy."). These are business decisions, and, like other business decisions, they are made in the context of the free enterprise system where competition is expected. *Musser,* 723 S.W.2d at 655.

Although Austin Cab finds Kassa's statement insulting and offensive, the statement lacks the element of disgrace or wrongdoing necessary for slander. Kassa's agent did nothing more than accuse Austin Cab of doing that which it had a legal right to do; thus, Kassa's statement is not defamatory. *Cf. Musser,* 723 S.W.2d at 655 (statement that former employee "relieved" his former employer of some of its accounts is not defamatory because it does not accuse employee of anything other than competitiveness); *Cook,* 17 S.W.3d at 456 n. 8 (statement that person invoked Fifth Amendment right is not defamatory as matter of law); *San Antonio Express News v. Dracos,* 922 S.W.2d 242, 248 (Tex.App.-San Antonio 1996, no writ) (statement that employee "walked off the job ... without any excuse" is not defamatory because it does not suggest he did anything illegal or unethical); *Einhorn v. LaChance,* 823 S.W.2d 405, 411 (Tex.App.-Houston [1st Dist.] 1992, writ dism'd w.o.j.) (statement that someone was "attempting to form a union" is not defamatory despite prejudice against unions); *Taylor v. Houston Chronicle Publ'g Co.,* 473 S.W.2d 550, 554 (Tex.Civ.App.-Houston [1st Dist.] 1971, writ ref'd n.r.e.) (statement that coach refused to do his job

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

315 S.W.3d 209
**(Cite as: 315 S.W.3d 209)**

263

unless player was traded is not defamatory because he had right to do so); *Herald–Post Publ'g Co. v. Hervey*, 282 S.W.2d 410, 415 (Tex.Civ.App.-El Paso 1955, writ ref'd n.r.e.) (statement that mayor changed city's retirement plan to get rid of one employee is not defamatory because mayor and council had right to formulate retirement plan as they saw fit).

Based on our review of the statement in light of the circumstances in which it was made, we hold that it is not defamatory as **\*216** a matter of law. Because the statement is not defamatory as a matter of law, Austin Cab produced no evidence of a defamatory statement and the trial court properly granted Kassa's no-evidence motion for summary judgment as to Austin Cab's claim for slander. We therefore overrule Austin Cab's sole issue on appeal.

## CONCLUSION
Having overruled Austin Cab's sole issue, we affirm the trial court's order.

Tex.App.–Austin,2010.
Means v. ABCABCO, Inc.
315 S.W.3d 209

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

▷

Supreme Court of the United States
BECKLEY NEWSPAPERS CORP.
v.
C. Harold HANKS.

No. 467.
Nov. 6, 1967.

Civil libel action by elected clerk of the Criminal and Circuit Courts of Raleigh County against a newspaper publisher. The Circuit Court of Wyoming County, West Virginia, entered judgment for clerk. The West Virginia Supreme Court of Appeals denied publisher's application for appellate review. Certiorari was granted. The Supreme Court held that any failure of newspaper publisher which published editorial, which was critical of opposition of clerk to fluoridation of local water supply, and which stated that perhaps clerk's blustering threats were able to intimidate the president of the county board of health, to make a prior investigation did not constitute proof sufficient to present a jury question as to whether the statements were published with reckless disregard of whether or not they were false.

Reversed and remanded for further proceedings.

West Headnotes

[1] Libel and Slander 237 ⬤─124(6)

237 Libel and Slander
    237IV Actions
        237IV(E) Trial, Judgment, and Review
            237k124 Instructions
                237k124(6) k. Privilege. Most Cited Cases

The giving of instruction that jury could find for elected clerk of criminal and circuit courts of county, who was allegedly libeled during his re-election campaign by three editorials highly critical of his official conduct, if it were shown that newspaper publisher had published the editorials with bad or corrupt motive, or from personal spite, ill will or a desire to injure clerk was erroneous.

[2] Federal Courts 170B ⬤─3186

170B Federal Courts
    170BXVI Supreme Court
        170BXVI(D) Presentation of Questions Below or on Review; Record; Waiver
            170Bk3186 k. Review of state courts. Most Cited Cases
    (Formerly 170Bk508, 106k397)

Because newspaper publisher sued for libel failed to object to erroneous instruction at trial, and in fact offered instructions which were themselves inadequate, issue of those instructions was not before the Supreme Court; however, since jury verdict was rendered upon instructions which misstated the law and since newspaper publisher had properly challenged sufficiency of evidence, the Supreme Court would undertake an independent examination of the record as a whole so as to assure that the judgment did not constitute a forbidden intrusion on the field of free expression.

[3] Libel and Slander 237 ⬤─112(2)

237 Libel and Slander
    237IV Actions
        237IV(C) Evidence
            237k112 Weight and Sufficiency
                237k112(2) k. Intent, malice, or good faith. Most Cited Cases

In action against newspaper publisher by the elected clerk of criminal and circuit courts of county who was allegedly libeled during his re-election campaign by three editorials, highly critical of his official conduct, which appeared in publisher's morning newspaper, proof presented to show actual malice lacked convincing clarity which constitutional standard in a civil libel action by a public official demands.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[4] **Libel and Slander 237 ⬦123(8)**

237 Libel and Slander
  237IV Actions
    237IV(E) Trial, Judgment, and Review
      237k123 Questions for Jury
        237k123(8) k. Privilege. Most Cited
Cases

Any failure of newspaper publisher which published editorial, which was critical of opposition of elected clerk of criminal and circuit courts of county to fluoridation of local water supply, and which stated that perhaps clerk's blustering threats were able to intimidate the president of the county board of health, to make a prior investigation did not constitute proof sufficient to present a jury question as to whether the statements were published with reckless disregard of whether they were false or not.

**\*\*198 \*81** Thurman Arnold and Jack A. Mann, for petitioner.

Harry G. Camper, Jr., for respondent.

**PER CURIAM.**

The petition for certiorari is granted.

Respondent Hanks is the elected Clerk of the Criminal and Circuit Courts of Raleigh County, West Virginia. He brought this libel action in the West Virginia Circuit Court, Wyoming County, alleging that during his re-election campaign he was libeled by three editorials, highly critical of his official conduct, which appeared in petitioner's morning newspaper. The jury returned a verdict for respondent and awarded him $5,000 damages. **\*82** The State Supreme Court of Appeals denied petitioner's application for appellate review.

[1][2] Although this action was tried subsequent to the decisions of this Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Henry v. Collins, 380 U.S. 356, 85 S.Ct.

992, 13 L.Ed.2d 892 (1965); and Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), and despite the fact that it was recognized at trial that the principles of New York Times were applicable, the case went to the jury on instructions which were clearly impermissible. The jury was instructed in part that it could find for the respondent if it were shown that petitioner had published the editorials 'with bad or corrupt motive,' or 'from personal spite, ill will or a desire to injure plaintiff.' Because petitioner failed to object to this erroneous interpretation of New York Times at trial, and in fact offered instructions which were themselves inadequate, the issue of these instructions is not before us. However, since it is clear that the jury verdict was rendered upon instructions which misstated the law and since petitioner has properly challenged the sufficiency of the evidence, we have undertaken an independent examination of the record as a whole 'so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of **\*\*199** free expression.' New York Times Co. v. Sullivan, supra, 376 U.S., at 285, 84 S.Ct., at 729. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 156—159, 87 S.Ct. 1975, 1992—1993, 18 L.Ed.2d 1094 (1967) (opinion of Mr. Justice Harlan); id., at 168—170, 87 S.Ct., at 1998—1999 (opinion of The Chief Justice).

[3] In New York Times we held that the Constitution forbids recovery of damages in a civil libel action by a public official, such as respondent, 'for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless **\*83** disregard of whether it was false or not.' 376 U.S., at 279—280, 84 S.Ct., at 726. Our examination of the whole record satisfies us that 'the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands * * *.' 376 U.S., at 285—286, 84 S.Ct., at 728.

We put aside the question whether the proofs show that the allegedly libelous statements were

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

false. If false, respondent did not and does not contend that petitioner published the statements with knowledge of their falsity. His contention was and is that the proofs were sufficient for the jury to find that petitioner published the statements with reckless disregard of whether they were false or not. However, virtually the only evidence we find bearing on that question relates to one of the editorials critical of the opposition of respondent and another public official, Mrs. Elinor Hurt, president of the county board of health, to fluoridation of the local water supply. That editorial, captioned 'The Fluoridation Situation Remains Unchanged,' was directed primarily at Mrs. Hurt's opposition[FN*] but also included the following:

> FN* When asked whether she had ever brought suit against petitioner for these or other statements, Mrs. Hurt replied, 'No, sir, I have big broad shoulders.' (Tr. 49.)

'Here, again, (Mrs. Hurt) seems to want to follow in the footsteps of Hanks. For it was Hanks who ordered over the telephone once that he did not want his name to appear in the Beckley Post-Herald again. He backed up this order with an inexplicit threat—one merely intended to frighten those who are easily intimidated.

'The only conclusion to which we can come is that either Hanks and Mrs. Hurt have been in league toward the fanatic end, believing all the wild-eyed *84 ravings against fluoridation despite decades of experience to disprove them, or that perhaps his blustering threats were able to intimidate the lady.' (Emphasis added.)

Respondent's argument is that since both he and Mrs. Hurt testified and denied any threats or intimidation, the following testimony of petitioner's president and general manager on cross-examination provides 'convincing proof' of the absence of prior investigation which entitled the jury to find that the 'offending charges' were published with reckless disregard of whether they were false or true:

'Q. But you can't tell this jury that any specific investigation was made before this man was attacked in any of these articles, can you?

'A. We watch the activities of the public servant. You don't have to make an investigation. His whole life is out in front of everybody.

'Q. Those editorials were not written by anybody who wanted to find out whether or not he threatened Mrs. Hurt, were they?

'A. There was cause on their part to feel there was that possibility.

**200 'Q. That possibility?

'A. That's right. 'Perhaps,' they said.

'A. It was our opinion that that was as near the facts and truth as we could get.' (Tr. 121—122.)

[4] We reject respondent's contention. Neither this passage nor anything else in the record reveals 'the high degree of awareness of * * * probable falsity demanded by New York Times * * *,' Garrison v. State of Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, it cannot be said on this record that any failure of petitioner to make a prior investigation constituted*85 proof sufficient to present a jury question whether the statements were published with reckless disregard of whether they were false or not. Cf. New York Times Co. v. Sullivan, supra, 376 U.S., at 287—288, 84 S.Ct., 729—730; Time, Inc. v. Hill, 385 U.S. 374, 388—389, 87 S.Ct. 534, 542—543, 17 L.Ed.2d 456 (1967). See also Curtis Publishing Co. v. Butts, supra, 388 U.S., at 153—154, 87 S.Ct., at 1990—1991 (opinion of Mr. Justice Harlan).

The judgment is reversed, and the case remanded to the Circuit Court of West Virginia, Wyoming County, for further proceedings not inconsistent with this opinion.

It is so ordered.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Reversed and remanded.

Mr. Justice BLACK, whom Mr. Justice DOUGLAS joins, concurs in the result for the reasons stated in his concurring opinions in New York Times Co. v. Sullivan, 376 U.S. 254, 293, 84 S.Ct. 710, 733, 11 L.Ed.2d 686, and Garrison v. State of Louisiana, 379 U.S. 64, 79, 85 S.Ct. 209, 218, 13 L.Ed.2d 125. Mr. Justice FORTAS took no part in the consideration or decision of this case.

U.S.W.Va. 1967.
Beckley Newspapers Corp. v. Hanks
389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248, 1 Media L. Rep. 1585

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))**

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RE-
LEASED FOR PUBLICATION IN THE PER-
MANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAW-
AL.

Court of Appeals of Texas,
Houston (1st Dist.).
CHENIERE ENERGY, INC., Charif Souki, Indi-
vidually, and Greg Rayford, Individually, Appel-
lants
v.
Azin LOTFI, Appellee.

No. 01–13–00515–CV.
Oct. 7, 2014.

**Background:** Company chief executive officer and
company general counsel challenged the 151st Dis-
trict Court, Harris County, denial of their motion to
dismiss, under Texas Citizens' Participation Act,
plaintiff's tortious interference with employment
claims against them.

**Holding:** The Court of Appeals, Harvey Brown, J.,
held that defendants failed to establish that their
communications fell within Act's definition of exer-
cise of the right of association.

Affirmed.

Terry Jennings, J., concurred and filed separate
opinion in which Sharp, J., joined.

West Headnotes

**[1] Appeal and Error 30 ⟜837(4)**

30 Appeal and Error
  30XVI Review
    30XVI(A) Scope, Standards, and Extent, in

General
    30k837 Matters or Evidence Considered
in Determining Question
      30k837(4) k. Pleadings and rulings
thereon. Most Cited Cases
    Court of Appeals considers the parties' plead-
ings and affidavits when reviewing a ruling on a
Texas Citizens' Participation Act (TCPA) motion to
dismiss. V.T.C.A., Civil Practice & Remedies Code
§ 27.006(a).

**[2] Constitutional Law 92 ⟜1440**

92 Constitutional Law
  92XVI Freedom of Association
    92k1440 k. In general. Most Cited Cases

**Pleading 302 ⟜358**

302 Pleading
  302XVI Motions
    302k351 Striking Out Pleading or Defense
      302k358 k. Frivolous pleading. Most
Cited Cases
    Absent any affidavit evidence to support their
contentions, discussions between company chief
executive officer and company general counsel
about whether to continue to retain plaintiff as a
company lawyer, were not attorney-client consulta-
tions that constituted the exercise of the right of as-
sociation, and, therefore, trial court properly denied
their motion to dismiss, under Texas Citizens' Parti-
cipation Act (TCPA), plaintiff's tortious interfer-
ence with employment claims against them.
V.T.C.A., Civil Practice & Remedies Code §
27.001 et seq.

Matthew L. Hoeg, Ryan R. McBrearty, Andrews
Kurth LLP, Houston, TX, for Appellants.

M. Todd Slobin, Martin A. Shellist, Shellist Lazarz
Slobin, LLP, Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, SHARP, and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))**

BROWN,

## OPINION

HARVEY BROWN, Justice.

*1 Appellants filed a motion for rehearing of our memorandum opinion of June 10, 2014. Their motion for rehearing is overruled. The memorandum opinion of June 10, 2014, is withdrawn, and the following substitute opinion is issued in its place.

Azin Lotfi sued her employer, Cheniere Energy, Inc., claiming her employment was wrongfully terminated. She also sued two of her co-workers, Charif Souki and Greg Rayford, for tortious interference with her employment at Cheniere.

In this accelerated appeal, Souki and Rayford challenge the trial court's denial of their motion to dismiss the claims against them under Chapter 27 of the Civil Practice and Remedies Code, which is an anti-SLAPP statute entitled "Actions Involving the Exercise of Certain Constitutional Rights" and commonly referred to as the Texas Citizens' Participation Act (TCPA). *See generally* TEX. CIV. PRAC. & REM.CODE ANN. § 27.001–.011 (West Supp.2014).[FN1]

Souki and Rayford contend that (1) they properly invoked the TCPA by establishing, by a preponderance of the evidence, that Lotfi's claims against them are related to their exercise of the "right of association" and (2) Lotfi failed to present clear and specific evidence to support each element of her prima facie case of tortious interference to avoid summary dismissal. We affirm.

### Background

Lotfi, Cheniere's former assistant general counsel, sued the company for "breach of contract, fraud, fraud in the inducement, unjust enrichment, and pending disability discrimination and retaliation claims under chapter 21 of the Texas Labor Code." Lotfi claimed that she was fired from Cheniere in retaliation for reporting improper activities within the company, including unauthorized disclosures of confidential company information to the son of Cheniere's CEO and board chairman. In addition to suing her former employer, Lotfi asserted a tortious interference claim against Cheniere's CEO, Charif Souki, and its senior vice president and general counsel, Greg Rayford.

Souki and Rayford moved to dismiss the tortious interference claim, arguing that it was a frivolous suit brought in response to their exercise of the "right of association" as defined in the TCPA. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.001(2) (defining "right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests.").

In deciding whether to grant a motion to dismiss under the TCPA, the statute directs the trial court to "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a). Lotfi filed a response to Souki and Rayford's motion to dismiss, but neither side filed affidavits. Thus, based on the pleadings but without any additional evidence, the trial court denied the Souki and Rayford's motion to dismiss. They appeal that order.

### The Text and Stated Purpose of the TCPA

*2 The TCPA is an anti-SLAPP law. *See Rehak Creative Servs., Inc. v. Witt,* 404 S.W.3d 716, 719 (Tex.App.-Houston [14th Dist.] 2013, pet. denied). "SLAPP" is an acronym for "Strategic Lawsuits Against Public Participation," which are suits filed against politically and socially active individuals—not with the goal of prevailing on the merits but, instead, of chilling those individuals' First Amendment activities. *See* George W. Pring & Penelope Canan, *Strategic Lawsuits Against Public Participation ("SLAPPS"): An Introduction for Bench, Bar and Bystanders,* 12 Bridgeport L.Rev. 937, 938 (1992). Anti–SLAPP statutes have been enacted in several states over the past two decades to "deter lawsuits ... brought primarily to chill the valid exercise" of First Amendment rights. *Barron*

*v. Vanier*, 190 S.W.3d 841, 843 (Tex.App.-Fort Worth 2006, no pet.). They do so by establishing a mechanism for early dismissal of frivolous lawsuits that threaten the free exercise of First Amendment rights. *See Fitzmaurice v. Jones*, 417 S.W.3d 627, 629 (Tex.App.-Houston [14th Dist.] 2013, no pet.); *Rehak*, 404 S.W.3d at 719.

Section 27.003 of the TCPA contains the dismissal provision Souki and Rayford seek to invoke:

If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action.

TEX. CIV. PRAC. & REM.CODE ANN. § 27.003. The Texas Legislature expressly stated its purpose for enacting this anti-SLAPP statute:

The purpose of this chapter is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.

*Id.* § 27.002. The Legislature defined the rights covered by the statute. *See id.* § 27.001. The "exercise of the right of association" is defined in the TCPA as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *Id.* § 27.001(2).

Souki and Rayford contend that Lotfi's tortious interference claim against them was "based on, relate[d] to, or ... in response to" their right of association and was, therefore, subject to summary dismissal. *See id.* § 27.003. Souki and Rayford argue that they have met their evidentiary burden, not through affidavit evidence concerning the substance and purpose of a communication between them that would qualify as an exercise of the right of association but, instead, by the mere fact that Lotfi and

Rayford held positions as in-house counsel at Cheniere:

Lotfi's tortious interference claim against Souki and Rayford is directly predicated upon the attorney/client communications that took place between Souki (the client representative) and Rayford (the attorney). Furthermore, those confidential communications directly concerned whether to continue to retain Lotfi as one of Cheniere's lawyers (i.e., whether to continue to associate with Lotfi). Thus, the tortious interference claim is necessarily and directly based on, related to, or in response to Appellants' exercise of the right of association.

**Standard of Review**

**\*3** [1] We consider the parties' pleadings and affidavits when reviewing a ruling on a TCPA motion to dismiss. TEX. CIV. PRAC. & REM.CODE ANN. § 27.006(a). Souki and Rayford bore the initial burden of demonstrating the TCPA's applicability to Lotfi's claim against them. *See id.* § 27.005(b); *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 80 (Tex.App.-Houston [1st Dist.] 2013, pet. denied). They were required to show by a preponderance of the evidence that Lotfi's claim was based on, related to, or in response to their exercise of the right of association. TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(b). This inquiry is a legal question we review de novo. *Newspaper Holdings*, 416 S.W.3d at 80. Only if we conclude Souki and Rayford met their burden, do we analyze whether Lotfi met her burden to establish by "clear and specific evidence" the elements of her prima facie case against them to avoid dismissal. TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(c).

Statutory construction is a question of law we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006). When construing a statute, our objective is to determine and give effect to legislative intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000). In determining the Legislature's intent, we look to the plain meaning of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))

the statute's words. *Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 840–41 (Tex.2007). "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). We cannot give one provision meaning out of harmony or inconsistent with other provisions, even if it might be susceptible to such a construction standing alone. *Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC,* No. 14-12-00896-CV, 2013 WL 407029, at *2 (Tex.App.-Houston [14th Dist.] Jan. 24, 2013, order). Additionally, we "must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous." *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008).

**Souki and Rayford Fail to Meet Their Burden to Obtain Dismissal**

The only relevant pleadings included in the appellate record are Lotfi's amended verified petition, Souki and Rayford's motion to dismiss, and Lotfi's response. Souki and Rayford chose not to submit affidavits in support of their motion to dismiss; therefore, their contention that they communicated when joined together to act in furtherance of a common interest remains unverified. Instead, they rely on Lotfi's pleading to meet their evidentiary burden, pointing us specifically to paragraphs 9, 10, 11, 15, and 21 of Lotfi's verified petition. The facts alleged by Lotfi in these paragraphs are summarized as follows:

• Lotfi started at Cheniere in September 2011 after being personally recruited by Rayford;

*4 • Lotfi raised violations of Cheniere's *Code of Business Conduct and Ethics,* documentation and accounting irregularities, and other compliance issues, which lead to her termination in retaliation;

• the company initially stated it would pay Lotfi the full amount of company stock owed which,

according to Lotfi, was only possible under the Restricted Stock Grant Agreement if she were being terminated "without Cause," then, quickly thereafter, the termination was revoked;

• Lotfi received "one of the highest" year-end bonuses given to a non-senior executive in December 2012 and did nothing to warrant a "for Cause" termination; and

• Souki and Rayford made the decision to terminate Lotfi; they exacted revenge on her; and the claim that she was fired for "cause" is false.

Lotfi responds that Souki and Rayford "have not provided any evidence to establish that the instant lawsuit was filed in response to the exercise of Souki and Rayford's First Amendment rights, and clearly they have not met the preponderance of evidence standard." In other words, she contends that Souki and Rayford's reliance on the factual assertions in her pleading is inadequate to establish that a communication occurred, that Souki and Rayford were joining together to collectively act in a common interest—as is required to meet the statutory definition of the exercise of the right of association—or, finally, that her claim relates or is in response to an exercise of the right of association.

Only one of the five factual assertions relied upon by Souki and Rayford could be read to indicate that a communication occurred. The last assertion is that Souki and Rayford "made the decision" to terminate Lotfi and, in doing so, "exacted revenge" on her. It may be that Souki and Rayford's decision was the result of (1) "a communication" (2) "between individuals who join together" (3) for the purpose of expressing, promoting, pursuing, or defending their "common interests." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.001(2). But the record supports alternate conclusions as well. For example, Souki and Rayford may have had divergent interests in seeking Lotfi's removal from the company: Souki arguably could have had a personal interest in dismissing Lotfi given Lotfi's allegation that Souki's son was given confidential com-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

271

Page 5

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))

pany information, whereas Rayford's interest in having Lotfi dismissed could have been to further the financial interests of Cheniere given that dismissal for cause invalidated Lotfi's right to merit-based bonus compensation. Without evidence on the matter, the extent to which Souki and Rayford acted in furtherance of a common interest is simply unknown.

Because we are to view the pleadings and evidence in the light most favorable to the non-movant, we conclude that the limited assertions in Lotfi's pleading fail to meet the movants' burden of establishing that they had a communication, they acted in furtherance of a common interest, and that Lotfi's claim against them is related to their exercise of the right of association. *See Newspaper Holdings,* 416 S.W.3d at 80. Absent affidavit evidence supporting their contentions, Souki and Rayford have failed to meet their burden to obtain dismissal.

### Evidentiary Burden Cannot be Met by Reliance on Attorney Status

**\*5** Souki and Rayford attempt to avoid the conclusion that they failed to meet their evidentiary burden by relying on Rayford's and Lotfi's status as attorneys to bridge the evidentiary gap. They argue that "every court to have considered the issue has recognized that the constitutionally-protected right of association applies directly to both a client's choice of legal counsel to represent and advise it, and a client's interactions with its chosen legal counsel." Souki and Rayford explain their contention that interaction with legal counsel invokes the right to association as follows:

[I]t was not necessary for Appellants to offer evidence of the specific communications between Souki and Rayford. Nor, for that matter, should a party ever have to disclose the details of what are indisputably privileged communications between corporate officers and the corporate general counsel to establish that their communications constitute the exercise of the right of association under the TCPA.

...

Because Rayford was the company's lawyer, the discussions between him and Souki about Lotfi, and about whether to continue to retain Lotfi as a lawyer, are classic examples of attorney/client consultations that constitute the exercise of the right of association. Moreover, because the discussions and the decision actually concerned the selection of legal counsel, they independently constituted the exercise of the right of association ....

[2] We do not agree that a bare assertion of counsel involvement can meet Souki and Rayford's evidentiary burden to establish that a communication occurred, that Souki and Rayford were joined together to collectively pursue common interests, or that Lotfi's suit was related to their exercise of the right of association. Nor do we agree that Souki and Rayford can be absolved from meeting their evidentiary burden by arguing that providing such evidence would also reveal "indisputably privileged communications."

Rayford wears two hats at Cheniere: he is both the general counsel and a senior vice president. Given his dual roles, his view on whether it was in the company's interest to retain Lotfi as an employee and any advice he may have provided on that issue is not, per se, legal advice. *See* Derek Lisk, *When Does the Texas Attorney–Client Privilege Protect Communications with In–House Counsel?,* 68 Tex. B.J. 386, 387 (2005) ("In-house counsel frequently wear more than one hat, performing other duties in addition to providing legal services."); *see also United States v. Davis,* 636 F.2d 1028, 1044 (5th Cir.1981) (attorney who acts as his client's business advisor is not acting in legal capacity); *In re Tom's Foods Inc.,* 345 B.R. 795, 798–99 (Bankr.M.D.Ga.2006) (holding that communications with attorney serving on corporation's board of directors were seeking business advice, not legal advice).

Rayford's status as corporate counsel does not

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))**

excuse Souki and Rayford from their burden to prove they had a qualifying communication and joined to pursue a common interest. If their contention was that their communication involved a privileged, attorney-client communication, they could have stated so in an affidavit; yet they failed to provide an affidavit in support of their motion to dismiss. *Cf.* 4A West's Tex. Forms, Commentary, Business Litigation § 24.2.11.60 (2d ed. June 2014) ("Counsel is well-advised to file one or more Affidavit(s) based on this form to accompany [an] Anti–SLAPP Motion to Dismiss."); *Tex.R. Evid.* 503 (lawyer-client privilege); *Borden, Inc. v. Valdez,* 773 S.W.2d 718, 720–21 (Tex.App.-Corpus Christi 1989, no writ) ("[N]ot all statements and communications made by a client to an attorney are privileged, and the burden is on the party resisting discovery to show that the communication was, in fact, protected by the privilege.").[FN2]

**\*6** Without an affidavit to establish either that a qualifying communication occurred or that a privileged attorney-client communication occurred regarding Cheniere's choice of legal counsel, Souki and Rayford's reliance on Rayford's status as general counsel does not meet their evidentiary burden. To hold otherwise would be to create a presumption that every communication with an in-house attorney meets the TCPA's definition of the "exercise of the right of association" and any claim "related to" such communications is subject to summary dismissal. TEX. CIV. PRAC. & REM.CODE ANN. § 27.001(2). Accepting that the TCPA has such a broad reach would (1) require us to ignore the TCPA provision specifically requiring evidence in support of a motion to dismiss and (2) be contrary to the explicitly stated purpose of the statute, namely, to *balance* the protection of First Amendment rights against the right all individuals have to file lawsuits to redress their injuries. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 27.005(b), 27.002; *Direct Commercial Funding,* 2013 WL 407029, at \*2 (rejecting statutory construction that causes provision to be out of harmony or inconsistent with other provisions); *Columbia Med. Ctr. of*

*Las Colinas,* 271 S.W.3d at 256.

Indeed, Lotfi's lawsuit against Cheniere, Souki, and Rayford does not in any way implicate the Legislature's express declaration of the purpose of this statute: to protect "the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government ...." TEX. CIV. PRAC. & REM.CODE ANN. § 27.002; *see Jardin v. Marklund,* 431 S.W.3d 765, 770–73 (Tex.App.-Houston [14th Dist.] 2014, no pet.) (stating that TCPA's legislative history, purpose, language, and context all support conclusion that "exercise of the right of association" as defined by TCPA requires that communication concern public interest and does not apply to private communications); *but see Combined Law Enforcement Ass'ns of Tex. v. Sheffield,* No. 03–13–00105–CV, 2014 WL 411672, at \*2 n. 1 (Tex.App.-Austin Jan. 31, 2014, pet. filed) (mem. op.) (stating that text of TCPA does not limit its scope).

We agree that the terms "citizen" and "participation" contemplate a larger public purpose. Further, the stated purpose of the statute indicates a requirement of some nexus between the communication used to invoke the TCPA and the generally recognized parameters of First Amendment protections. Otherwise, any communication that is part of the decision-making process in an employment dispute—to name just one example—could be used to draw within the TPCA's summary dismissal procedures private suits implicating only private issues. *Cf. Pickens v. Cordia,* 433 S.W.3d 179, 184–85 (Tex.App.-Dallas 2014, no pet.) (holding that TCPA protection of "exercise of the right of free speech" did not apply to suit over content of appellant's blog, on which he made allegedly disparaging comments about his family members, because those communications were not matter of public concern).

**\*7** Because Souki and Rayford failed to meet their burden of establishing, by a preponderance of the evidence, that their communications fell within the statutory definition of exercise of the right of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

association, the trial court did not err in denying their motion to dismiss.

Given our conclusion that Souki and Rayford failed to meet their evidentiary burden, we do not reach Souki and Rayford's second issue regarding whether Lotfi established a prima facie case of tortious interference.

**Conclusion**

Because Souki and Rayford failed to meet their evidentiary burden, the trial court did not err in denying their motion to dismiss under the TCPA. We affirm.

Justice JENNINGS, joining the majority opinion and concurring separately.
Justice SHARP, joining the majority opinion and the concurrence.
TERRY JENNINGS, Justice, concurring.

I join the lead opinion, but write separately to emphasize that, given its specific language and expressly stated purpose to protect only the *constitutional rights* to free speech, petition, and association, the Texas Citizen Participation Act ("TCPA") does not apply to the claim of appellant, Azin Lotfi, against appellees, Charif Souki and Greg Rayford, for tortious interference with her employment contract. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.001 –.011 (Vernon Supp.2014).

Under Chapter 27 of the Texas Civil Practice and Remedies Code, which is entitled "Actions Involving the Exercise of Certain Constitutional Rights," a party may file a motion to dismiss a legal action that is "based on, relates to, or is in response to [the] party's exercise of the *right* of free speech, *right* to petition, or *right* of association." *Id.* § 27.003(a) (emphasis added). After a hearing on the motion, a trial court must dismiss the action if the moving party "shows by a preponderance of the evidence" that the legal action is "based on, relates to, or is in response to *the party's exercise*" of:

(1)the *right* of free speech;

(2)the *right* to petition; or

(3)the *right* of association.

*Id.* § 27.005(b) (emphasis added).

In the TCPA itself, the legislature expressly stated its purpose:

The purpose of this chapter is to *encourage and safeguard the constitutional rights of persons* to petition, speak freely, associate freely, *and otherwise participate in government* to the maximum extent permitted by law *and, at the same time,* protect the rights of a person to file meritorious lawsuits for demonstrable injury.

*Id.* § 27.002 (emphasis added). Thus, the TCPA serves to encourage and protect only the "constitutional rights" to "free speech," "petition," and "association." *See* U.S. CONST. amend I; *see also* TEX. CONST. art. I, §§ 8, 27.

Moreover, as explained by the Texarkana Court of Appeals, "[b]y including the phrase 'otherwise participate in government' " in section 27.002, the legislature "intended to protect" only constitutionally protected freedoms "that rise[ ] to such a level that [they] can be considered participation in government." *Whisenhunt v. Lippincott*, 416 S.W.3d 689, 697 (Tex.App.-Texarkana 2013, pet. filed). Indeed, in his statement of intent, the sponsor of the TCPA explained:

*\*8 Citizen participation is the heart of our democracy.* Whether petitioning the government, writing a traditional news article, or commenting on the quality of a business, involvement of citizens in the exchange of idea [s] benefits our society.

Yet frivolous lawsuits *aimed at silencing those involved in these activities are becoming more common, and are a threat to the growth of our democracy.* The Internet age has created a more permanent and searchable record of *public participation* as *citizen participation* in democracy grows through self-publishing, citizen journal-

Page 8

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))

ism, and other forms of speech. Unfortunately, abuses of the legal system, *aimed at silencing these citizens,* have also grown. *These lawsuits are called Strategic Lawsuits Against Public Participation or "SLA[P]P" suits.*

Twenty-seven states and the District of Columbia have passed similar acts, most commonly known as either "Anti–SLAPP" laws or "Citizen Participation Acts" that allow defendants in such cases to dismiss cases earlier than would otherwise be possible, thus limiting the costs and fees. The Texas Citizen Participation Act would allow defendants—who are sued as a result of exercising their right to free speech or their right to petition the government—to file a motion to dismiss the suit, at which point the plaintiff would be required to show by clear and specific evidence that he had a genuine case for each essential element of the claim. In addition, if the motion to dismiss is granted, the plaintiff who has wrongly brought the lawsuit may be required to pay attorney's fees of the defendant.

C.S.H.B. 2973 amends current law relating to *encouraging public participation by citizens by protecting a person's right to petition, right of free speech, and right of association from merit less lawsuits arising from actions taken in furtherance of those rights.*

Senate Comm. on State Affairs, Bill Analysis, Tex. H.B. 2973, 82nd Leg., RS (2011) (emphasis added). Thus, the broader purpose of the Texas *Citizen Participation* Act is to stop such Strategic Lawsuits Against *Public Participation.*

Here, the complained-of acts of Souki and Rayford in regard to their alleged tortious interference with Lotfi's employment contract do not at all concern their constitutional rights to petition, speak freely, associate freely, "and otherwise participate in government," i.e., engage in citizen or public participation. Lotfi's lawsuit against Souki and Rayford has nothing to do with their constitutional right to engage in citizen or public participation. And

Lotfi's allegation that Souki and Rayford tortiously interfered with her employment contract cannot in any reasonable sense be read as an attempt to strategically silence them, prevent them from engaging in citizen or public participation, prevent them from associating for such purposes, or in any other way infringe upon their constitutional rights.

Regardless, Souki and Rayford claim that Lotfi's lawsuit constitutes an attempt to thwart their constitutional right to associate as defined in the TCPA. In the TCPA, the legislature does broadly and vaguely define the "exercise of the right of association" as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.001(2). Standing alone, this awkward definition does appear to include communications that are not constitutionally protected and do not concern citizen or public participation. However, we cannot read section 27.001(2) in isolation. The TCPA necessarily contemplates that any communication, as discussed in section 27.001(2), must involve constitutionally protected rights and citizen or public participation.

**\*9** As noted in the lead opinion, when construing a statute, our objective is to determine and give effect to legislative intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). Although the "plain meaning of the text is the best expression of the legislative intent," this is not true when "a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). And we "must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous." *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008).

Here, reading the TCPA in its entirety, the broad definition of "exercise of the right of association" is necessarily restricted by the expressly stated purpose of the TCPA "to encourage and safe-

Page 9

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))

guard the *constitutional rights* of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent *permitted by law.*" TEX. CIV. PRAC. & REM.CODE ANN. § 27.002 (emphasis added). Although citizens most certainly do have a First Amendment right to associate to bring about social and political change for our "common interests," there is no constitutional right to engage in criminal behavior, commit civil wrongs, or otherwise inflict injury upon others. Importantly, the legislature expressly included within the stated purpose of the TCPA its intent to, "at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.*

Construing the definition of "exercise of the right of association" in section 27.001(2) in isolation, without any regard for the legislature's expressly stated purpose of the TCPA in section 27.002 to protect "constitutional rights," would certainly lead to absurd results. As explained by the Texarkana Court of Appeals:

> The statement of intent confirms the concept gathered from reading the statute as a whole that the Legislature was attempting by this law to protect a citizen's public participation.[ ] Otherwise, pre-discovery dismissals, attorney's fees, and sanctions would loom over any plaintiff filing an action for private defamatory speech, *which would have the effect of chilling meritorious private defamation suits,* a result neither intended nor required under the TCPA.

*Whisenhunt,* 416 S.W.3d at 698 (emphasis added). Here, the results flowing from reading section 27.001(2) in isolation would also be absurd. Such a reading would serve to actually thwart any meritorious lawsuit for demonstrable injury in which a plaintiff alleges that two or more persons engaged in a civil wrong involving a communication. The defendants could, at the very least, add unnecessary delay and expense to a plaintiff's lawsuit, no matter how meritorious, by simply asserting that, in committing their complained-of acts, they were exer-

cising their right of association by engaging in a communication "to collectively express, promote, pursue, or defend" their own private, "common interests." This is too clever by half.

**\*10** To the extent that the definition of "exercise of the right of association" in section 27.001(2) can possibly be read as including communications not constitutionally protected and not concerning citizen or public participation, and, thus, be used by litigants to add expense and unnecessary delay to meritorious litigation, especially via interlocutory appeal, the legislature could drop the definition from the TCPA altogether. At the very least, although repetitive, the legislature could revise the definition to include qualifying language, repeating in the definition its stated purpose of the TCPA to protect and encourage the use of "constitutional rights." Although not necessary, such a change would serve to further "protect the rights of a person to file meritorious lawsuits for demonstrable injury" from those who would otherwise abuse the Texas *Citizen Participation* Act and use it to unreasonably delay and add expense to claims for injuries resulting from their private, civil wrongs.

JENNINGS, J., concurring, joined by SHARP, J.

> FN1. The TCPA authorizes this interlocutory appeal. *See KTRK Television, Inc. v. Robinson,* 409 S.W.3d 682 (Tex.App.-Houston [1st Dist.] 2013, pet. denied); *San Jacinto Title Servs. of Corpus Christi, LLC v. Kingsley Props., LP.,* No. 13-12-00352-CV, ---- S.W.3d ----, 2013 WL 1786632 (Tex.App.-Corpus Christi Apr. 25, 2013, pet. denied); *cf. Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC,* No. 14-12-00896-CV, 2013 WL 407029 (Tex.App.-Houston [14th Dist.] Jan. 24, 2013, order) (finding jurisdiction over order granting motion that remained interlocutory due to pending counterclaims).

--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))
**(Cite as: 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.)))**

FN2. *See also Pownell v. Credo Petroleum Corp.*, No. 09-CV-01540-WYD-KLM, 2011 WL 1045418, at *2 (D.Colo. Mar. 17, 2011) (stating that "the attorney-client privilege does not protect communications related to business advice"); *Baptist Health v. BancorpSouth Ins. Servs., Inc.*, 270 F.R.D. 268, 276 (N.D.Miss.2010) (stating that, for questions of privilege in a corporate setting, "the critical inquiry is whether any particular communication facilitated the rendition of predominantly legal advice or services to the client"); *In re Tom's Foods Inc.*, 345 B.R. 795, 798 (Bankr.M.D.Ga.2006) (holding that communications seeking business advice were not protected by attorney-client privilege); *see also* Restatement (Third) of Law Governing Lawyers § 68 (2000) (requiring a communication to be "for the purpose of obtaining or providing legal assistance" to invoke the attorney-client privilege).

Tex.App.–Houston [1 Dist.],2014.
Cheniere Energy, Inc. v. Lotfi
--- S.W.3d ----, 2014 WL 5011132 (Tex.App.-Hous. (1 Dist.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

94 S.Ct. 2770                                                                                                    Page 1
418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121
(Cite as: 418 U.S. 264, 94 S.Ct. 2770)

▷

Supreme Court of the United States
OLD DOMINION BRANCH NO. 496, NATION-
AL ASSOCIATION OF LETTER CARRIERS,
AFL-CIO, et al., Appellants,
v.
Henry M. AUSTIN et al.

No. 72—1180.
Argued Nov. 14, 1973.
Decided June 25, 1974.

Nonunion letter carriers brought libel actions against local and national letter carriers' unions under the Virginia 'insulting words' statute based on union publications labeling such nonunion carriers as scabs. The Law and Equity Court of the City of Richmond entered judgments in favor of the carriers, and the unions appealed. The Supreme Court of Virginia, 213 Va. 377, 192 S.E.2d 737 affirmed and an appeal was taken. The Supreme Court, Mr. Justice Marshall, held that the judgments could not stand because of the erroneous instruction defining malice in common-law terms rather than as a reckless or knowing falsehood and that federal labor laws preempt application of state libel laws to the extent that state seeks to make actionable defamatory statements in labor disputes published without knowledge of their falsity or reckless disregard of truth.

Reversed.

Mr. Justice Douglas filed an opinion concurring in the result, Mr. Justice Powell filed a dissenting opinion in which the Chief Justice and Mr. Justice Rehnquist, joined.

West Headnotes

[1] Labor and Employment 231H ☞960

231H Labor and Employment
    231HXII Labor Relations

231HXII(A) In General
        231Hk960 k. In general. Most Cited Cases
(Formerly 232Ak2 Labor Relations)
    Freedom of speech is a basic tenet of federal labor policy.

[2] States 360 ☞18.55

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.45 Labor and Employment
                360k18.55 k. Disputes and concerted activities. Most Cited Cases
(Formerly 360k4.12)
    Libel actions under state law are preempted by federal labor laws to the extent that the state seeks to make actionable defamatory statements made in labor disputes and which are published without knowledge of their falsity or reckless disregard for the truth.

[3] Labor and Employment 231H ☞970

231H Labor and Employment
    231HXII Labor Relations
        231HXII(A) In General
            231Hk970 k. Construction and operation of statutes, ordinances, and regulations, in general. Most Cited Cases
(Formerly 232Ak47 Labor Relations)
    Federal labor policies favor uninhibited, robust and wide open debate in labor disputes.

[4] States 360 ☞18.46

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.45 Labor and Employment
                360k18.46 k. In general. Most Cited Cases
(Formerly 360k18.45, 360k4.12)

United States 393 ☞28

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

393 United States
   393I Government in General
      393k28 k. Exercise of supreme executive authority. Most Cited Cases

Executive order governing labor-management relations in executive branch of federal government constitutes a reasonable exercise of President's responsibility for efficient operation of the executive branch as well as being authorized by express statute, and such order may create rights protected against inconsistent state laws through the supremacy clause. Executive Order No. 11491, § 10, 5 U.S.C.A. § 7301 note.

**[5] States 360 ⬤➡18.46**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.46 k. In general. Most Cited Cases
      (Formerly 360k18.45, 360k4.12)

Executive order governing labor management relations in the executive branch of the federal government does not show an intent to restrict in any way the robust debate which has been protected under the National Labor Relations Act so that libel actions under state law are preempted to the extent that state seeks to make actionable defamatory statements in labor disputes published without knowledge of falsity or reckless disregard for truth. Executive Order No. 11491, § 10, 5 U.S.C.A. § 7301 note.

**[6] States 360 ⬤➡18.53**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.53 k. Labor organizations; members, officers, and dues. Most Cited Cases
      (Formerly 360k4.12)

Any publication made during course of union organizing efforts which is arguably relevant to that organizational activity is entitled to protection from state libel laws to the extent that state seeks to make actionable defamatory statements made in labor disputes which are published without knowledge of falsity or reckless disregard for truth, regardless of any distinction between union's organizing efforts leading to recognition and postrecognition organizing activities. Executive Order No. 11491, § 10, 5 U.S.C.A. § 7301 note.

**[7] States 360 ⬤➡18.53**

360 States
   360I Political Status and Relations
      360I(B) Federal Supremacy; Preemption
         360k18.45 Labor and Employment
            360k18.53 k. Labor organizations; members, officers, and dues. Most Cited Cases
      (Formerly 360k4.12)

State court judgments awarding damages to postal employees for libel because of the union publication of their names under the term "scab" together with a pejorative definition thereof must be reversed because of state courts' erroneous instructions which defined malice in the common-law sense as being personal spite, ill will, or desire to injure, since libel remedies were preempted by federal labor policy unless it could be shown that the publication was knowingly false or made with reckless disregard for the truth.

**[8] Constitutional Law 92 ⬤➡1490**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and Press
      92XVIII(A) In General
         92XVIII(A)1 In General
            92k1490 k. In general. Most Cited Cases
      (Formerly 92k90(1))

**Constitutional Law 92 ⬤➡1905**

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and

Press

92XVIII(O) Labor and Employment in General

92k1905 k. In general. Most Cited Cases

(Formerly 92k90(1))

### Constitutional Law 92 ⊂⇒1911

92 Constitutional Law

92XVIII Freedom of Speech, Expression, and Press

92XVIII(O) Labor and Employment in General

92k1910 Labor Relations

92k1911 k. In general. Most Cited Cases

(Formerly 92k90.1(7.1), 92k90.1(7))

In cases involving free expression, Supreme Court has the obligation not only to formulate principles of general application but also to review facts to insure that the speech involved is not protected under federal law; court must make an independent examination of whole record to assure itself that judgment does not constitute forbidden intrusion on field of free expression, and this obligation exists in cases involving speech claimed to be protected under federal labor laws as well as claims in the context of the First Amendment. U.S.C.A.Const. Amend. 1; National Labor Relations Act, §§ 1 et seq., 8(a)(3), 14(b) as amended 29 U.S.C.A. §§ 151 et seq., 158(a)(3), 164(b); 39 U.S.C.A. §§ 201, 1201–1209, 1209(c); Executive Order No. 11491, § 12(c), 5 U.S.C.A. § 7301 note.

### [9] Libel and Slander 237 ⊂⇒6(1)

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k6 Actionable Words in General

237k6(1) k. In general. Most Cited Cases

### Libel and Slander 237 ⊂⇒55

237 Libel and Slander

237III Justification and Mitigation

237k55 k. Truth of part of defamatory matter; substantial truth. Most Cited Cases

### States 360 ⊂⇒18.53

360 States

360I Political Status and Relations

360I(B) Federal Supremacy; Preemption

360k18.45 Labor and Employment

360k18.53 k. Labor organizations; members, officers, and dues. Most Cited Cases

(Formerly 360k4.12)

Union newsletter's use of epithet "scab" with respect to nonunion postal employees was protected under federal law and could not be basis of a state libel judgment in that naming such nonunion employees as scabs was literally and factually true; similarly, publication of pejorative definition of scab was not actionable in that use of words like "traitor" could not be construed as representations of fact. Executive Order No. 11491, § 10, 5 U.S.C.A. § 7301 note.

### [10] Labor and Employment 231H ⊂⇒1001

231H Labor and Employment

231HXII Labor Relations

231HXII(B) Labor Organizations

231Hk1001 k. Powers of organizations in general. Most Cited Cases

(Formerly 232Ak129 Labor Relations)

Federal law gives union license to use intemperate, abusive or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point.

**\*\*2771 \*264 Syllabus**[FN\*]

> FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

As part of its ongoing efforts to organize the remainder of letter carriers, appellant union, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

carriers' collective-bargaining representative in Richmond, Virginia, published a 'List of Scabs' in its newsletter, including the names of appellees, together with a pejorative definition of 'scab' using words like 'traitor.' Appellees brought libel actions. Though recognizing that the case involved the publications of a labor union that were relevant to the union's organizational campaign, the trial court overruled appellants' motions to dismiss based on the ground that the publication had First Amendment and federal labor law protection. The court interpreted Linn v. Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 to permit application of state libel laws as long as the challenged statements were made with 'actual malice,' defined as being 'actuated by some sinister or corrupt motive such as hatred, personal spite, ill will, or desire to injure the plaintiff . . . or . . . with such gross indifference and recklessness as to amount to a wanton or wilful disregard of the rights of the plaintiff.' The jury awarded appellees damages, and the State Supreme Court affirmed. Held:

1. Although Linn v. Plant Guard Workers, supra, held that federal labor law does not completely pre-empt the application of state laws to libels published during labor disputes, that decision recognized that federal law does pre-empt state law to the extent that the State seeks to make actionable defamatory **2772** statements in labor disputes published without knowledge of their falsity or reckless disregard of the truth. Pp. 2774—2776.

2. Federal labor laws favor uninhibited, robust, and wide-open debate in labor disputes. Pp. 2775—2779.

(a) The relevant law here is Executive Order No. 11491, governing labor relations in federal employment. The basic provisions of the Executive Order are like those of the National Labor Relations Act, and similarly afford wide latitude for union freedom *265 of speech. The partial pre-emption of Linn is thus equally applicable here. Pp. 2775—2779.

(b) The free speech protections afforded union organizing efforts extend to post-recognition organizing activity to the same degree as to pre-recognition activity. Pp. 2778—2779.

3. The trial court's instruction defining malice in common-law terms was erroneous and reflected a misunderstanding of Linn, which adopted the reckless-or-knowing-falsehood test of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. Pp. 2779—2780.

4. The state libel award arising out of the publication of the union news-letter here did not comport with the protection for freedom of speech in labor disputes recognized in Linn. The use of the epithet 'scab,' which was literally and factually true and is common parlance in labor disputes, was protected under federal law. Publication of the pejorative definition was likewise not actionable, since the use of words like 'traitor' cannot be construed as representations of fact and their use in a figurative sense to manifest the union's strong disagreement with the views of workers opposing unionization is also protected by federal law. Cf. Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6. Pp. 2780—2782.

213 Va. 377, 192 S.E.2d 737, reversed.

Mozart G. Ratner, Washington, D.C., for appellants.

Stephen M. Kapral and Parker E. Cherry, Richmond, Va., for appellees.

*266 Mr. Justice MARSHALL delivered the opinion of the Court.

This case involves three state libel judgments imposing liability of $165,000 on a labor union as a result of statements made in a union newsletter during a continuing organizational drive. The question presented is whether these libel judgments can be squared with the freedom of speech in labor disputes guaranteed under federal law.

I

Appellant Old Dominion Branch No. 496 is a local union affiliated with the appellant National Association of Letter Carriers, AFL-CIO. At all times relevant to this case, the Branch was recognized by postal authorities as the exclusive local collective-bargaining representative of letter carriers in the Richmond, Virginia, area in accordance with s 10 of Executive Order No. 11491,[FN1] governing**2773** labor-management relations in the Executive Branch of the Federal Government. Appellees, Henry M. *267 Austin, L. D. Brown, and Roy P. Ziegengeist, were letter carriers in Richmond who neither were members of the Union nor paid any dues or fees to the Union.[FN2]

FN1. 34 Fed.Reg. 17605 (1969), 3 CFR 861 (1966—1970 Compilation), as amended, 3 CFR 254 (1974). The Executive Order was promulgated on October 29, 1969, and became effective on January 1, 1970. It remains in effect with respect to most employees in the Executive Branch today. Postal employees, however, are no longer covered by the Executive Order. The Postal Reorganization Act of 1970, 84 Stat. 719, convered the cabinet-level Post Office Department into the United States Postal Service, an 'independent establishment of the executive branch,' 39 U.S.C. s 201. As part of this reorganization, labor-management relations in the Postal Service were largely placed under the regulation of the National Labor Relations Act and the NLRB, effective July 1, 1971. See 39 U.S.C. ss 1201—1209. While the Branch apparently remains the exclusive bargaining representative for letter carriers in Richmond under the Postal Reorganization Act, this case arose during the brief period when the Executive Order was controlling.

FN2. Section 12(c) of the Executive Order provides:

'(N)othing in the agreement (between an agency and a labor organization) shall re-

quire an employee to become or to remain a member of a labor organization, or to pay money to the organization . . ..'

The Postal Reorganization Act continues this prohibition of union security agreements, 39 U.S.C. s 1209(c). The NLRA, of course, permits certain union security agreements, s 8(a)(3), 61 Stat. 140, 29 U.S.C. s 158(a)(3), except insofar as they may violate state law, s 14(b), 29 U.S.C. s 164(b). See Retail Clerks Local 1625 v. Schermerhorn, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963).

Although it had already been selected as bargaining representative by a majority of the postal workers in the unit, the Branch in the spring of 1970 was engaged in an ongoing effort to organize the remainder of the letter carriers. As part of this campaign, the Branch periodically published in its monthly newsletter, the Carrier's Corner, a list of those who had not yet joined the Union, under the heading 'List of Scabs.' After his name twice appeared in the 'List of Scabs,' appellee Austin complained to the Richmond Postmaster and the President of the Branch that the Union was trying to coerce him into joining. Austin said that he did not know what a scab was, but that he was going to sue the Union if he was called a scab again.

Several weeks later, the June issue of the Carrier's Corner was distributed to Branch members. Once again the newsletter contained a 'List of Scabs,' including the names of the three appellees, as well as 12 others. Just above the list of names, the newsletter noted that '(s)ome co-workers are in a quandary as to what a scab is' and said 'we submit the following.' There followed *268 a well-known piece of trade union literature, generally attributed to author Jack London, which purported to supply a definition:

'The Scab

'After God had finished the rattlesnake, the toad, and the vampire, He had some awful sub-

stance left with which he made a scab.

'A scab is a two-legged animal with a corkscrew soul, a water brain, a combination backbone of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

'When a scab comes down the street, men turn their backs and Angels weep in Heaven, and the Devil shuts the gates of hell to keep him out.

'No man (or woman) has a right to scab so long as there is a pool of water to drown his carcass in, or a rope long enough to hang his body with. Judas was a gentleman compared with a scab. For betraying his Master, he had character enough to hang himself. A scab has not.

'Esau sold his birthright for a mess of pottage. Judas sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. The scab sells his birthright, country, his wife, his children and his fellowmen for an unfulfilled promise from his employer.

'Esau was a traitor to himself; Judas was a traitor to his God; Benedict Arnold was a traitor to his country; a SCAB is a traitor to his God, his country, his family and his class.'

App. 8—9. (Emphasis supplied.)

Appellees filed these defamation actions against the Branch and the National Association shortly after the *269 June newsletter was published.[FN3] Appellants **2774 sought dismissal of the actions on the ground that the publication was protected speech under the First Amendment and under federal labor law. The trial judge recognized that this case involved the 'publications of a labor union which (were) relevant to and in the course of a campaign to organize federal employees.' App. 20. Nevertheless, he overruled the demurrers, interpreting this Court's decision in Linn v. Plant Guard Workers Local 114, 383 U.S. 53, 83 S.Ct. 657, 15 L.Ed.2d 582 (1966), to permit application of state

libel laws in such circumstances as long as the statements were made with 'actual malice.' The judge defined 'actual malice' in his instructions to the jury as follows:

> FN3. These actions are actually based on Virginia's 'insulting words' statute, Va.Code Ann. s 8—630 (1957), which provides:
>
> 'All words which from their usual construction and common acceptation are construed as insults and tend to violence and breach of the peace shall be actionable.'
>
> However, the Virginia courts have held that '(a)n action for insulting words under Code, s 8—630 is treated precisely as an action for slander or libel, for words actionable per se' with one exception not relevant here. Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 6, 82 S.E.2d 588, 591 (1954). See opinion below in 213 Va. 377, 381, 192 S.E.2d 737, 740 (1972).

'The term 'actual malice' is that conduct which shows in fact that at the time the words were printed they were actuated by some sinister or corrupt motive such as hatred, personal spite, ill will, or desire to injure the plaintiff; or that the communication was made with such gross indifference and recklessness as to amount to a wanton or wilful disregard of the rights of the plaintiff.' App. 93.

The jury returned a verdict awarding each of the appellees $10,000 in compensatory damages and $45,000 in punitive damages.[FN4]

> FN4. At least one suit brought by one of the other 12 letter carriers whose names were listed in the June newsletter has been held in abeyance pending the outcome of this appeal. The potential damages liability growing out of this publication is thus greater even than the $165,000 which has already been awarded.

**\*270** The Supreme Court of Virginia affirmed. 213 Va. 377, 192 S.E.2d 737 (1972). In view of appellants' substantial claims that their statements in the newsletter were protected expression under the First Amendment and federal labor law, and that the state courts had erred in interpreting the preemptive effect of Linn, we noted probable jurisdiction and set this case for oral argument with Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, 412 U.S. 917, 93 S.Ct. 2731, 37 L.Ed.2d 143 (1973). We reverse.

## II

[1] As noted, this case calls upon us to determine the extent to which state libel laws may be applied to penalize statements made in the course of labor disputes without undermining the freedom of speech which has long been a basic tenet of federal labor policy. We do not approach this problem, however, with a clean slate. The Court has already performed the difficult task of reconciling the competing state and federal interests involved in this area, and established the framework for our analysis here, in Linn v. Plant Guard Workers, supra.

In Linn, an assistant general manager of Pinkerton's Detective Agency brought suit under state libel laws against the Plant Guard Workers in a diversity action in federal court. Linn alleged that statements made in a union leaflet during a campaign to organize the company's employees, which charged him with 'lying' to the employees and 'robbing' them of pay increases, were false and defamatory. The District Court dismissed the complaint on the ground that the National Labor Relations Board had exclusive jurisdiction over the subject **\*271** matter of the complaint, finding that the union's conduct would arguably be an unfair labor practice under s 8(b) of the National Labor Relations Act, as amended, 29 U.S.C. s 158(b), and that the Court's decision in **\*\*2775**San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), therefore compelled dismissal on pre-emption grounds. The Court of Appeals affirmed.

A bare majority of this Court disagreed, however, and held that the NLRA did not completely pre-empt the application of state laws to libels published during labor disputes. The Court found that the exercise of state jurisdiction over such defamation actions would be a 'merely peripheral concern' of the federal labor laws, within the meaning of Garmon, as long as appropriate substantive limitations were imposed to insure that the freedom of speech guaranteed by federal law was protected. Further, the Court recognized an "overriding state interest' in protecting (state) residents from malicious libels.' 383 U.S., at 61, 86 S.Ct., at 662. Mr. Justice Clark, writing the opinion for the Court, also pointed out that application of state law to libels occurring during labor disputes would not significantly interfere with the NLRB's role in considering arguable contemporaneous violations of the Act. As he observed, the Board has different substantive interests from state libel law, being concerned with the coercive or misleading nature of the statements, rather than their defamatory quality. And the NLRA and state laws provide quite different remedies: only state law can provide damages to compensate the libel victim; only the NLRB can order a new representation election if the libel is found to have substantially affected the outcome of an election.

On the other hand, the Court recognized the danger that unrestricted libel actions under state law could **\*272** easily interfere with federal labor policy. The Court observed:

'Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable per se in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions. Both labor and management often speak bluntly and recklessly, embellishing their respective positions with imprecatory language.' 383 U.S., at 58, 86 S.Ct., at 660.

This freewheeling use of the written and spoken word, we found, has been expressly fostered by Congress and approved by the NLRB. Thus, Mr. Justice Clark acknowledged that there was 'a congressional intent to encourage free debate on issues dividing labor and management.' id., at 62, 86 S.Ct., at 663, and noted that 'the Board has given frequent consideration to the type of statements circulated during labor controversies, and . . . it has allowed wide latitude to the competing parties.' Id., at 60, 86 S.Ct., at 662.

[2] The Court therefore found it necessary to impose substantive restrictions on the state libel laws to be applied to defamatory statements in labor disputes in order to prevent 'unwarranted intrusion upon free discussion envisioned by the Act.' Id., at 65, 86 S.Ct., at 664. The Court looked to the NLRB's decisions, and found that 'although the Board tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees, it does not interpret the Act as giving either party license to injure the other intentionally by circulating defamatory or insulting material known to be false.' Id., at 61, 86 S.Ct., at 662. The Court therefore found it appropriate to adopt by analogy the standards of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Accordingly,*273 we held that libel actions under state law were pre-empted by the federal labor laws to the extent that the State sought to make actionable defamatory statements in labor disputes which were published without knowledge of their falsity or reckless disregard for the truth.

### III

[3][4] In this case, of course, the relevant federal law is Executive Order No. 11491 rather than the NLRA. Nevertheless,**2776 we think that the same federal policies favoring uninhibited, robust, and wide-open debate in labor disputes are applicable here, and that the same accommodation of conflicting federal and state interests necessarily follows.FN5

FN5. The Executive Order is plainly a

reasonable exercise of the President's responsibility for the efficient operation of the Executive Branch. American Federation of Government Employees v. Hampton, 77 L.R.R.M. 2977 (DC), aff'd sub nom. Wolkomir v. Federal Labor Relations Council, 79 L.R.R.M. 2634 (CADC 1971), cert. denied, 405 U.S. 920, 92 S.Ct. 954, 30 L.Ed.2d 791 (1972); Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (1965), cert. denied, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); cf. United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 555, 93 S.Ct. 2880, 2885, 37 L.Ed.2d 796 (1973). Moreover, the Executive Order finds express statutory authorization in 5 U.S.C. s 7301, which provides that '(t)he President may prescribe regulations for the conduct of employees in the executive branch.' In view of the substantial federal interests in effective management of the business of the National Government and exclusive control over the conduct of federal employees, and this congressional authorization, we have no difficulty concluding that the Executive Order is valid and may create rights protected against inconsistent state laws through the Supremacy Clause. See United States v. Pink, 315 U.S. 203, 230—232, 62 S.Ct. 552, 565—567, 86 L.Ed. 796 (1942); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635—637, 72 S.Ct. 863, 870—871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring); Farkas v. Texas Instruments, Inc., 375 F.2d 629, 632 (CA5), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); Farmer v. Philadelphia Electric Co., 329 F.2d 3, 8 (CA3 1964).

The basic provisions of the Executive Order establish a labor-management relations system for federal employment*274 which is remarkably sim-

ilar to the scheme of the National Labor Relations Act.[FN6] Although several significant adjustments have been made to reflect the different structure and responsibilities of the governmental employer, [FN7] it is apparent that the Order adopted in large part the provisions and policies of the NLRA as its model.[FN8] Indeed, one of the primary purposes of the *275 Executive Order was to 'substantially strengthen the Federal labor relations system by bringing it more into line with practices in the private sector of the economy.' 5 Presidential Documents 1508 (Oct. **2777 29, 1969) (announcement of the signing of Exec. Order No. 11491). Accordingly, while decisions under the NLRA may not be binding precedent under the Executive Order, the Assistant Secretary of Labor charged with administration of the Order has held that his decisions will 'take into account the experience gained in the private sector under the Labor-Management Relations Act.' Charleston Naval Shipyard Case Nos. 40—1940 (CA), 40—1950 (CA), A/SLMR No. 1, p. 3 (Nov. 3, 1970).

> FN6. Section 1 of the Order grants federal employees 'the right, freely and without fear of penalty or reprisal, to form, join, and assist a labor organization,' as well as 'to refrain from any such activity,' and provides that 'each employee shall be protected in the exercise of this right,' much as employees in the private sector are protected by s 7 of the NLRA. Sections 19(a) and 19(b) of the Order define unfair labor practices of agency management and unions, respectively, which are largely taken from the prohibitions of ss 8(a) and 8(b) of the NLRA. And s 10 of the Executive Order establishes a system of exclusive recognition of labor organizations chosen by a majority of the employees in an appropriate unit through representation elections by secret ballot, as under s 9(c)(1) of the NLRA.

> Primary responsibility for administration

of this system is given to the Assistant Secretary of Labor for Labor-Management Relations, who largely performs the role of the NLRB in the private sector. Under s 6(a) of the Order, he is empowered to make determinations of appropriate collective-bargaining units, to supervise the conduct of representation elections, and to decide complaints alleging unfair labor practices. Upon a finding of a violation of the Order, s 6(b) empowers the Assistant Secretary to order Government agencies or unions to cease and desist from violations of the Order, and to take appropriate affirmative action. Appeals from decisions of the Assistant Secretary are heard by the Federal Labor Relations Council, established under s 4 of the Order, which is also given a significant policymaking function.

> FN7. Most notable among the departures from the NLRA are the prohibition of strikes and picketing in s 19(b)(4) of the Executive Order and the limitation of subjects of bargaining in s 11(b). See generally Hampton, Federal Labor-Management Relations: A Program in Evolution, 21 Cath.U.L.Rev. 493 (1972).

> FN8. See Naumoff, Ground Rules for Recognition under Executive Order 11491, 22 Lab.L.J. 100 (1970); cf. Hart, Government Labor's New Frontiers through Presidential Directive, 48 Va.L.Rev. 898, 904—905 (1962) (discussing Exec. Order No. 10988, predecessor of the present Order).

[5] In light of this basic purpose, we see nothing in the Executive Order which indicates that it intended to restrict in any way the robust debate which has been protected under the NLRA. Such evidence as is available, rather, demonstrates that the same tolerance for union speech which has long characterized our labor relations in the private sector has been carried over under the Executive Order. For example, one of the Regional Administrat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ors under the Executive Order program has stated, in the context of union organizing campaigns:

'It is a cliche by now but, nonetheless, an embedded policy in labor relations that electioneering or campaigning has a broad tolerance. We do not encourage, nor do we prohibit, the exaggeration, the dissemination of half-truth or accusation. In sum, we leave it to the employee to decide.'[FN9]

> FN9. Naumoff, supra, n. 8, at 103. Compare the similar language of the Board in Stewart-Warner Corp., 102 N.L.R.B. 1153, 1158 (1953), quoted in Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 60, 86 S.Ct. 657, 661, 15 L.Ed.2d 582 (1966).

*276 And the Assistant Secretary has held that agency censorship of union materials, even if only to delete 'slanderous' or 'inflammatory' material, is unlawful interference with employee rights protected under the Order and an unfair labor practice under s 19(a)(1). Los Angeles Air Route Traffic Control Center, Case No. 72—CA—3014(26), A/SLMR No. 283, App. 4 (June 30, 1973) (summarized in BNA Govt.Empl.Rel.Rep.No. 514, July 30, 1973. p. A—10).

We recognize that the Executive Order does not contain any provision corresponding to s 8(c) of the NLRA,[FN10] relied on in part by the Court in Linn. But the Court recognized that this section was primarily intended 'to prevent the Board from attributing anti-union motive to an employer on the basis of his past statements.' 383 U.S., at 62—63, n. 5, 86 S.Ct., at 663 (emphasis added). A provision corresponding to s 8(c) was apparently thought unnecessary in the Executive Order because it directs the Government, as employer, to adopt a position of neutrality concerning unionization of its employees. [FN11] 'Government *277 officials do not mount 'vote no' campaigns.' Hampton, Federal Labor-Management Relations: A Program in Evolution, 21 Cath.U.L.Rev. 493, 502 (1972).

> FN10. Section 8(c) provides:
>
> 'The expressing of any views, argument, or opinion, or the dissemination thereof, . . . shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit.'
>
> FN11. This policy of agency neutrality is derived from two parts of the Executive Order. The preamble of the Order recites that
>
> 'the well-being of employees and efficient administration of the Government are benefited by providing employees an opportunity to participate in the formulation and implementation of personnel policies and practices affecting the conditions of their employment.'
>
> And s 1(a) directs the head of each agency to 'take the action required to assure that employees in the agency are apprised of their rights under this section and that no interference, restraint, coercion, or discrimination is practiced within his agency to encourage or discourage membership in a labor organization.'
>
> See Hampton, supra, n. 7, at 501—502.

The primary source of protection for union freedom of speech under the NLRA, however, particularly in an organizational context, is the guarantee in s 7 of the Act of the employees' rights **2778 'to form, join, or assist labor organizations.'[FN12]

> FN12. In other contexts, other provisions of the NLRA may be sources of protection for union freedom of speech. For example, one such source would be the system of representation elections by secret ballot established by s 9(c) (1) of the Act. Wide latitude for what is written and said in elec-

94 S.Ct. 2770

418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121
(Cite as: 418 U.S. 264, 94 S.Ct. 2770)

Page 11

tion campaigns is necessary to insure the free exchange of information and opinions, and thus to promote the informed choice by the employees needed to make the system work fairly and effectively. The same policy is applicable under the Executive Order, which establishes in s 10 a similar system of representation elections for federal employees.

'Basic to the right guaranteed to employees in s 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection. Indeed, even before the Norris-LaGuardia Act, 47 Stat. 70 and the Wagner Act, 49 Stat. 449 this Court recognized a right in unions to 'use all lawful propaganda to enlarge their membership.'' NLRB v. Drivers Local 639, 362 U.S. 274, 279, 80 S.Ct. 706, 709, 4 L.Ed.2d 710 (1960) (citations omitted).

Vigorous exercise of this right 'to persuade other employees to join' must not be stifled by the threat of liability for the overenthusiastic use of rhetoric or the innocent mistake of fact. Thus, the Board has concluded that statements of fact or opinion relevant to a union organizing campaign are *278 protected by s 7, even if they are defamatory and prove to be erroneous, unless made with knowledge of their falsity. See, e.g., Atlantic Towing Co., 75 N.L.R.B. 1169, 1171—1173 (1948). The Court in Linn recognized the importance of this s 7 protection, in words quite pertinent to this case:

'Likewise, in a number of cases, the Board has concluded that epithets such as 'scab,' 'unfair,' and 'liar' are commonplace in these struggles and not so indefensible as to remove them from the protection of s 7, even though the statements are erroneous and defame one of the parties to the dispute.' 383 U.S., at 60—61, 86 S.Ct., at 662.

These considerations are equally applicable under the Executive Order. Section 1 of the Order guarantees federal employees these same rights.

FN13

FN13. Section 1 of the Executive Order does not grant federal employees the right, guaranteed by s 7 of the NLRA for employees in the private sector, 'to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.' The right to attempt to persuade others to join the union, however, is derived from the rights to form, join, and assist a union, as well as from the right to engage in concerted activities. The absence of mention of a right to engage in concerted activities is obviously no more than a reflection of the fact that the Order does not permit federal employee unions to engage in strikes or picketing. The prohibition of picketing and the lack of protection for concerted activities might be thought to indicate an intention in the Executive Order to regulate the location or form of employee speech to a somewhat greater extent than under the NLRA, but we do not perceive any intention to curtail in any way the content of union speech.

Section 7 of the NLRA and s 1 of the Executive Order also dispose of appellees' suggestion that no 'labor dispute' within the meaning of Linn is presented on the facts of this case. It is true, as appellees point out, that there was no dispute between labor and management *279 involved here, and that the union's organizing efforts were neither during the course of a representation election campaign nor directed toward achieving recognition. But whether Linn's partial pre-emption of state libel remedies is applicable obviously cannot depend on some abstract notion of what constitutes a 'labor dispute'; rather, application of Linn must turn on whether the defamatory publication is made in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated.

[6] As noted, one of the primary reasons for the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

law's protection of union **2779 speech is to insure that union organizers are free to try peacefully to persuade other employees to join the union without inhibition or restraint. Accordingly, we think that any publication made during the course of union organizing efforts, which is arguably relevant to that organizational activity, is entitled to the protection of Linn. We see no reason to limit this protection to statements made during representation election campaigns. The protection of s 7 and s 1 is much broader. Indeed, Linn itself involved union organizing activity outside the election campaign context. We similarly reject any distinction between union organizing efforts leading to recognition and post-recognition organizing activity. Unions have a legitimate and substantial interest in continuing organizational efforts after recognition. Whether the goal is merely to strengthen or preserve the union's majority, or is to achieve 100% employee membership—a particularly substantial union concern where union security agreements are not permitted, as they are not here, see n. 2, supra—these organizing efforts are equally entitled to the protection of s 7 and s 1. FN14

> FN14. Appellees argue that, rather than being entitled to the protection of Linn, the union's organizing efforts here were unlawful attempts to 'coerce' them into joining the union in violation of s 19(b)(1) of the Order. But we would expect s 19(b)(1) to be interpreted in light of the construction the Court has given the parallel provision of the NLRA, s 8(b)(1)(A). In NLRB v. Drivers Local 639, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960), the Court held that s 8(b)(1)(A) was 'a grant of power to the Board limited to authority to proceed against union tactics involving violence, intimidation, and reprisal or threats thereof.' Id., at 290, 80 S.Ct., at 715. Mr. Justice Brennan emphasized that there was no intention to restrict the use by unions of methods of peaceful persuasion, quoting Senator Taft's remarks during the debate

on the Taft-Hartley Act:

> 'It seems to me very clear that so long as a union-organizing drive is conducted by persuasion, by propaganda, so long as it has every legitimate purpose, the Board cannot in any way interfere with it. . . .

> 'The Board may say, 'You can persuade them; you can put up signs; you can conduct any form of propaganda you want to in order to persuade them, but you cannot, by threat of force or threat of economic reprisal, prevent them from exercising their right to work.'' Id., at 287—288, 80 S.Ct., at 714.

It is true that the Executive Order provides that a union may not 'interfere with' an employee in the exercise of his right to refrain from joining the union, as well as incorporating the wording of the NLRA making it unlawful to 'restrain' or 'coerce' an employee. The Court in Drivers Local 639 pointed out, however, that even the words 'interfere with,' which originally appeared in a draft of the Taft-Hartley Act, were intended to have a 'limited application' and to reach 'reprehensible practices' like violence and threats of loss of employment, but not methods of peaceful persuasion. Id., at 286, 80 S.Ct., at 713. It seems likely that the Executive Order was similarly not intended to limit union propaganda or prohibit any other method of peaceful persuasion.

In any event, appellees' contention is properly addressed to the Assistant Secretary in the first instance, through an unfair labor practice complaint, and not to this Court. Even if appellees should ultimately prove to be correct, Linn is still applicable here, and state libel remedies are pre-empted unless appellees can show that the publication was knowingly false or made with

reckless disregard for the truth.

### *280 IV

[7] The courts below did not question the applicability of Linn to this case. Instead, both courts believed that Linn required only that the jury be instructed that it *281 must find the defamatory statements to have been made with malice before it could impose liability. And both courts thought that instructions which defined malice in the common-law sense—as 'hatred, personal spite, ill will, or desire to injure'—were adequate under Linn.

This reflects a fundamental misunderstanding of the Court's holding in Linn. The Linn Court explicitly adopted the standards of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and the heart of the New York Times test is the requirement that recovery can be permitted only if the defamatory publication was made **2780 'with knowledge that it was false or with reckless disregard of whether it was false or not.' Id., at 280, 84 S.Ct., at 726. The adoption in Linn of the reckless-or-knowing falsehood test was reiterated time and again in the Court's opinion. See 383 U.S., at 61, 63, 65, 86 S.Ct., at 662, 663, 664.

Of course, the Court also said that recovery would be permitted if the defamatory statements were shown to have been made with malice. But the Court was obviously using 'malice' in the special sense it was used in New York Times—as a short-hand expression of the 'knowledge of falsity or reckless disregard of the truth' standard. See New York Times Co. v. Sullivan, supra, 376 U.S., at 279—280, 84 S.Ct., at 726. Instructions which permit a jury to impose liability on the basis of the defendant's hatred, spite, ill will, or desire to injure are 'clearly impermissible.' Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248 (1967). '(I)ll will toward the plaintiff, or bad motives, are not elements of the New York Times standard.' Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296 (1971) (opinion of Brennan, J.). Accord, *282Garrison v. Louisiana, 379 U.S.

64, 73—74, 77—79, 85 S.Ct. 209, 215—216, 217—218, 13 L.Ed.2d 125 (1964); Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965); Rosenblatt v. Baer, 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966); Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6, 9—11, 90 S.Ct. 1537, 1539—1540, 26 L.Ed.2d 6 (1970). It is therefore clear that the libel judgments in this case must be reversed because of the court's erroneous instructions.

[8] This, however, cannot be the end of our inquiry. The Court has often recognized that in cases involving free expression we have the obligation, not only to formulate principles capable of general application, but also to review the facts to insure that the speech involved is not protected under federal law. New York Times Co. v. Sullivan, supra, 376 U.S., at 284—285, 84 S.Ct., at 728—729; Pickering v. Board of Education, 391 U.S. 563, 574—575, 88 S.Ct. 1731, 1737—1738, 20 L.Ed.2d 811 (1968); Greenbelt Cooperative Publishing Assn. v. Bresler, supra, 398 U.S., at 11, 90 S.Ct., at 1540. 'We must 'make an independent examination of the whole record,' Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.' New York Times Co. v. Sullivan, supra, 376 U.S., at 285, 84 S.Ct., at 729.

While this duty has been most often recognized in the context of claims that the expression involved was entitled to First Amendment protection, the same obligation exists in cases involving speech claimed to be protected under the federal labor laws. This obligation, derived from the supremacy of federal labor law over inconsistent state regulation, Hill v. Florida ex rel. Watson, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945); Teamsters Local 24 v. Oliver, 358 U.S. 283, 295—296, 79 S.Ct. 297, 304—305, 3 L.Ed.2d 312 (1959), requires us to determine whether any state libel award arising out of the publication of the union newsletter involved here would be inconsistent with the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121
**(Cite as: 418 U.S. 264, 94 S.Ct. 2770)**

protection for freedom of speech in labor disputes recognized in Linn.

[9][10] It should be clear that the newsletter's use of the epithet 'scab' was protected under federal law and cannot*283 be the basis of a state libel judgment. Rather than being a reckless or knowing falsehood, naming the appellees as scabs was literally and factually true. One of the generally accepted definitions of 'scab' is 'one who refuses to join a union,' Webster's Third New International Dictionary (unabridged ed. 1961), and it is undisputed that the appellees had in fact refused to join the Branch. To be sure, the word is most often used as an insult or epithet. But **2781 Linn recognized that federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point. Indeed, the Court observed that use of this particular epithet is common parlance in labor disputes and has specifically been held to be entitled to the protection of s 7 of the NLRA. 383 U.S., at 60—61, 86 S.Ct., at 661—662.

Appellees nonetheless argue that the publication here may be actionable under state law, basing their claiming on the newsletter's publication of Jack London's 'definition of a scab.' Appellees contend that this can be read to charge them with having 'rotten principles,' with lacking 'character,' and with being 'traitor(s)'; that these charges are untrue; and that appellants knew they were untrue. The Supreme Court of Virginia upheld the damages awards here on the basis of these charges. 213 Va., at 384, 192 S.E.2d, at 742.

We cannot agree. We believe that publication of Jack London's rhetoric is equally entitled to the protection of the federal labor laws.[FN15] The sine qua non of recovery for defamation in a labor dispute under Linn is the existence of falsehood. Mr. Justice Clark put it *284 quite bluntly: 'the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth.' 383 U.S., at 63, 86 S.Ct., at 663. Before the test of reckless

or knowing falsity can be met, there must be a false statement of fact. Gertz v. Robert Welch, Inc., 418 U.S., at 339—340, 94 S.Ct., at 3006—3007. But, in our view, the only factual statement in the disputed publication is the claim that appellees were scabs, that is, that they had refused to join the union.

> FN15. In view of our conclusion that the publication here was protected under the federal labor laws, we have no occasion to consider the First Amendment arguments advanced by appellants.

The definition's use of words like 'traitor' cannot be construed as representations of fact. As the Court said long before Linn, in reversing a state court injunction of union picketing, 'to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies—like 'unfair' or 'fascist'—is not to falsity facts.' Cafeteria Employees Local 302 v. Angelos, 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943). Such words were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization. Expression of such an opinion, even in the most pejorative terms, is protected under federal labor law. Here, too, 'there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.' Gertz v. Robert Welch, Inc., 418 U.S., at 339—340, 94 S.Ct., at 3007.

Appellees' claim is similar to that rejected by the Court recently in Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). There, petitioners had characterized the position of the respondent, a public figure, in certain negotiations as 'blackmail,' and he had recovered damages for libel on the theory that petitioners knew that he had committed no such criminal offense. The Court reversed, holding that this use of the word 'blackmail' could not be the basis of a libel judgment *285 under the New York

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121
(Cite as: 418 U.S. 264, 94 S.Ct. 2770)

Times standard. Mr. Justice Stewart, writing for the Court, reasoned:

'It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper**2782 articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.' 398 U.S., at 14, 90 S.Ct., at 1542 (footnote omitted).

It is similarly impossible to believe that any reader of the Carrier's Corner would have understood the newsletter to be charging the appellees with committing the criminal offense of treason. FN16 As in Bresler, Jack London's*286 'definition of a scab' is merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join. The Court in Linn recognized that such exaggerated rhetoric was commonplace in labor disputes and protected by federal law. Indeed, we note that the NLRB has held that the use of this very 'definition of a scab' is permissible under federal law. Cambria Clay Products Co., 106 N.L.R.B. 267, 273 (1953), enforced in pertinent part, 215 F.2d 48 (CA6 1954). It has become a familiar piece of trade union literature; according to undisputed testimony in this case, it has been published countless times in union publications over the last 30 years or more. Permitting state libel judgments based on publication of this piece of literature would be plainly inconsistent with the union's justifiable reliance on the protection of federal law.

FN16. On the contrary, it is apparent from the record that the basis for the libel action in this case was the use of the epithet 'scab' rather than the claimed charge of treason. It was the publication of the 'List of Scabs' which disturbed the appellees, and which moved appellee Austin to complain prior to the June publication at issue and to threaten to sue if he was called a scab again. Moreover, it appears that the only asserted damage to appellees followed from the publication of the fact that they were 'scabs.' Appellees testified only that their coworkers and others became hostile to them, referring to them as the 'scabs' the union was talking about, and that this made them tense and nervous and caused headaches. There is no evidence that anyone took literally the use of the word 'traitor' or that appellees were in any way concerned about or affected by this charge.

Nor can it be claimed that the jury's verdict is itself some indication that the charge of 'traitor' was construed as a defamatory representation of fact. There is certainly nothing in the trial court's instructions which would suggest that the newsletter's use of 'scab' was not the basis for the jury's verdict. The court did not instruct the jury that the use of 'scab' could not be the basis for imposing liability. The court did not even instruct the jury that a true statement of fact could not be the foundation for liability. Indeed, the trial court's instruction that 'insults' made with 'ill will' were sufficient to impose liability fairly invited the jury to base its verdict on the newsletter's use of 'scab.'

This is not to say that there might not be situations where the use of this writing or other similar rhetoric in a labor dispute could be actionable, particularly if some of its words were taken out of context and used in such a way as to convey a false representation of fact. See Greenbelt Cooperative Publishing Assn. v. Bresler, supra, 398 U.S., at 13,

90 S.Ct., at 1541. But in the context of this case, no such factual representation can reasonably be inferred, and **\*287** the publication is protected under the federal labor laws.[FN17] Accordingly, the judgments appealed from must be reversed.

> FN17. Since we find that any libel award on the basis of this publication would be inconsistent with the protection of federal law, we need not rule on appellants' alternative argument that the damages awarded here were excessive. We think it important again to point out, however, that 'in view of the propensity of juries to award excessive damages for defamation, the availability of libel actions may pose a threat to the stability of labor unions and smaller employers.' Linn, 383 U.S., at 64, 86 S.Ct., at 664. It is for this reason that the Court in Linn held that '(i)f the amount of damages awarded is excessive, it is the duty of the trial judge to require a remittitur or a new trial.' Id., at 65—66, 86 S.Ct., at 664 (emphasis added).

Judgment reversed.

**\*\*2783** Mr. Justice DOUGLAS, concurring in the result.

As the Court states, this case calls upon us to determine the extent to which state libel laws may be used to penalize statements expressed in the course of a labor dispute. In this instance Virginia's libel laws were used to impose massive damages[FN1] upon a labor union for publicly expressing, during the heat of an organizational drive, its highly pejorative but not too surprising opinion of 'scabs.' I agree that this expression is protected and that the judgments below cannot stand. Unlike the Court, however, I do not view the task of reconciling the competing state and federal interests in this area as a difficult one, nor do I view the federal interest as merely a matter of federal labor policy. I think that such expression is constitutionally protected and I cannot agree that there might be situations 'where the use of **\*288** this writing or other similar rhetoric

in a labor dispute could be actionable.'

> FN1. The judgments in this case awarded damages of $165,000 but the total figure might be larger since at least one other suit arising out of the same publication has been held in abeyance pending the outcome of this appeal.

I agree with the Court that federal labor policy, as manifested both in the NLRA and in Executive Order 11491, favors uninhibited, robust and wide open debate in labor disputes. I disagree with the Court, however on the reach of that policy. I think that the pre-emptive effect of federal labor regulation is such that States are prohibited from interfering with those federally regulated relations by arming disputants in labor controversies with an arsenal of defamation laws. See Linn v. Plant Guard Workers Local 114, 383 U.S. 53, 69, 86 S.Ct. 657, 666, 15 L.Ed.2d 582 (Fortas, J., dissenting). Though referring to this state of affairs as federal labor policy, I expressly reject any implication that the policy could be otherwise were Congress or the Executive to reassess the underlying considerations and attempt to reformulate the policy.

We said in Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1993, that, '(i)n the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.[FN2] Since I do **\*289** not think that discussion is free in the constitutional sense when it subjects the speaker to the penalty of libel judgments, in my view the ability of Congress or the Executive to formulate any labor policy penalizing those who might 'say naughty things during labor disputes'[FN3] is precisely nil. I believe the Framers did all the policy-making necessary in this area when they devised the constitutional framework which binds us all. As I stated in Gertz v. Robert Welch, Inc., supra, 418 U.S. 323, at 356—357, 94 S.Ct. 2997, at 3015, 41 L.Ed.2d 789, the **\*\*2784** First Amendment would prohibit Congress from passing any libel law[FN4]

418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121
(Cite as: 418 U.S. 264, 94 S.Ct. 2770)

and the limitation on labor policy formulation is but an example of that general restriction.

FN2. The view has been expressed that the First Amendment should accord protection only to explicitly political speech. See Bork, Neutral Principles and Some First Amendment Problems, 47 Ind.L.J. 1, 20 (1971). Decisions such as Thornhill, however, reject any such emasculative reading of the First Amendment. As Mr. Justice Black has said: 'There is nothing in the language of the First Amendment to indicate that it protects only political speech, although to provide such protection was no doubt a strong reason for the Amendment's passage.' H. Black, A Constitutional Faith 46 (1969). The importance of free discussion in all areas was well perceived in this country before our constitutional scheme was formulated. In a letter sent to the inhabitants of Quebec in 1774, the Continental Congress spoke of 'five great rights,' stating in part: 'The last right we shall mention, regards the freedom of the press. The importance of this consists, besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government . . ..' 1 Journals of the Continental Congress 1774—1789 p. 108 (Ford ed. 1904) (emphasis added).

FN3. See Linn v. Plant Guard Workers Local 114, 383 U.S. 53, 67, 86 S.Ct. 657, 665, 15 L.Ed.2d 582 (Black, J., dissenting).

FN4. See also Rosenblatt v. Baer, 383 U.S. 75, 90, 86 S.Ct. 669, 678, 15 L.Ed.2d 597 (concurring). In explaining the constitutional history which led him to the same conclusion, Mr. Justice Black said of the Framers: 'They knew what history was behind them; they were familiar with the sad and useless tragedies of countless people who had had their tongues plucked out, their ears cut off or their hands chopped off, or even worse things done to them, because they dared to speak or write their opinions. They wanted to ordain in this country that the new central government should not tell the people what they should believe or say or publish.' H. Black, A Constitutional Faith, at 46 (1968).

If the States were not limited to the same extent as the Federal Government in restraining discussion, the pre-emptive effect of federal labor regulations would be crucial. But I have always thought that the application of the First Amendment to the States through the Fourteenth[FN5] leaves the States as constitutionally impotent*290 as the Federal Government in enforcing such restrictions. This conclusion is compelled if freedom of speech is regarded, as I think it must, be as a privilege or immunity of United States citizenship within the meaning of that term in the Fourteenth Amendment rather than some ephemeral right protected against state intrusion only to the extent a majority of this Court might view as 'implicit in the concept of ordered liberty.'[FN6] As I stated in my dissent to Gertz v. Robert Welch, Inc., 418 U.S., at 358—359, 94 S.Ct., at 3016:

FN5. See, e.g., Stromberg v. California, 283 U.S. 359, 368—369, 51 S.Ct. 532, 535—536, 75 L.Ed. 1117, cases compiled in Gertz v. Robert Welch, Inc., 418 U.S., at 359 n. 8, 94 S.Ct., at 3016 (Douglas, J., dissenting).

FN6. See Palko v. Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288.

'(T)he Court frequently has rested state free speech and free press decisions on the Fourteenth Amendment generally rather than on the Due Process Clause alone. The Fourteenth Amendment speaks not only of due process but also of 'privileges and immunities' of United States citizenship. I can conceive of no privilege or immunity

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

with a higher claim to recognition against state abridgement than the freedoms of speech and of the press.'

Since labor disputes are "within that area of free discussion that is guaranteed by the Constitution" and since in my view the States and the Federal Government are equally bound to honor that guarantee, the fate of the libel award in this case is clear. 'Discussion is not free . . . within the meaning of our First Amendment, if that discussion may be penalized by judgments for damages in libel actions.' Linn v. Plant Guard Workers Local 114, 383 U.S., at 68, 86 S.Ct., at 666 (Black, J., dissenting). The extensive damages awarded in this case well illustrate that any protection short of a complete bar to suits for defamation will be cold comfort to those who enter the arena of free discussion in labor disputes. The imaginative vituperation which is commonplace in labor strife well exceeds the 'normal' levels of hyperbole to which *291 most members of the community may be accustomed. A jury determination in a libel suit, no matter what the standard of recovery, is as likely to be influenced by community attitudes toward unionization and the often colorful individuals involved in its promotion as by any real appreciation for the damage perceived as inflicted by any alleged falsehood.

Since I do not believe that the judgments below are consistent with either federal labor policy or with constitutionally protected free speech, I concur in their reversal.

Mr. Justice POWELL, with whom THE CHIEF JUSTICE and Mr. Justice REHNQUIST join, dissenting.

Today the Court extends the rule of **2785 New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), to encompass every defamatory statement made in a context that falls within the majority's expansive construction of the phrase 'labor dispute.' Because this decision appears to allow both unions and employers to defame individual workers with little or no risk of being held accountable for doing so, I dissent.

I

Executive Order 11491 establishes for certain federal employees a legal system for labor-management relations essentially similar to that provided employees in the private sector by the National Labor Relations Act. (NLRA). The Court acknowledges that the two schemes are not identical but finds no persuasive reason to differentiate between them for the purpose of determining their pre-emptive impact on state libel law. With this much I agree.

The majority then concludes that the instant case is controlled by Linn v. Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). In Linn the Court construed the NLRA to bar state libel judgments for defamatory statements made *292 in a 'labor dispute' covered by the Act, unless those statements were made 'with knowledge of their falsity or with reckless disregard of whether they were true or false. . . .' Id., at 65, 86 S.Ct., at 664. Thus the Court adopted as a rule of labor law pre-emption the constitutional standard of media liability for defamation originally enunciated for libel actions by public officials in New York Times Co., supra, and subsequently extended to public figures in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In the instant case the majority relies on the analogy to the NLRA to support its conclusion that Executive Order 11491 pre-empts the libel judgments in favor of these appellees because liability was not premised on the knowing-or-reckless falsity standard that Linn held applicable to defamatory statements made in a 'labor dispute.' I perceive no reason in law or in public policy for such a sweeping extension of New York Times. Linn is distinguishable on its facts and in its rationale, and the New York Times rule of knowledge of falsity or reckless disregard for the truth is therefore inapplicable to the case at hand.

Linn involved a classic confrontation between

94 S.Ct. 2770

418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121
(Cite as: 418 U.S. 264, 94 S.Ct. 2770)

Page 19

union and management locked in combat during an organizational campaign. Linn was assistant general manager of Pinkerton's National Detective Agency, Inc. Pinkerton's employees were then the subject of an organizational campaign by the United Plant Guard Workers. In the course of that effort the union published a leaflet urging Pinkerton's employees to join the union and allegedly accusing Linn of 'lying' to the employees and 'robbing' them of pay increases. Linn sued the union for libel, but the trial court held that the National Labor Relations Board had exclusive jurisdiction over the subject matter of the dispute. It found that Linn's complaint charged the union with conduct arguably constituting an unfair labor practice under the NLRA and that *293 San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), therefore required dismissal of the suit.

This Court disagreed with that reasoning. It recognized an "overriding state interest' in protecting (state) residents from malicious libels . . .,' 383 U.S., at 61, 86 S.Ct., at 662, and noted that federal labor law does not protect individuals against injury to reputation. Even where statements actionable as libel under state law would also constitute an unfair labor practice, the Board's interest would be limited to their coercive or misleading character, and the Board would be powerless to award damages or take any other step to redress the injury to the reputation of a defamed individual. The Court therefore held that the NLRA does not wholly pre-empt state libel law, even where the subject matter of the libel action might also constitute **2786 an unfair labor practice under the Act. Even in that circumstance, the States remain free to award damages for defamatory falsehoods published with knowledge of their falsity or in reckless disregard of the truth.

The result of Linn is a rule of partial pre-emption. The States may award libel judgments on the basis of the knowing-or-reckless-falsity formulation but are pre-empted from allowing defamation plaintiffs to recover under any less demanding

standard of liability. The level of pre-emption is defined by New York Times Co. v. Sullivan. But the Linn rule of partial pre-emption has another dimension, one that distinguishes the case at hand. That is the scope of the rule—in other words, the range of circumstances in which state libel law is partially displaced by federal labor law. This is determined by the phrase 'labor dispute.'

In Linn the Court relied on the presence of a 'labor dispute' to justify partial preemption of state libel law, but it did not delineate the boundaries of that concept. Indeed, the Court had no occasion to do so, for, as we have seen, Linn involved a prototypical organizational*294 campaign confrontation between labor and management. Given that factual setting, the Court found a potential conflict between federal labor law and state libel law. One side or the other could use defamation actions as an unauthorized weapon in the battle for the loyalty of unorganized employees and possibly undermined the federal policies favoring uninhibited debate between union and management. The instant dispute is so for removed from the factual setting in Linn that the considerations supporting partial preemption of state libel law in that case simply do not obtain here.

Appellant union had long been recognized by the postal authorities as the exclusive collective-bargaining representative for the letter carriers in the Richmond area. Of a maximum of 435 letter carriers in the unit, all save 15 were active union members. Thus the union was solidly entrenched, with approximately 96% of the letter carriers signed up. The three appellees were among those 15 employees who elected not to join the union. There is no evidence of concerted action by these 15 letter carriers; they were acting individually, motivated by principle or personal conviction or perhaps, as appellant union alleges, by a desire not to pay dues. In any event, the three appellees had worked as letter carriers for 14, 13, and 12 years, respectively, without any sort of trouble either with the postal authorities or with their fellow employees. In fact,

there is no evidence that the appellees were involved in a dispute with anyone until the union officials became displeased with appellees' exercise of their admitted right not to join the union and began to subject them to public ridicule and vilification.

The majority characterizes the union's actions as part of an ongoing organizational campaign, ante, at 2773, and treats this situation as a 'labor dispute' within the intendment of the Linn rule of partial pre-emption. But *295 this is accurate only if federal labor law is sufficiently implicated to warrant pre-emption of state libel law whenever an employee declines an invitation to become a union member. Certainly, there was no dispute here between labor and management. There was also no conflict between competing labor organizations and no effort, either organized or otherwise, to encourage defection from appellant union. There was, in short, no dispute of any sort save the union's attempt to coerce appellees by scurrilous and defamatory statements to do what they had an admitted legal right not to do. Thus the union, by its own coercive conduct, created a 'dispute,' the presence of which, according to the majority, provides partial immunity from the consequences of its wrondoing under state law.

In my view this is an unnecessary and unwise extension of Linn. Here there **2787 was no confrontation between powerful forces of labor and management, no clash of opposing economic interests that might warrant the attention of federal regulatory authorities, and hence no prospect whatever that reliance on state libel law might subvert the federal scheme for the fair and peaceful resolution of labor disputes. Yet the majority nevertheless holds that the state libel judgments entered below are pre-empted by federal labor law. This conclusion seems to me a needless denigration of the 'overriding state interest' in compensating individuals for injury to reputation. Moreover, it leaves these appellees without effective remedy for the wrong done them. Far from representing a powerful

economic interest that could fight for itself within the federally created system of individual self-government, these appellees were defenseless individuals.[FN*] In their 'dispute' *296 with the union, appellees found themselves in that state of helpless inequality that first gave social meaning to the labor movement. And after today's decision, the individual employee's exposure to harm without effective remedy is not limited to defamation by a labor union, for presumably a corporate employer may also claim the knowing-or-reckless-falsity privilege as a bar to liability for defamatory statements concerning an employee's decision to join or remain in a union. I do not believe Linn can fairly be construed to warrant any such regressive result.

> FN* The publication was sent in the union's paper to all members and also was posted on the bulletin board. Appellees had no means to reply or defend their reputations.

## II

As an alternative basis for its decision, the Court concludes that appellees are prohibited from recovering because there was no libel, indeed no falsehood of any kind, in the union's publication. According to the majority, the only factual allegation contained in the article was that appellees were 'scabs,' as that term is used in the labor movement, and that naming the appellees as scabs was literally and factually true.' Ante, at 2780. It is true, of course, that appellees were identified by name as 'scabs' in the union newsletter, but it is also true that the use of the word 'scab' was explicated by a long and vituperative article appearing immediately above appellees' names. The only fair way to read this article is to substitute each appellee's name for the word 'scab' whenever it appears. So construed, the plain meaning and import of this publication was that appellees lacked character, that they had 'rotten principles,' and that they were traitors to their God, their country, their families, and their friends. Appellants make no attempt to prove the truth of these accusations, contending instead that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

94 S.Ct. 2770

418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121
**(Cite as: 418 U.S. 264, 94 S.Ct. 2770)**

Page 21

they were mere hyperbole involving no statement of fact. The majority accepts this argument, in my view erroneously.

**\*297** It seems to me that the majority fails to distinguish between defamatory references to an anonymous group, class, or occupation, and a similar description of a named individual. It is one thing to say that lawyers are shysters and that doctors are quacks, but it is quite another matter—indeed, it is libelous per se—to publish that lawyer Jones is a shyster or that Dr. Smith is a quack. Here the union did not merely voice its opinion of 'scabs' generally; it identified these appellees by name and specifically impugned their character.

I would hold that federal law does not prohibit appellees from recovering from appellant union for injury to reputation. I would reverse and remand for a new trial in accord with our decision in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.

U.S.Va. 1974.
Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin
418 U.S. 264, 94 S.Ct. 2770, 86 L.R.R.M. (BNA) 2740, 41 L.Ed.2d 745, 74 Lab.Cas. P 10,121

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

409 S.W.3d 682, 298 Ed. Law Rep. 559, 41 Media L. Rep. 2191
**(Cite as: 409 S.W.3d 682)**

▷

Court of Appeals of Texas,
Houston (1st Dist.).
KTRK TELEVISION, INC., Appellant
v.
Theaola ROBINSON, Appellee.

No. 01–12–00372–CV.
July 11, 2013.
Rehearing Overruled Aug. 21, 2013.

**Background:** Former director and superintendent of charter school, whose operations had been suspended by State, sued television broadcaster for defamation per se following broadcast of news program alleging financial mismanagement at the school. Broadcaster filed motion to dismiss under the Texas Citizens Participation Act (TCPA). The 234th District Court, Harris County, Mauricio Reece Rondon, J., denied motion, and broadcaster appealed.

**Holdings:** The Court of Appeals, Jim Sharp, J., held that:

(1) it had jurisdiction to consider broadcaster's appeal, and

(2) director failed to establish prima facie case of defamation per se.

Reversed and remanded.

West Headnotes

**[1] Appeal and Error 30 ⬤═66**

30 Appeal and Error
　30III Decisions Reviewable
　　30III(D) Finality of Determination
　　　30k66 k. Necessity of final determination.
Most Cited Cases
　　Generally, courts of appeals have jurisdiction only over appeals from final judgments.

**[2] Appeal and Error 30 ⬤═68**

30 Appeal and Error
　30III Decisions Reviewable
　　30III(D) Finality of Determination
　　　30k67 Interlocutory and Intermediate Decisions
　　　　30k68 k. In general. Most Cited Cases
　　Appellate courts have jurisdiction over interlocutory orders only when that authority is explicitly granted by statute.

**[3] Appeal and Error 30 ⬤═68**

30 Appeal and Error
　30III Decisions Reviewable
　　30III(D) Finality of Determination
　　　30k67 Interlocutory and Intermediate Decisions
　　　　30k68 k. In general. Most Cited Cases
　　Statutes authorizing interlocutory appeals are strictly construed because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable.

**[4] Appeal and Error 30 ⬤═70(3)**

30 Appeal and Error
　30III Decisions Reviewable
　　30III(D) Finality of Determination
　　　30k67 Interlocutory and Intermediate Decisions
　　　　30k70 Nature and Scope of Decision
　　　　　30k70(3) k. On motions relating to pleadings. Most Cited Cases
　　Statute governing appeals from dismissal of legal actions based on a party's exercise of right of free speech permits an interlocutory appeal from a trial court's written order denying a motion to dismiss under the Texas Citizens Participation Act (TCPA). V.T.C.A., Civil Practice & Remedies Code §§ 27.001 et seq., 27.008.

**[5] Pretrial Procedure 307A ⬤═622**

307A Pretrial Procedure
　307AII Dismissal

307AIII(B) Involuntary Dismissal
307AIII(B)4 Pleading, Defects In, in General
307Ak622 k. Insufficiency in general. Most Cited Cases

A "prima facie case" within the meaning of Texas Citizens Participation Act (TCPA) prohibiting dismissal if plaintiff establishes by clear and specific evidence a prima facie case for each essential element represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true. V.T.C.A., Civil Practice & Remedies Code § 27.005(c).

**[6] Libel and Slander 237 ☜1**

237 Libel and Slander
237I Words and Acts Actionable, and Liability Therefor
237k1 k. Nature and elements of defamation in general. Most Cited Cases

To maintain a defamation cause of action, a plaintiff must prove that the defendant (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement.

**[7] Libel and Slander 237 ☜123(2)**

237 Libel and Slander
237IV Actions
237IV(E) Trial, Judgment, and Review
237k123 Questions for Jury
237k123(2) k. Construction of defamatory language in general. Most Cited Cases

Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court.

**[8] Appeal and Error 30 ☜893(1)**

30 Appeal and Error
30XVI Review

30XVI(F) Trial De Novo
30k892 Trial De Novo
30k893 Cases Triable in Appellate Court
30k893(1) k. In general. Most Cited Cases

Questions of law are subject to de novo review.

**[9] Libel and Slander 237 ☜6(1)**

237 Libel and Slander
237I Words and Acts Actionable, and Liability Therefor
237k6 Actionable Words in General
237k6(1) k. In general. Most Cited Cases

Whether a publication is an actionable statement of fact for defamation purposes depends on its verifiability and the context in which it was made.

**[10] Libel and Slander 237 ☜32**

237 Libel and Slander
237I Words and Acts Actionable, and Liability Therefor
237k31 Injury from Defamation
237k32 k. In general. Most Cited Cases

Statements that are defamatory per quod are actionable only upon allegation and proof of damages.

**[11] Libel and Slander 237 ☜33**

237 Libel and Slander
237I Words and Acts Actionable, and Liability Therefor
237k31 Injury from Defamation
237k33 k. Presumption as to damage; special damages. Most Cited Cases

**Libel and Slander 237 ☜116**

237 Libel and Slander
237IV Actions
237IV(D) Damages
237k115 Elements of Compensation
237k116 k. In general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

409 S.W.3d 682, 298 Ed. Law Rep. 559, 41 Media L. Rep. 2191
(Cite as: 409 S.W.3d 682)

In cases involving defamation per se, damages are presumed to flow from the nature of the defamation itself and, in most situations, a plaintiff injured by a defamatory per se communication is entitled to recover general damages without specific proof of the existence of harm.

**[12] Libel and Slander 237 ⬤⇝6(2)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k6 Actionable Words in General
           237k6(2) k. Imputation of falsehood, dishonesty, or fraud. Most Cited Cases

**Libel and Slander 237 ⬤⇝7(1)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k7 Words Imputing Crime and Immorality
           237k7(1) k. In general. Most Cited Cases

**Libel and Slander 237 ⬤⇝9(1)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k9 Words Tending to Injure in Profession or Business
           237k9(1) k. In general. Most Cited Cases

**Libel and Slander 237 ⬤⇝10(.5)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k10 Words Imputing Unfitness for or Misconduct or Criminal Acts in Office or Employment
           237k10(.5) k. In general. Most Cited Cases

The law presumes certain categories of statements are defamatory per se, including statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity or (2) are falsehoods that injure one in his office, business, profession, or occupation.

**[13] Libel and Slander 237 ⬤⇝7(12)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k7 Words Imputing Crime and Immorality
           237k7(12) k. Forgery, false pretenses, and breach of trust. Most Cited Cases

**Libel and Slander 237 ⬤⇝9(5)**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k9 Words Tending to Injure in Profession or Business
           237k9(5) k. Teachers and other educators. Most Cited Cases

Complained-of statements in television broadcast about State's investigation into suspended charter school's mismanaged funds did not unambiguously charge school's former director and superintendent with engaging in criminal behavior or constitute falsehood that injured her in her profession and thus were not defamation per se; reports did not say or imply that entire amount of state funds allocated to the school had been misappropriated or embezzled, but statements spoke to insufficiency of financial records to account for spent State funds, and director did not counter reports that State found school's financial records insufficient to fully account for money spent, or that State did not know how money had been spent.

**[14] Libel and Slander 237 ⬤⇝32**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k31 Injury from Defamation
           237k32 k. In general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

To be "defamatory per se," the defamatory nature of the challenged statement must be apparent on its face without reference to extrinsic facts or "innuendo;" if the court must resort to innuendo or extrinsic evidence to determine whether a statement is defamatory, then it is "defamation per quod" and requires proof of injury and damages.

**[15] Libel and Slander 237 ⬦➔30**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k30 k. Falsity. Most Cited Cases

Media defendants cannot be liable for defamation for varying subjective impressions that may have been generated from the broadcast of true statements.

**[16] Libel and Slander 237 ⬦➔30**

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k30 k. Falsity. Most Cited Cases

Discrepancies as to details do not demonstrate material falsity for defamation purposes.

**\*683** Laura Lee Prather, Catherine Lewis Robb, Haynes and Boone, LLP, Austin, TX, for Appellant.

**\*684** Berry Dunbar Bowen, Houston, TX, for Appellee.

Panel consists of Justices BLAND, SHARP, and MASSENGALE.

## OPINION

JIM SHARP, Justice.

Following a series of news reports by KTRK Television, Inc. alleging financial mismanagement, Benji's Special Education Academy ("BSEA"), a charter school, and Theaola Robinson sued KTRK. KTRK moved to dismiss the action pursuant to the then-recently enacted Texas Citizens Participation Act ("TCPA").[FN1] In a written order, the trial court denied the motion. In five issues, KTRK contends that the trial court erred in denying KTRK's motion to dismiss. In her brief, the school's former director and superintendent, Robinson, also challenges this Court's jurisdiction to consider KTRK's appeal.[FN2] We hold that we have jurisdiction over this appeal, that the trial court erred by denying KTRK's motion to dismiss, and we reverse.

> FN1. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 27.001–.011 (West Supp.2012).

> FN2. BSEA is no longer a party to this case.

## Background
### A. The Charter School

In May 1980, Robinson founded BSEA, a non-profit corporation, to provide a day care and education for special needs children ("Benji's"). In November 1998, the Texas State Board of Education ("SBOE") granted BSEA a charter to operate Benji's as an open-enrollment, publicly funded pre-K through twelfth grade charter school.[FN3] As such, compliance with the laws governing public schools was required.

> FN3. The original plaintiffs in this suit were BSEA, the non-profit corporation that ran the charter school, and Robinson. Although both the school and the corporation use the name "Benji's" or "Benji's Special Education Academy," Benji's (the school) was never a plaintiff. Robinson amended her petition and dropped BSEA from the case, leaving Robinson as the sole plaintiff. As a result, Robinson is the sole appellee.

By the mid–2000s, Benji's enrollment had increased nearly five-fold and, on behalf of BSEA, Robinson applied for a renewal of the charter to the Texas Education Agency ("TEA") in April 2003.

409 S.W.3d 682, 298 Ed. Law Rep. 559, 41 Media L. Rep. 2191
**(Cite as: 409 S.W.3d 682)**

The TEA refused action on the application, however, pending resolution of BSEA's growing list of problems. Indeed, five years later, the renewal application was still pending and, in December 2008, the TEA informed Robinson that it would remain pending until resolution of BSEA's problems in the following areas: financial management, academic performance, performance-based monitoring activities, audit requirements, and special education laws and policies.

By letter dated July 8, 2010, TEA Commissioner Robert Scott notified Robinson that in light of longstanding academic, governance, and financial concerns, and despite numerous agency investigations and interventions, the TEA intended to appoint a Board of Managers and a new Superintendent for the school. Following a hearing on August 19, 2010, Robinson and Benji's board of directors were notified on September 3, 2010, that the TEA would proceed to appoint a Board of Managers and Superintendent, which appointments effectively suspended any and all prior grants of authority to the former board of directors and Robinson.

On September 16, 2010, after the TEA had learned of the extent of the financial problems at Benji's, it issued an Order *685 Suspending Charter Operations and Funds, stating, in relevant part, as follows:

[The urgent financial conditions at Benji's were not] known either to the board of managers or to the new superintendent when they met on September 6, 2010. Rather, the information leading to the conclusion that an urgent financial condition may exist at the charter school was disclosed by painstaking effort to assemble and evaluate information that had not been viewed by the former administration as indicating such a conclusion. Subsequent events have made plain that the former administration continues to maintain that there was and is no urgent financial condition presented by these facts.

The newly appointed Superintendent advised the parents by letter of the immediate suspension of the school's operations. The letter cited the school's critical cash flow problem, which included a virtually depleted bank account and numerous outstanding debts (including one to the Internal Revenue Service), as the reason that "the school cannot continue to operate as it does not have the necessary funds to pay its staff members or meet its current financial obligations."

Despite having been relieved of her duties as superintendent, Robinson directed staff to continue reporting to work as usual and asked parents to continue sending their children to school. Robinson also conducted a televised press conference at which she stated that she would not allow the new superintendent to carry out the TEA's decision and that the school would remain open despite the board's decision. Notwithstanding the State-mandated closure, on September 15, 2010, Robinson re-opened Benji's as an unaccredited private school using the same public school property and buses.

The next day, TEA Commissioner Scott ordered the immediate suspension of all of Benji's funding as well as its open-enrollment charter. Commissioner Scott subsequently sent a letter to Robinson and BSEA's board outlining the various grounds for revoking Benji's charter, including its "failure to satisfy generally accepted accounting standards of fiscal management." The letter detailed examples of the school's fiscal mismanagement, which had resulted in significant wasting of financial resources. Examples of Benji's financial problems while under Robinson's direction included the following:

(1) BSEA was the subject of a warrant hold following its nonpayment to the Teachers Retirement System in the amount of $43,000 for retirement contributions and $13,000 in health coverage;

(2) The Department of Agriculture cancelled BSEA's participation in child nutrition programs

409 S.W.3d 682, 298 Ed. Law Rep. 559, 41 Media L. Rep. 2191
**(Cite as: 409 S.W.3d 682)**

because of BSEA's failure to demonstrate fiscal responsibility;

(3) BSEA owed a debt of $87,000 to the IRS in unpaid taxes;

(4) BSEA's board failed to oversee or adequately supervise its financial resources; and

(5) BSEA had been in poor financial condition for many years.

In his letter, the TEA Commissioner also noted the irregularities in Benji's rental arrangement and payments: BSEA leased the property from the City of Houston for $1 per year and re-leased this same property to Benji's for $9,000 per month, an arrangement for which the City had never given its permission.

**B. KTRK's Statements at Issue**

A public outcry ensued over the charter revocation and the school's closing. Several local media outlets—including KTRK— **\*686** broadcast and posted numerous reports about the ongoing controversy. KTRK's reports included the following statements upon which Robinson bases her defamation claim:

(1) "According to the State[,] millions in taxpayer dollars cannot be accounted for" and "[t]he State closure is based on a lack of sufficient financial records, meaning the State doesn't know where over three million dollars of taxpayer money given last year has been spent." (4:30 p.m., September 15, 2010 broadcast)[FN4]

> FN4. As an exhibit to its Motion to Dismiss, KTRK attached the affidavit of KTRK reporter Cynthia Cisneros. In her affidavit, Cisneros states "I was [ ] informed by the TEA that Benji's had received $3.3 million in 2009–2010."

(2) "For the State, the issue is simple—where is the money? They say millions of taxpayer dollars are unaccounted for ... The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the more than $3 million of taxpayer money given last year has been spent...." (September 15, 2010 article published on KTRK's website)

(3) "Where is taxpayer money going and how is a taxpayer-owned building being used? ... The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions." (September 25, 2010 article published on KTRK's website)

(4) "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (September 27, 2010 article published on KTRK's website)

(5) "The [S]tate says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (September 30, 2010 article published on KTRKs website)

(6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in State funding that was not accounted for." (October 11, 2010 article published on KTRK's website)

**C. Trial Court Proceedings**

On September 14, 2011, Robinson and BSEA sued KTRK for defamation.[FN5] On December 21, 2011, KTRK filed a motion to dismiss under the TCPA. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 27.001–.011 (West Supp.2012). KTRK argued that it was entitled to dismissal because (1) plaintiffs' claim was based on, related to, or in response to KTRK's exercise of its right of free speech, and (2) plaintiffs could not establish by clear and specific evidence a prima facie case for each essential element of their case. Robinson filed a response.[FN6] Both parties attached affidavits and other evidence to their pleadings.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN5. Robinson originally filed this suit against KTRK's parent company, The Walt Disney Company, in federal court. After the suit was dismissed, Robinson attempted to add Disney and KTRK to a federal lawsuit against the TEA in which she had joined. The federal court denied leave to add Disney and KTRK as defendants in the federal action.

FN6. BSEA was no longer a plaintiff in the case.

The trial court conducted a hearing on February 13, 2012. On February 23, 2012, the trial court entered an amended order denying KTRK's motion to dismiss. On February 29, 2012, KTRK filed its request for findings and conclusions regarding the court's denial of its motion to dismiss. On **\*687** March 20, 2012, the trial court issued its "Findings of Fact In Connection with CPRC § 27.007." KTRK timely appealed.

### Discussion
#### A. Appellate Jurisdiction

[1][2][3] As a threshold matter, we address Robinson's contention that we do not have jurisdiction over this interlocutory appeal. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004) ("[A] court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided.") Generally, courts of appeals have jurisdiction only over appeals from final judgments. *Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 195 (Tex.2001). Further, appellate courts have jurisdiction over interlocutory orders only when that authority is explicitly granted by statute. *Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex.2007). Statutes authorizing interlocutory appeals are strictly construed because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable. *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex.2011).

[4] Section 27.008 of the TCPA, entitled "Appeal," provides:

(a) If a court does not rule on a motion to dismiss under Section 27.003 in the time prescribed by Section 27.005, the motion is considered to have been denied by operation of law and the moving party may appeal.

(b) An appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court's order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005.

(c) An appeal or other writ under this section must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by Section 27.005 expires, as applicable.

TEX. CIV. PRAC. & REM.CODE ANN. § 27.008.

Robinson relies on the Fort Worth Court of Appeals's decision in *Jennings v. WallBuilders Presentations, Inc.* to argue that although section 27.008(a) authorizes an interlocutory appeal when a movant's motion to dismiss is denied by operation of law, the TCPA does not authorize an interlocutory appeal of a trial court's signed order denying a motion to dismiss. *See Jennings*, 378 S.W.3d 519, 524–27 (Tex.App.-Fort Worth 2012, pet. filed). There, the court held that the language in the TCPA conferred jurisdiction to review a decision under the TCPA, but only if the motion is denied by operation of law, and not if the trial court signs an order denying the motion. *See id.* at 526–27. The *Jennings* court concluded that the legislature intended to ensure that a court would review and rule on the motion, but not that its ruling would be subject to appellate review. *See id.* at 527.

Since *Jennings*, several other courts of appeals have considered the issue. In *Direct Commercial Funding, Inc. v. Beacon Hill Estates, LLC*, the

Fourteenth Court of Appeals declined to follow *Jennings. See* No. 14–12–00896–CV, 2013 WL 407029 (Tex.App.-Houston [14th Dist.] Jan. 24, 2013, order). The *Beacon Hill Estates* court noted that section 27.008(b) requires an appellate court to "expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss ... or from a trial court's failure to rule." *Id.* at *3. The court reasoned that "[i]f no interlocutory appeal is available when the trial court expressly rules on a motion to dismiss by signing an order, then the phrase 'from a trial court order on a motion to dismiss' appearing after the phrase 'whether interlocutory or not' is **\*688** rendered meaningless." *Id.* The court further concluded the most natural reading of the phrase "whether interlocutory or not" is to read it as modifying both of the subsequent references to "a trial court order" and "a trial court's failure to rule." *Id.* Finally, the court noted that section 27.008(c) states an appeal "must be filed on or before the 60th day after the date the trial court's order is signed or the time prescribed by section 27.005 expires, as applicable." *Id.* at *4. The court concluded that "[i]f no signed order can be the subject of an interlocutory appeal, then the reference to the date on which 'the trial court's order is signed' also is superfluous." *Id.* The Fifth and Thirteenth Courts of Appeals have since adopted the Fourteenth Court of Appeals's interpretation of section 27.008. *See Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, INC.,* 402 S.W.3d 299, 306–07 (Tex.App.-Dallas 2013, no pet. h.) (finding reasoning of Fourteenth Court of Appeals persuasive and concluding that it had jurisdiction under TCPA over interlocutory appeal of trial court's order denying defendant's motion to dismiss); *San Jacinto Title Svcs., LLC v. Kingsley Props., LP.,* ——S.W.3d ——, 2013 WL 1786632, at *4 (Tex.App.-Corpus Christi 2013, no pet. h.) (agreeing with Fourteenth Court of Appeals that to conclude that no signed order can be subject of interlocutory appeal would render portions of section 27.008(b) and (c) meaningless).

We agree with the Fourteenth Court of Appeals's reasoning in *Beacon Hill Estates.* We conclude that section 27.008 permits an interlocutory appeal from the trial court's written order denying a motion to dismiss under the TCPA.

**B. Application of the TCPA**

In enacting the TCPA, the Legislature explained that the statute's purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM.CODE ANN. § 27.002. The statute is to "be construed liberally to effectuate its purpose and intent fully." *Id.* § 27.011(b).

In deciding whether to grant a motion under the TCPA and dismiss the lawsuit, the statute directs the trial court to "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006. The court must then determine whether (1) the moving defendant has shown "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of the right of free speech, the right to petition, or the right of association"; and (2) the plaintiff has shown "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(b), (c). The first step of this inquiry is a legal question we review de novo. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.,* No. 01–12–00581–CV, 2013 WL 1867104, at *6 (Tex.App.-Houston [1st Dist.] May 2, 2013, no pet. h.).

[5] The Legislature's use of the term "prima facie case" in the second step implies a minimal factual burden: "[a] prima facie case represents the minimum quantity of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* at *6 (quoting *Rodriguez v. Printone Color Corp.,* 982 S.W.2d 69, 72 (Tex.App.-Houston [1st Dist.] 1998, pet. denied)). Nonetheless, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

409 S.W.3d 682, 298 Ed. Law Rep. 559, 41 Media L. Rep. 2191
**(Cite as: 409 S.W.3d 682)**

statute requires that the proof offered address and support each "essential element" of every claim asserted with "clear and specific evidence."**\*689** *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(b), (c). Because the statute does not define "clear and specific" evidence, these terms are given their ordinary meaning. *See TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011). "Clear" means "unambiguous," "sure," or "free from doubt." Black's Law Dictionary 268 (8th ed. 2004). "Specific" means "explicit" or "relating to a particular named thing." *Id.* at 1167. Accordingly, we examine the pleadings and the evidence to determine whether Robinson marshaled "clear and specific" evidence to support each alleged element of her cause of action.

As a preliminary matter, we note that Robinson has never asserted, either in the trial court below or on appeal, that her claim is not covered by the TCPA. That is, she does not argue that her defamation claim is not based on, related to, or in response to KTRK's exercise of its right to "petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." As such, we begin with the second step of the inquiry—whether Robinson has demonstrated by clear and specific evidence a prima facie case for each essential element of her claim.

### C. Prima Facie Case

[6][7][8][9] To maintain a defamation cause of action, a plaintiff must prove that the defendant (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998). "Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court." *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). Questions of law are subject to de novo review. *In re Humphreys,* 880 S.W.2d 402, 404 (Tex.1994).

Whether a publication is an actionable statement of fact depends on its verifiability and the context in which it was made. *See Bentley v. Bunton,* 94 S.W.3d 561, 581 (Tex.2002).

### Defamatory Statement

Robinson argues that she has demonstrated that KTRK "made up" the complained-of statements and, in doing so, has established a prima facie case of defamation *per se.* KTRK contends that Robinson failed to establish with clear and specific evidence that the complained-of statements were defamatory *per se.*

[10][11] We initially address KTRK's contention that Robinson has alleged only a claim of defamation *per se.* Defamation claims are divided into two categories—defamation *per se* and defamation *per quod*—according to the level of proof required to make them actionable. *See Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.,* 219 S.W.3d 563, 580 (Tex.App.-Austin 2007, pet. denied). Statements that are defamatory *per quod* are actionable only upon allegation and proof of damages. *Id.* at 580; *Alaniz v. Hoyt,* 105 S.W.3d 330, 345 (Tex.App.-Corpus Christi 2003, no pet.). That is, before a plaintiff can recover for defamation *per quod,* she must carry her burden of proof as to both the defamatory nature of the statement and the amount of damages caused by its publication. *See Texas Disposal,* 219 S.W.3d at 580 (citing *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 374 (Tex.1984)). By contrast, in cases involving defamation *per se,* damages are presumed to flow from the nature of the defamation itself and, in most situations, a plaintiff injured by a defamatory *per se* communication is entitled to recover **\*690** general damages without specific proof of the existence of harm. *Bentley,* 94 S.W.3d at 604 ("Our law presumes that statements that are defamatory *per se* injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish.").

KTRK argues that Robinson neither pleaded nor presented any proof of the amount of alleged

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

damages, and thus, her claim is one for defamation *per se* only. In her petition, Robinson alleged that KTRK's statements damaged her reputation. In her prayer, Robinson sought judgment "[f]or libel *per se* damages found by the trier of fact without proof of special damages [and] for actual damages and exemplary damages for malicious libel...." In her appellate brief, Robinson does not dispute KTRK's contention that her claim sounds only in defamation *per se*. Indeed, she asserts that she has "established by clear and specific evidence a prima facie case on each element of her claim that the complained of statements were defamatory *per se*." Based upon the record before us, we agree that Robinson has not alleged a claim for defamation *per quod* and, therefore, our analysis treats upon Robinson's claim as one for defamation *per se*.

[12][13] The law presumes certain categories of statements are defamatory *per se*, including statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity or (2) are falsehoods that injure one in his office, business, profession, or occupation. *Main v. Royall*, 348 S.W.3d 381, 390 (Tex.App.-Dallas 2011, no pet.). Robinson complains of the following statements made by KTRK:

(1) "According to the State[,] millions in taxpayer dollars cannot be accounted for" and "[t]he State closure is based on a lack of sufficient financial records, meaning the State doesn't know where over three million dollars of taxpayer money given last year has been spent." (4:30 p.m., September 15, 2010 broadcast)

(2) "For the State, the issue is simple—where is the money? They say millions of taxpayer dollars are unaccounted for ... The State closure is based on a lack of sufficient financial records, meaning the State doesn't know where the more than $3 million of taxpayer money given last year has been spent...." (September 15, 2010 article published on KTRK's website)

(3) "Where is taxpayer money going and how is a taxpayer-owned building being used? ... The Texas Education Agency says it doesn't know how Benji's spent $3 million of taxpayer money, and a lease agreement obtained by Eyewitness News raises even new questions." (September 25, 2010 article published on KTRK's website)

(4) "The Texas Education Agency doesn't know how the academy spent $3 million of state money." (September 27, 2010 article published on KTRK's website)

(5) "The [S]tate says it had no choice, alleging Benji's did not provide proper financial records to account for over $3 million in state funding for the past year." (September 30, 2010 article published on KTRKs website)

(6) "On September 14, the TEA ordered Benji's Academy to close, citing millions of dollars in state funding that was not accounted for." (October 11, 2010 article published on KTRK's website)

Robinson argues these statements to be defamatory *per se* because they insinuate that she embezzled over $3 million and **\*691** thereby falsely imputed criminal behavior to her. Robinson also contends that KTRK's statements have damaged her reputation and, in support of her argument, points to the following third-party comments posted by readers on KTRK's website in response to the broadcasts and articles:

• "Call and ask where the money went. I'm sure Theola [sic] Robinson tell you."

• "Could it be in somebody's pockets?'

• "Ms. Robinson should be arrested, not because she's black, because she's a thief!"

• "I am just amazed as to why the parents are not suing Theaola Robinson and the old Board of Director[s], they are the ones who are stealing their children's future...."

- "You bet they want to keep it open, if its [sic] closed an investigation will show they were all taking money not to mention they won't be able to afford their new house, Hummer and boat payments the school and taxpayers were helping to buy."

- "The state is not to blame here. They need to sue the administrators to find out where the money is followed by prosecution of those who may have 'mis-spent' it. Put blame where blame is due!"

- "Simple! No money! Can not account for $9 million! Close the doors and take the administrators to court for mis-use of government (your) money...."

- "The only thing organized about this plan is the organized crime."

- "The parents are supporting the administrators who have a little charisma along with a talent for lining their pockets...."

- "The mgmt. of this facility will continue to steal under the guide [sic] of a school, where the kids will continue to suffer."

[14] Robinson's reliance on third-party comments posted on KTRK's comment board to prove defamation *per se* is misplaced. To be defamatory *per se*, the defamatory nature of the challenged statement must be apparent on its face without reference to extrinsic facts or "innuendo." *Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex.App.-Waco 2005, no pet.) (noting that "the very definition of 'per se,' 'in and of itself,' precludes the use of innuendo"). If the court must resort to innuendo or extrinsic evidence to determine whether a statement is defamatory, then it is defamation *per quod* and requires proof of injury and damages. *Main*, 348 S.W.3d at 390. There is nothing intrinsically defamatory about KTRK's reports on the State's investigation into Benji's mismanaged funds. The reports did not say or imply that the entire $3 million

in state funds had been misappropriated or embezzled. Rather, the statements speak to the insufficiency of financial records to account for spent state funds. Similarly, the September 25th broadcast questioning the lease situation neither states nor implies that state funds were misappropriated.

[15] Further, the evidence shows that the TEA's longstanding concern about and subsequent investigation into Benji's accounting resulted in the suspension and, ultimately, the revocation of the school's charter due to the urgent financial conditions and its fiscal mismanagement. Thus, KTRK's reports that the State found Benji's financial records insufficient to fully account for the money spent, and that the State did not know how the money had been spent, were based on evidence that Robinson did not counter. Media defendants cannot be liable for varying **\*692** subjective impressions that may have been generated from the broadcast of true statements. *See ABC, Inc. v. Gill*, 6 S.W.3d 19, 35–38 (Tex.App.-San Antonio 1999, pet. denied).

[16] Robinson also argues that because KTRK's broadcasts on questions of financial mismanagement reported the amount of total funding, the statements falsely suggest that she failed to account for any of it, when, in fact, she did provide records to show how part of the funds were spent. KTRK's reports, however, never recited that she had failed to account for any of it, but that the TEA *had* found the records provided were insufficient to account for the full amount. Moreover, discrepancies as to details do not demonstrate material falsity for defamation purposes. *See, e.g., Dolcefino v. Turner*, 987 S.W.2d 100, 115 (Tex.App.-Houston [14th Dist.] 1998), *aff'd*, 38 S.W.3d 103 (Tex.2000) (showing that insurance fraud "scam" involved $1.7 million, rather than $6.5 million, did not demonstrate falsity of statement); *Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 471–73 (Tex.App.-Dallas 1994, writ denied) (misstatement that charity spent 10% of its donations on actual services, rather than 43%, was immaterial to gist of articles concerning misuse of charity funds); *Fink-*

409 S.W.3d 682, 298 Ed. Law Rep. 559, 41 Media L. Rep. 2191
**(Cite as: 409 S.W.3d 682)**

*lea v. Jacksonville Daily Progress*, 742 S.W.2d 512, 514–15 (Tex.App.-Tyler 1987, writ dism'd w.o.j.) (misstatement that plaintiff had four drug convictions, rather than two, was substantially true); *Shihab v. Express–News Corp.*, 604 S.W.2d 204, 206–08 (Tex.Civ.App.-San Antonio 1980, writ ref'd n.r.e.) (inaccurate designation of which of several news stories was fabricated was insignificant where the main charge was fabrication and one story was fabricated); *Downer v. Amalgamated Meatcutters & Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex.Civ.App.-Dallas 1977, writ ref'd n.r.e.) (misstatement that plaintiff embezzled $2,187.77, rather than $840.73, was substantially true); *Fort Worth Press Co. v. Davis*, 96 S.W.2d 416, 419–20 (Tex.Civ.App.-Fort Worth 1936, writ ref'd) (article charging official with wasting $80,000 of tax money rather than only $17,500 was substantially true).

In sum, there is nothing in the complained-of statements that unambiguously charged Robinson with engaging in criminal behavior or constituted a falsehood that injured her in her profession. Because Robinson has not adduced clear and specific evidence that the challenged statements made by KTRK in its broadcasts and reports are defamatory *per se*, she has not made a prima facie case for each essential element of her defamation claim against KTRK. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.005(b), (c) (West Supp.2012).

### Conclusion

Having concluded that we have jurisdiction over this interlocutory appeal and that Robinson failed to sustain her burden to show a prima facie case for each essential element of her defamation claim, we reverse the trial court's denial of KTRK's motion to dismiss, and remand the case to the trial court for further proceedings as required by the statute to order dismissal of the suit. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 27.009(a).

Tex.App.–Houston [1 Dist.],2013.
KTRK Television, Inc. v. Robinson
409 S.W.3d 682, 298 Ed. Law Rep. 559, 41 Media

L. Rep. 2191

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

Supreme Court of Texas.
FORBES INC. and William P. Barrett
v.
GRANADA BIOSCIENCES, INC. and Granada
Foods Corporation.

No. 01–0788.
Argued on Jan. 15, 2003.
Decided Dec. 19, 2003.

**Background:** Related corporations brought business disparagement claims, and company executives brought defamation and intentional infliction of emotional distress claims, against magazine publisher, author of article appearing in magazine, and source for article. The 190th District Court, Harris County, John P. Devine, J., granted summary judgment for defendants, and plaintiffs appealed. The Amarillo Court of Appeals, 958 S.W.2d 215, reversed the summary judgment order insofar as it affected plaintiff companies' business disparagement claims, but affirmed the remainder of the judgment. On remand, the District Court, John P. Devine, J., granted summary judgment for defendants on the business disparagement claims, and plaintiffs appealed. On overruling of rehearing, the Houston Court of Appeals, Fourteenth District, Maurice Amidei, Justice, sitting by assignment, 49 S.W.3d 610, reversed and remanded. Review was granted.

**Holdings:** The Supreme Court, O'Neill, J., held that:

(1) author's statements after article was printed and in distribution could not be evidence of actual malice at time of publication, and

(2) generic statements about organization of related businesses were not made with actual malice and were not business disparagement as to two corporate subsidiaries, even if untrue as to them.

Reversed and rendered.

West Headnotes

**[1] Libel and Slander 237 ⚷133**

237 Libel and Slander
   237V Slander of Property or Title
      237k133 k. Actionable words or conduct relating to quality or value. Most Cited Cases

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff.

**[2] Libel and Slander 237 ⚷133**

237 Libel and Slander
   237V Slander of Property or Title
      237k133 k. Actionable words or conduct relating to quality or value. Most Cited Cases

The tort of business disparagement differs from defamation in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests.

**[3] Libel and Slander 237 ⚷51(5)**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein
      237k51 Existence and Effect of Malice
         237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

Public figures cannot recover for damaging statements made about them absent proof of actual malice.

**[4] Libel and Slander 237 ⚷51(5)**

237 Libel and Slander
   237II Privileged Communications, and Malice Therein
      237k51 Existence and Effect of Malice
         237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

Cases

"Actual malice" that a public figure plaintiff must show in a defamation action requires proof that the defendant made a statement with knowledge that it was false or with reckless disregard of whether it was true or not.

**[5] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

To establish reckless disregard, a public-figure plaintiff must prove in a defamation suit that the defendant entertained serious doubts as to the truth of his publication or had a high degree of awareness of the probable falsity of the published information; reckless disregard is a subjective standard focusing on the defendant's state of mind, and mere negligence is not enough.

**[6] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

Constitutional malice necessary for defamation action by public-figure plaintiff generally consists of calculated falsehood. U.S.C.A. Const.Amend. 1.

**[7] Libel and Slander 237 ☞51(5)**

237 Libel and Slander
    237II Privileged Communications, and Malice Therein
        237k51 Existence and Effect of Malice
            237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited

Cases

When the defendant's words lend themselves to more than one interpretation, a public-figure plaintiff must establish either that the defendant knew that the words would convey a defamatory message or had reckless disregard for their effect.

**[8] Libel and Slander 237 ☞112(2)**

237 Libel and Slander
    237IV Actions
        237IV(C) Evidence
            237k112 Weight and Sufficiency
                237k112(2) k. Intent, malice, or good faith. Most Cited Cases

Actual malice must be proved by clear and convincing evidence at trial in defamation action.

**[9] Appeal and Error 30 ☞934(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k934 Judgment
                30k934(1) k. In general. Most Cited Cases

**Judgment 228 ☞185(5)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
        228k185 Evidence in General
            228k185(5) k. Weight and sufficiency. Most Cited Cases

In reviewing a no-evidence summary judgment motion, the Supreme Court examines the record in the light most favorable to the non-movant; if the non-movant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

**[10] Judgment 228 ☞185(5)**

228 Judgment
    228V On Motion or Summary Proceeding

228k182 Motion or Other Application
228k185 Evidence in General
228k185(5) k. Weight and sufficiency.
Most Cited Cases

A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

[11] **Judgment 228 ☞185(5)**

228 Judgment
228V On Motion or Summary Proceeding
228k182 Motion or Other Application
228k185 Evidence in General
228k185(5) k. Weight and sufficiency.
Most Cited Cases

Less than a scintilla of evidence exists in opposition to no-evidence summary judgment motion when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact; more than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(i).

[12] **Libel and Slander 237 ☞136**

237 Libel and Slander
237V Slander of Property or Title
237k136 k. Defenses. Most Cited Cases

Statements by author after magazine article was printed and in distribution could not be evidence of actual malice at time of publication of article allegedly resulting in business disparagement.

[13] **Libel and Slander 237 ☞51(5)**

237 Libel and Slander
237II Privileged Communications, and Malice Therein
237k51 Existence and Effect of Malice
237k51(5) k. Criticism and comment on public matters and publication of news. Most Cited Cases

The actual malice inquiry in a defamation action by a public-figure plaintiff focuses on the defendant's state of mind at the time of publication.

[14] **Libel and Slander 237 ☞136**

237 Libel and Slander
237V Slander of Property or Title
237k136 k. Defenses. Most Cited Cases

Statements in magazine article about organization of related businesses were not made with actual malice and were not business disparagement as to two corporate subsidiaries, even though the author stated that certain generic references to the organization were not intended to apply to the subsidiaries; the author was charged with the task of producing a readable article about an extremely complicated network of business entities and was at most guilty of using imprecise language, and while it would have been more accurate for the author to identify the precise entities, the careless use of the generic term was no evidence of serious doubts as to the truth or a high degree of awareness of falsity.

*169 Peter D. Kennedy, David H. Donaldson Jr., George & Donaldson, L.L.P., Austin, for petitioner.

Michael D. Sydow, Ralph S. Carrigan, Sydow, Kormanik, Carrigan & Eckerson, L.L.P., Houston, for respondent.

Thomas S. Leatherbury, Vinson & Elkins, L.L.P., Dallas, for amicus curiae.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice JEFFERSON, Justice SMITH, Justice WAINWRIGHT, and Justice BRISTER joined.

Granada Biosciences, Inc. and Granada Foods Corporation sued Forbes, Inc., publisher of *Forbes* magazine, and writer William P. Barrett for business disparagement. The trial court rendered summary judgment for *Forbes* and *Barrett*, and the court of appeals reversed. 49 S.W.3d 610. We hold that the court of appeals erred in reversing the trial

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

court's summary judgment because the plaintiffs produced no evidence that Forbes and Barrett acted with actual malice in publishing the article that is the subject of this controversy. Accordingly, we reverse the court of appeals' judgment and render judgment for Forbes and Barrett.

## I

In its issue dated November 11, 1991, Forbes published an article entitled "The Incredible Shrinking Empire." [FN1] The article, authored by Barrett, focused on the financial condition of the Granada Corp., a privately held company, and on its chairman, David Eller. Granada Corp. was the parent of a number of other private and public entities. While the Granada organization consisted of dozens of entities, the article only named two of the public entities, Granada Foods Corp. (GFC) and Granada Biosciences, Inc. (GBI). In general, the Granada entities were engaged in developing and applying advanced technology in the area of agriculture, primarily cattle production. The article noted that the *Wall Street Journal* had described Granada Corp. as a "corporate star[ ] of the future" in 1989, and that the organization, under Eller's stewardship, had garnered much favorable publicity. But, the article said, "there is less to Granada than meets the eye. Actually, its total revenues, $1 billion as recently as 1988, will scarcely be $200 million for 1991. Profits: zilch. Granada's work force has shrunk to below 900 from 2,200; its cattle herd has dwindled to 25,000 from 1 million." The article identified GFC and GBI as the two publicly traded stock companies within the Granada organization, and said that they were "so broke they haven't been able to publish their 1990 annual reports." It went on to say that "Granada is beset with a series of serious shareholder lawsuits," including one filed by "Fort Worth near-billionaire Edward Bass." It is undisputed that, while a person with that name had sued one of the Granada entities, it was not the "Fort Worth near-billionaire." Furthermore, the article described a number of other signs of serious financial trouble: "Possibly anticipating a bankruptcy filing, former Granada employees say

officials in recent months have moved some farm equipment and vehicles off Granada books and gotten rid of backup documentation."

> FN1. The article is attached as an Appendix to this opinion.

According to Barrett's affidavit, he used the term "Granada" in a generic sense to describe the various entities controlled by Eller, and when he "intended to specifically address Granada Biosciences, Inc. or Granada Food Corporation, [he] did so by *170 name." The day the article was released, the shares of GBI and GFC dropped precipitously, and trading was permanently suspended in early 1992.

GBI, GFC, Eller, and his wife, Linda, sued Barrett, Forbes, Inc., and Cheryl Munke, an employee of a former Granada affiliate, for damages allegedly caused by the article's publication. Forbes and Barrett (collectively "Forbes") filed joint motions for summary judgment, which the trial court granted. On appeal, the Seventh District court of appeals, to which the case was transferred, reversed, holding that Forbes's summary judgment motion did not address the plaintiffs' business disparagement claims. *Granada Biosciences, Inc. v. Barrett*, 958 S.W.2d 215, 221 (Tex.App.-Amarillo 1997, pet. denied). [FN2] On remand, Forbes filed a renewed and supplemental summary judgment motion under Rule 166a(c) and(i), which specifically addressed the plaintiffs' business disparagement claims. The trial court again granted summary judgment in Forbes's favor, but the Fourteenth District court of appeals reversed, concluding that several fact issues precluded summary judgment. The court determined that there were fact issues concerning whether the article as a whole and several specific passages in the article were false and disparaging. 49 S.W.3d at 621–22. The court agreed with Forbes's contention that, to recover on their business disparagement claims, the plaintiffs were required to satisfy the constitutional actual-malice standard the United States Supreme Court established in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

710, 11 L.Ed.2d 686 (1964), but held that a fact issue on Forbes's state of mind at the time of publication precluded summary judgment. We hold that GBI and GFC presented no evidence of actual malice under the *New York Times* standard, and thus reverse the court of appeals' judgment.

> FN2. The Amarillo court affirmed the summary judgment as to all claims against Munke, and she is no longer a party. *Granada Biosciences, Inc.,* 958 S.W.2d at 222. It also affirmed the summary judgments as to the Ellers' claims. *Id.* at 222–25.

## II

[1][2] To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). A business disparagement claim is similar in many respects to a defamation action. *Id.* The two torts differ in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests. *Id.* In *Hurlbut,* a suit brought by an insurance agent against his former employer, we noted that a business disparagement defendant may be held liable "only if he knew of the falsity or acted with reckless disregard concerning it, or *if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion.*" *Id.* (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 623A, cmt. g (1977)).

The court of appeals noted in this case that GBI and GFC did not dispute Forbes's contention that they were "public figures for the purpose of discussing their respective financial statuses," a conclusion that GBI and GFC do not challenge here. 49 S.W.3d at 615 n. 2. The court then held that ill will or intent to interfere with the plaintiff's economic interest will not suffice to establish malice in a

business disparagement claim brought by a public figure **\*171** against a media defendant. *Id.* at 618. Instead, the court held that the constitutional interests at stake—"the conflict between constitutionally-protected free expression and a state's power to award damages based on a defendant's statements"—require proof of actual malice under the standard the United States Supreme Court articulated in *New York Times. Id.* at 618. Accordingly, the court held that GFC and GBI must establish that Forbes published the article with knowledge that it made false statements about them, or with reckless disregard as to the statements' truth. *Id.* In this Court, GBI and GFC do not challenge the court of appeals' application of the constitutional malice standard. We thus assume without deciding that the *New York Times* actual-malice standard applies in a public figure's business disparagement suit against a media defendant.<sup>FN3</sup>

> FN3. We note, however, that the United States Supreme Court has applied the *New York Times* standard in contexts other than defamation, applying it to an intentional infliction of emotional distress claim, *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), and to a product disparagement claim, *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 511–14, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

## III

[3] The actual malice standard articulated in *New York Times* fortifies our Constitution's guarantees of free speech and a free press. *New York Times,* 376 U.S. at 254, 84 S.Ct. 710. The relatively demanding standard honors our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures. *New York Times,* 376 U.S. at 270, 84 S.Ct. 710. The standard recognizes that "erroneous statement is inevitable in free debate,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " *Id.* at 271, 84 S.Ct. 710 (quoting *N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Thus, public figures cannot recover for damaging statements made about them absent proof of actual malice. *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710; *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998).

[4][5][6][7] Actual malice, in this context, "is a term of art." It is not ill will, spite, or evil motive. *Huckabee v. Time Warner,* 19 S.W.3d 413, 420 (Tex.2000) (citing *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989)). Instead, "actual malice" requires proof that the defendant made a statement " 'with knowledge that it was false or with reckless disregard of whether it was true or not.' " *Huckabee,* 19 S.W.3d at 420 (quoting *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710). To establish reckless disregard, a public-figure plaintiff must prove that the defendant " 'entertained serious doubts as to the truth of his publication.' " *Huckabee,* 19 S.W.3d at 420 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Bentley v. Bunton,* 94 S.W.3d 561, 591 (Tex.2002). Mere negligence is not enough. *Id.* Rather, the plaintiff must establish " 'that the defendant in fact entertained serious doubts as to the truth of his publication,' " or had a " 'high degree of awareness of ... [the] probable falsity' " of the published information. *Id.* (quoting *Harte–Hanks Comm., Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). Constitutional malice generally consists of " '[c]alculated falsehood.' " *Bunton,* 94 S.W.3d at 591 (quoting **\*172** *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew that the words would convey a defamatory message, or had reckless disregard for

their effect. *See Bunton,* 94 S.W.3d at 603.

[8] Actual malice must be proved by clear and convincing evidence at trial. *Huckabee,* 19 S.W.3d at 420. However, we have declined to adopt the clear-and-convincing standard for summary judgment purposes, because its application would "suggest[ ] that the trial court must weigh the evidence." *Id.* at 421–22. Accordingly, Forbes was entitled to summary judgment unless the record reveals a fact issue as to actual malice.

## IV

[9][10][11] In its no-evidence summary judgment motion, Forbes asserted that there was no evidence of actual malice to support the plaintiffs' claims. *See* TEX.R. CIV. P. 166a(i). In reviewing a no-evidence summary judgment motion, we examine the record in the light most favorable to the nonmovant; if the nonmovant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper. *King Ranch v. Chapman,* 118 S.W.3d 742, 750 (Tex.2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002). A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX.R. CIV. P. 166a(i); *Wal–Mart,* 92 S.W.3d at 506. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch,* 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch,* 118 S.W.3d at 751 (citing *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). Thus, if *GBI* and GFC presented evidence creating more than a surmise or suspicion that Forbes published the article with actual malice, summary judgment is improper. The court of appeals concluded that fact issues about Forbes's state of mind at the time of publication precluded summary judgment. 49 S.W.3d at 627. We disagree.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

## A

[12] The court of appeals rested its decision, in large part, on evidence suggesting that Barrett misled Eller into believing that he would have an opportunity to review the article for accuracy before its publication. 49 S.W.3d at 626. In his affidavit, Eller stated that when Barrett first contacted him about writing the article, Barrett agreed to let him review it before it was published. On Friday, October 25, 1991, Eller received a copy of "what [Barrett] said was a draft of the article." According to Eller, he read the article that day and telephoned Barrett, telling him that the article "contained innumerable false statements and clearly misleading and false innuendos." Eller's affidavit maintains that he was misled in the conversation into believing that the article could still be corrected, and that he told Barrett he would send him a letter identifying the purported inaccuracies as quickly as possible. Eller transmitted the letter to a courier for delivery by late the next day. According to the court of appeals, this evidence "creates a fact question as to Barrett's state of mind at the time of publication, provided that the article was not published until *after* Barrett's **\*173** representation." *Id.* at 625 (emphasis added).

[13] The actual malice inquiry focuses on the defendant's state of mind at the time of publication. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). It is undisputed, however, that the article had been "locked up"—printed and mailed to subscribers—on October 21st, before Barrett's October 25th conversation with Eller and before Forbes received Eller's letter. Nevertheless, the court of appeals held that the record presented a fact issue on malice "[b]ecause the summary judgment proof raises a question as to whether the October 25 conversation took place *before the article was published.*" 49 S.W.3d at 627 (emphasis added). The court concluded that the conversation may have taken place before the article was published based on authority holding that, for limitations purposes, " 'publication is complete on the

last day of the mass distribution of copies of the printed matter.' " *Id.* at 626 (quoting *Holloway v. Butler,* 662 S.W.2d 688, 692 (Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.)).

The court of appeals erred in applying the *Holloway* limitations standard in this context. Determining the date of an article's publication for limitations purposes involves considerations entirely different from those that apply when gauging whether actual malice exists at the time of publication. In *Holloway,* the plaintiff sued for libel based upon an article that appeared in *Texas Monthly* magazine. 662 S.W.2d at 690. Like most mass-media publishers, the defendant distributed its magazine through the mail and by private delivery in the month prior to the month indicated on the issue cover. Accordingly, distribution of the March 1977 issue occurred on February 17 and 18, 1977. By special order, though, some back issues were sold after February 22, 1977. Plaintiff filed suit on February 22, 1978. In response to the defendant's assertion of limitations, the plaintiff relied on the "multiple-publication rule," which recognizes a new cause of action each time a copy of the allegedly libelous publication is sold. Noting that such a rule would allow stale claims, encourage multiple suits, and create a number of other problems, and recognizing that mass publication of a single defamatory statement constitutes, in effect, a single wrong, the court adopted what it referred to as the "single-publication rule." *Id.* at 691. Under the court of appeals' articulation of that rule, publication is complete "on the last day of the mass distribution of copies of the printed matter" because "[i]t is that day when the publisher, editors and authors have done all they can to relinquish all right of control, title and interest in the printed matter." *Id.* at 692. The court emphasized that defining publication in this manner "provides ample time for a diligent plaintiff to pursue a cause of action for libel and also allows full recovery for any damages suffered." *Id.*

The single-publication rule's definition of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

publication date for limitations purposes is clearly designed to protect publishers from repeated liability based on old publications that might be reprinted or back ordered. *See* ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 7.2 (2003). It has nothing to do with determining the publisher's state of mind at the time of publication. Applying the single-publication rule in this context could lead to virtually uncontrollable liability and potentially absurd results. For example, a media defendant could be held liable for knowingly publishing false information even if it did not become aware of the error until the article has ***174** been printed and mailed to subscribers or otherwise distributed. Such a result would have an impermissible " 'chilling' effect ... antithetical to the First Amendment's protection of true speech on matters of public concern." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 778, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (holding that application of state law that did not require private media defamation defendant to prove falsity violated First Amendment). Moreover, the focus of the actual-malice inquiry is the defendant's state of mind during the editorial process. *See Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Evidence concerning events after an article has been printed and distributed, has little, if any, bearing on that issue. Because the Forbes article was printed and in distribution before Eller's October 25th conversation with Barrett, the conversation cannot constitute evidence of actual malice at the time of publication.

**B**

During Barrett's October 25th conversation with Eller, he acknowledged that he had that day become aware that he had misidentified the Edward Bass that had sued one of the Granada entities.[FN4] GBI and GFC argue that this constitutes some evidence of actual malice. For the same reason that any misleading statements Barrett may have made in the October 25th conversation are no evidence of malice, his acknowledgment that he had become aware of the Bass error that day is no evidence of

actual malice.

> FN4. The error was corrected in a later issue of the magazine.

**C**

[14] Finally, the plaintiffs contend that the article made a number of negative statements about "Granada" that Forbes was aware were untrue as to GFC and GBI. By failing to specifically distinguish the public corporations from other entities within the Granada group, they argue, Forbes knowingly or recklessly juxtaposed true statements to create the misleading impression that they applied to GFC and GBI. They argue that Barrett's affidavit itself provides some evidence of malice because he testified that he used the term "Granada" to describe "the organization of subsidiaries, affiliates, limited partnerships, joint ventures and other business organizations that were managed or otherwise under the direction and control of David Eller," a group that includes GFC and GBI. Because Barrett also testified that certain of the generic Granada references were not intended to apply to GBI or GFC, the plaintiffs maintain that the article is admittedly false with respect to those statements. In essence, the plaintiffs contend that Forbes should have included qualifying language specifically excluding GBI and GFC whenever the article referred to "Granada."

Read fairly, Barrett's affidavit establishes, at most, that Forbes was " 'guilty of using imprecise language in the article—perhaps resulting from an attempt to produce a readable article.' " *Bose*, 466 U.S. at 492, 104 S.Ct. 1949 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 197 (1st Cir.1982)). Both we and the United States Supreme Court have repeatedly held that a media defendant's poor choice of words or content, without more, does not amount to actual malice.

In *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex.2000), for example, we considered a political candidate's contention that a television news story suggesting that he had participated in a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

multi-million dollar insurance scam defamed him. *175 Turner had drafted a will for a man named Foster shortly before Foster disappeared under suspicious circumstances. Foster, the target of several criminal investigations, signed the will three days before he was reported to have drowned. Foster's life had been insured for more than $1.7 million, and American authorities learned some time later that he was alive in a Spanish prison. KTRK, a Houston television station, broadcast a story about the connection between Turner and Foster in the midst of Turner's campaign for mayor of Houston. The story omitted several critical contextual facts and juxtaposed others in a misleading manner in the course of suggesting that Turner had engaged in unethical conduct. We therefore held that the broadcast as a whole conveyed a false and defamatory message. *Id.* at 119. But we rejected Turner's contention that the story's discussion of the timing of his work on the will was evidence of actual malice. *Id.* at 121. We agreed that a reasonable viewer could take the segment to mean that "Turner 'drew up' the will three days before Foster disappeared." *Id.* But we concluded that even obviously misleading statements, without more, were not enough to constitute clear and convincing evidence of actual malice:

> We agree that there was a discrepancy in the segment's language and that it is possible that [the reporter] cleverly manipulated this language to deceive viewers. But it is equally possible that [the reporter] simply failed to choose his words with proper precision, that is, by stating that Foster "drew up" rather than "signed" the will (outside of Turner's presence) three days before he disappeared. Because there is no other evidence that [the reporter] knew or strongly suspected that this segment would mislead viewers, its lack of clarity alone is not clear and convincing evidence of actual malice.

*Id.* at 121–22.

In *Huckabee,* we affirmed summary judgment granted to a media defamation defendant that had been sued for statements in a documentary about four southeast Texas cases in which family courts granted custody of a child to the father after the mother accused him of child abuse. *Huckabee,* 19 S.W.3d at 417. One of the judges who presided over two of the custody disputes sued Time–Warner, alleging that the documentary omitted key information in an effort to depict him as biased or corrupt. We acknowledged that a publisher might present such an incomplete or unbalanced picture of the facts as to constitute evidence of actual malice. *Id.* at 426. On the facts of that case, however, we held that the record presented no evidence of actual malice, even though the story might have been misleading:

> Although the facts omitted might or might not have led a reasonable viewer to suspend judgment or even to reach an opposite conclusion regarding Judge Huckabee's order, their omission did not grossly distort the story. At most, HBO's failure to capture accurately all the story's details suggests an error in judgment, which is no evidence of actual malice.

> *Id.*

Similarly, in *Bose,* the Supreme Court considered a manufacturer's claim that a *Consumer Reports* article describing a new Bose speaker system disparaged the product. The district court had ruled that the article falsely stated as fact that "instruments heard through the *Bose* system 'tended to wander about the room,' " and rendered judgment for Bose, the manufacturer. *Bose,* 466 U.S. at 488, 104 S.Ct. 1949. Applying the *New York Times'* actual-malice standard, the Supreme Court *176 rendered judgment for the publisher. The Court observed that the circuit court correctly concluded "that there is a significant difference between proof of actual malice and mere proof of falsity." *Id.* at 511, 104 S.Ct. 1949 (citations omitted). The district court had found that the writer's actual perception was that sound moved "along the wall" rather than "about the room." *Id.* Nevertheless, the Court held that the writer's choice of language,

though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella.... The statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies.... "Realistically, ... some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times* [and other cases] to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material."

*Id.* at 513, 104 S.Ct. 1949 (citations omitted).

Here, Barrett was charged with the task of producing a readable article about an extremely complicated network of business entities related to the Granada Corp. While it would have been more ac-

curate for Forbes to identify the precise entities within that group to which it was referring, Forbes's careless use of the generic "Granada" is no evidence that Forbes entertained serious doubts as to the statements' truth or had a high degree of awareness of their falsity. *See Turner,* 38 S.W.3d at 121.

### V

The record before us presents no evidence that Forbes published defamatory statements about GBI and GFC with actual malice. Accordingly, we reverse the court of appeals' judgment and render judgment that the plaintiffs take nothing.

Justice SCHNEIDER did not participate in the decision.

*177 APPENDIX

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

## APPENDIX: Forbes article

Houston's Granada Corp. talks of 1991 revenues of $2 billion. Try $200 million. This much-touted high-tech food concern is near collapse.

# The incredible shrinking empire

By William P. Barrett

IN 1989 THE *Wall Street Journal* included Granada Corp. among its "corporate stars of the future." The newspaper cited the research by this Houston-based parent of several public and private entities into cattle cloning and embryo transfers. The plug was but one more triumph in the relentless and largely successful quest for publicity by David Eller, Granada's chairman and chief executive. Newer news clippings, which Granada's press agents still hand out, call Granada a $1 billion organization. In mid-October a Granada executive told FORBES that revenues this year would reach $2 billion.

But there is less to Granada than meets the eye. Actually, its total revenues, $1 billion as recently as 1988, will scarcely be $200 million for 1991. Profits: zilch. Granada's work force has shrunk to below 900 from 2,200; its cattle herd has dwindled to 25,000 from 1 million.

There are two publicly traded stock companies within the Granada organization, Granada Foods (1990 revenues, $149 million) and Granada BioSciences ($16 million). They are so broke they haven't been able to publish their 1990 annual reports. The Granada organization is vacating the Houston headquarters building it co-owns with the Eller family so the property can be sold to satisfy the mortgage holder. In addition, Granada is beset with a series of serious shareholder lawsuits.

Granada is yet another case of the media and many investors taking exaggerated claims at face value. In 1972 David Eller, now 53, and his brother James, 59, founded Granada



Granada's David Eller
No money to print the annual report.

Corp., which they still own 50-50. Stated purpose: to bring high technology to the ancient craft of farming, mainly cattle farming. Indeed, starting in the late 1970s Granada earned a reputation for research into ways of transferring bovine embryos and cloning the perfect cow. The idea was that genetically engineered cattle would produce more meat or milk cheaper.

From 1975 on, the outfit was largely financed by tax-sheltered limited partnerships. A petroleum engineer by background, with an easy, genial demeanor, David Eller proved to be one terrific salesman. In a series of five limited partnerships formed from 1981 to 1986, he raised $249 million. These interests were later rolled over—without a vote of limited partners—into Granada Foods and Granada BioSciences, still majority-owned by the Ellers.

Today that $249 million in public

money has a market value of only $26 million. The development cost of all this whiz-bang technology proved to be so expensive that old-fashioned cattle breeding techniques, including artificial insemination, were a lot cheaper. Granada's overhead was also quite high. "We got science conquered, but our efficiencies were very poor," Eller concedes.

Granada lost an estimated $30 million speculating in cattle commodities, then couldn't sell off its own stock profitably. Plans to set up a vertically integrated operation including eateries and retail stores foundered. And a large amount of funds was drained off into the Eller family through management fees and transactions with enterprises it controlled. The big 1986 changes in the tax laws cut off the flow of new funds into the Granada partnerships because they removed most of the tax incentives for investing in them.

Yet even while its affairs were deteriorating, Granada managed to hide the facts from the outside world. How? Through its complex corporate structure, which involved a score of interlocking entities, most of them private. Their dealings with one another exaggerated Granada's actual revenues. The partners did not know the overall picture.

What they did know was that David Eller was a prominent figure in Houston's celebrity world. He and his wife, Linda, a Granada official who was just voted Houston Business Woman of the Year, were frequently featured on the society pages and photographed for posh national magazines like *Town & Country*. Eller served four years as the board chairman of his alma mater, Texas A&M University, where a building is named after him.

But now the image is fraying fast. According to their latest filings, Granada Foods (recently trading at 5¼) and Granada BioSciences (recently 6¼) are losing money and have negative cash flows from operations. Recently laid off employees—even ten-year veterans—got only two weeks' severance plus vacation. Many vendors have Granada on a C.O.D. basis. Last year Granada BioSciences announced executives had bought $300,000 of stock with company loans, a seeming vote of confidence.

48

Forbes • November 11, 1991

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162
**(Cite as: 124 S.W.3d 167)**

Granada Corp.

Only later did it become known that the company would cover any losses.

Eller's team is scrambling for fresh funds to keep going—really scrambling. In mid-September, according to Houston deed records, a Granada Foods subsidiary got a $2 million bank loan—but only after the Eller family signed personal guarantees and also posted some unrelated collateral. Attempts by Granada to find joint venture partners have been unsuccessful. Even Texas A&M balked at supporting a bond issue that would have helped Granada. Contracts selling goods or technology to foreign buyers, announced by Granada Bio-Sciences amid much hoopla, have generated little money.

In a Houston court pleading this summer, one Granada entity acknowledged huge unpaid legal bills—a virtual admission of insolvency. Not surprising. A half-dozen serious lawsuits are moving toward trial, filed by disgruntled Granada investors claiming Eller and others misled them over the years or siphoned off assets. One investor lawsuit accuses Granada of touting tax-writeoff advantages while aware the Internal Revenue Service had successfully challenged deductions by individual taxpayers. Among the many people suing Granada is Fort Worth near-billionaire Edward Bass. Granada responds it has done nothing wrong.

Possibly anticipating a bankruptcy filing, former Granada employees say officials in recent months have moved some farm equipment and vehicles off Granada books and gotten rid of backup documentation. Eller denies any improprieties. But this is not exactly unheard-of stuff at Granada; in the course of continuing litigation, a Granada employee admitted under oath that he signed back-dated loan and corporate documents at the direction of superiors. Other embarrassing documents have also surfaced.

Don't write Granada off—completely. You can't rule out that some larger company will buy part or all of the Granada organization, or that Eller will find foreign joint venture partners with deep pockets. David Eller is one resourceful man. But his unfortunate fellow shareholders can kiss most of their original investment good-bye. ■

124 S.W.3d 167, 32 Media L. Rep. 1498, 47 Tex. Sup. Ct. J. 162

Tex.,2003.

Forbes Inc. v. Granada Biosciences, Inc.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

11/14/2014 9:26:38 AM
Chris Daniel - District Clerk Harris County
Envelope No. 3176652
By: JEANETTA SPENCER
Filed: 11/14/2014 9:26:38 AM

No. 2014-59665

| | |
|---|---|
| ALOYSIUS HOANG<br><br>VS.<br><br>THINH DAT NGUYEN<br><br>THOI BAO HOUSTON | IN THE 215TH DISTRICT COURT<br>HARRIS COUNTY, TEXAS |

P-1
(11)A

## ORDER ON DEFENDANTS'
## AMENDED MOTION TO DISMISS
## UNDER THE TEXAS CITIZENS PARTICIPATION ACT

On the defendants' motion, this case is DISMISSED.

The Court FINDS that the legal action was brought to deter or prevent the defendants from exercising constitutional rights and was brought for an improper purpose, including to harass or to cause unnecessary delay or to increase the cost of litigation.

The Court ORDERS the plaintiff to pay the defendants' court costs, reasonable attorney's fees of $5,000, and interpreter fees within thirty days.

~~The Court AWARDS to each defendant _____ as sanctions against the plaintiff to deter the plaintiff from bringing similar actions described in the Texas Citizens Participation Act and orders the plaintiff to pay that amount to each defendant within thirty days.~~

NOV 18 2014
_____
DATE

_____
JUDGE PRESIDING

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

323

```
JURN7 (NSA#)    JUSTICE INFORMATION MANAGEMENT SYSTEM    JAN 16, 2015(C1)
ACT50                  CIVIL COURT ACTIVITY              OPT: _____ - ACT
                         GENERAL INQUIRY                 PAGE:   1 -    1

CASE NUMBER: 201459665__  POST JUDGMENT NUMBER> __  CURRENT COURT: 215 PUB? _
CASE TYPE: LIBEL_____ CASE STATUS: CASE ON APPEAL_____
STYLE: HOANG, ALOYSIUS (AKA AL HOANG AKA VS. THOI BAO MAGAZINE_____
           SEQ  ACT   PJN
   DATE    NUM  CODE              DESCRIPTION         PJN COURT INS>
_ 11/18/2014 2____ 11A__ _  DISMISSED ON DEFENDANT'S MOTION__ __ 215  1__
  IMAGE NUM: 63220552_____ PGS: 1___ LCD: 11182014 CLERK: SPENCER, JEANETT
_ 11/18/2014 1____ PC___ _  PLAINTIFF COSTS _____ __ 215  1__
                                     LCD: 11182014 CLERK: SPENCER, JEANETT




==> *** (2) RECORDS FOUND ***
1=NOTICE INQ  2=SETTING INQ 3=ACT ENTRY   4=PARTY INQ   5=MIN. INQ.
6=CASE. SUMM. 7=BACKWARD    8=FORWARD                   10=REFRESH   11=HELP
```

324

# 2014-59665

**COURT:** 215th

**FILED DATE:** 10/13/2014

**CASE TYPE:** ANSWER



### HOANG, ALOYSIUS (AKA AL HOANG AKA HOANG

Attorney: HOANG, ALOYSIUS DH

### vs.

### THOI BAO MAGAZINE

Attorney: BENNETT, MARK W.

| Docket Sheet Entries | |
|---|---|
| **Date** | **Comment** |
| 11/18/2014 | 11A - DISMISSED ON DEFENDANT'S MOTION |

11/24/2014 11:29:49 AM
Chris Daniel - District Clerk
Harris County
Envelope No: 3277098
By: GILMORE, DUANE

CAUSE NO. 2014-59665

| ALOYSIUS HOANG | § | IN THE DISTRICT COURT OF |
| aka HOANG DUY HUNG   Plaintiff | § | |
| | § | |
| | § | |
| VS. | § | 215TH JUDICIAL DISTRICT |
| | § | |
| THINH DAT NGUYEN, Individual | § | |
| THOI BAO HOUSTON | § | |
| THOI BAO | § | |
| Defendants | § | HARRIS COUNTY, TEXAS |

## NOTICE OF APPEAL

COME NOW, Aloysius Hoang, aka Hoang Duy Hung, hereinafter referred to as Plaintiff, and file this his NOTICE OF APPEAL.

1.  Appeal is from 215th Judicial Court of Harris County, Texas, cause no. 2014-59665, and the Presiding Judge is the Honorable Judge Elaine H. Palmer.

2. The appeal is from the ruling of the Judge dismissing the case in favor of Defendants pursuant to Texas Citizens Participation Act (the "Texas Anti-SLAPP statute"), Texas Civil Practice & Remedies Code, Chapter 27.

3. The Order to Dismiss was signed on November 18, 2014.

4. The Appeal is by Aloysius Hoang, Plaintiff, and to be appealed to the Court of Appeal either in the First or in the 14th Court of Appeal to be assigned by the Court.

**5. Appellant Aloysius Hoang request to have an Accelerated Appeal and to be heard by the Court of Appeals.**

326

Aloysius Hoang, pro se. Pursuant to TRCP, hereby invokes the Jurisdiction of the Court of Appeals and desires to appeal the Trial Court's ruling in dismissing the case.

Respectfully submitted

Hoang & Associates
Aloysius Duy-Hung Hoang
State Bar No. 24002295
801 Congress St. #350
Houston, TX 77002
Telephone: 713/229-8900
Telecopier: 713/224-3111
pro se

## CERTIFICATE OF SERVICE

I, Aloysius Duy-Hung Hoang, hereby certify that a true and correct copy of the above and foregoing was served in accordance with the Texas Rules of Civil Procedure on all counsel of record by placing same in the United States mail, certified mail, return receipt requested, by hand delivery or by telecopier, on this the 24th day of November, 2014.

Aloysius Hoang

# HOANG & ASSOCIATES
## 801 Congress St. #350
## Houston TX 77002
Tel. 713-229-8900  Fax 713-224-3111 Email: Alhoang77072@gmail.com

November 24, 2014

Harris County District Clerk
Mr. Chris Daniel
201 Caroline St
Houston TX 77002

RE:  Cause No. . 2014-59665, in the 215th Judicial District Court.
**Notice of Appeal**

Dear Mr. Chris Daniel:

Please file this Notice of Appeal.

If you have any question, please do not hesitate to contact me.

Thank you for your help and concern in this matter.

Best regards,

Al Hoang

328

<u>**CERTIFICATE**</u>

**THE STATE OF TEXAS**

**COUNTY OF HARRIS**

        **I, CHRIS DANIEL,** Clerk of the District Court in and for Harris County, Texas, do hereby certify that the above and foregoing are true and correct copies of all the proceedings directed by Counsel and/or Rule 34 to be included in the **Original Clerks Record** in the Cause of

**ALYOSIUS HOANG AKA HOANG DUY HUNG**

        **VS.**       **NO. 2014-59665**

**THINH DAT NGUYEN INDIVIDUAL THOI BAO HOUSTON AND THOI BAO**

as the same appear from the originals now on file of record in this office.

        GIVEN under my hand and seal of said Court at office in the City of Houston, on the **20TH day of JANUARY A.D., 2015**



                CHRIS DANIEL,
                CLERK DISTRICT COURT,
                HARRIS COUNTY, TEXAS

                BY: /s/ PHYLLIS WASHINGTON
                   **PHYLLIS WASHINGTON, DEPUTY**

**BILL OF COSTS**

**APPELLATE COURT NO.  14-14-00942-CV**

**THE STATE OF TEXAS**
**COUNTY OF HARRIS**

**ALYOSIUS HOANG AKA HOANG DUY HUNG**
        **APPELLANT(S)**

**VS.**                                **TRIAL COURT CASE NO.  2014-59665**

**THINH DAT NGUYEN INDIVIDUAL THOI BAO HOUSTON AND THOI BAO**
        **APPELLEE(S)**

**TO OFFICERS OF COURT,**

**CLERK'S COSTS**

**ORIGINAL CLERKS RECORD**          $330.00

                      TOTAL $    **$330.00**

THE STATE OF TEXAS
COUNTY OF HARRIS

      I, CHRIS DANIEL, Clerk of the District Court in and for Harris County, Texas, do hereby certify that the above is a

Correct Bill of all Costs incurred in preparation of the above numbered and entitled suit up to this date.

      IN WITNESS WHEREOF, I, hereunto affix my hand and seal of the Court at office in Houston, Texas this **20TH day of**

**JANUARY A.D., 2015.**



                                CHRIS DANIEL,
                                CLERK DISTRICT COURT,
                                HARRIS COUNTY, TEXAS

                  BY:   /s/ PHYLLIS WASHINGTON
                       **PHYLLIS WASHINGTON, DEPUTY**

Revised July 12, 2012

# APPENDIX 2

CAUSE NO. 2014-59665

```
                              )
ALOYSIUS HOANG                 )   IN THE DISTRICT COURT
                              )
                              )
           PLAINTIFFS,         )
                              )
VS.                           )
                              )   HARRIS COUNTY, TEXAS
                              )
TOI BAG OF HOUSTON            )
                              )
                              )
                              )
           DEFENDANTS.         )   215TH JUDICIAL DISTRICT
```

MOTION TO DISMISS
TEXAS CITIZENS PARTICIPATION ACT

On December 8, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable, Elaine E. Palmer, Judge presiding, held in Houston, Harris County, Texas.

Proceedings reported by machine shorthand and computer-aided transcription.

APPEARANCES

FOR THE PLAINTIFF:

Mr. Aloysius Hoang
Attorney at Law
801 Congress St., Ste. 350
Houston, Texas  77002


FOR THE DEFENDANT:

Mr. Mark Bennett
Bennett & Bennett
735 Oxford Street
Houston, Texas  77007
713.224.1747

INDEX

PAGE

By the Court........................................ 4

By Mr. Bennett..................................... 4

By Mr. Hoang....................................... 7

By Mr. Bennett..................................... 10

By Mr. Hoang....................................... 11

By Mr. Bennett..................................... 12

By Mr. Hoang....................................... 13

THE COURT: Cause Number 2014-59665. Aloysius Hoang versus Toi Bag Magazine.

MR. BENNETT: Good morning. I am Mark Bennett for Mr. Nguyen and Toi Bag of Houston, which is the magazine. We have a number of interested onlookers. Would you rather we did it at the bench?

THE COURT: Yes.

MR. BENNETT: I also have a Vietnamese interpreter for Mr. Nguyen if she may approach with us and Mr. Nguyen.

THE COURT: Okay.

MS. LE: Good morning. I'm Thuy Le. I represent the Defendant.

THE COURT: How do you spell your first Thuy, T-H-U-Y and L-E.

MR. BENNETT: Your Honor, what we have today is a Motion Under the Texas Citizens Participation Act to Dismiss the Case for Legal Fees and Other Relief. We are having a hearing rather than doing it by submission, because the statute requires a hearing. But the statute also requires that the Court consider the pleadings and the affidavits. So, it's not a hearing to take evidence. It's just a hearing to be the hearing to close out the evidence and then the Court has 30 days in which to rule on the motion. So, the Plaintiff has filed some pleadings. The Defendants have filed some pleadings

and today filed two affidavits. I don't know if those show up on your screen, yet. But this morning after coming to court we filed my affidavit, which is on legal fees. That's the affidavit of Mark Bennett. And affidavit of Mr. Nguyen. That's affidavit of Thinh Dat Nguyen. I can give the Court copies, if you please, but if you're not anticipating making a decision right now, which I don't think you have to, they'll be on the system.

THE COURT: We are on the record.

MR. BENNETT: So, it's not a complex case, Your Honor. The Civil Practice and Remedies Code allows for a Motion to Dismiss a case if the case is based on the exercise of the right of free speech. Here Mr. Hoang's lawsuit is based on Mr. Nguyen's and the magazine's exercise of their right to free speech. That is criticizing Mr. Hoang who is a public official and a public figure. I don't think that he disputes he is both a public official and public figure. In order for him to overcome the motion he has to make a prima facia showing with clear and -- clear and specific evidence of each essential element of his claim. He has failed to do so and, so, end of the day the Court's going to have to grant the Motion to Dismiss. The statute provides for mandatory attorney's fees. I have filed an affidavit on my attorney's fees. They are reasonable given the circumstances. And we're also asking for sanctions. My Amended Motion to Dismiss has various

attachments in which -- they're public records in which Mr. Hoang has filed other lawsuits to try to stop people from exercising they're first amendment right. The Texas Citizens Participation Act allows sanctions against a Plaintiff to discourage him from trying to shut down people's free speech by filing lawsuits. It's appropriate in this case. I don't know how much is appropriate. Maybe a token amount would discourage Mr. Hoang from doing this in the future. It might lead to be a very large amount. He could probably answer that better than I what it would take to stop him from filing lawsuits that attempt to punish people for exercising their free speech rights.

And with that, since we're in a hearing I guess we rest. We've filed the evidence. I want to make sure that the evidence is closed out before we leave here today so that we don't get into a situation where Mr. Hoang decides, oh, I can file this affidavit, I can file that affidavit. He is pro se. He is a licensed lawyer, but he as pro se and with all respect to him I want to make sure that we're clear that this is the evidence that we're going to be dealing with, so that if I filed a brief he doesn't come back and say, oh, I'm going say this is what.

MR. HOANG: Can I respond to his, Your Honor?

THE COURT: Yes.

MR. HOANG: First of all he says that I filed

all the lawsuits just to discourage other people. Your Honor, those lawsuits, we went through mediations. The Defendants wrote letter of apologies and in accordance to the mediation procedures once an apology like that and just to promote harmony I dismissed that. It cannot be a base just for this lawsuit, Your Honor. The second thing is, Your Honor, the anti -- statute, Chapter 27 of TCPR, Your Honor, doesn't allow the Defendant just to fabricate facts to liable somebody. In this case, Your Honor, I have filed my motions and supplemental answer. Clearly, the Defendant fabricated fact. Even today before coming to Court he called and he said that I was sued for calling a communist a communist. So, he affirms that I'm a communist. In reality I've been fighting against the communists over 30 years. I was imprisoned by the Vietnamese communist government in solitary confinement.

MR. BENNETT: I'm sorry, I have to object. The statute provides for evidence to be the pleadings and the affidavit and not for live testimony on the issues. Mr. Hoang has said this in his pleadings that he was imprisoned for fighting the communist. I don't dispute that he has said that and I know that he wants to make a persuasive case, but the statute requires it to be done in writing.

MR. HOANG: Yes, Your Honor. In my original petition I have laid out the elements very clearly that he called me a communist. He affirms that I'm a spy, an insider

of the communist regime working for the interests of the Vietnamese communist government. Your Honor, that's liable. How could he identify me as an insider for the Vietnamese communist. And in an anticommunist community like in Houston, Your Honor, that would be a threat to my life. In reality, Your Honor, the second phrase, the second statement he made is this: Mr. Hoang, this is what it is, in his article, article here, Your Honor, and I have the certified translation already. Hoang was planning to put a death threat bomb putting him and his family members of his house and then call the police to blame on the Vietnamese Nationalist Activist. Afterward, he took the pictures to take credit with the Vietnamese communists. Your Honor, this is not an opinion. This is statement of fact libeling me I was the victim of a death threat bomb right in front of my house. Now, he turn around and said that I put it just to try to get the credits with the communists. And that on prima facia case is already there, Your Honor. And then the first statement it says my father died because of an old accident. An undocumented immigrant was here. She negligently passed a red light and hit my father who then went to Ben Taub Hospital and he passed in Ben Taub Hospital in the year 2007. I, at that time, was not elected the President of the Vietnamese community, yet. But thousands of people already knew the facts. They went to the funeral. Then after that I got elected as the President of the

Vietnamese community, Your Honor.

MR. BENNETT: Again, Your Honor, for the record and I stopped talking, but I have to object that the evidence in this case is the pleadings and the affidavits.

MR. HOANG: These are in the pleadings. It's already in the pleadings.

MR. BENNETT: Some of this is in the pleadings, but I'm saying he wants to put more into the record -- not really what the statute allows.

MR. HOANG: Mr. Mark Bennett, I let you have your chance. This is in the pleadings. I just repeat the pleadings that is there. He then turn around and said my father commit suicide, because my father found out I was following the communists. It's not true, Your Honor. Those are the facts that he made me affirm, Your Honor. It's not opinion. It's not opinion, Your Honor. Maybe this is opinion. He has that right. I understand that he has the First Amendment right, but making up facts like that, Your Honor, damage not only my reputation, but also putting my life and my family members in jeopardy.

And in reality he objected, but I have -- later on I have proof that I have asked him numerous times please have a debate, you know. Because we have ways to fight against the communists. If you can show me a better way I will kneel down and carry your shoes. From that day on I will be your

servant the rest of my life. I don't want to pick on those people. The statute here, Your Honor, you have to read the statute, the legislative intent is to protect the little ones. To protect those -- to protect those who write comments to the editor-in-chief. But in this case, I don't know, he's the editor-in-chief. Is he protected under statute? That's the first question.

Now, if the statutes are going to be applied to him the second issue is, Your Honor, does the statute is going to protect him from fabricating facts, Your Honor. And I don't think the statute does. I have provided numerous cases from Texas Supreme Court. Defamation by itself, Your Honor, is the fabrication of fact like that. He's not going to be protected.

MR. BENNETT: You rest?

MR. HOANG: Yes.

THE COURT: Okay.

MR. BENNETT: I think the Defendant has rested. I would like to respond to two things. One is that Mr. Hoang filed Phoungh Dingh Nguyen's affidavit, which purports to be a translation of this article that he complains about from the paper. And I would note, I don't like the allegation that somebody's father committed suicide because of what the son had done. If that were asserted as true I wouldn't like it. I don't think that that's very nice. I would note, however, that in the translation it said he succeeded to an extent that the

Tong Nguyen on-line raised the question that his father was so shameful of the betrayal son, whereby he committed suicide. To that extent it's reporting what some on-line source said.

What Mr. Hoang is missing here at the end of the day is malice, actual malice. Actual malice means that Mr. Nguyen and the magazine knew that they were publishing falsity or were reckless about whether they were publishing falsity. And all of the evidence that he has raised, none of it makes the prima facia case there was actual malice. I have briefed it for you. I can provide the brief. I haven't filed it, yet. I can give you a courtesy copy now. I'll file it when I get back to my office. I'll give Mr. Hoang a copy and I have the cases in support of it, as well, if otherwise we're done with this hearing.

MR. HOANG: Your Honor, I will respond to that actual malice. He raised the first statement of fact that Mr. Nguyen stated that posted on-line that my father committed suicide. They say that. I object to it, Your Honor. Now, even if that is the case those are two of the statements, Your Honor. He called me an insider working for the communist regime. And, also, the second thing is he said that I planted a bomb in front of my house. Those, Your Honor, is not a suspicion or is not an opinion. It's a statement of fact. Those facts, I have requested to have a debate with him. But, Your Honor, it's very clear that he didn't check it. Actual

malice is there, Your Honor. Not one day. He doesn't publish one magazine only. He publishes it many issues. Issue in and issue out. So, that is something that is so constant, Your Honor. And that's actual malice, Your Honor. He can publish it. I told him that. He can contact me, call me, ask me. I can give him answer. I even provided him all the messages. He didn't even care to bring it back. He has his affidavit. I have my own allegation. But I provided him opportunity to contact me. I have tons of witnesses on this. I have provided him chance to say, this is not right. You can contact me. I will provide you my version. Your Honor, for four years he has only printed his version. Not one from me. And I have objection to that many times. Actual malice is already there.

MR. BENNETT: Since it's my motion I suppose I can have the last word?

THE COURT: Sure.

MR. BENNETT: I think Mr. Hoang misunderstands actual malice. A failure to investigate is not actual malice. He has to show that Mr. Nguyen actually knew it wasn't true or acted in reckless disregard. And he talks about opinion versus fact. The nature of actual malice law, first amendment law is that a newspaper has the right to be wrong without being sued. A newspaper can get the facts wrong without being liable for it as long as the newspaper is not acting with this actual malice, which is very high standard which, Mr. Hoang's evidence for

purposes of this hearing does not meet.

And I thank you for your time, Your Honor. If you would like a courtesy copy of my brief now I can give it to you or I will file it and you will have it electronically. I also have copies of the cases. I can provide those to you now or when I file the brief I can provide copies attached electronically.

THE COURT: Just do it all electronically.

MR. HOANG: May I respond to that? To the brief? I haven't received his brief.

THE COURT: You have or have not?

MR. HOANG: I have not.

MR. BENNETT: He has now.

MR. HOANG: Okay. Thank you. First thing and then the second thing is if the magazine makes a false statement of fact or because of negligence they print it wrong they have to apologize. And this is the case, I put it in my pleadings very clearly from the beginning we have dinner at his house. And I said, "They are inviting me to go to Vietnam with them." He said immediately, "If you go to Vietnam I'm going to pull you down. I'm going to meet you and pull you down." Actual malice is there, Your Honor.

MR. BENNETT: My plan to get the last word didn't work, Your Honor. I thank you for your time and I'll provide you with the brief. I think you will be able to decide

14

based on the papers.

THE COURT:  All right.

MR. BENNETT:  Thank you very much.


(Hearing concluded.)

STATE OF TEXAS

COUNTY OF HARRIS

      I, Karen D. deShetler, Deputy Court Reporter, in and for the 215th District Court of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

      I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

      I further certify that the total cost for the preparation of the Reporter's Record is $100 and will be paid by the Plaintiff.

      WITNESS MY OFFICIAL HAND this the 25th day of August, 2015.

      //Karen D. deShetler//

_____

Karen D. deShetler, CSR 1688
Expiration Date: 12/31/2016
Certified Court Reporter
74 Lyric Arbor Circle
The Woodlands, Texas 77381
Telephone: 281-723-9090